STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)
**BARRACK, RODOS & BACINE**
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
*sbasser@barrack.com*
*sward@barrack.com*

JEFFREY A. BARRACK*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile:  (215) 963-0838
*jbarrack@barrack.com*
*Pro Hac Vice* application to be filed

*Counsel for the New Mexico State Investment Council and Proposed Lead Council for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 HEALTH & WELFARE FUND, RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 GENERAL FUND, and RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 BENEFITS TRUST FUND, on behalf of themselves and all others similarly situated,<br><br>                     Plaintiffs,<br>v.<br><br>STITCH FIX, INC., KATRINA LAKE, ELIZABETH SPAULDING, STEVEN ANDERSON II, BASELINE VENTURES LLC, BASELINE VENTURES 2009 LLC, BASELINE INCREASED EXPOSURE FUND, LLC, | CASE NO. 4:22-CV-04893<br><br>THE NEW MEXICO STATE INVESTMENT COUNCIL'S RESPONSE TO COMPETING MOTIONS SEEKING APPOINTMENT OF LEAD PLAINTIFF AND APPROVAL OF SELECTION OF COUNSEL<br><br>Date:       January 5, 2023<br>Time:       2:00 P.M.<br>Judge:      Haywood S. Gilliam, Jr.<br>Courtroom: 2 |

BASELINE CABLE CAR, LLC, and BASELINE ENCORE, L.P.,

Defendants.

## I.      Introduction

With losses of $1,318,489, calculated on a last-in-first-out ("LIFO") basis, reflecting 30,745 shares retained at the end of the Class Period and 25,967 net shares purchased during the Class Period, NMSIC has the largest financial interest and stake in the outcome of this class action of any movant who held Stitch Fix, Inc. ("Stitch Fix") securities through both corrective disclosures pleaded in the complaint. Dkt. No. 1. On that basis, NMSIC seeks appointment as a lead or co-lead plaintiff in this action.

## II.      Defendants Did Not Fully Disclose the Truth Until the End of the Class Period - March 8, 2022

On December 8, 2020, Stitch Fix introduced its "Freestyle Program" which it asserted would "expand our addressable market, deepen client engagement, and grow wallet share over time" and would "serve as a catalyst as we attract new clients, covert prospective clients and reactivate lapsed clients." (¶ 22). Within months of the introduction of Freestyle, Defendants pushed back on concerns of Freestyle "potentially cannibalizing the existing Fix business," contending that what Stitch Fix was "seeing that is actually an additive experience" and agreed that "[Freestyle] is additive to the Fix business for our Fix customers, so we like what we're seeing there from an incrementality standpoint." (¶ 28).

Defendants maintained an ongoing deception regarding the Freestyle Program until after the market closed on March 8, 2022, when the Company finally and fully acknowledged that "in our efforts to launch and promote Freestyle, we chose to direct visitors coming to stitchfix.com towards the Freestyle experience.  It is important to note that stitchfix.com is the primary landing page for customers interested in ordering a Fix.  Therefore, in leading clients to the Freestyle experience first, we inadvertently created friction for those seeking a Fix."  Stitch Fix further admitted that the negative impact of Freestyle had been present since its introduction, acknowledging that the Company "*created friction when [it] introduced Freestyle to the landing page, given the intent of the majority of those clients coming to our site was for a Fix*." (¶ 36).

In connection with this adverse impact Freestyle was having on the Company, its March 8, 2022 earnings press release provided a weaker than expected net revenue projection of $485-$500 million for

the third quarter of 2022, reflecting a decline of between 7%-10% compared to the same quarter of the prior year. In addition, the Company slashed its revenue guidance for the full fiscal year 2022, stating that "[g]iven softness in the number of active clients in the first half of fiscal 2022 and uncertainty in the timing of improvements in conversion, we are lowering the prior full year revenue outlook that we shared on our December 7, 2021 earnings call," and further stating that it *anticipated "revenue to be flat to slightly down year-over-year."*[1] The Company also withdrew its adjusted EBITDA projection for the year, citing the fact that it was "actively evaluating our marketing spend[.]" *Id.*

On this news, the trading price of Stitch Fix common stock fell 6%, closing at $10.34 per share on March 9, 2022.

Prior to the March 8, 2022 disclosures, on December 7, 2021, Stitch Fix made a deceptive partial corrective disclosure, acknowledging that, as a result of the "expansion into Freestyle," Stitch Fix "may experience *short-term* impacts of cannibalization." (emphasis added). However, the Company tempered this concern over "short-term impacts" by contending that "we see *significant new client potential ahead* as Freestyle enables us to access a greater share of shopping occasions" and assuring investors that the Company was working to "reduc[e] friction for new clients to access freestyle through testing new onboarding approaches." Defendant Spaulding continued, as he had done for a year, to assure investors that "*we expect* [Freestyle] *will expand our addressable market*, deepen client engagement *and grow wallet share over time,*" and said that while the Company was cutting its full year revenue projection from a prior estimate of less than or equal to 15% to "high single digits" this revision was not attributed to any specific factors.[2] Following the December 7, 2021 disclosure, the trading price of Stitch Fix common stock fell $5.97 per share, to close at $19.00 per share on December 8, 2021.

The December 7, 2021 partial disclosure by Defendants that Freestyle "may experience short-term impacts of cannibalization," offset by the positive spin that "we see significant new client potential ahead" and "we expect [Freestyle] will expand our addressable market" and "grow wallet share over time" was

---

[1] The Company's March 8, 2022 Press Release, referenced in the Complaint at ¶ 36, is attached hereto as Exhibit 1.

[2] The Company's December 7, 2021 Press Release, referenced in the Complaint at ¶ 21, is attached hereto as Exhibit 2.

itself deceptive and misleading. Indeed, it was not until the March 8, 2022 disclosures by Defendants making clear that Freestyle "cannibalization" was not "short-term" and had occasioned a substantial negative impact on revenue for at least the remainder of the fiscal year, that the whole truth respecting the "cannibalization" was finally and adequately revealed and the artificial price inflation created by the prior false and misleading statements was thereby fully removed.

**III.    Argument**

### a. The District Court Has Broad Discretion in Identifying the "Most Adequate Plaintiff"

Pursuant to the PSLRA, the court must consider a three-factor test in identifying the presumptively "most adequate plaintiff." 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I). In this case, three movants, NMSIC, Local 338, and an individual investor, Dax Billcheck, have "either filed the complaint or made a motion in response to a notice under subparagraph (A)(i)." 15 U.S.C. § 77z-1(a)(3)(B)(iii) (I)(aa).[3] The second factor is which movant "in the determination of the court, has the largest financial interest in the relief sought by the class[.]" 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(bb). Finally, the Court must confirm that the presumptively most adequate plaintiff "otherwise satisfies the Requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(cc). The "most adequate plaintiff" is the movant asserting the largest financial interest that *also* makes a threshold showing of typicality and adequacy under Fed. R. Civ. P. 23 *and* is not subject to unique defenses. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii). "The PSLRA 'does not permit courts simply to 'presume' that the movant with 'the largest financial interest in the relief sought by the class' satisfies the typicality and adequacy requirements.'" *Milbeck v. Truecar, Inc.*, No. 2:18-cv-02612-SVW-AGR, 2018 U.S. Dist. LEXIS 237336, at *9 (C.D. Cal. June 27, 2018), quoting *In re Cendant Corp. Litig.,* 264 F.3d 201, 264 (3d Cir. 2001).

In determining which movant has the largest financial interest in the outcome of a securities class action, the Ninth Circuit has placed discretion in the hands of the District Court, requiring only that the

---

[3] Lead plaintiff movant Dax Billcheck subsequently withdrew his motion seeking appointment as lead plaintiff. Dkt. No. 32.

Court "select accounting methods that are both rational and consistently applied." *In re Cavanaugh*, 306 F.3d 726, 730 n.4 (9th Cir. 2002).

### b. Beyond the *Olsten-Lax* Factors, Courts Place Weight on Retention of Shares Through Corrective Disclosures

Typically, courts within the Ninth Circuit begin their analysis with the four "*Olsten-Lax*" factors to determine which lead plaintiff movant has the largest financial interest in the action: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered." *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 3d 286, 295 (E.D.N.Y. 1998) (citing *Lax v. First Merchants Acceptance Corp.*, Nos. 97 C 2715, *et al.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).  Here, the relative figures for NMSIC and Local 338 are as follows:

|  | NMSIC | Local 338[4] |
|---|---|---|
| Shares Purchased | 46,253 | 89,727[5] |
| Net Shares Purchased | 25,967 | 0 |
| Net Funds Expended | 1,301,589 | $1,702,897 |
| LIFO Losses | ($1,318,489) | ($1,702,897) |

NMSIC acknowledges the weight of authority placing greater significance on the fourth of the *Olsten-Lax* factors, the approximate losses suffered. *See, e.g. In re: Lyft Sec. Litig.*, No. 19-cv-02690-HSG,

---

[4] Local 338 is a group of four related funds. Dkt. No. 26 at 1. This loss calculation is based solely on transactions by the Retail Wholesale Department Store Union Local 338 Retirement Fund (the "Retirement Fund"), consistent with the fact that the remaining three funds that constitute Local 338 sold all of their holdings in Stitch Fix ***prior to*** the first corrective disclosure alleged in the complaint filed on their behalf. *See* Dkt. No. 26-2.

[5] When factoring in sales by the Retirement Fund prior to the first corrective disclosure, the Retirement Fund held 55,441 shares at the time of the initial corrective disclosure, all of which were sold shortly following the disclosure. *See* Dkt. No. 26-2.

2020 U.S. Dist. LEXIS 37606, *10 (N. D. Cal. Mar. 4, 2020). However, courts have also relied on either a retained shares calculation or a calculation of net shares purchased during the class period to identify the plaintiff with the largest financial interest in the litigation. *See In re Network Assoc., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999) (beginning analysis with a calculation of net shares purchased during the class period); *Rihn v. Acadia Pharms., Inc.*, No. 15cv575 BTM(DHB), 2015 U.S. Dist. LEXIS 119363, *9-*10 (S.D. Cal. Sept. 8, 2015) (discussing application of retained shares and net shares purchased analyses and appointing movant with the largest number of net shares purchased despite the fact that a competing plaintiff's calculated losses were more than twice as high).

NMSIC also notes that this Court has both recognized that the retained shares approach is an appropriate methodology under *Cavanaugh* and has applied the retained share analysis in cases involving a single corrective disclosure rather than a series of partial corrective disclosures during the class period. *See Markette v. Xoma*, No. 15-cv-03425-HSG, 2016 U.S. Dist. LEXIS 63701, *19 (N.D. Cal. Oct. 26, 2022) (applying retained shares analysis); *In re Lyft Sec. Litig.*, 2020 U.S. Dist. LEXIS 37606 at *9-*13, *16-*17 (discussing application of retained shares analysis, but appointing movant with largest loss in Section 11 case and noting that "[i]mportantly [that lead plaintiff movant] *held shares through throughout the period"* prior to the first corrective disclosure and continued to hold through each of the two additional corrective disclosures ).

In *Lyft*, this court addressed a case involving a series of at least three partial corrective disclosures, each "correct[ing] misstatements in the Offering Documents." *Id.* at *13. As the Court recognized, these corrective disclosures addressed several disparate issues. "Minimally, the complaints allege a disclosure after April 11, 2019 of Uber's market share in its Form S-1, *Malig* Compl. ¶ 78, *Lewis* Compl. ¶ 35; a disclosure on April 15, 2019 that 1,000 bicycles were being removed from Lyft's rideshare program, *Malig* Compl. ¶ 79, *Lewis* Compl. ¶ 37; and a disclosure on May 5, 2019 of a labor disruption." *Id.* at *13. The nature of the disclosures at issue in *Lyft* appears to have given rise to the Court's concern that the retained shares analysis is less effective where "there are [] multiple partial disclosures that reveal the purported fraud during the class period." *Id.* at *12.

In contrast, in the complaint before this Court, there is just one partial disclosure, which was itself deceptive, and one complete disclosure of the adverse truth that ends the Class Period. Dkt. No. 1 at ¶ 38.

Both of these disclosures are connected to the same facts, *i.e.*, the negative impact of the introduction of Freestyle on the business and revenues of Stitch Fix. ¶¶ 32-37. These two related disclosures resulted in a price decline of $5.97 per share for shareholders who, like Local 338, held only through the partial disclosure on December 7, 2021, and a price decline of $6.64 per share for shareholders who, like NMSIC, also held through the entire class period. As a result, the class here will benefit from the representation of a shareholder, like NMSIC, that held through both the partial and deceptive corrective disclosure of December 7, 2021, and the final corrective disclosure of March 8, 2022, consistent with the appointment made by this Court in *Lyft*.

In considering net shares purchased during the class period or the number of shares purchased during the class period ***and retained at the end of the class period***, courts seek to address two concerns. First, doing so addresses the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), in which the Court held that plaintiffs ***may only recover for losses experienced "after the truth makes its way into the marketplace." Id.*** at 342. (emphasis added). *See also, In re AudioEye, Inc.*, No. CV-15-163-TUC-DCB, 2015 U.S. Dist. LEXIS 193348, *12-*13 (D. Az. Aug. 3, 2015) (economic loss may arise only from the shares retained or sold after the truth makes its way into the marketplace) (internal quotation omitted). Second, doing so touches on typicality and adequacy, allowing courts to address movants whose trading patterns may render them atypical of the class.

Immediately following the partial disclosure of December 7, 2021, Local 338 sold into a still inflated market while shareholders, such as NMSIC, who retained stock throughout the class period, suffered the full impact of the alleged fraud. *See* Dkt. No. 26-2. This presents a potential conflict of interest for Local 338 in representing class members who purchased shares after December 7, 2021 at artificially inflated prices or who retained shares through the end of the class period; Local 338 has no interest in advocating on behalf of those class members. In contrast, NMSIC retained 30,745 shares at the end of the class period, suffering losses on retained shares of approximately $1,294,198. Dkt. No. 19-2.

In *Schueneman v. Arena Pharms., Inc.*, No. 10-cv-1959 BTM, 2011 U.S. Dist. LEXIS 87373, *14 (S.D. Cal. Aug. 8, 2011), where, like here, there were just two corrective disclosures, the court "adopt[ed] the retained share methodology, which looks at the number of retained shares at the end of the class period." Based on a determination that one plaintiff had "***a significantly greater number of retained shares***" than

6

the other, the court determined that the plaintiff with the greater number of retained shares had the greatest financial interest in the litigation. Significantly, in *Schueneman*, while **both movants** retained shares at the end of the class period, the court **appointed the movant with the most retained shares** even though that plaintiff had a **smaller total estimated loss**. *Id*. at *15-*16. NMSIC is deserving of appointment under this accepted approach.

### c. The Class Can Be Well Served by Appointing Local 338 and NMSIC as Co-Lead Plaintiffs

While NMSIC has demonstrated that it is the most adequate movant to serve as lead plaintiff on behalf of the entire class of investors involved in this case, given the trading patterns of NMSIC and Local 338, NMSIC respectfully submits that the class can be well served if NMSIC and Local 338 **are both appointed as co-lead plaintiffs**. Although NMSIC has the greatest financial loss when viewed from the perspective of the losses the movants incurred on shares that were retained as of the end of the class period, meriting NMSIC's appropriate appointment as a lead plaintiff by this Court, NMSIC suggests that it could be appropriate to appoint both NMSIC and Local 338 as co-lead plaintiffs – each of whom can demonstrate the largest stake in the outcome of the litigation depending on which methodology is used. Both are institutional investors, and both have selected experienced counsel, each of which has lengthy experience as lead and co-lead counsel prosecuting securities class actions, including highly successful class actions the two firms have litigated together.

Where a plaintiff only had standing to assert losses on one or some partial disclosures, courts have raised concerns about the typicality of the plaintiff. For example, in *Pardi v. Tricida, Inc.*, No. 21-CV-00076-LHK, 2021 U.S. Dist. LEXIS 65991, at *3 (N.D. Cal. Apr. 2, 2021), a case involving three alleged corrective disclosures, Judge Koh held that a movant was an "atypical plaintiff because she certifies, under penalty of perjury, that she had sold all her Tricida securities by July 17, 2020—**months before** October 29, 2020, **the date of the last corrective disclosure** alleged in the instant case." (emphasis added). As a result, Judge Koh found that the movant's "sales possibly subject her to the unique defense that [she] cannot prove loss causation." (internal quotation omitted).

Judge Koh's holding reflects a concern articulated in *Constr. Workers Pension Tr. Fund v. Navistar Int'l Corp.*, No. 13 C 2111, 2013 U.S. Dist. LEXIS 106246, at *14-15 (N.D. Ill. July 30, 2013), where the court held that a movant who sold out their position after the first of three corrective disclosures "has no incentive to fairly and adequately protect the interests of the class as to later disclosures." In contrast, another movant who retained shares at the end of the class period was found to have "a great incentive to vigorously litigate all material issues in this case." *Id.* Here, NMSIC satisfies the requirements of the PSLRA because it is the only movant with a great incentive to vigorously litigate all material issues in this case through the entire proposed class period. In the alternative, the court can ensure such class-wide zealous advocacy by appointing NMSIC and Local 388 as co-lead plaintiffs – both of which are institutional investors with million dollar plus losses arising from the alleged fraud, and both of which are represented by counsel with lengthy experience in successfully litigating securities class actions.

Courts have recognized the value of appointing co-lead plaintiffs where the failure of one movant to retain stock throughout the class period gives rise to concerns regarding adequacy and typicality. In *Pub. Employees' Ret. Sys. of Miss. v. Millennial Media, Inc. (In re Millennial Media, Inc. Sec. Litig.)*, 87 F. Supp. 3d 563, 570 (S.D.N.Y. 2015), the court laid this issue out plainly:

> Mississippi is the only movant to have purchased Millennial Media common stock pursuant and/or traceable to the Company's initial public offering of stock on March 28, 2012 and the Company's secondary offering of stock on October 24, 2012." 14 Civ. 7923, Dkt. 45, Ex. A, at 2. From the perspective of adequacy and typicality, this fact may prove significant. ***It may prove, for example, not to be in the best interests of the entire putative class to entrust its claims solely to a representative that did not own MM stock during the entire class period***. Depending on how the facts develop, this could give rise to a challenge to the lead plaintiff's ability to represent the class, potentially resulting in non-certification or in shortening the class period.
>
> On these facts, therefore, the Court concludes that it is in the class's best interests to have co-lead plaintiffs, provided (the Court addresses this issue below) that the co-lead plaintiffs satisfy the relevant requirements of Federal Rule of Civil Procedure 23. ***A co-lead plaintiff structure best protects the interests of the class***; affords the class the benefit of combined resources to defray what may prove to be significant up-front litigation costs; and gives the class the advantages of the combined knowledge, experience, and judgment of both lead plaintiffs.

*Id*. (emphasis added).[6] Similarly, in *Sayce v. Forescout Techs.*, No. 20-cv-00076-SI, 2020 U.S. Dist. LEXIS 217198, at *23 (N.D. Cal. Nov. 19, 2020), where the lead plaintiff process was reopened following

---

[6] Indeed, even courts applying the *Lax* factors have recognized that the fact that one plaintiff held through the entire class period is significant in determining whether to appoint co-lead plaintiffs. *See Maiman v. Talbott*, No. SACV 09-0012 AG (ANx), 2009 U.S. Dist. LEXIS 139673, at *9-*10 (C.D. Cal. Sep. 14,

the consolidation of complaints, Judge Illston noted that "adding [another plaintiff, Meitav] as co-lead counsel [sic] will best protect the interests of the class should issues later arise specific to the year-long class period before the merger announcement, ***when only Meitav had stock purchases***." (emphasis added). Here, appointing NMSIC as a lead or co-lead plaintiff assures that shareholders who held through both of the alleged corrective disclosures have a voice in litigation strategy and any potential resolution of this case.

NMSIC unquestionably satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure as to typicality and adequacy. A plaintiff satisfies the typicality requirement of Rule 23(a)(3) when the plaintiff (1) suffered the same injuries as the absent class members, (2) as a result of the same course of conduct by defendants, and (3) its claims are based on the same legal issues. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). At the lead plaintiff stage, typicality is established where "other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *In re Aqua Metals Sec. Litig.*, No. 17-cv-7142-HSG, 2018 WL 4860188, at *3 (N.D. Cal. May 23, 2018). Here, NMSIC satisfies the typicality requirement because it purchased shares during the class period, held Stitch Fix common stock throughout the class period, and suffered damages when defendants' two alleged corrective disclosures removed artificial inflation from the trading price of Stitch Fix common stock. NMSIC's claims are based on the same legal theory and arise from the same events, course of conduct, and disclosures as the claims of the entire proposed class.

A proposed lead plaintiff "is 'adequate' when the representative's interests are not antagonistic to the interests of absent class members, it is unlikely that the action is collusive, and counsel for the class is qualified and competent." *Schueneman v. Arena Pharm., Inc.*, 2011 U.S. Dist. LEXIS 87373 at *16, *quoting In re Northern Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig.*, 693 F.2d 847, 855 (9th Cir.

2009) (noting the significance of the fact that one member of a three-member lead plaintiff group "did not sell his shares before the end of the class period"). *See also Yanbing Min v. Aratana Therapeutics, Inc. (In re Aratana Therapeutics Sec. Litig.)*, No. 17 Civ. 880(PAE), 2017 U.S. Dist. LEXIS 87351, at *10 (S.D.N.Y. June 6, 2017) (citing *Millennial Media, Inc. Secs. Litig.*, 87 F. Supp. 3d 563 and noting that "no lead plaintiff candidates held Aratana stock for the full class period"). *Emerson v. Mut. Fund Series Tr.*, No. 17-cv-2565 (ADS)(GRB), 2018 U.S. Dist. LEXIS 236261, at *5 (E.D.N.Y. Jan. 8, 2018).

1982). Here, NMSIC, which held shares through both of the alleged corrective disclosures, has interests that are on all fours with those of the absent class and has retained Barrack, Rodos & Bacine, counsel with lengthy experience litigating securities class actions at every stage. *See generally*, Dkt. No. 19-4. In addition, Barrack, Rodos & Bacine and counsel for Local 338, Bernstein Litowitz, Berger & Grossmann, have a long history of serving efficiently and effectively as co-lead counsel, including in *In re WorldCom, Inc. Secs. Litig.*, No. 02 Civ. 3288 (DLC) (S.D.N.Y.) (see Dkt. No. 19-4 at 22-23); *In re McKesson HBOC, Inc. Sec. Litig.*, No. C-99-20743(RMW) (N.D. Cal.); *In re Cendant Corp. Litig.*, No. 98-CV-1664 (WHW) (D.N.J.); *In re The Mills Corp. Sec. Litig.*, No. 06-cv-00077 (E.D. Va.); and *Louisiana Municipal Police Employees Retirement System v. Green Mountain Coffee Roasters, et al.*, No. 11-cv-00289 (D. Vt.).

## IV.    CONCLUSION

As set forth above, in light of the differing transactional patterns of NMSIC and Local 338, and in the interests of providing absent class members with undisputedly adequate representation, NMSIC respectfully requests that it be appointed as a lead plaintiff or co-lead plaintiff in this action and that its selected counsel, Barrack, Rodos & Bacine, be appointed as a lead or co-lead counsel.

DATED:  November 8, 2022                     Respectfully submitted,

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
SAMUEL M. WARD

/s/ SAMUEL M. WARD

SAMUEL M. WARD

600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  (619) 230-0800
Facsimile:  (619) 230-1874

JEFFREY A. BARRACK*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

E-mail:  jbarrack@barrack.com
Telephone:  (215) 963-0600
Facsimile:  (215) 963-0838

*Counsel for the New Mexico State
Investment Council and Proposed
Lead Counsel for the Class*

*Pro Hac Vice* application to be filed

11