**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs Retail Wholesale Department Store Union Local 338 Retirement Fund, Retail Wholesale Department Store Union Local 338 Health & Welfare Fund, Retail Wholesale Department Store Union Local 338 General Fund, and Retail Wholesale Department Store Union Local 338 Benefits Trust Fund*

[Additional Counsel Appear on Signature Block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 HEALTH & WELFARE FUND, RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 GENERAL FUND, and RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 BENEFITS TRUST FUND, on behalf of themselves and all others similarly situated,<br><br>Lead Plaintiffs,<br>v.<br><br>STITCH FIX, INC., KATRINA LAKE, and ELIZABETH SPAULDING,<br><br>Defendants. | Case No. 4:22-cv-04893-HSG<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION |

# TABLE OF CONTENTS


Page

I. INTRODUCTION .... 1

II. JURISDICTION AND VENUE .... 5

III. PARTIES .... 6

A. Lead Plaintiffs .... 6

B. Defendants .... 6

IV. SUMMARY OF THE FRAUD .... 7

A. Stitch Fix's Core "Fix" Product .... 7

B. Stitch Fix Launches A Second Product Line, Called "Direct Buy," And Tells Investors That Early Internal Tests Show "Success" .... 8

C. The Company Hires Defendant Spaulding As President And The Market Views The Success Of Direct Buy As Critical To Her Success .... 9

D. At The Start Of The Class Period, Defendants Tout Direct Buy, Representing That Fix And Direct Buy Are "Additive" And "Complementary" .... 10

E. In Truth, Defendants Know From Stitch Fix's Internal Testing That Direct Buy Is Cannibalizing The Fix Business .... 11

F. Stitch Fix Delays The Full Launch Of Direct Buy To New Customers In March 2021, But Continues To Falsely Deny Cannibalization And Assure That Direct Buy And Fix Are "Complementary," "Additive" And "Incremental" .... 15

G. Defendant Spaulding Is Named Incoming CEO And The Market Views Her Promotion As Evidence Of Direct Buy's Continued Success .... 16

H. Defendants' Summer 2021 Testing Confirms That Direct Buy Is Cannibalistic As Defendants Continue To Falsely Assure Investors That It Is "Incremental" To Fix And Promise To Launch By The End Of The Quarter .... 17

I. Defendant Spaulding Becomes CEO And Pushes The Direct Buy Launch Through To New Customers, Despite Knowing From Internal Testing That Direct Buy Was Cannibalizing Fix .... 19

J. Defendants Continue to Falsely Tout Direct Buy And Fix's "Incrementality" and "Complementar[ity]" And Deny Cannibalization .... 21

V. THE TRUTH EMERGES ........ 22

A. Stitch Fix's December 7, 2021 Earnings Announcement For The First Fiscal Quarter Of 2022 ........ 22

B. Stitch Fix's March 8, 2022 Earnings Announcement For The Second Fiscal Quarter Of 2022 ........ 23

C. Stitch Fix Announces Freestyle-Related Layoffs And Additional Freestyle Cannibalization On June 9, 2022 ........ 24

D. Post-Class Period Developments ........ 27

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 28

A. December 2020: Q1 2021 Disclosures ........ 28

B. February 10, 2021 Goldman Sachs Technology and Internet Virtual Conference ........ 30

C. March 2021: Q2 2021 Disclosures ........ 32

D. June 2021: Q3 2021 Disclosures ........ 34

E. June 10, 2021 Baird Global Consumer Technology Conference ........ 35

F. September 2021: Q4 2021 Disclosures ........ 36

VII. LOSS CAUSATION ........ 37

VIII. ADDITIONAL SCIENTER ALLEGATIONS ........ 40

IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 47

X. THE PRESUMPTION OF RELIANCE ........ 48

XI. CLASS ACTION ALLEGATIONS ........ 49

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........ 51

COUNT I ........ 51

COUNT II ........ 53

XIII. PRAYER FOR RELIEF ........ 54

XIV. JURY DEMAND ........ 54

Court-appointed Lead Plaintiffs Retail Wholesale Department Store Union ("RWDSU") Local 338 Retirement Fund, RWDSU Local 338 Health & Welfare Fund, RWDSU Local 338 General Fund, and RWDSU Local 338 Benefits Trust Fund (collectively, "Lead Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all persons who purchased the common stock of Stitch Fix, Inc. ("Stitch Fix" or the "Company") between December 8, 2020 and June 9, 2022, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on, among other things, the independent investigation of their undersigned counsel. This investigation included, among other things, a review and analysis of: (i) Stitch Fix's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by Stitch Fix; (v) press releases and media reports; (vi) securities pricing data; (vii) interviews with former Stitch Fix employees; and (viii) other material and data identified herein. Lead Counsel's investigation into the alleged factual allegations is continuing, and many of the relevant facts are known only by Defendants and are exclusively within their custody or control.

## I. INTRODUCTION

1. This case arises from misstatements and omissions by the senior executives of Stitch Fix about a new business line called "Direct Buy" that Defendants and analysts celebrated as the "pivotal transformation" of the Company. Led by its new CEO, Defendant Elizabeth Spaulding, Stitch Fix assured investors that Direct Buy was "additive," "incremental" and "complementary" to its core product, the "Fix." In fact, the opposite was true because Defendants knew from extensive internal test results that Direct Buy was cannibalizing the Fix business. When the truth was revealed to investors through multiple partial disclosures, Lead Plaintiffs and the Class suffered significant losses as the Company's market capitalization declined by over $6 billion, or approximately 90%.

2. Stitch Fix is a clothing and apparel company whose core product is the "Fix," a box of five items of clothing or accessories curated by the Company's stylists. The Company sends the Fix to its customers who then accept or reject the items in the box, purchase what they decide to keep, return the rest, and pay a styling fee.

3. Prior to the start of the Class Period and with much fanfare, Defendants announced that the Company was launching a second product line called "Direct Buy," which would allow customers to shop on the Company's website for specific products. The Company's founder, Defendant Katrina Lake, told investors that Direct Buy would increase engagement from current Fix customers, attract new clients, and be "incremental" to Fix.

4. As part of Defendant Lake's efforts to transform the Company, she brought on Defendant Spaulding—first as President, and later as CEO. Lake told investors that Spaulding's principal objective was to launch Direct Buy and make it a success, a mission that Spaulding readily accepted. As a result, the market closely connected the success of Direct Buy with Defendant Spaulding's success as Stitch Fix's CEO. Defendants promised investors on March 9, 2020 that Direct Buy would be launched to new customers within "the next quarter or two."

5. The Class Period begins on December 8, 2020, the first trading day after Defendants Lake and Spaulding touted Direct Buy as working together with the Fix to attract new clients and grow the business. Defendants assured investors that Fix and Direct Buy were "additive" and "complementary." For instance, Defendant Lake stated with respect to Direct Buy and Fix that "what we're seeing is that the two experiences are really additive[.]" Defendant Spaulding reiterated that Direct Buy was "highly additive" to Fix and there's a "real complementarity" between Direct Buy and Fix. Defendants repeated these and similar statements throughout the Class Period. They also repeatedly and emphatically denied that Direct Buy was cannibalizing Fix in response to direct questions from analysts about whether such cannibalization was occurring.

6. In truth, Lead Counsel's investigation confirmed that Defendants knew from extensive internal tests conducted throughout the Class Period that Direct Buy was cannibalizing the Fix business. For instance, one former Senior Manager who personally worked on the Direct

Buy launch during the Class Period explained that the Company's test results showed that Direct Buy was cannibalistic. The former Senior Manager described how the Company's data science team ran a test that they referred to internally as the "New Fix Customer Test." This test revealed that Direct Buy was going to negatively impact customer acquisition. Specifically, the Company's onboarding process would sacrifice customers who came in for a Fix, were funneled to Direct Buy, and then ultimately did not make a purchase or they bought less. The Company's data science team put together slide decks compiling the results of all these tests that were reviewed in weekly meetings with Defendant Spaulding. Among others interviewed by Lead Counsel, a former Data Scientist during the Class Period confirmed that internally it was obvious from test results as well as continuous customer research conversations that Direct Buy was taking customers away from the Company's existing Fix business. He also confirmed that those test results were shared with senior executives, including Defendant Spaulding in routine meetings.

7. The "next quarter or two" that Defendant Lake had promised for the Direct Buy new customer launch on March 9, 2020 came and went. One full year later, on March 8, 2021, the Company told investors that the launch would be delayed until the end of the 2021 fiscal year. But Defendant Spaulding mischaracterized the delay as resulting merely from the Company's effort to get things right. In truth, the Company's internal testing revealed that things were very wrong—namely, that Direct Buy was cannibalizing Fix. One concerned analyst specifically asked Defendant Spaulding about cannibalization, and again, Defendant Spaulding falsely and emphatically denied it, reiterating that Direct Buy was an "additive" experience to Fix.

8. By the summer of 2021, the Company's internal testing continued to reveal that Direct Buy was cannibalizing Fix. Nonetheless, Defendant Spaulding determined to push the launch of Direct Buy to new customers through precisely because the success of Direct Buy was so critical to her success. For instance, a former Data Scientist and a former Director who worked with Data Science and Analytics confirmed that Direct Buy was Defendant Spaulding's baby, and described how she pushed the launch of Direct Buy through too fast despite the negative test results reported widely throughout the Company.

9. On August 1, 2021, Defendant Spaulding formally became the CEO of Stitch Fix and one week later, on August 9, 2021, she launched Direct Buy to new customers. During her first earnings call as CEO on September 21, 2021, Defendant Spaulding changed the name of Direct Buy to "Freestyle" and underscored the "strength" of having customers participate in both Freestyle and Fix.[1] Defendant Spaulding continued to emphatically deny that there was cannibalization in response to analyst questions, instead touting the "incrementality of these two offerings really being quite complementary." Analysts believed Defendants. For instance, on September 21, 2021, an analyst from Truist Securities wrote that Direct Buy was "incremental" to Fix.

10. Meanwhile, between March 8, 2021 and November 18, 2021, Defendant Lake sold more than $49 million of Stitch Fix stock.

11. The market learned the truth through three partial disclosures, beginning on December 7, 2021, when Defendant Spaulding revealed that as a result of the "expansion into Freestyle," the Company "may experience short-term impacts of cannibalization." In response to this disclosure, the price of Stitch Fix stock declined 24%. But Defendants continued to assure investors that Direct Buy and Fix were "complementary" and "additive." Analysts accordingly were both surprised by Defendants' revelations and reassured that the Company would be able to resolve the potential cannibalization issue in the short term.

12. Then, on March 8, 2022, Defendant Spaulding shocked investors when she disclosed that the Company was continuing to experience cannibalization that had not been resolved in the short term. Defendant Spaulding revealed that the Company had created a "friction" between Fix and Freestyle customers because Defendants chose to direct customers who came to the Company website to buy a Fix to Freestyle instead. These would-be clients ended up buying nothing and as Defendant Spaulding acknowledged, "conversion of new visitors for Fix

---

[1] As discussed in Section IV.J below, the Company announced that they changed the name of the Direct Buy program to "Freestyle" during their earnings call for the fourth fiscal quarter of 2021, held on September 21, 2021. "Direct Buy" and "Freestyle" are used interchangeably throughout this Complaint.

and Freestyle is not where we want it to be." As a result of these disclosures, the price of Stitch Fix stock declined by 6%.

13. Finally, the full truth was revealed on June 9 and 10, 2022, when Defendant Spaulding announced significant layoffs and disclosed with respect to Freestyle that "the conversion of new visitors was not where we wanted it to be in the second quarter[.]" Defendant Spaulding explained that Stitch Fix had modified the Company website's onboarding path to address the reality that Freestyle was cannibalizing Fix, but even so, the Company is "still not yet at our desired conversion level." Accordingly, the Company issued new downward revisions to guidance. As a result of these disclosures, the price of Stitch Fix stock declined 27%.

14. In the aftermath of the fraud, Defendant Spaulding was forced to resign from her position as CEO and Stitch Fix has effectively abandoned Freestyle as a business strategy. On January 5, 2023, the Company issued a press release announcing that Defendant Spaulding was not the right person to lead the Company's "ambitious transformation." Further, Defendant Lake, as interim CEO, announced on March 7, 2023 that the Company would "refocus" on the Fix, and that Stitch Fix would no longer think of Freestyle as a "separate business unit" because it "was less effective" as a "customer acquisition vehicle."

## II. JURISDICTION AND VENUE

15. This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

16. This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

17. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c). At all relevant times, Stitch Fix had its principal executive offices located in this District and conducted (and currently conducts) substantial business here. In addition, many of the acts alleged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

18. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

### A. Lead Plaintiffs

19. Lead Plaintiffs RWDSU Local 338 Retirement Fund, RWDSU Local 338 Health & Welfare Fund, RWDSU Local 338 General Fund, and RWDSU Local 338 Benefits Trust Fund are multi-employer pension and benefits funds that provide retirement benefits to retirees in a variety of industries, including retail supermarkets, pharmacies, healthcare facilities, maintenance facilities, and school monitors and bus drivers. As reflected in the certification previously submitted and attached to Lead Plaintiffs' Initial Complaint (ECF No. 1), Lead Plaintiffs purchased shares of Stitch Fix Class A common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Defendants

20. Defendant Stitch Fix (the "Company") sells a range of apparel, shoes, and accessories through its website and mobile application. The Company maintains its corporate headquarters at 1 Montgomery Street, Suite 1500, San Francisco, California. Stitch Fix stock trades on the NASDAQ, which is an efficient market, under the ticker symbol "SFIX."

21. Defendant Katrina Lake ("Lake") is the founder of Stitch Fix and has served as the Executive Chairperson of the Company's Board of Directors since August 1, 2021. Defendant Lake previously served as the Company's Chief Executive Officer from its founding in 2011 until August 1, 2021, and again as interim CEO from January 5, 2023 through June 26, 2023. Defendant Lake signed and certified each of the Company's quarterly SEC filings during her tenure as CEO falling in the Class Period.

22. Defendant Elizabeth Spaulding ("Spaulding") was the CEO of Stitch Fix and a member of its Board of Directors from August 1, 2021 through January 4, 2023. Defendant Spaulding stepped down from both positions effective January 5, 2023. She previously served as

Stitch Fix's President from January 27, 2020 through July 31, 2021. Defendant Spaulding signed and certified each of the Company's quarterly SEC filings during her tenure as CEO falling in the Class Period.

23. Defendants Lake and Spaulding are collectively referred to as the "Executive Defendants." The Executive Defendants directly participated in the management of Stitch Fix's operations, had direct supervisory involvement in Stitch Fix's day-to-day operations, and had the ability to control and did control Stitch Fix's statements to investors and financial reporting. The Executive Defendants possessed the power and authority to control the contents of Stitch Fix's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Executive Defendants were both involved in drafting, reviewing, publishing, and making the false and misleading statements and omissions alleged herein.

## IV. SUMMARY OF THE FRAUD

### A. Stitch Fix's Core "Fix" Product

24. Based in San Francisco, California, Stitch Fix sells apparel, shoes, and accessories through its website and mobile application.

25. Stitch Fix began with one product line, the "Fix," which is a boxed shipment of five pieces of clothing or accessories curated by the Company's stylists. The stylists determine which clothes to send their customers based on the results of a "style quiz." When the Fix arrives at the customer's residence, the customer chooses which, if any, items to buy, and returns the rest. The customer pays a "styling fee" per Fix, and that fee is then applied to the total cost of the items, if any, that the customer purchases.

### B. Stitch Fix Launches A Second Product Line, Called "Direct Buy," And Tells Investors That Early Internal Tests Show "Success"

26. During the Company's October 1, 2019 earnings call (for the fourth fiscal quarter of 2019[2]), Defendant Lake announced that Stitch Fix had developed a second product line, initially referred to as "Direct Buy" and later called "Freestyle." Direct Buy allowed customers to shop on the Company's website for specific products, essentially adopting a traditional online retail model. Direct Buy consisted of four verticals, which the Company rolled out to existing Fix customers in four phases between June 1, 2019 and April 1, 2021: Shop New Colors, Shop Your Looks, Trending For You, and Shop By Category.

27. Defendant Lake heralded Direct Buy as a way for the Company to increase engagement among existing clients and obtain new clients. For instance, on October 1, 2019, Defendant Lake touted the latest initiative in the Direct Buy program, called "Shop Your Looks," as "an exciting step for us and one that has the potential to drive further engagement between Fixes, increase our ability to serve clients well and get deeper share of the wallet." Defendant Lake similarly emphasized that Direct Buy would attract "new clients" because it would "provide [a] new entry point into our business and allow us to customize the ways in which people want to buy and engage with us to address many more types of clients in this space." During the same call, Defendant Lake stated multiple times that beta testing that the Company had conducted on Direct Buy showed "success" in increasing both engagement and purchases among clients. Further, in response to an analyst question about whether Direct Buy was "cannibalistic" to Fix, Defendant Lake assured that, "we definitely think that in aggregate it's very incremental, and it's going to be very incremental[.]"

28. Analysts were watching closely to see whether Stitch Fix would be able to grow its business as Defendant Lake promised investors, and some analysts expressed concern. For instance, Wells Fargo Securities noted on October 1, 2019 that Direct Buy would "cause some investor angst (as the pivot from the traditional model will likely drive concern over their ability to continue growing their core business)."

---

[2] The Company's fiscal year ends on the Saturday that is closest to July 31 of that year.

### C. The Company Hires Defendant Spaulding As President And The Market Views The Success Of Direct Buy As Critical To Her Success

29. On December 9, 2019, Stitch Fix issued a press release announcing that Defendant Spaulding would join Stitch Fix as President, starting in January 2020, and that her principal mandate was to execute the new Direct Buy strategy. In another press release issued the same day, Defendant Lake promised that Defendant Spaulding "will help lead us into our next chapter of growth, including the expansion of our customer experience beyond our core Fix offering."

30. Analysts immediately tied Defendant Spaulding's success to Direct Buy's success. For instance, SunTrust Robinson Humphrey echoed Lake's remarks on December 9, 2019, observing that Spaulding would "lead the expansion of Stitch Fix's customer experience beyond the core Fix offering," and celebrating Direct Buy as "transformational."

31. Over the following year, Defendants continued to tout Direct Buy, and Defendant Spaulding, as the future of Stitch Fix. For instance, on February 11, 2020, Defendant Lake assured investors with respect to the potential for cannibalization that Direct Buy was "definitely incremental" to Fix. As another example, on March 9, 2020, Defendant Lake told investors that Direct Buy "is highly complementary to our Fix offering," and Defendant Spaulding promised that Direct Buy would be rolled out to new customers within "the next quarter or two."

32. The following quarter, on June 8, 2020, Defendant Lake introduced Defendant Spaulding by explaining that Spaulding would "provide an update on all of the exciting progress and momentum we're seeing in Direct Buy as well as across our broader company evolution." On the same call, Defendant Spaulding confirmed that Direct Buy was not cannibalizing Fix customers, telling investors: "I think what we're most excited about is to just see that these two offerings are so highly complementary versus any sort of cannibalization between the two."[3] Analysts, such as RBC Capital Markets, celebrated that "Direct Buy continu[es] to be incremental to Fixes." By June 30, 2020, the Company launched the third phase of Direct Buy, Trending For You, to existing customers.

[3] Unless otherwise stated, emphasis is added and internal citations and punctuation are omitted.

33. Immediately prior to the start of the Class Period, the Company expanded business operations to facilitate the surge in revenue that Defendants promised investors Direct Buy would bring. In anticipation of the much-hyped rapid growth of Direct Buy, the Company began "aggressively hiring additional engineering talent." Indeed, on September 22, 2020, Defendant Spaulding told investors that Stitch Fix had "continued investing across engineering, data science, and products" because "direct buy . . . can offer a step change in our growth trajectory." As such, Defendants positioned Direct Buy, and Defendant Spaulding as Direct Buy's main proponent, as driving the "pivotal transformation" and growth of Stitch Fix.

### D. At The Start Of The Class Period, Defendants Tout Direct Buy, Representing That Fix And Direct Buy Are "Additive" And "Complementary"

34. The Class Period begins on December 8, 2020, the first trading day after the Company announced its earnings results for the first fiscal quarter of 2021 and held an earnings conference call. During the call, Defendants Lake and Spaulding emphasized that Fix and Direct Buy were "additive" and "complementary." For instance, Defendant Lake told investors with respect to Direct Buy and Fix that "what we're seeing is that <u>the two experiences are really additive</u>," and "<u>the kind of combination of those two things will allow us to address many more types of clients</u>." Defendant Spaulding reiterated that Direct Buy was "<u>highly additive</u>" to Fix, and "<u>there's a real complementarity</u>" between the two products.

35. Defendants cited the "active client" metric that they reported on their first fiscal quarter 2021 Form 10-Q, and throughout the Class Period, as evidence that Fix and Direct Buy were "additive," "complementary," and "incremental." Defendants defined an "active client" in the Form 10-Q as "a client who checked out a Fix or was shipped an item using our direct-buy functionality in the preceding 52 weeks[.]" Notably, the active client metrics that Defendants reported failed to distinguish between active clients in the Fix or Direct Buy offerings, therefore concealing the cannibalization that Direct Buy was inflicting on Fix, and omitting critical information embedded within the active client figures, as discussed in Section VI below.

36. Defendants also cited the Company's internal test results as the source for their knowledge that Direct Buy and Fix were purportedly "additive" and "complementary." For

instance, on the December 7, 2020 call, Defendant Lake explained that she knew "direct buy certainly has been a significant contributor" to revenue generation because "we're running A/B tests all the time."

37. Analysts were assured by Defendants' representations. The Company's stock price rose from $35.83 at close on December 7 to $49.89 at close on December 8, 2020. Goldman Sachs described Direct Buy as an "incremental revenue stream," in their December 7, 2020 analyst report. Barclays also wrote on December 7, 2020, that "Direct Buy allows SFIX to expand their wallet share among new/existing customers." Deutsche Bank echoed that sentiment on December 8, 2020, reporting that "we continue to see Direct Buy as a long term driver of top line growth."

38. Thereafter, Defendants continued to tout the "incrementality" of Direct Buy and Fix, and analysts continued to believe Defendants. For instance, on February 10, 2021, Defendant Lake responded to a Goldman Sachs' analyst's question at a Goldman Sachs Conference by stating, "<u>we've seen clear incrementality with direct buy</u>. We can see that through kind of our numbers and cohort performance." In an analyst report issued that day, Goldman Sachs wrote that the Company is "driven by initiatives such as the Direct Buy program, which can be incremental to Stitch Fix's customer wallet share," and "[m]anagement believes there is clear incrementality to Stitch Fix wallet share and customer spend from Direct Buy[.]"

### E. In Truth, Defendants Know From Stitch Fix's Internal Testing That Direct Buy Is Cannibalizing The Fix Business

39. Contrary to Defendants' representations to investors that Direct Buy and Fix were "highly additive," "complementar[]y," and "clear[ly] incremental[]," Lead Counsel's investigation confirmed that in fact, the Company's internal tests were negative and revealed that Direct Buy was cannibalizing the Fix business. For instance, Former Employee ("FE") 1[4] was a Senior Manager, Product Marketing at Stitch Fix from July 2019 until April 2021, who was based in the

[4] The terms "Former Employees" and "FE" refer to the former employees of Stitch Fix whose reports are discussed in this Complaint. To preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" in connection with all of the Former Employees, regardless of their gender.

Company's San Francisco office and reported to Neha Masson and later Betsy Dobbin. FE 1 personally worked on the Direct Buy launch, and he confirmed that the Company's test results showed that Direct Buy was cannibalistic.

40. According to FE 1, multiple internal tests were done before he left the Company in April 2021 to understand whether Direct Buy would attract new clients, and those test results were very bad. FE 1 learned about these negative test results in February or March 2021 because he was in meetings in which the negative test results came up, and he also heard about it from colleagues. FE 1 confirmed that in February or March 2021, there were very clear test results where the recommendation from Data Science was that Stitch Fix was not ready and the tests did not look good.

41. FE 1 explained that the Data Science team at Stitch Fix ran a test that they referred to internally as the "New Fix Customer Test." According to FE 1, through the New Fix Customer Test, the Data Science team would use their framework and methodology around multi-variant testing to model out what completion looked like through the onboarding function. FE 1 confirmed that they understood from the New Fix Customer Test that Direct Buy was going to negatively impact customer acquisition. Specifically, according to FE 1, the Company's onboarding process would sacrifice customers who came in for a Fix, were funneled to Direct Buy, and then ultimately did not make a purchase or they bought less. FE 1 explained that the Direct Buy customers were converting at a lower rate, or they would spend less money, compared to Fix customers.

42. FE 1 confirmed that Defendant Spaulding saw the results of all the tests. According to FE 1, the Data Science team put together Google Slides decks compiling the results of all the tests and showing the standard operating process of how Data Science ran these tests. The decks were reviewed in weekly meetings with Defendant Spaulding. Indeed, FE 1 explained, the entire purpose of those weekly meetings was to inform Defendant Spaulding of the tests and the status moving forward. In addition to Defendant Spaulding, the primary people in these weekly meetings were the lead on the Data Science team who was responsible for the test, some others from Data Science, Product Managers who were focused on Direct Buy, the Strategy team, and the Strategy lead. FE 1 recalled that the weekly meetings were called the "Weekly Direct Buy Meetings" or

"Weekly Direct Buy Testing Meetings." They were also called "share-out" meetings, consistent with the purpose of the meetings which was to share where they were with the current test results and where they were with decisions that needed to be made with respect to experiments. FE 1 worked directly with Shubhi Jain in Data Science who attended the Weekly Direct Buy Testing Meetings, along with his manager. FE 1 confirmed that there was cannibalization testing that was done on Direct Buy for the specific purpose of updating senior management that was presented in those Weekly Direct Buy Testing Meetings.

43. Additional former employees interviewed by Lead Counsel confirmed that the Company's internal tests showed that Direct Buy was cannibalizing Fix customers, and that those results were shared with senior management, including the Executive Defendants. FE 2, Director, Men's Apparel Design: Using Data Science & Analytics to Drive Design at Stitch Fix from October 2017 until June 2022 who reported to the Senior Director of Merchandise, Brandon Kettle, joined the Direct Buy team in July or August 2020. Since FE 2 approached design from a data standpoint, he had a lot of interaction with data scientists in his role at the Company. According to FE 2, when Stitch Fix launched the initial beta test for Freestyle, the test was going to run for two weeks and after the two weeks, it had failed.

44. FE 2 explained that there was a standing Freestyle touch base meeting every Friday attended by senior management and he understood that the results of the tests were shown to Defendant Spaulding at that meeting. Early the next week, FE 2 personally found out the results of the tests and that they were pushing forward. Specifically, FE 2 personally attended weekly standing meetings run by the Product Management team that included a group of 7-15 people. During one of these meetings, he learned from a data scientist named Rajeev Jain who worked on the Direct Buy beta test that the beta test failed.

45. FE 2 had concerns that the beta tests would not go well and would hurt the Company's brand, and he discussed those concerns with the head of Freestyle, Lindsay Ferstandig; Jenny Herr, the Women's trends manager at Stitch Fix; his boss, Kettle; the General Manager of Kids' Merchandise, Carla Feely; the product manager, Allison Barrow; and the Vice President of Women's Merchandise, Samara Fetto-Gee. FE 2 explained that in his role, he had familiarity with

the data set that the data scientists were using to test Freestyle. FE 2 confirmed that the data points that the data scientists collected from Freestyle and the data points they collected from Fix did not line up. FE 2 explained that this data inconsistency presented multiple red flags. Drawing from his graphic design background, he created a presentation showing that this was a problem and he told his direct managers to share it with the C-suite.

46. FE 2 confirmed that cannibalization was a big topic of conversation at Stitch Fix. FE 2 further confirmed that it was clear internally that the initial beta test was a failure. There was a second test shortly after the initial beta test which was either inconclusive or failed as well. According to FE 2, the tests conducted prior to the launch of Freestyle had failed, and the launch was moving forward anyway.

47. FE 3, a former Data Scientist at Stitch Fix from June 2020 until June 2021 who was responsible for developing one variant of the algorithms used to recommend clothes to customers, confirmed that there were team meetings with data scientists in which cannibalization was discussed. FE 3 heard his fellow data scientists observing that it was obvious from test results as well as continuous customer research conversations that Freestyle was taking customers away from the Company's existing Fix business.

48. FE 3 confirmed that there were routine meetings happening between data scientists and executive leadership, including Defendant Spaulding, regarding the performance of Freestyle. He further confirmed that he received weekly email blasts containing relevant data, which he specifically described as top line revenue numbers and breakdowns by customer category as well as Freestyle versus Fix. The format of this information was similar to an Excel file. According to FE 3, trends concerning new customer acquisition and customer retention in regard to Freestyle would be reflected in those reports. FE 3 confirmed that these weekly email blasts went to Defendant Spaulding and Defendant Lake. He further confirmed that Defendants Spaulding and Lake had the ability to access data concerning the cannibalization of Fix by Freestyle through the data scientists.

### F. Stitch Fix Delays The Full Launch Of Direct Buy To New Customers In March 2021, But Continues To Falsely Deny Cannibalization And Assure That Direct Buy And Fix Are "Complementary," "Additive" And "Incremental"

49. On March 8, 2021, Defendants issued a letter to shareholders for the second fiscal quarter of 2021 and held an earnings conference call. During the call, held a full year after Defendant Spaulding had told investors on March 9, 2020 that Direct Buy would be rolled out to new customers within "the next quarter or two," Defendants announced that their launch of Direct Buy to new customers would be delayed. CFO Dan Jedda, stated "with respect to the delay of our [D]irect [B]uy to non-Stitch Fix clients . . . [w]e plan to roll that out late in Q4 now as we get the product right." Defendant Spaulding reiterated that Stitch Fix would not "introduce direct buy to new clients [until] the end of the fiscal year." Defendant Spaulding cited "evolving our client onboarding process and user interface, tightening logistics and operations, and streamlining client style collection information" as the reasons for the delay.

50. Defendants said nothing about how the Company's internal tests revealed that Direct Buy was cannibalizing Fix. To the contrary, both in the letter to shareholders and during the earnings call, Defendants continued to mislead investors, including in response to analyst questions. For instance, the March 8, 2021 shareholder letter stated that Direct Buy "complement[ed] our core Fix form factor" and touted the "incrementality" between Fix and Direct Buy. Similarly, on the earnings call, Defendant Spaulding falsely assured investors that Direct Buy was "additive" to Fix and highlighted the "incrementality" of the two programs. Defendant Lake falsely reiterated that Direct Buy would "complement our core Fix form factor."

51. Notably, during the same March 8, 2021 call, an analyst from Piper Sandler specifically asked Defendant Spaulding whether the Direct Buy roll out to first-time clients could "potentially cannibaliz[e] the existing Fix business . . . ?" In response, Defendant Spaulding falsely and emphatically denied cannibalization, representing that the Company was "seeing that [Direct Buy] is actually an additive experience."

52. Analysts reacted positively to Defendants' assurances and they emphasized Direct Buy's incrementality. For instance, Truist Securities wrote on March 8, 2021 that they "remain bullish on the Direct Buy opportunity . . . which has shown significant momentum recently, and

would materially expand the company's addressable market[.]" Deutsche Bank Research similarly reported on March 8, 2021 that "Direct Buy is resonating with the company's existing customers[.]" BMO Capital Markets wrote on March 9, 2021 that "the direct buy business is expected to be incremental, allowing for a larger addressable market with a larger platform and to open up more wallet share."

53. Importantly, based on the Company's assurances, analysts viewed the delay of the launch of Direct Buy to new customers as evidence that the Company was trying to get the product right, as opposed to a sign that something was very wrong. For instance, on March 8, 2021, Truist Securities noted that the Direct Buy launch was delayed because "the company continues to test the Direct Buy product before rolling it out to non-Fix customers, in order to ensure a seamless customer onboarding experience." On March 9, 2021, Telsey Advisory Group similarly noted that "the delay of the rollout was cited as being more of an effort to make sure the rollout is executed correctly[.]"

### G. Defendant Spaulding Is Named Incoming CEO And The Market Views Her Promotion As Evidence Of Direct Buy's Continued Success

54. On April 13, 2021, the Company announced that effective August 1, 2021, Defendant Spaulding would be elevated to CEO, as Defendant Lake transitioned to the role of Executive Chairperson. In the press release announcing the transition, the Company stated that "Spaulding is focused on driving the next phase of the company's growth, including the expansion of the next generation of consumer shopping experiences[.]"

55. Analysts interpreted Defendant Spaulding's promotion as further confirmation that Direct Buy was and would continue to be successful. For instance, Truist Securities wrote on April 13, 2021 that Defendant Spaulding "had a positive impact on the company's operations since joining" by "continuing to push for the Direct Buy roll out[.]" Deutsche Bank Research wrote on the same day that "[s]ince she joined the company, we believe Ms. Spaulding has been the driving force behind expanding Direct Buy[.]"

56. Defendant Spaulding personally acknowledged that she was brought in to lead this "second founding of the Company." For instance, during a May 3, 2021 interview with

Bloomberg, Defendant Spaulding stated that she intended to bring about "transformative change" at Stitch Fix, and that companies like Stitch Fix need to "change or die." Indeed, Defendant Spaulding compared Stitch Fix's "shopping feed and that shop experience" to "moving from . . . our DVD era into the streaming era."

### H. Defendants' Summer 2021 Testing Confirms That Direct Buy Is Cannibalistic As Defendants Continue To Falsely Assure Investors That It Is "Incremental" To Fix And Promise To Launch By The End Of The Quarter

57. In stark contrast to Defendant Spaulding's rosy statements to investors, Defendants' testing during the summer of 2021 confirmed that Direct Buy was continuing to cannibalize the Fix business. For instance, FE 3 (a former Data Scientist at Stitch Fix) confirmed that by June 2021, there was a clear trend that customer acquisition was dropping and it was the largest source of conversation within Stitch Fix that Freestyle was cannibalizing Fix.

58. Despite knowing from their internal tests that Direct Buy was cannibalistic, Defendants continued to tell the market the opposite. For instance, on June 7, 2021, Stitch Fix held a conference call with analysts and investors to discuss the Company's earnings and operations for its third fiscal quarter of 2021. During that call, Defendant Lake stated that "[t]he success in incrementality that Direct Buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix." Defendant Spaulding announced that in March 2021, the Company had launched the fourth phase of Direct Buy, Shop By Category, to existing customers. Defendant Lake also confirmed that, following the previous quarter's delay announcement, Defendants would "introduce direct buy to new clients by the end of the quarter."

59. As before, analysts responded positively to Defendants' assurances and were comforted by Defendants' statements that the launch of Direct Buy to new customers was imminent. For instance, Canaccord Genuity's main takeaway on June 7, 2021 was that "Sti[t]ch Fix's broadening of the direct buy program to new clients is on schedule for late 4Q21" and that "enhanced functionality across both the core Fix offering and direct buy are driving heightened engagement, retention, and AOV, laying the foundation for continued top-line growth and improving profitability." Canaccord Genuity accordingly increased their quarterly and yearly

estimates. Also on June 7, Truist Securities remarked that "SFIX's comfortable beat reflects the positive momentum the company is seeing . . . around a new product, Direct Buy (a central piece of the SFIX LT bull thesis, set for general launch in F4Q21) . . . SFIX is set to deliver a strong FY22 . . . all indications from the company lead us to believe it has resulted in primarily incremental spend and increased wallet share among SFIX's most loyal customers." J.P. Morgan similarly wrote on June 8, 2021 that "SFIX remains on track for a full scale product launch of Direct Buy for new clients at the end of 4QFY . . ." and "Direct Buy continues to be well received by existing customers . . . resulting in a meaningful increase in client engagement[.]"

60. Days later, on June 10, 2021, Stitch Fix participated in the Baird Global Consumer Technology Conference. During the conference, one analyst asked Defendant Spaulding directly whether Direct Buy was cannibalizing Fix. In response, Defendant Spaulding emphatically and falsely denied that there was cannibalization, and cited the Company's testing as the basis for her conclusion, as reflected in the following exchange:

> Q. Analyst Mark R. Altschwager from Baird: As you look at some of your core clients that really are engaged with that core Fix experience, what are you seeing with direct buy, is it additive to those purchases, is it replacing some of the Fixes that they otherwise would have ordered? What are you seeing there?
>
> A: Defendant Spaulding: Yeah. I mean we really like what we've been seeing. We originally did the most pur[e]st sense of that as kind of an A/B test of hold out which we no longer can truly do, but we did that before we took on direct buy to launch. And, of course, it was a much narrower experience at the time. And we loved what we saw at that point. <u>It was highly, highly incremental. And we see all of those signs continuing.</u> Our clients that engage in both are spending more with us. They're spending more sooner with us, like we've noticed that each new cohort of Fix clients are engaging faster with direct buy and it's expanding their spend with us[.]

61. At the same conference, an analyst asked Defendant Spaulding about how "there's been meaningful evolution in the model over the past year" and how "Direct Buy is a big piece of that." In response, Defendant Spaulding harkened back to the analogy she made a month earlier, discussed in ¶56 above, describing Stitch Fix's evolution from Fix to Direct Buy: "[I]f we were to make the Netflix analogy, we're kind of going from our DVD era into our streaming era."

**I. Defendant Spaulding Becomes CEO And Pushes The Direct Buy Launch Through To New Customers, Despite Knowing From Internal Testing That Direct Buy Was Cannibalizing Fix**

62. On August 1, 2021, Defendant Spaulding formally became the CEO of the Company, and one week later, on August 9, 2021, Stitch Fix launched Direct Buy to new customers. Lead Counsel's investigation confirmed that Defendant Spaulding pushed the launch through even though the Company's internal testing had consistently revealed cannibalization precisely because the success of Direct Buy was so critical to Defendant Spaulding's personal success.

63. FE 3 confirmed that it was his understanding from his conversations with fellow data scientists that Freestyle was personal for Defendant Spaulding and that her success depended on its success. Freestyle was the main focus of the Company moving forward. FE 3 confirmed that Freestyle was Defendant Spaulding's baby and she pushed the launch to new customers both too fast and despite the negative testing results that were coming through at the Company.

64. FE 2, described in ¶¶43-46 above as having personal knowledge of the internal testing showing cannibalization, confirmed that even though the Freestyle tests failed and showed cannibalization, and against everyone's judgment and despite questions from employees, Stitch Fix "launched Freestyle before it was ready, and we damaged our brand." FE 2 was told in weekly standing meetings run by the Product Management team that he personally attended, at which the senior director was the top level in attendance, that the tests of Freestyle had failed and that it was decided from above that the Company was still going to push forward with the launch. According to FE 2, a decision came from senior management to move forward with the launch even though the test had failed, and he was very uncomfortable with that. FE 2 confirmed his understanding that Spaulding was aware of the bad test results and she decided to push the launch forward anyway. According to FE 2, the Company should have made adjustments to Freestyle, but a decision had been made. FE 2 felt that "we were going to be launching something that was setting us up for failure."

65. FE 2 understood based on the standing meetings that he personally attended, and conversations that he had with others at the Company, that Freestyle was one of Defendant

Spaulding's babies and she was going after that initiative as CEO. Defendant Spaulding pushed Freestyle forward because Spaulding had a time in her head that they were going to launch it by.

66. FE 2 further confirmed that Stitch Fix changed its landing page to direct everyone to Freestyle. FE 2 was hearing consistently in multiple meetings with different people, including members of the Freestyle group, that this tactic was stopping the Company's growth with Fix clients and that they were not getting the growth they expected in Freestyle. According to FE 2, it was clear internally that "there was a crash and burn that happened." FE 2 explained that there were so many things pointing to Freestyle not doing what they needed it to do and what the Company expected it to do, and those of them who were working on it were not surprised by this because that is what the testing showed.

67. FE 1 confirmed that despite the recommendation from Data Science that the Company was not ready to launch Direct Buy and the tests did not look good as discussed in ¶¶39-42 above, the response from Defendant Spaulding was that the Company was going to launch anyway. FE 1 understood that Defendant Spaulding was under pressure to get Direct Buy launched. There were multiple instances where Defendant Spaulding had circumvented the Company's Public Relations plan or had talked about Direct Buy ahead of launches in a very leading way, which was frustrating to the Marketing Department. According to FE 1, every time Defendant Spaulding spoke about Direct Buy, her remarks were focused on how we have to do this, this is going to be a game changer, this is going to be the differentiator, and this is where we are going to win. When Defendant Spaulding came in, according to FE 1, part of the expectation was for her to take Direct Buy and accelerate it because the Company knew the Fix model only had so much life left in it to be able to continue to grow at the rate it had and they already saw that Fix growth was slowing. The Company needed something and there was a lot of conviction from the Defendant Spaulding level and the C-suite level that Direct Buy was going to be it. FE 1 confirmed that Spaulding saw the results of the Company's internal tests which revealed that Direct Buy was cannibalizing Fix, and it was his understanding that Spaulding pushed the launch through anyway because of these reasons.

### J. Defendants Continue to Falsely Tout Direct Buy And Fix's "Incrementality" and "Complementar[ity]" And Deny Cannibalization

68. During her first earnings call as CEO, Defendant Spaulding certified her ownership of the Direct Buy product. On September 21, 2021, Stitch Fix held a conference call with analysts and investors to discuss the Company's earnings and operations for its fourth fiscal quarter of 2021. Defendant Spaulding renamed the product as her first public act as CEO, announcing on the call that "what we have often referred to as [D]irect [B]uy, we have now branded this channel, Stitch Fix Freestyle."

69. During the call, Defendant Spaulding emphasized the success of the Freestyle launch and specifically touted the "strength" of "consumers participating in both of these channels," i.e., Freestyle and Fix. Defendant Spaulding also continued to emphatically deny cannibalization in response to analyst questions. For instance, during the call, an analyst from MKM Partners asked, "in the past you've talked about low cannibalization, but I'm just curious to get the updated thoughts." Defendant Spaulding responded as to the "specific cannibalization question, maybe two thoughts to offer. One is just we think that revenue per active client that we shared and the knowledge that we have of like the new cohorts of clients is <u>the real strength and incrementality of these two offerings really being quite complementary</u>." Defendant Spaulding went on to add, "I think we see solid growth in both sides of the business in the coming year."

70. Analysts continued to believe Defendants' assurances. For instance, Truist Securities observed on September 21, 2021, "[Freestyle] has proven to be largely incremental to Fix clients' spending on the platform."

71. Analysts also recognized that Defendant Spaulding was instrumental to the success of Freestyle. For instance, on October 1, 2021, Lane Research explained, "With SFIX essentially doubling down on its big bet [i.e., Freestyle], investors should note the increased burden on its new senior management team, particularly incoming CEO Elizabeth Spaulding, to execute on this pivotal transformation of the company."

## V. THE TRUTH EMERGES

### A. Stitch Fix's December 7, 2021 Earnings Announcement For The First Fiscal Quarter Of 2022

72. Although Defendants knew from their internal test results that Freestyle was cannibalizing the existing Fix business, Defendants continued to mislead investors. As discussed above, Defendants told investors that Freestyle and Fix were "incremental," "additive," and "complementary," when in fact, Freestyle was cannibalizing Fix.

73. Defendants were eventually forced to reveal part of the truth. On December 7, 2021, after the market closed, Stitch Fix announced a net loss of $1.8 million and diluted loss per share of $0.02 for its first fiscal quarter of 2022 and cut its full-year revenue projections. That same day, during a conference call with analysts and investors to discuss the Company's earnings and operations for the quarter, Defendant Spaulding acknowledged for the first time that as a result of the "expansion into Freestyle," the Company "may experience short-term impacts of cannibalization." Defendant Spaulding further stated that "people are making a trade-off between do I want to try Fix, do I want to try Freestyle," and "we experienced lower Fix conversion rates than we expected."

74. As a result of this disclosure, the price of Stitch Fix stock declined by $5.97 per share, or nearly 24%, from a closing price of $24.97 per share on December 7, 2021, to a closing price of $19.00 per share on December 8, 2021, on high trading volume.

75. Defendants falsely maintained, however, that the cannibalization problem was merely possible and "short-term." Further, Defendant Spaulding claimed that this problem would be fixed rapidly, and repeatedly assured investors that "we've already made some adjustments on that," or "we've already made some adjustments as we've entered into Q2 and just more learning to just make it, frankly, a lot easier for new clients that want to get shopping right away to get into that experience as quickly as possible."

76. Defendants also continued to falsely assure investors that Freestyle and Fix were "complementary" and "additive." On the December 7, 2021 earnings call, Defendant Spaulding stated that Stitch Fix had "see[n] our clients leveraging both Fixes and Freestyle, demonstrating

the complementarity of our growth offering." In addition, Defendant Spaulding stated that "we feel really good about the additive nature of Fixes together with Freestyle for clients in our ecosystem."

77. Analysts accordingly were both surprised by Defendants' revelations and reassured that the Company would be able to fix the potential for cannibalization in the short term. For instance, Truist Securities wrote on December 7, 2021 that Freestyle's launch suffered from "transitory issues, which should start abating in F2H22," but believed that "Freestyle can be complementary to the Fix offering[.]" J.P. Morgan similarly observed on December 8, 2021 that "Freestyle [is] very successful but going through some growing pains & complicating the client onboarding process."

**B. Stitch Fix's March 8, 2022 Earnings Announcement For The Second Fiscal Quarter Of 2022**

78. On March 8, 2022, after the market closed, Stitch Fix reported earnings for its second fiscal quarter of 2022, offered a weak outlook for its third fiscal quarter of 2022, and cut its guidance for the full year. During the Company's earnings conference call held after hours on the same day, Defendant Spaulding attributed the guidance cut to continued cannibalization that had not been fixed during the short-term. Specifically, Defendant Spaulding acknowledged that "in our efforts to launch and promote Freestyle, we chose to direct visitors coming to stitchfix.com towards the Freestyle experience. It is important to note that stitchfix.com is the primary landing page for customers interested in ordering a Fix. Therefore, in leading clients to the Freestyle experience first, we inadvertently created friction for those seeking a Fix." Defendant Spaulding also disclosed that the Company "created friction when [it] introduced Freestyle to the landing page, given the intent of the majority of those clients coming to our site was for a Fix." Additionally, Defendant Spaulding revealed that "conversion of new visitors for Fix and Freestyle is not where we want it to be." Defendant Spaulding directly connected these events to the reduction in the Company's earnings outlook, stating, "The lower net client adds we have experienced in the first half of the year have impacted our revenue and are driving our revised outlook for the back half due to the compounding nature of fewer new clients buying."

79. As a result of this disclosure, the price of Stitch Fix stock declined by $0.67 per share, or 6%, from a closing price of $11.01 per share on March 8, 2022, to a closing price of $10.34 per share on March 9, 2022 on high trading volume.

80. Nonetheless, Defendants continued to falsely assure investors that there were "good things" in that quarter's results which indicated that the underlying cannibalization problem was resolved. For example, Defendant Spaulding reiterated that there was "incrementality provided by Freestyle to our existing client base." Later on the call, in response to an analyst from MKM Partners' question about "the average spend in Freestyle for a Fix customer versus a pure Freestyle customer," CFO Dan Jedda stated that, "When Fix customers do engage in Freestyle, we do see both their Fix and their Freestyle go up, and so that's just really back to the point of how the two really work in tandem together from an overall client experience standpoint." Defendant Spaulding insisted that, "we continue to see really good things in terms of overall spend and new categories that are being driven by Freestyle," and "we also really like what we see on, to Dan [Jedda]'s point, the unit economics both with Fixes and even better with Freestyle."

81. Therefore, analysts believed that the cannibalization problem was largely due to a company error and believed Defendants when they said that Freestyle was "incremental," "additive," and "complementary" to Fix, rather than cannibalistic. For instance, Truist Securities noted on March 8, 2022, "Freestyle can be complementary to the Fix offering, as clients tend to seek out more intent-based categories that may not work as well in a Fix . . . [w]e are still believers in the LT story of an expanded TAM via Freestyle[.]" Lane Research explained on March 9, 2022, "Since we believe this channel conflict is entirely self-inflicted, likewise, we believe it can be self-remedied, the result of which could be an important catalyst for the stock." J.P. Morgan concluded on March 9, 2022 that they "are believers in the Freestyle product, which we think is complementary to the Fix biz[.]"

### C. Stitch Fix Announces Freestyle-Related Layoffs And Additional Freestyle Cannibalization On June 9, 2022

82. On June 9, 2022, as first reported by CNBC during trading hours, Defendant Spaulding emailed all Company employees, informing them that Stitch Fix had determined to

reduce its workforce by 15% "[i]n light of our recent business momentum and an uncertain macroeconomic environment." As Defendant Spaulding explained, "We've taken a renewed look at our business and what is required to build our future," and this decision, Spaulding said, "was one needed to make to position ourselves for profitable growth."

83. As a result of this disclosure, the price of Stitch Fix's stock declined by $0.91 per share, or approximately 10%, from a closing price of $8.69 on June 8, 2022 to a closing price of $7.78 on June 9, 2022, on high trading volume.

84. Later that day, Defendants finally revealed the full extent of their fraud. After the close of trading on June 9, 2022, the Company issued an earnings announcement press release, SEC Form 8-K, and SEC Form 10-Q. The Form 10-Q, signed by Defendant Spaulding, stated "We had 3,907,000 and 4,107,000 active clients as of April 30, 2022, and May 1, 2021, respectively, representing year-over-year decline of 4.9%. The decline in active clients was driven by client conversion challenges and lower site traffic. We experienced weaker-than-expected conversion of new clients due to onboarding friction[.]"

85. During the Company's after-hours earnings call, Defendant Spaulding further disclosed that "[the] conversion of new visitors was not where we wanted it to be in the second quarter[.]" To address this cannibalization problem, Defendant Spaulding explained that "we began directing all stitchfix.com traffic to a simplified Fix first onboarding path. Now clients entering through stitchfix.com are directed to schedule a Fix upon completing a style profile. After scheduling, their Freestyle shop is unlocked." However, Defendant Spaulding concluded, "we are still not yet at our desired conversion model. In addition, overall new client traffic to our website was down in Q3 . . . [B]oth factors, conversion and traffic, ultimately played a role in the 3% decline in our total active client counts quarter-over-quarter."

86. Additionally, Jedda issued new downward revisions to guidance: "we expect net revenue in the range of $485 million to $495 million, representing a year-over-year decline of 15% to 13%. . . . we expect Q4 adjusted EBITDA in the range of negative $30 million to negative $25 million or EBITDA margins of negative 6% to negative 5% of net revenue. This guidance assumes

that net active clients will be slightly down quarter-over-quarter." That quarter, the Company posted an EBITDA of negative $36 million, missing the consensus of negative $27 million.

87. As a result of these disclosures, the price of Stitch Fix stock declined by $1.44 per share, or nearly 19%, from a closing price of $7.78 per share on June 9, 2022, to a closing price of $6.34 per share on June 10, 2022 on high trading volume.

88. Analysts were shocked at Defendants' revelation that they could not resolve the Freestyle cannibalization issue, resulting in significant losses for the Company. For instance, Wells Fargo reported on June 9, 2022 that "user retention challenges [were] evident in 3Q results," losses were "accelerating," and they were wary that "[n]o guidance was given on when active users (and subsequently, revenue) could swing back to growth." (Emphasis in original.) Wells Fargo subsequently decreased their price target by 25%.

89. Morgan Stanley similarly wrote on June 10, 2022 that "the most surprising thing we learned was management's decision to direct all customers to create and schedule a Fix delivery before being able to shop Freestyle . . . effectively eliminating the bull case until further notice." Accordingly, Morgan Stanley noted that "Freestyle does not appear to be the unlock once perceived by the market," and the Company could expect "limited upside from Freestyle and further declines in the Fix business." Morgan Stanley cut their price target by 44%.

90. Telsey Advisory Group wrote on June 10, 2022 that "adjusted EBITDA missed guidance by a siz[e]able margin and the fourth quarter EBITDA guide disappointed as well." In the same report, Telsey wrote that the Company's layoffs were "yet another major move by the company following significant shifts in both management and strategy over the last year. Since last August when founder and former-CEO Katrina Lake transitioned to the role of Executive Chairperson, there has also been a substantial shift in strategy, with SFIX introducing the direct-buy Freestyle program. While we expected this additional channel to expand the company's addressable market and drive incremental revenue, it has proven difficult to roll out without adding friction to the onboarding of new Fix customers." Telsey lowered their price target by approximately 29%.

91. On June 10, 2022, William Blair similarly noted their "concerns around the incrementality of the Freestyle segment and the declining active client base . . . The biggest risk is about the company's ability to acquire and convert new customers[.]"

**D. Post-Class Period Developments**

92. Three distinct post-class period events confirm that Freestyle cannibalized Fix and that Defendant Spaulding's push to launch Freestyle notwithstanding the Company's extensive internal test results revealing cannibalization was a complete failure.

93. First, Freestyle's failure led to the end of Defendant Spaulding's tenure at Stitch Fix. On January 5, 2023, the Company issued a press release announcing that Defendant Spaulding would "step down as CEO." Defendant Spaulding acknowledged in that press release that she was not the right person to lead Stitch Fix on the Company's "ambitious transformation," and that her Freestyle initiative had taken the Company into the red: "in the immediate term, the focus for the team is squarely on creating a leaner, more nimble organization to set the company up for a return to profitability." Defendants announced that Defendant Lake, former CEO and Executive Chairperson, would replace Defendant Spaulding as CEO on an interim basis—the lack of a ready replacement for Defendant Spaulding suggests that she was asked to leave.

94. Analysts were not surprised that the poor performance of Defendant Spaulding, and her Freestyle initiative, led to her departure. For example, Wedbush explained on January 5, 2023, that "Ms. Spaulding was given the CEO seat to spearhead the transition of the business model away from one focused on the legacy 'Fix' offering (a 'mystery box' of 5 items sent to a customer sight-unseen), and towards a business model diversified between 'Fix' and the newer 'Freestyle' offering (more akin to a traditional e-commerce model, with more personalization). However, the transition has been very rocky, due to both macro factors and internal missteps." William Blair also noted on the same day, "The announcement is not surprising given Stitch Fix's challenging performance under Spaulding's tenure as CEO, including the company's failed strategy around its direct business[.]" Also on the same day, Barclays further highlighted the Company's "self-induced missteps (e.g., . . . Fix vs. Freestyle onboarding flow mishaps)." Barclays acknowledged that Defendant Spaulding was, effectively, fired, concluding that "we're not entirely surprised that

the Board opted to make a change." On the same day, J.P. Morgan similarly wrote that "Elizabeth's departure does not come as a surprise[.]"

95. Second, and contemporaneous with Defendant Spaulding's firing, the Company sent a letter to employees explaining that they would cut approximately another 20% of their salaried staff. This further cost cutting was necessary to return the Company to profitability after Freestyle had cannibalized the Company's core Fix business.

96. Finally, Defendant Lake, in her role as interim CEO, announced that Stitch Fix intended to move away from Freestyle entirely. On March 7, 2023, Defendant Lake announced that the Company would "refocus" on the Fix, and that Stitch Fix would no longer think of Freestyle as a "separate business unit" because it "was less effective" as a "customer acquisition vehicle." Defendant Lake reiterated on June 7, 2023 that after "a full analysis of our network strategy," Stitch Fix was determined to "refocus[] on our core Fix business."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

97. Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions. Specifically, Defendants represented to investors that Direct Buy was "additive," "incremental" and "complementary" to its core product, the "Fix," when, in truth, Direct Buy was cannibalizing Fix. Defendants also touted materially misleading active client and net additional client metrics which concealed the truth that Direct Buy was cannibalizing Fix.

### A. December 2020: Q1 2021 Disclosures

98. On December 7, 2020, Stitch Fix filed a Letter to Shareholders, signed by Defendants Lake and Spaulding, which was filed with the SEC on Form 8-K (the "December 2020 Letter to Shareholders"), and held an earnings conference call for the first fiscal quarter of 2021. During the call, in response to an analyst from Goldman Sachs's question about "the combination of direct buy and the trends that you're seeing in keep rates," Defendant Lake stated, "At a high level, honestly, I mean, what we're seeing is that the two experiences are really additive[.]" Defendant Lake concluded her answer by stating that "it's unlocking, I think, both client opportunity but also pretty significantly on the wallet share opportunity side where if you're

looking for a down jacket to eat outside, as an example, you'd actually love to buy that through Stitch Fix in a more frictionless way, and on direct buy it's going to be a great way to do that."

99. The statements identified in ¶98 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Lake to state that the Fix and Direct Buy "experiences are really additive," and that Direct Buy would permit purchasing "in a more frictionless way." In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and neither "additive" to Fix, nor "frictionless" with Fix.

100. Furthermore, Defendant Lake's statements identified in ¶98 above were also at a minimum materially misleading and omitted material facts. Having chosen to tout that Fix and Direct Buy "experiences are really additive," and that Direct Buy would permit purchasing "in a more frictionless way," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

101. In response to the same question from the Goldman Sachs analyst identified in ¶98 above, Defendant Spaulding stated with respect to Direct Buy, "And that notion of the shopping feed and especially what Katrina [Lake] was alluding to with the categories where people can input their preferences and immediately see recommendations on categories they're looking for, that is highly additive to the surprise and delight of our Fix experience for those occasions that you might have gone into the store to look for something. And so there's a real complementarity[.]"

102. The statements identified in ¶101 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to state that Direct Buy's shopping feed was "highly additive to the surprise and delight of our Fix experience" and that there was a "real complementarity." In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and neither "highly additive" nor "complementar[y]" to Fix.

103. Furthermore, Defendant Spaulding's statements identified in ¶101 above were also at a minimum materially misleading and omitted material facts. Having chosen to tout that Direct

Buy's shopping feed was "highly additive to the surprise and delight of our Fix experience" and that there was a "real complementarity," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

104. On December 8, 2020, the first day of the Class Period, Stitch Fix filed its quarterly report on Form 10-Q (the "Q1 2021 Form 10-Q"). The Q1 2021 Form 10-Q was signed by Defendant Lake.

105. In the Q1 2021 Form 10-Q, Defendants stated, "We had 3,763,000 and 3,416,000 active clients as of October 31, 2020, and November 2, 2019, respectively, representing year-over-year growth of 10.2%." The December 2020 Letter to Shareholders similarly stated, "We grew our active client count to nearly 3.8 million as of October 31, 2020, an increase of 347,000 or 10.2% year over year[.]" On the December 7, 2020 earnings call, Defendant Lake added that Stitch Fix "delivered an increase of over 240,000 net active clients quarter-over-quarter, a return to double-digit year-over-year active client growth which we expect will increase further this fiscal year."

106. Defendants Lake and Spaulding's statements identified in ¶105 above were at a minimum materially misleading and omitted material facts. Having chosen to tout growth in active clients and net active clients, the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

### B. February 10, 2021 Goldman Sachs Technology and Internet Virtual Conference

107. On February 10, 2021, Defendant Lake attended the Goldman Sachs Technology and Internet Virtual Conference on behalf of Stitch Fix. During the conference, a Goldman Sachs analyst asked Defendant Lake, "[W]hat is the vision for direct buy and how has the offering evolved over the last year or so since you started rolling it out?" In response, Defendant Lake

stated, "I think this really is one of the most exciting things that I've had the privilege of getting to work on because it's one of those initiatives that is both really powerful and we can see in the data that it's working. And at the same time there's still so much opportunity."

108. The statement identified in ¶107 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Lake to state with respect to Direct Buy that "we can see in the data that it's working." In truth, Defendants' internal test results, i.e., the "data," showed that Direct Buy was cannibalizing Fix customers and not "working" in tandem with Fix.

109. Furthermore, Defendant Lake's statement identified in ¶107 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout that "we can see in the data that it's working," Defendant Lake was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

110. During the same February 10, 2021 conference, a Goldman Sachs analyst asked Defendant Lake "how direct buy and some of your other initiatives like that might be changing" wallet share for apparel. In response, Defendant Lake stated, "And then what's been interesting with direct buy is that we've seen clear incrementality with direct buy."

111. The statement identified in ¶110 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Lake to state that "we've seen clear incrementality with direct buy." In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and not "incremental[]" to Fix.

112. Furthermore, Defendant Lake's statement identified in ¶110 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout that "we've seen clear incrementality with direct buy," Defendant Lake was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

**C. March 2021: Q2 2021 Disclosures**

113. On March 8, 2021, Stitch Fix filed a Letter to Shareholders, signed by Defendants Lake and Spaulding, which was filed with the SEC on a Form 8-K (the "March 2021 Letter to Shareholders"), and held an earnings call for the second fiscal quarter of 2021. The March 2021 Letter to Shareholders stated that Direct Buy "is delivering incremental lifetime value," and reiterated the "incrementality" between Fix and Direct Buy, stating, "This incrementality gives us more optimism to believe that as our direct buy offering expands, client lifetime values will continue to grow."

114. The statements identified in ¶113 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants Lake and Spaulding to state that Direct Buy was "delivering incremental lifetime value" and cite "[t]his incrementality" between Direct Buy and Fix. In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and not "incremental" to Fix.

115. Furthermore, Defendants Lake and Spaulding's statements identified in ¶113 above were also at a minimum materially misleading and omitted material facts. Having chosen to tout that Direct Buy was "delivering incremental lifetime value" and cite "[t]his incrementality," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

116. On the March 8, 2021 earnings call, an analyst from KeyBanc Capital Markets asked Defendant Spaulding about "launching direct buy and cold starting people in direct buy" and whether "there [were] other initial signs that indicated that the product needs kind of more work before launching?" In response, Defendant Spaulding answered that "[t]he contribution margin and lifetime values have been very strong and incremental relative to last year when we were really more of a Fix-only offering."

117. The statement identified in ¶116 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to state that "contribution margin and lifetime values have been very strong and incremental relative to

last year when we were really more of a Fix-only offering." In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and not "incremental" to Fix.

118. Furthermore, Defendant Spaulding's statement identified in ¶116 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout that "contribution margin and lifetime values have been very strong and incremental relative to last year when we were really more of a Fix-only offering," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

119. During the same March 8, 2021 earnings call, an analyst from Piper Sandler asked Defendant Spaulding whether Direct Buy was "potentially cannibalizing the existing Fix business or at least what you're seeing today with the added offering to those that already use the Fix business?" In response, Defendant Spaulding denied cannibalization, citing "<u>the incrementality that we've observed with active Fix clients as they participate in both and seeing that is actually an additive experience.</u>"

120. The statement identified in ¶119 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to state that Direct Buy was an "additive experience" providing "incrementality" with "active Fix clients." In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and neither "additive," nor "incremental[]" to Fix.

121. Furthermore, Defendant Spaulding's statement identified in ¶119 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout that Direct Buy was an "additive experience" providing "incrementality" with "active Fix clients," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

122. On March 9, 2021, Stitch Fix filed its quarterly report on Form 10-Q (the "Q2 2021 Form 10-Q"). The Q2 2021 Form 10-Q was signed by Defendant Lake.

123. In the Q2 2021 Form 10-Q, Defendants stated, "We had 3,873,000 and 3,465,000 active clients as of January 30, 2021, and February 1, 2020, respectively, representing year-over-year growth of 11.8%." The March 2021 Letter to Shareholders similarly stated that, "We grew our active client count to 3.9 million as of January 30, 2021, an increase of 408,000 or 11.8% year over year. This also resulted in 110,000 net active clients quarter over quarter[.]"

124. Defendants Lake and Spaulding's statements identified in ¶123 above were at a minimum materially misleading and omitted material facts. Having chosen to tout growth in active clients and net active clients, the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

**D. June 2021: Q3 2021 Disclosures**

125. On June 7, 2021, Stitch Fix held an earnings conference call for the third fiscal quarter of 2021. During the June 7, 2021 earnings call, Defendant Spaulding stated, "The <u>success in incrementality that direct buy has demonstrated to date</u> gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix."

126. The statement identified in ¶125 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to tout the "success in incrementality that direct buy has demonstrated to date[.]" In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and not "incremental[]" to Fix.

127. Furthermore, Defendant Spaulding's statement identified in ¶125 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout the "success in incrementality that direct buy has demonstrated to date," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

128. On June 8, 2021, Stitch Fix filed its quarterly report on Form 10-Q (the "Q3 2021 Form 10-Q"). The Q3 2021 Form 10-Q was signed by Defendant Lake.

129. In the Q3 2021 Form 10-Q, Defendants stated, "We had 4,107,000 and 3,418,000 active clients as of May 1, 2021, and May 2, 2020, respectively, representing year-over-year growth of 20.2%." During the June 7, 2021 earnings call, Defendant Lake stated, "During the quarter, we grew our active client count to over 4.1 million, representing a year-over-year increase of 689,000 clients or 20% growth. And on a quarter-over-quarter basis, we added 234,000 active clients, our second highest client addition ever."

130. Defendant Lake's statements identified in ¶129 above were at a minimum materially misleading and omitted material facts. Having chosen to tout growth in active clients and net active clients, the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

**E. June 10, 2021 Baird Global Consumer Technology Conference**

131. On June 10, 2021, Defendant Spaulding attended the Baird Global Consumer Technology Conference on behalf of Stitch Fix. During the conference, an analyst from Baird asked Defendant Spaulding, "what are you seeing with direct buy, is it additive to those purchases, is it replacing some of the Fixes that they otherwise would have ordered?" In response to this direct question about cannibalization, Defendant Spaulding stated, "[W]e really like what we've been seeing. We originally did the most pur[e]st sense of that as kind of an A/B test of hold out which we no longer can truly do, but we did that before we took on direct buy to launch. And, of course, it was a much narrower experience at the time. And we loved what we saw at that point. <u>It was highly, highly incremental. And we see all of those signs continuing</u>." Defendant Spaulding added, "Our clients that engage in both are spending more with us. They're spending more sooner with us, like <u>we've noticed that each new cohort of Fix clients are engaging faster with direct buy and it's expanding their spend with us</u>."

132. The statements identified in ¶131 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to state that the testing showed that Direct Buy "was highly, highly incremental," and that "we see all of those signs continuing." It was also materially false and misleading for Defendant Spaulding to state that "we've noticed that each new cohort of Fix clients are engaging faster with direct buy and it's expanding their spend with us." In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and neither "highly, highly incremental" to Fix, nor "expanding" Fix client "spend."

133. Furthermore, the statements identified in ¶131 above were also at a minimum materially misleading and omitted material facts. Having chosen to tout that the Company's internal testing showed that Direct Buy "was highly, highly incremental," that "we see all of those signs continuing," and that "each new cohort of Fix clients are engaging faster with direct buy and it's expanding their spend with us," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

**F. September 2021: Q4 2021 Disclosures**

134. On September 21, 2021, Stitch Fix held an earnings conference call for the fourth quarter of fiscal year 2021. During the September 21, 2021 earnings call, in response to an analyst from MKM Partners' question about "how you're thinking about growth of the Fix business as your Freestyle business ramps" and how "in the past you've talked about low cannibalization," Defendant Spaulding answered "the specific cannibalization question," by stating that "we think that revenue per active client that we shared and the knowledge we have of like the newer cohorts of clients <u>is the real strength and incrementality of these two offerings really being quite complementary</u>."

135. The statement identified in ¶134 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to state in response to the "specific cannibalization question" that Direct Buy and Fix provided "real strength

and incrementality," and that the two offerings were "quite complementary." In truth, Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers and neither "incremental[]" nor "complementary" to Fix.

136. Furthermore, Defendant Spaulding's statement identified in ¶134 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout that Direct Buy and Fix provided "real strength and incrementality," and that the two offerings were "quite complementary," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

137. On September 27, 2021, Stitch Fix filed its annual report on Form 10-K (the "2021 Form 10-K"). The 2021 Form 10-K was signed by Defendant Spaulding. In the 2021 Form 10-K, Defendants stated, "We had 4,165,000 and 3,522,000 active clients as of July 31, 2021, and August 1, 2020, respectively, representing year-over-year growth of 18.3%." Similarly, on the September 21, 2021 earnings call, Defendant Spaulding stated, "We ended the quarter with 4.165 million active clients and closed out the second half of the year with nearly 300,000 total net adds."

138. Defendant Spaulding's statements identified in ¶137 above were at a minimum materially misleading and omitted material facts. Having chosen to tout growth in active clients and net active clients, the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers.

## VII. LOSS CAUSATION

139. The fraud alleged herein was the proximate cause of the economic loss suffered by Lead Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (*i.e.*, stock price declines) described herein. *See, e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

140. During the Class Period, Lead Plaintiffs and the Class members purchased or otherwise acquired Stitch Fix common stock at artificially inflated prices, and were damaged thereby when the price of Stitch Fix common stock declined in response to the partial disclosures. Throughout the Class Period, the price of Stitch Fix common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Stitch Fix common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which occurred after trading hours on December 7, 2021 and March 8, 2022, and both during trading and after trading hours on June 9, 2022. These disclosures reduced the amount of inflation in the price of Stitch Fix's publicly traded stock, causing economic injury to Lead Plaintiffs and other members of the Class.

141. Specifically, after the market closed on December 7, 2021, Stitch Fix held an earnings call to discuss the Company's results for the first fiscal quarter of 2022. Defendant Spaulding disclosed that the Company "may experience short-term impacts of cannibalization." Defendant Spaulding further explained that "in the short-term, people are making a trade-off between do I want to try Fix, do I want to try Freestyle." Defendant Spaulding continued, "I think we acknowledge in onboarding we may be distracting some of those clients with shopping in Freestyle when in reality they just want the support of a stylist."

142. Stitch Fix's disclosures caused the Company's stock price to decline by $5.97 per share, or nearly 24%, from a closing price of $24.97 per share on December 7, 2021, to a closing price of $19.00 per share on December 8, 2021, on high trading volume.

143. Then, after the market closed on March 8, 2022, Stitch Fix held an earnings call to discuss the Company's results for the second fiscal quarter of 2022. Defendant Spaulding acknowledged, "In our efforts to launch and promote Freestyle, we chose to direct visitors coming to stitchfix.com towards the Freestyle experience . . . in leading clients to the Freestyle experience first, we inadvertently created friction for those seeking a Fix." Defendant Spaulding reiterated, "We believe that we created friction when we introduced Freestyle to the landing page, given the intent of the majority of those clients coming to our site was for a Fix." Defendant Spaulding

further revealed that "conversion of new visitors for Fix and Freestyle is not where we want it to be." Defendant Spaulding explained that, as a result, "[t]he lower net client adds we have experienced in the first half of the year have impacted our revenue and are driving our revised outlook for the back half due to the compounding nature of fewer clients buying."

144. Thus, the March 8, 2022 disclosures further revealed to the market that Freestyle was cannibalizing Fix and that the Company had not succeeded in implementing its solution to the problem in the short-term, but rather continued to experience "friction" between Freestyle and Fix, including in the client onboarding process.

145. As a result of this disclosure, the price of Stitch Fix stock declined by $0.67 per share, or 6%, from a closing price of $11.01 per share on March 8, 2022, to a closing price of $10.34 per share on March 9, 2022, on high trading volume.

146. Last, on June 9, 2022, Defendants announced additional Freestyle cannibalization and significant layoffs. During trading hours as first reported by CNBC, Defendant Spaulding emailed all Company employees, informing them that Stitch Fix had determined to reduce its workforce by 15% "[i]n light of our recent business momentum and an uncertain macroeconomic environment." As Defendant Spaulding explained, "We've taken a renewed look at our business and what is required to build our future," and this decision, Spaulding said, "was one we needed to make to position ourselves for profitable growth."

147. As a result of this disclosure, the price of Stitch Fix's stock declined by $0.91 per share, or approximately 10%, from a closing price of $8.69 on June 8, 2022 to a closing price of $7.78 on June 9, 2022, on high trading volume.

148. Later that day, Defendants finally revealed the full extent of their fraud. After the close of trading on June 9, 2022, the Company issued an earnings announcement press release, SEC Form 8-K, and SEC Form 10-Q, and held an earnings conference call. The Form 10-Q, signed by Defendant Spaulding, stated, "We had 3,907,000 and 4,107,000 active clients as of April 30, 2022, and May 1, 2021, respectively, representing year-over-year decline of 4.9%. The decline in active clients was driven by client conversion challenges and lower site traffic. We experienced weaker-than-expected conversion of new clients due to onboarding friction[.]"

149. During the Company's earnings call, Defendant Spaulding further disclosed that "[the] conversion of new visitors was not where we wanted it to be in the second quarter[.]" To address this problem, Defendant Spaulding explained that "we began directing all stitchfix.com traffic to a simplified Fix first onboarding path. Now clients entering through stitchfix.com are directed to schedule a Fix upon completing a style profile. After scheduling, their Freestyle shop is unlocked." However, Defendant Spaulding concluded, "we are still not yet at our desired conversion model. In addition, overall new client traffic to our website was down in Q3. . . . [B]oth factors, conversion and traffic, ultimately played a role in the 3% decline in our total active client counts quarter-over-quarter."

150. As a result of these disclosures, the price of Stitch Fix stock declined by $1.44 per share, or nearly 19%, from a closing price of $7.78 per share on June 9, 2022, to a closing price of $6.34 per share on June 10, 2022, on high trading volume.

151. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the existing artificial inflation of the price of Stitch Fix common stock. It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly or proximately caused by Defendants' false and misleading statements or omissions.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

152. Numerous facts, in addition to those discussed above, raise a strong inference that Defendants knew or were deliberately reckless in not knowing that their Class Period misrepresentations were false or misleading when made.

153. <u>First</u>, Defendants saw and reviewed contemporaneous data and information that contradicted Defendants' false and misleading statements. The Executive Defendants received reports and attended presentations showing the negative results of the Company's internal cannibalization testing, and the Executive Defendants discussed those results in Company meetings. Defendants concealed these internal testing results from investors and misled investors

concerning the test results and the issues addressed by the testing, which supports a strong inference of scienter.

154. As confirmed by multiple former employees, including FE 1, FE 2, and FE 3, Stitch Fix conducted extensive internal testing, which revealed that Direct Buy was cannibalizing Fix, and those test results were shared with the Executive Defendants during the Class Period. As discussed in Sections IV.E and IV.I above, FE 1, FE 2, and FE 3 confirmed that the Company's internal tests were negative and showed that Direct Buy was cannibalizing Fix. FE 1, FE 2, and FE 3 further confirmed that those test results were shared with Defendant Spaulding during routine and weekly meetings.

155. Indeed, FE 1 explained, the entire purpose of those weekly meetings was to inform Defendant Spaulding of the tests, including the New Fix Customer Test. FE 1 was personally in meetings in which the negative test results were discussed, and he also heard about the negative results from colleagues. FE 3 further confirmed that executive leadership, including Defendant Spaulding, held routine meetings with data scientists who ran the internal tests regarding the performance of Freestyle. The purpose of those meetings was for Defendant Spaulding to understand the results of the various testing, including cannibalization testing, around Freestyle. FE 2 further confirmed that there was a standing Freestyle touch base meeting every Friday attended by senior management and he understood that the results of the tests were shown to Defendant Spaulding at that meeting. Further, FE 2 himself created a presentation describing his concerns with the data from Freestyle and the data from Fix not lining up, and he told his direct managers to share it with the C-suite.

156. <u>Second</u>, Stitch Fix tracked live data showing that Direct Buy was cannibalizing Fix, and the Executive Defendants received this real-time information reflecting cannibalization in weekly reports, which supports a strong inference of scienter.

157. For instance, on February 10, 2021, Defendant Lake told investors that the Company was tracking key performance indicators, or "KPIs," on a "daily, weekly basis," and was "constantly running A/B test[s]." Those KPIs included client retention, wallet share, and average spend per customer.

158. FE 3 confirmed that he received weekly email blasts with specific data such as top line revenue numbers and breakdowns by customer category as well as Freestyle versus Fix. The format of this information was similar to an Excel file. According to FE 3, trends concerning new customer acquisition and customer retention in regard to Freestyle were reflected in those reports. FE 3 confirmed that these weekly email blasts went to Defendants Spaulding and Lake.

159. FE 1 also confirmed that the Company followed the average order value and the number of Fixes for new clients who signed up. FE 1 explained that Stitch Fix also tracked customer churn, or those customers who had been dormant for 12 months. FE 1 further confirmed that the metrics were real-time in the systems, and reports were generated weekly. FE 1 confirmed that these reports and numbers were discussed and shared in business review meetings that he personally attended and that Defendant Spaulding occasionally attended.

160. Third, the Executive Defendants had access to the relevant data showing that Direct Buy was cannibalizing Fix through the Company's internal Looker system and through the data scientists who maintained the test results, which supports a strong inference of scienter.

161. FE 1 explained that specific data such as customer acquisition, new customer acquisition, week-over-week churn, the number of Fixes, and the number of Direct Buy purchases, were all readily available to Company employees in Looker. The Company also maintained an executive dashboard view that was built for executives within Looker. The Looker system included the data that was shared in the weekly business review meetings that FE 1 personally attended and that Defendant Spaulding occasionally attended. Anyone at the Company could access the business review reports stored on the Looker system at any time, including the C-Suite. FE 2 confirmed that the Company used Looker to make more complex dashboards that employees could share across areas. The C-Suite could look at these high-level Looker dashboards any time they wanted.

162. FE 1 and FE 3 further confirmed that Defendants Spaulding and Lake had the ability to access data concerning the cannibalization of Fix by Freestyle through the data scientists. Indeed, FE 3 confirmed that fellow data scientists observed that it was obvious from test results as

well as continuous customer research conversations that Freestyle was taking customers away from the Company's existing Fix business.

163. Fourth, the Executive Defendants spoke to investors and securities analysts regarding Direct Buy's cannibalization of Fix and the Company's internal test results, claiming comprehensive personal knowledge of this topic. The fact that the Executive Defendants held themselves out to investors and analysts as knowledgeable about the Company's internal tests and what they showed about cannibalization supports a strong inference of scienter.

164. Defendants openly and frequently discussed the tests, and the test results, with investors during the Class Period. For example, on the December 7, 2020 earnings call, Defendant Lake explained that she knew "direct buy certainly has been a significant contributor" to revenue generation because "we're running A/B tests all the time." On the same call, Defendant Lake also told investors that "we've been doing some testing around what is the best way to introduce direct buy[.]" Similarly, when an analyst from Needham & Company asked for "more insight into the plan to introduce Direct Buy to prospective clients later this year," Defendant Spaulding responded that the Company was "in the flight of building and testing right now" and "doing a number of tests." Later on the same call, Defendant Lake reiterated that Stitch Fix had "been doing some testing around what is the best way to introduce Direct Buy and like what is the best way for us to actually figure out like this is somebody who should be on a conversion path to Fixes versus this is somebody that we actually should have into a direct buy first."

165. As another example, on February 10, 2021, Defendant Lake told investors that the Company was "constantly running A/B test[s]." On June 10, 2021, Defendant Spaulding reiterated that the Company "originally did . . . an A/B test" before the Direct Buy launch "and we loved what we saw at that point. It was highly, highly incremental. And we see all of those signs continuing."

166. Fifth, the Executive Defendants specifically denied that Direct Buy was cannibalizing Fix in response to analyst questions, and they cited the Company's internal test results as the basis for those denials, which supports a strong inference of scienter.

167. For instance, during the March 8, 2021 earnings call, an analyst from Piper Sandler specifically asked Defendant Spaulding whether the Direct Buy roll out to first-time clients could "potentially cannibaliz[e] the existing Fix business?" In response, Defendant Spaulding falsely and emphatically denied cannibalization, representing that the Company was "seeing that [Direct Buy] is actually an additive experience." Later in the call, CFO Dan Jedda reiterated that "Direct Buy is additive to the Fix business for our Fix customers, so we like what we're seeing there from an incrementality standpoint."

168. As another example, on June 10, 2021, an analyst from Baird asked Defendant Spaulding whether Direct Buy was cannibalizing Fix, posing the question, "As you look at some of your core clients that really are engaged with that core Fix experience, what are you seeing with direct buy, is it additive to those purchases, is it replacing some of the Fixes that they otherwise would have ordered? What are you seeing there?" In response, Defendant Spaulding emphatically and falsely denied that there was cannibalization, citing the Company's testing as the basis for her conclusion:

> Yeah. I mean we really like what we've been seeing. We originally did the most pur[e]st sense of that as kind of an A/B test of hold out which we no longer can truly do, but we did that before we took on direct buy to launch. And, of course, it was a much narrower experience at the time. And we loved what we saw at that point. It was highly, highly incremental. And we see all of those signs continuing. Our clients that engage in both are spending more with us. They're spending more sooner with us, like we've noticed that each new cohort of Fix clients are engaging faster with direct buy and it's expanding their spend with us.

169. As another example, during the September 21, 2021 earnings call, an analyst from MKM Partners asked, "in the past you've talked about low cannibalization, but I'm curious to get the updated thoughts." Defendant Spaulding responded as to the "specific cannibalization question, maybe two thoughts to offer. One is just we think that revenue per active client that we shared and the knowledge that we have of like the new cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary." Defendant Spaulding went on to say, "I think we see solid growth in both sides of the business in the coming year."

170. Sixth, the fact that Defendant Spaulding pushed the launch of Direct Buy to new customers through when she knew that the Company's internal tests revealed that Direct Buy was cannibalizing Fix supports a strong inference of scienter.

171. As described above in ¶¶39-42, FE 1 confirmed that despite the recommendation from Data Science that the Company was not ready to launch Direct Buy and the fact that the tests did not look good, and that the data showed that Direct Buy customers were converting at a lower rate, or they would spend less money, compared to Fix customers, the response from Defendant Spaulding was that the Company was going to launch anyway.

172. FE 3 corroborated FE 1's account. FE 3 explained that it was his understanding from his conversations with fellow data scientists that Freestyle was personal for Defendant Spaulding, that her success depended on its success, and that Spaulding pushed the launch to new customers too fast despite the negative testing results that were coming through at the Company. FE 2 also understood based on the standing meetings that he personally attended and conversations that he had with others at the Company that Freestyle was one of Defendant Spaulding's babies and she was going after that initiative as CEO. He reiterated that even though the Freestyle tests failed and showed cannibalization, and against everyone's judgment and despite questions from employees, Stitch Fix "launched Freestyle before it was ready, and we damaged our brand." FE 2 confirmed his understanding that Spaulding was aware of the bad test results and she decided to push the launch forward anyway because she had a time in her head that they were going to launch it by.

173. Seventh, while Plaintiffs need not allege any motive to plead scienter, Defendant Spaulding stood to receive substantial performance-based compensation that created a strong financial incentive for her to grow Freestyle regardless of whether it was cannibalizing the Fix business. In the Company's 2021 Proxy Statement, Defendant Spaulding's annual cash bonus was 40% determined by net revenue, 40% determined by active client count, and 20% determined by "growing its Freestyle service during fiscal year 2022." This is a change from her 2020 cash bonus, which was 40% determined by net revenue, 40% determined by active client count, and 20% determined by adjusted EBITDA excluding stock-based compensation expenses. The fact

that Defendant Spaulding's compensation in part depended on "growing Freestyle" supports a strong inference of scienter because she was financially motivated to commit fraud—by growing Freestyle and concealing that Freestyle was cannibalizing Fix—and would personally financially benefit from it.

174. Defendant Lake also capitalized on her materially false and misleading statements and omissions to investors by disposing of personally-held shares at artificially inflated prices. During the Class Period, Defendant Lake reaped millions of dollars from selling Stitch Fix stock while simultaneously being aware of Freestyle's cannibalization of Fix. As negative facts about Freestyle's cannibalization of Fix accumulated, Defendant Lake sold approximately $78 million worth of Company stock. Of that, Defendant Lake sold 1,072,088 shares, reaping more than $49 million in proceeds, during the time between Defendants' March 8, 2021 earnings call—when Defendant Spaulding announced that Freestyle would be launched to new customers before the end of the fiscal year—and Defendants' December 7, 2021 earnings call—when Defendant Spaulding first partially revealed that Freestyle was cannibalizing Fix. In other words, Defendant Lake executed more than 73 percent of her total Class Period sales in the months between Freestyle's promised launch, and the first indication to the public that Freestyle was cannibalizing Fix. All told, during the Class Period, Defendant Lake sold 1,471,118 shares for proceeds of $78,329,893. Based on Defendant Lake's Schedule 14A, filed with the SEC in the month prior to the start of the Class Period, Defendant Lake sold approximately 12.7% of her holdings during the Class Period.

175. Eighth, on January 5, 2023, Stitch Fix announced the departure of Defendant Spaulding, effective that day. This departure occurred less than six months after the end of the Class Period, when Defendants disclosed the full extent of the truth as the Company revealed that Freestyle was cannibalizing the Fix business, and suggests that Defendant Spaulding's departure was associated with the alleged misconduct described in the Complaint.

176. Finally, the core operations doctrine supports a strong inference of scienter for two reasons. First, as discussed in ¶¶156-65 above, the Executive Defendants admitted detailed involvement in the minutia of Stitch Fix's operations, including data monitoring and the

Company's internal testing which revealed cannibalization. Second, the fact that Direct Buy was cannibalizing Fix was of such prominence that it would be absurd to suggest that the Executive Defendants were without knowledge of the matter. As set forth in Sections IV.C and IV.G above, Defendants touted Freestyle as the entire future of the Company and Defendant Spaulding was specifically brought in as President and CEO to lead that effort.

177. The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Defendants' scienter.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

178. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. The misstatements complained of herein were historical statements or statements of purportedly current facts and conditions existing at the time or prior to when the statements were made.

179. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see* Sections IV and VI, *supra*), then-existing facts contradicted Defendants' statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was insufficient to insulate Defendants from liability from their materially untrue and misleading statements.

180. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and the statement was authorized or approved by an executive officer of Stitch Fix who knew that the statement was false or misleading when made.

## X. THE PRESUMPTION OF RELIANCE

181. The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Stitch Fix's common stock was efficient for the following reasons, among others:

a. Stitch Fix's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

b. Stitch Fix's common stock traded at high weekly volumes;

c. As a regulated issuer, Stitch Fix filed periodic reports with the SEC;

d. Stitch Fix was eligible to file registration statements with the SEC on Form S-3;

e. Stitch Fix regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

f. Stitch Fix was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace;

g. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Stitch Fix common stock; and

h. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Stitch Fix common stock between the time Defendants

misrepresented or failed to disclose material facts and the time the true facts were disclosed.

182. As a result of the foregoing, the market for Stitch Fix's common stock reasonably promptly digested current information regarding Stitch Fix from all publicly available sources and reflected such information in the price of Stitch Fix's common stock. All purchasers of Stitch Fix common stock during the Class Period suffered similar injury through their purchase of Stitch Fix common stock at artificially inflated prices, and a presumption of reliance applies.

183. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose that Freestyle was cannibalizing Fix—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material, i.e., that a reasonable investor might have considered the omitted facts important in making investment decisions. Given the importance of the Fix business to Stitch Fix, as set forth above, that requirement is satisfied here.

## XI. CLASS ACTION ALLEGATIONS

184. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Stitch Fix common stock from December 8, 2020 through June 9, 2022, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

185. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Stitch Fix common stock was actively traded on the NASDAQ Stock Market. As detailed in the Company's November 4, 2021 proxy materials, the only proxy materials the Company filed during the Class Period, there were approximately 83

million shares of Stitch Fix Class A common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are least hundreds-of-thousands of members of the Class. Class members who purchased Stitch Fix common stock may be identified from records maintained by Stitch Fix or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

186. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

187. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Lead Plaintiffs have no interests that conflict with the interests of the Class.

188. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a. Whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

b. Whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

c. Whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

d. Whether the members of the Class have sustained damages, and the proper measure of damages.

189. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)

190. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

191. This Count is asserted on behalf of all members of the Class against Stitch Fix and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

192. During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew were, or they deliberately disregarded as, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

193. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Stitch Fix common stock during the Class Period.

194. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Stitch Fix common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Stitch Fix's knowledge of test results indicating Freestyle was cannibalizing the Fix business; (b) artificially inflate and maintain the market price of Stitch Fix common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase Stitch Fix common stock at artificially inflated prices and suffer loss when the true facts became known.

195. Stitch Fix and the Executive Defendants are all liable for all materially false and misleading statements made during the Class Period, as alleged above.

196. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Stitch Fix stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

197. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Stitch Fix common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Stitch Fix common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially misleading statements.

198. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Stitch Fix common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act (Against The Executive Defendants)

199. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

200. This count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

201. The Executive Defendants acted as controlling persons of Stitch Fix within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

202. By reasons of their high-level positions of control and authority as the Company's most senior officers, the Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Stitch Fix during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

203. Each of the Executive Defendants spoke to investors on behalf of the Company during the Class Period. Therefore, each of the Executive Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Stitch Fix during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

204. By virtue of their positions as controlling persons of Stitch Fix and as a result of their own aforementioned misconduct, the Executive Defendants are liable pursuant to Section

20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired Stitch Fix securities. As detailed above, during the respective times, the Executive Defendants served as officers and/or directors of Stitch Fix.

205. As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchase or acquisition of Stitch Fix common stock.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

206. Lead Plaintiffs hereby demand a trial by jury.

Dated: August 15, 2023

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Rebecca E. Boon*
Rebecca E. Boon (*pro hac vice*)
(rebecca.boon@blbglaw.com)

John C. Browne (*pro hac vice*)
(johnb@blbglaw.com)
Scott R. Foglietta (*pro hac vice forthcoming*)
(scott.foglietta@blbglaw.com)
William E. Freeland (*pro hac vice*)
(billy.freeland@blbglaw.com)
Brandon A. Slotkin (*pro hac vice*)
(brandon.slotkin@blbglaw.com)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs Retail Wholesale Department Store Union Local 338 Retirement Fund, Retail Wholesale Department Store Union Local 338 Health & Welfare Fund, Retail Wholesale Department Store Union Local 338 General Fund, and Retail Wholesale Department Store Union Local 338 Benefits Trust Fund*