**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs Retail Wholesale
Department Store Union Local 338
Retirement Fund, Retail Wholesale
Department Store Union Local 338 Health
& Welfare Fund, Retail Wholesale
Department Store Union Local 338 General
Fund, and Retail Wholesale Department
Store Union Local 338 Benefits Trust Fund*

[Additional Counsel Appear on Signature Block]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 HEALTH & WELFARE FUND, RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 GENERAL FUND, and RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 BENEFITS TRUST FUND, on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br>v.<br><br>STITCH FIX, INC., KATRINA LAKE, and ELIZABETH SPAULDING,<br><br>              Defendants. | Case No. 5:22-cv-04893-PCP<br><br>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br><u>CLASS ACTION</u><br><br>Date: April 18, 2024<br>Time: 10:00 AM<br>Courtroom: 8, 4th Floor |

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

I.   STATEMENT OF ISSUES TO BE DECIDED ..................................................................1

II.   INTRODUCTION ..................................................................................................................1

III.   STATEMENT OF FACTS ....................................................................................................2

    A.   Spaulding Leads the "Pivotal Transformation" to Direct Buy ...............................2

    B.   Defendants Tout Direct Buy as "Additive," "Incremental," and "Complementary" To Fix, and Deny Cannibalization..............................................3

    C.   Extensive Internal Tests Reveal That Direct Buy Is Cannibalizing Fix .................3

    D.   Defendants Continue To Mislead Investors About Cannibalization ......................4

    E.   The Truth Emerges: Defendants Admit Freestyle Is Cannibalizing Fix.................6

IV.   ARGUMENT..........................................................................................................................7

    A.   The Complaint Adequately Alleges Falsity..............................................................7

        1.   Actionable Misstatements and Omissions Throughout the Class Period ........................................................................................................8

        2.   Defendants' Arguments Fail ......................................................................10

            a.   The December 2020 Statements Are Actionable...........................10

            b.   The February/March 2021 Statements Are Actionable ..................................................................................................11

            c.   The June 2021 Statements Are Actionable...................................16

            d.   The September 2021 Statements Are Actionable ..........................17

            e.   Defendants' Remaining Arguments Fail ......................................18

    B.   The Complaint Adequately Alleges Scienter...........................................................19

    C.   The Complaint Adequately Alleges a Section 20(a) Claim...................................25

V.   CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Accuray, Inc. Sec. Litig.*,
757 F.Supp.2d 936 (N.D. Cal. 2010) ........................................................................24

*In re Allied Nevada Gold Corp. Sec. Litig.*,
743 F. App'x 887 (9th Cir. 2018) ............................................................................20

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .......................................................................................7

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ................................................................................22

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ...........................................................23

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ...........................................................22

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .........................................................19

*Berson v. Applied Signal Tech. Inc.*,
527 F. 3d 982 (9th Cir. 2008) ...........................................................................16, 24

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .............................................................23

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..................................................................................15

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ......................................................................9

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal.) ......................................................................23, 24

*Costabile v. Natus Med. Inc.*,
293 F. Supp. 3d 994 (N.D. Cal. 2018) .....................................................................18

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................................21, 24

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .................................................................................18

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ..............................................................22, 23, 24, 26

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ........................................................................ *passim*

*In re ECOtality, Inc. Sec. Litig.*,
    2014 WL 463280 (N.D. Cal. Sept. 16, 2014) ...............................................................18

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ...............................................................7

*In re Extreme Networks, Inc. Sec. Litig.*,
    2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)...............................................................13

*In re Fastly, Inc. Sec. Litig.*,
    2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ...............................................................19

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ...............................................................8

*In re Foundry Networks, Inc.*
    2003 WL 23211577 (N.D. Cal. Feb. 14, 2003) ...............................................................13

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...............................................................7

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ...............................................................15, 18, 21

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ...............................................................22

*Greenberg v. Cooper Cos, Inc.*,
    2013 WL 2403648 (N.D. Cal. May 31, 2013)...............................................................13

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ...............................................................13, 22

*Heliotrope General, Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999) ...............................................................11

*Howard v. Everex Sys.*,
    228 F.3d 1057 (9th Cir. 2000) ...............................................................19

*Irving Firemen's Relief & Ret. Fund v. Uber Technologies*,
    2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ...............................................................19

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...............................................................7

*Kovtun v. VIVUS, Inc.*,
  2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ...........................................................22

*Luna v. Marvell Tech. Grp. Ltd.*,
  2016 WL 5930655 (N.D. Cal. Oct. 12, 2016)..............................................................23

*Macovski v. Groupon, Inc.*,
  553 F. Supp. 3d 460 (N.D. Ill. 2021) ...........................................................................9

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ....................................................................................23

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) ...................................................................................8, 19

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015) ........................................................................25

*Mulderrig v. Ameyris*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ...................................................................20, 22

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ..........................................................................13

*Nguyen v. Endologix*,
  962 F.3d 405 (9th Cir. 2020) ......................................................................................22

*No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Co.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................7, 22, 25, 26

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .............................................................................20, 21

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .............................................................................23, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)......................................................................................................8

*In re Peregrine Sys., Inc. Sec. Litig.*,
  2005 WL 8158825 (S.D. Cal. Mar. 30, 2005) ............................................................22

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 17974627 (N.D. Cal. Nov. 7, 2022) ......................................................18, 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .............................................................................24, 25

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ...................................................................................23

*In re Qualcomm Inc. Sec. Litig.*,
  2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ................................................................21

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .............................................................7, 19, 20, 24

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ...........................................................................21, 24

*Ret. Tr. v. RH, Inc.*,
  302 F. Supp. 3d 1028 (N.D. Cal. 2018) ..............................................................9

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ..................................................................20, 24, 25

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .......................................................8, 9, 15, 19

*SEC v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ...........................................................................10

*Shenwick v. Twitter*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..............................................................10

*In re Siebel Sys., Inc. Sec. Litig.*,
  2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ....................................................16

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ..............................................................................13

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
  775 F. Supp. 2d 227 (D. Mass. 2011) ..................................................................9

*In re Splunk Inc. Sec. Litig.*,
  592 F. Supp. 3d 919 (N.D. Cal. 2022) ..................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................19, 20

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal 2016).................................................................24

*In re Twitter, Inc. Securities Litigation*,
  506 F.Supp.3d 867 (N.D. Cal. 2020) ..................................................................22

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................23

*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) ......................................................23

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
  2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ................................................................21

*Wenger v. Lumisys, Inc.*,
  2 F.Supp.2d 1231 (N.D. Cal. 1998) ...........................................................................19

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ..............................................................................11, 13

*Wozniak v. Align Technology, Inc.*,
  850 F.Supp.2d 1029 (N.D. Cal. 2012) .......................................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ....................................................................................23

**STATUTES & REGULATIONS**

Securities Exchange Act of 1934:

  §20(a), 15 U.S.C. §78t(a).................................................................................1, 7, 25

  §10(b), 15 U.S.C. §78j(b) ..........................................................................................1

17 C.F.R. §240.10b-5.................................................................................................1, 8

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiffs hereby oppose Defendants' motion to dismiss (ECF No. 69, "MTD").[1]

## I.   STATEMENT OF ISSUES TO BE DECIDED

Whether the Complaint alleges facts that, considered holistically, state claims under §10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a).

## II.   INTRODUCTION

This case concerns Defendants' deliberate efforts to conceal the truth about a new business line called Direct Buy, which they touted as the "second founding" of the Company. Led by Defendant Elizabeth Spaulding, Stitch Fix assured investors that Direct Buy was "additive," "incremental" and "complementary" to its core product, the "Fix." In response to questions from analysts about whether Direct Buy was cannibalizing the Company's core Fix business, Defendants assured investors that they were "testing all the time" and denied cannibalization.

In truth, as detailed by multiple former employees (FEs), the Company's extensive internal test results revealed that Direct Buy was cannibalizing Fix. These FEs each held senior roles at Stitch Fix and were personally immersed in the relevant testing and data. The FEs further described how these negative test results were shared with the Executive Defendants in weekly meetings and detailed reports. Defendants touted their own personal knowledge as well as the frequency of the testing when they spoke to investors about these very issues.

Spaulding's career depended on the successful launch of Direct Buy. Accordingly, despite negative test results showing cannibalization, as her first act as CEO, Spaulding pushed the launch of Direct Buy to new customers through and rebranded the product as "Freestyle." Then, Freestyle continued to cannibalize the Fix business. FEs confirmed that this came as no surprise to those familiar with the Company's internal test results, but it shocked the market: when the truth was revealed through a series of partial disclosures, the Company's market capitalization collapsed by 90%. Shortly thereafter, Spaulding left the Company and Stitch Fix discontinued Freestyle.

---

[1] Citations to "¶_" are to the Complaint (ECF No. 52), emphasis is added, and internal citations and quotations are omitted. Capitalized terms have the meanings ascribed in the Complaint.

In response to the well-pled allegations in the Complaint, Defendants advance two primary arguments. First, Defendants contend that when they were touting Direct Buy and Fix as "incremental," "additive," "complementary," and denying cannibalization, they were only speaking about "current" Fix customers, not "prospective" customers. As set forth below, this purported distinction is irrelevant and mischaracterizes what Defendants said and what the market understood. In fact, Defendants did not carve out any clients when they made the alleged misrepresentations to investors. They simply (falsely) represented that these facts were true, never once giving the impression that they were true only with respect to current clients but not others. Accordingly, the market understood that Direct Buy was not cannibalizing any clients, when Defendants' internal cannibalization test results revealed the opposite.

Second, Defendants attack their own former employees to contend that the allegations attributed to them are not sufficiently particularized. But the FEs' allegations corroborate each other, explain how and why they each knew about the cannibalization testing in their roles at the Company, and describe—in meticulous detail—exactly how the test results were shared with the Executive Defendants. Contrary to Defendants' assertions, these allegations go far beyond what is required at the pleading stage of a Securities Exchange Act case. The motion should be denied.

## III. STATEMENT OF FACTS

### A. Spaulding Leads the "Pivotal Transformation" to Direct Buy

Stitch Fix originally had one signature product line: the "Fix," a boxed shipment of five pieces of clothing or accessories curated by the Company's stylists. ¶25. In October 2019, with much fanfare, the Company announced the launch of a second product line: "Direct Buy," which would allow customers to shop on the Company's website for specific products. ¶26. Company-founder Defendant Katrina Lake told investors that Direct Buy would both increase engagement from current Fix customers and attract "new clients." ¶27. To lead what she touted as a "pivotal transformation" of the Company (¶33), Lake brought on Defendant Spaulding—first as President, and later as CEO. ¶¶29, 62. Lake told investors that Spaulding's principal objective was to launch Direct Buy and "lead us into our next chapter of growth." ¶29. As a result, the market closely connected Defendant Spaulding's success to Direct Buy's success. ¶30.

**B.      Defendants Tout Direct Buy as "Additive," "Incremental," and "Complementary" To Fix, and Deny Cannibalization**

The Class Period begins on December 8, 2020, when the Company announced its earnings results for the first fiscal quarter of 2021. On the earnings conference call, Lake stated with respect to Direct Buy and Fix that "what we're seeing is that the two experiences are really additive[.]" ¶34. Spaulding reiterated that Direct Buy was "highly additive" to Fix and there is a "real complementarity" between Direct Buy and Fix. *Id.* Defendants also reported growth in the number of "active clients" as evidence that Fix and Direct Buy were "additive," "complementary," and "incremental." ¶35. Defendants repeated these and similar statements throughout the Class Period. *See, e.g.*, ¶110 ("[W]e've seen clear incrementality with Direct Buy"); ¶113 ("This incrementality gives us more optimism to believe that as our Direct Buy offering expands, client lifetime values will continue to grow"); ¶125 ("The success in incrementality that direct buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix."); ¶131 (original "A/B test of hold out" was "highly, highly incremental. And we see all of those signs continuing."); ¶134 ("revenue per active client that we shared and the knowledge we have of like the newer cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary.").

Citing the Company's internal test results, Defendants also emphatically denied that Direct Buy was cannibalizing Fix in response to direct questions from analysts. For example, on March 8, 2021, an analyst asked whether Direct Buy's roll out to first-time clients could "potentially cannibaliz[e] the existing Fix business." ¶119. In response, Spaulding denied cannibalization, and drew a direct comparison between incrementality for "active Fix clients" and "new consumers," citing "the incrementality that we've observed with active Fix clients as they participate both and seeing that is actually an additive experience." *Id.*; MTD Ex. 14; *see also* ¶¶166-69.

Analysts believed Defendants. *See, e.g.*, ¶37 ("Direct Buy allows SFIX to expand their wallet share among new/existing customers"); *see also* ¶¶52; 70.

**C.      Extensive Internal Tests Reveal That Direct Buy Is Cannibalizing Fix**

In truth, Defendants knew from extensive internal tests conducted throughout the Class

Period that Direct Buy was cannibalizing Fix. Cross-corroborating accounts of three former employees (FEs) detailed how these internal test results directly contradicted Defendants' statements to investors. For instance, FE 2, a former Director, Men's Apparel Design: Using Data Science & Analytics to Drive Design from October 2017 until June 2022, joined the Direct Buy team in the summer of 2020. ¶43. FE 2 reported that Stitch Fix's initial beta test for Direct Buy failed, and yet the launch moved forward anyway despite "multiple red flags." ¶¶43, 45. Cannibalization, FE 2 reported, was a big topic of conversation internally, and additional tests conducted prior to the launch of Direct Buy also failed. ¶46. Defendants' own statements corroborate that the Company was testing Direct Buy and its effect on Fix "all the time." ¶36.

FE 1, a former Senior Manager who personally worked on the Direct Buy launch during the Class Period, explained that internal test results showed that Direct Buy was cannibalistic. FE 1 learned about negative test results in February or March 2021, and confirmed that by then, "there were very clear test results"—plural—where the recommendation from Data Science was that Stitch Fix was not ready to launch Direct Buy. ¶40. FE 1 described how the Company's data science team ran a test that they referred to internally as the "New Fix Customer Test," which, like the beta test described by FE 2, revealed that Direct Buy was cannibalistic and would negatively impact customer acquisition. ¶¶40-41. Specifically, the Company's onboarding process would sacrifice customers who came in for a Fix, were funneled to Direct Buy, and then ultimately did not make a purchase or they bought less. ¶41. The data science team put these results into slide decks, which Spaulding reviewed in the "Weekly Direct Buy Meeting." ¶42.

FE 3, a Data Scientist during the Class Period, confirmed that internally it was obvious from test results as well as continuous customer research conversations that Direct Buy was taking customers away from Fix. ¶47. FE 3 received weekly email blasts with the relevant data—whose format and content he detailed—and he corroborated that Spaulding and Lake received those emails and that the negative test results were shared with Spaulding in routine meetings. ¶¶48, 57.

**D.    Defendants Continue To Mislead Investors About Cannibalization**

On March 8, 2021, Defendants told investors that the formal launch of Direct Buy to new customers would be delayed. But Spaulding mischaracterized the delay as resulting merely from

an effort to get things right. ¶49. In truth, the Company's internal testing revealed that things were very wrong—namely, that Direct Buy was cannibalizing Fix. Spaulding—described by analysts as "the driving force behind Direct Buy"—nevertheless falsely and emphatically denied cannibalization in response to analyst questions, reiterating that Direct Buy was an "additive" experience to Fix and touting its "incrementality." ¶¶55, 113, 119.

In June of 2021, FE 3 confirmed, the Company's internal testing continued to reveal that Direct Buy was cannibalizing Fix. ¶57. Nonetheless, Spaulding was determined to push the launch of Direct Buy to new customers through precisely because the success of Direct Buy was so critical to her success. Spaulding had already declared that she intended to bring about "transformative change" at the Company, comparing the shift to Direct Buy to "moving from . . . our DVD era into the streaming era." ¶56. FE 3 confirmed that Direct Buy was Spaulding's baby, and described how she pushed the launch of Direct Buy through too fast despite the negative test results reported widely throughout the Company. ¶63. FE 2 likewise confirmed that Direct Buy was one of Spaulding's babies, and that she was aware of the bad test results, but decided to push the launch forward anyway. ¶¶64-65. Publicly, Spaulding doubled-down. On June 7, 2021, she stated, "The success in incrementality that direct buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix." ¶58. Three days later, Spaulding insisted that Direct Buy "was highly, highly incremental. And we see all of those signs continuing." ¶60. Spaulding also again touted Direct Buy's as "transformative," reiterating the "Netflix analogy" she made previously. ¶61.

On August 1, 2021, Spaulding formally became the CEO of Stitch Fix and one week later, on August 9, 2021, she launched Direct Buy to new customers. ¶62. During her first earnings call as CEO on September 21, 2021, Spaulding changed the name of Direct Buy to "Freestyle" and underscored the "strength" of having customers participate in both Freestyle and Fix. ¶¶68-69. Spaulding continued to emphatically deny cannibalization in response to analyst questions, instead touting the "incrementality of these two offerings really being quite complementary." ¶69. Analysts believed Defendants, writing that Freestyle was "incremental" to Fix (¶70) and that Stitch Fix was "essentially doubling down on its big bet"—*i.e.*, Freestyle—and this meant an "increased

burden" on Spaulding to "execute on this pivotal transformation for the company." ¶71.

Meanwhile, between March 8, 2021 and November 18, 2021, Defendant Lake sold more than $49 million of Stitch Fix stock. ¶174.

**E.      The Truth Emerges: Defendants Admit Freestyle Is Cannibalizing Fix**

The market learned the truth through three partial disclosures, beginning on December 7, 2021, when Spaulding revealed that due to the "expansion into Freestyle," the Company "may experience short-term impacts of cannibalization." ¶73. In response to this disclosure, the price of Stitch Fix stock declined 24%. ¶74. But Defendants continued to falsely assure investors that Freestyle and Fix were "complementary" and "additive." ¶76. Analysts accordingly were both surprised by Defendants' revelations and reassured that the Company would be able to resolve the potential cannibalization issue in the short term. ¶77.

Then, on March 8, 2022, Spaulding shocked investors when she disclosed that the Company was continuing to experience cannibalization that had not been resolved in the short term. Spaulding revealed that the Company had created a "friction" between Fix and Freestyle customers because Defendants chose to direct customers who came to the Company website to buy a Fix to Freestyle instead. ¶78. These would-be clients ended up buying nothing and as Spaulding acknowledged, "conversion of new visitors for Fix and Freestyle is not where we want it to be." *Id*. As a result of these disclosures, the price of Stitch Fix stock declined by 6%. ¶79. Once again, Defendants continued to falsely reassure investors that there was "incrementality provided by Freestyle to our existing client base." ¶¶80-81.

Finally, the full truth was revealed on June 9-10, 2022, when Spaulding disclosed with respect to Freestyle that "the conversion of new visitors was not where we wanted it to be in the second quarter[.]" ¶85. Spaulding explained that Stitch Fix had modified its website's onboarding path to address the reality that Freestyle was cannibalizing Fix, but it was "still not yet at our desired conversion level." ¶13. Accordingly, the Company issued new downward revisions to guidance. ¶86. As a result of these disclosures, the price of Stitch Fix stock declined, approximately 10% on June 9 and 19% on June 10. ¶¶83, 87. With the truth fully disclosed, analysts observed, "Freestyle does not appear to be the unlock once perceived by the market" and noted "concerns

around the incrementality of the Freestyle segment and the declining active client base." ¶¶89, 91.

In the aftermath of the fraud, Spaulding was forced to resign as CEO. ¶93. Analysts were "not surprise[ed] given Stitch Fix's challenging performance under Spaulding's tenure as CEO, including the company's failed strategy around its direct [buy] business." ¶94. Lake announced on March 7, 2023 that the Company would "refocus" on the Fix, and no longer think of Freestyle as a "separate business unit" because it "was less effective" as a "customer acquisition vehicle." ¶96.

## IV.   ARGUMENT

Courts evaluating motions to dismiss securities class action complaints must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). "[A] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 698 (9th Cir. 2021). A plaintiff need not "prove its case at the outset . . . [but] has to provide a narrative of fraud—facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). A district court evaluating a motion to dismiss is "not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (reversing dismissal).

### A.   The Complaint Adequately Alleges Falsity

There are multiple ways to plead actionable statements under the Exchange Act. A statement is false if it is an "untrue statement of a material fact." *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Co.*, 320 F.3d 920, 933 (9th Cir. 2003). "Even if a statement is not false, it may be misleading if it omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023). "[O]nce defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse

information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). It is well-established that "statements literally true on their face may nonetheless be misleading…in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-187, 190 (2015) ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor," who "understands a statement * * * in its full context."); 17 C.F.R. § 240.10b-5(b) (prohibits "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . ."). "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).

### 1.    Actionable Misstatements and Omissions Throughout the Class Period

Throughout the Class Period, Defendants repeatedly made two categories of actionable misstatements and/or omissions. ¶¶98, 101, 105, 107, 110, 113, 116, 119, 123, 125, 129, 131, 134, 137. First, Stitch Fix assured investors that Direct Buy was "additive," "incremental," and "complementary" to its core product, the Fix, including when Defendants specifically denied that Direct Buy was cannibalizing the Fix business. For example:

- On December 7, 2020, Lake stated, "what we're seeing is that the two experiences are really additive." Lake added that Direct Buy would permit purchasing "in a more frictionless way." ¶98. Spaulding similarly stated that Direct Buy was "highly additive" to Fix and there was "a real complementarity." ¶101.

- On February 10, 2021, Lake stated, "[W]e've seen clear incrementality with Direct Buy," and "we can see in the data" that Direct Buy is "working." ¶¶107, 110.

- On March 8, 2021, Lake and Spaulding stated in a Letter to Shareholders that Direct Buy "is delivering incremental lifetime value," and that "[t]his incrementality gives us more optimism to believe that as our Direct Buy offering expands, client lifetime values will continue to grow." ¶113. Spaulding further stated in response to an analyst's question about "launching direct buy and cold starting people in direct buy" that Direct Buy was "very strong and incremental . . . ." ¶116. In response to another analyst question about whether Direct Buy was "potentially cannibalizing the existing Fix business," Spaulding cited "the incrementality that we've observed with active Fix clients as they participate in both and seeing that is actually an additive experience." ¶119.

- On June 7, 2021, Spaulding stated, "The success in incrementality that direct buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix." ¶125.

- On June 10, 2021, in response to another analyst question about cannibalization, Spaulding

cited the Company's internal "A/B test[s]" and said that Direct Buy "was <u>highly, highly incremental</u>. And we see all of those signs <u>continuing</u>." ¶131.

- On September 21, 2021, in response to another analyst, Spaulding answered "the specific cannibalization question" by stating that "we think the revenue per active client that we shared and the knowledge we have of like the newer cohorts of clients is the real strength and <u>incrementality</u> of these two offerings really being <u>quite complementary</u>." ¶134.

These statements were false or, at minimum, misleading because they created an "impression of a state of affairs" which "differ[ed] in a material way from" the reality that Defendants' internal test results showed that Direct Buy was cannibalizing Fix. *NVIDIA*, 81 F.4th at 928; *see also City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1041 (N.D. Cal. 2018) (defendant's "rosy representations," including that new brand was "trending to add significant incremental revenues," were materially false because they "concealed" negative issues plaguing the brand); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 753-55 (S.D. Ohio 2006), (false to tout "incremental revenue" while "Company was still hesitant about its transition to a new distribution model"); *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 481-82 (N.D. Ill. 2021) (false to tout "earning incremental [gross profit]" from business line while CFO "knew" the business line "was not operating profitably") (alterations in original); *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 234 n.66, 241-42 (D. Mass. 2011) (false to tout "incremental net revenue" when "substantial amount" of it "constituted money that ADPI wrongfully diverted to itself").

<u>Second</u>, Defendants reported active client growth and net active client metrics throughout the Class Period as evidence that Fix and Direct Buy were "additive," "complementary," and "incremental." *See, e.g.*, ¶¶105, 123, 129, 137. These statements are actionably misleading for two reasons. In touting "positive information" about growth in active clients and net active clients, Defendants were obligated, but failed, to disclose adverse information that cut against those positive representations—namely, that their own internal test results showed that Direct Buy was cannibalizing Fix. *Arena*, 840 F.3d at 705-06; *see also In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 932 (N.D. Cal. 2022) (misleading to "tout positive information" without "disclosing adverse information that cuts against [it]"). Defendants' statements were also actionably

misleading because the active client metrics failed to distinguish whether active clients were in Fix or Direct Buy, including whether a Fix client had been funneled to Direct Buy, therefore concealing the cannibalization that Direct Buy was inflicting on Fix and omitting critical information embedded within the active client figures. *Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2017). Thus, these statements created "the impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*; *see also SEC v. Todd*, 642 F.3d 1207, 1222 (9th Cir. 2011) (statements actionable that "impliedly attributed" revenue growth to a list of factors because if "[defendant]…had disclosed the true source of the revenue, the investing public would have been alerted to the lesser rate of growth for [] traditional sources of revenue").

### 2.    Defendants' Arguments Fail

#### a.    The December 2020 Statements Are Actionable

Defendants wrongly contend that their December 2020 statements are not actionable because "Plaintiffs do not plead particularized facts showing Stitch Fix had ***any*** 'internal test results' when these statements were made." MTD 10 (emphasis in original). But the Complaint expressly alleges that Defendants had internal test results on the day these statements were made and well before then. When Lake announced the launch of Direct Buy on October 1, 2019, she "stated multiple times that <u>beta testing that the Company had conducted on Direct Buy</u> showed 'success' in increasing both engagement and purchases among clients." ¶27. On December 7, 2020, "Lake explained that she knew 'direct buy certainly has been a significant contributor' to revenue generation because '<u>we're running A/B tests all the time</u>.'" ¶36. Defendants referred to pre-December 2020 tests throughout the Class Period. *See* ¶131 (discussing "original" "A/B test").

The fact that the Company had internal test results showing cannibalization by December 2020 is corroborated by the particularized allegations of the FEs. FE 2—who joined the Direct Buy team in July or August 2020, prior to the Class Period—specifically confirmed "that it was clear internally that the initial beta test was a failure," that "a second test shortly after the initial beta test [] was either inconclusive or failed as well," and that "cannibalization was a big topic of conversation at Stitch Fix." ¶46. FE 2 discussed his concerns about these beta tests repeatedly, including with the head of Direct Buy, and he was familiar enough with the data set being used to

test Direct Buy that he created a presentation explaining the problem and told his managers to share it with the C-suite. ¶¶45-46. FE 3, Data Scientist from June 2020 to June 2021, corroborated that "it was obvious from test results as well as continuous customer research conversations that Freestyle was taking customers away from the Company's existing Fix business." ¶47.

Defendants' argument that "the first alleged test was from February or March 2021" (MTD 10) ignores these allegations. It also mischaracterizes the particularized allegations of FE 1. FE 1's allegations only refer to his awareness of testing in February 2021. From that, Defendants cannot infer all testing began in February 2021. Given that Defendants spoke about testing as early as October 2019, the Complaint sufficiently alleges that Defendants had test results by December 2020. By contrast, in *Weston Family Partnership LLLP v. Twitter, Inc.*, plaintiffs asked the court to "implausibly infer" that defendants knew about product issues "based on later facts or developments." 29 F.4th 611, 621 (9th Cir. 2022). For the same reason, *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971 (9th Cir. 1999) is inapposite.

Defendants also contend in a footnote (MTD 10 n.8) that the December 2020 statements only addressed current Fix customers. But Lake told investors, "what we're seeing is that the two experiences are really additive" and "frictionless" (¶98); she did not say they were only additive and frictionless for current and not prospective clients. Indeed, an analyst wrote on Dec. 7, 2020 that "Direct Buy allows SFIX to expand their wallet share among new/existing customers." ¶37.

### b.     The February/March 2021 Statements Are Actionable

With respect to February and March, Defendants first assert that the Complaint fails to allege that Stitch Fix conducted internal tests showing that Direct Buy was cannibalizing Fix "before these challenged statements were made." MTD 11. Again, as discussed directly above, the Complaint alleges that Defendants conducted the internal tests before and at this time. Indeed, one analyst expressly noted on March 8, 2021 that "the company continues to test the Direct Buy product before rolling it out to non-Fix customers." ¶53.

Second, Defendants wrongly contend that the FE accounts concerning the Company's internal testing are not sufficiently particular. MTD 11. As summarized directly below, the FEs provide firsthand and cross-corroborating accounts of how Defendants regularly conducted tests

which revealed that Direct Buy was cannibalizing Fix throughout the Class Period. ¶¶39-48, 172.

FE 2—who joined the Direct Buy team in July or August of 2020 and whose job entailed approaching design from a data standpoint—interacted frequently with data scientists and knew from attending weekly meetings regarding Direct Buy that Stitch Fix's initial beta test for Direct Buy failed. ¶43. FE 2 discussed his concerns about cannibalization with Company leaders including the head of Direct Buy. ¶¶44-45. The launch moved forward anyway—despite FE 2's concerns, the inconsistent Direct Buy and Fix data that presented "multiple red flags," the fact that cannibalization was a "big topic of conversation," and the continued testing failures prior to the launch of Direct Buy. ¶¶45-46.

FE 1, a Senior Manager, Product Marketing from July 2019 to April 2021 who personally worked on the Direct Buy launch, corroborates this account. ¶39. FE 1 explained how the Company ran the "New Fix Customer Test." ¶¶40-41. That test, like the beta test described by FE 2, showed that Direct Buy was cannibalizing Fix. ¶41. FE 1 specifically detailed how "multi-variant testing" would "model out what completion looked like through the onboarding function," and that these tests showed that customers, who were looking for a Fix, would be funneled to Direct Buy, and would ultimately either buy less or not make a purchase at all. *Id.* According to FE 1, Direct Buy customers were converting at a lower rate, or they would spend less money, compared to Fix customers. *Id.* Spaulding reviewed slide decks compiling these results in weekly meetings. ¶42.

FE 3, a Data Scientist from June 2020 until June 2021, further confirmed that he received weekly email blasts with relevant data and described their format and content, which showed trends concerning new customer acquisition and customer retention. ¶¶48, 158. FE 3 also confirmed that these weekly emails went to Spaulding and Lake. *Id.* By June 2021, according to FE 3, there was a clear trend that customer acquisition was dropping, and Direct Buy's cannibalization of Fix was the largest source of conversation within Stitch Fix. ¶57.

These detailed allegations easily satisfy this Circuit's standards for particularity. Not only are they reliable, the FE accounts detail their personal knowledge of negative test results, pervasive internal discussions about cannibalization, and how Spaulding and Lake learned about these

results. *See Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 963 (N.D. Cal. 2014) ("The question [] is whether Plaintiffs have properly alleged facts suggesting that the confidential witnesses have personal knowledge about the incidents they address."). The FE accounts (¶¶39-48, 172) also "corroborate each other," which "further supports the reliability of their statements." *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018); *see also Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (FEs corroborated "'so many' daily and weekly meetings" to discuss production problems).

Further, contrary to Defendants' argument (MTD 12), the Complaint expressly alleges what cannibalization is. For example, FE 1 detailed how the New Fix Customer Test showed that Direct Buy was going to negatively impact customer acquisition because the Company's onboarding process would sacrifice customers who came in for a Fix, were funneled to Direct Buy, and then ultimately did not make a purchase or they bought less—i.e., cannibalization. ¶41. FE 3 similarly described how data scientists discussed cannibalization in team meetings, and it was "obvious from test results as well as continuous customer research conversations that Freestyle was taking customers away from the Company's existing Fix business." ¶47.

These details, combined with Defendants' own admissions about testing, do not require assumptions, implausible inferences, vague allegations, or inferential leaps of the kind found in the cases on which Defendants rely. *Cf. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022); *Greenberg v. Cooper Cos, Inc.*, 2013 WL 2403648, at *10 (N.D. Cal. May 31, 2013); *In re Foundry Networks, Inc.* 2003 WL 23211577, at *5 (N.D. Cal. Feb. 14, 2003); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999).

And of course, when Lake and Spaulding adamantly denied cannibalization in response to analyst questions, they did not ask for clarification or otherwise pretend not to know what it was. *See, e.g.*, ¶¶60, 69, 119. Defendants' unfounded speculation that the cannibalization testing described by the FEs "could have been less than 1% of testing" (MTD 12) is flatly contradicted by allegations that this testing was a significant focus for Defendants who acknowledged they were testing "all the time." ¶¶36, 39-48, 63-67.

Third, Defendants wrongly contend that the February and March statements were limited

to current clients. MTD 12. But again, Defendants touted the "incrementality" of Fix and Direct Buy without qualification. ¶¶110, 113, 116, 119. Moreover, Defendants were specifically asked about and discussed prospective clients at this time. For instance, on March 8, 2021, an analyst asked Spaulding whether the Direct Buy roll out to "new customers" could "potentially cannibaliz[e] the existing Fix business or at least what you're seeing today with the added offering those that already use the Fix business?" In response, Spaulding represented that the Company was "seeing that [Direct Buy] is actually an additive experience," and that "we're thinking about it similarly as we bring new consumers onto the platform." ¶51; MTD Ex. 14.[2]

On the same call, another analyst specifically asked about "launching direct buy and cold starting people in direct buy" and Spaulding stated, "The contribution margin and lifetime values have been very strong and incremental relative to last year when we were really more of a Fix-only offering." ¶116; see ¶113 (March 2021 Letter to Shareholders citing "incrementality" between Fix and Direct Buy, and stating, "This incrementality gives us more optimism to believe that as our direct buy offering expands, client lifetime values will continue to grow."). Thus, Defendants did not limit their statements to current clients alone.

Further, Defendants and analysts cited what Defendants were "seeing" at this time and with respect to current clients as directly relevant to prospective clients. ¶¶5, 32, 34, 51, 59, 60, 119, 131, 167, 168. Defendants' argument that prospective client and current client cannibalization and testing are separate and "unrelated" (MTD 3) is contradicted by their own statements.

Defendants also argue that because the Complaint only alleges statements about current clients, the Complaint must contain allegations about testing of current clients and fails to do so. MTD 14. However, as discussed directly above, Defendants' statements were not limited to current clients and neither were their tests. Defendants ignore the testing allegations provided by FE 2 (¶¶43-46) and FE 3 (¶47), as well as Defendants' own words (¶¶27, 36, 131, 164). Defendants also contend that FE 1's account of the "New Fix Customer Test" only applied to "prospective clients"

---

[2] Plaintiffs are objecting to Defendants' request that the Court incorporate by reference or judicially notice sixteen exhibits. ECF Nos. 71, 73. But, should the Court decide to consider these exhibits, they contain language that directly rebuts Defendants' argument.

(MTD 14), but later in their brief, Defendants argue that their alleged misstatements about "new Fix clients" only "relate to existing clients." MTD 16. This contradictory argument underscores that Defendants did not make the current/prospective distinction they rely on now when they made their alleged misstatements to investors or when they conducted their cannibalization tests.

Even if the testing allegations in the Complaint were limited to "prospective" clients, Defendants' statements would still be actionably misleading for two reasons. Those statements created the false impression that Direct Buy did not cannibalize any Fix clients when the test results showed that it did. *See NVIDIA*, 81 F.4th at 928-32; *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023) (statements "contravened the unflattering facts in [defendant's] possession"); *cf. Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (press release "neither stated nor implied anything regarding a merger," and if it had, it "may well have been misleading."). In addition, Defendants touted positive information, while omitting to disclose "adverse information that cuts against [it]"—namely, the negative cannibalization tests they had for "prospective" clients. *See Arena*, 840 F.3d at 705-06.

Fourth, Defendants argue that "none of the challenged statements about Fix created any impression about the separate and future launch of Direct Buy to the public." MTD 15. However, this contention is contradicted by what Defendants said and what analysts understood, including in the February and March timeframe when these statements were made. Again, in response to questions about the Direct Buy launch, Defendants denied cannibalization and said the programs were "incremental." *See, e.g.*, ¶116 (Spaulding stating "strong and incremental" when asked about "launching direct buy and cold starting people in direct buy"); ¶¶51, 119 (Spaulding stating "incremental" and "additive" when asked about Direct Buy's roll-out to "new customers" "potentially cannibalizing the Fix business"). As a result, analysts had the distinct impression that the launch would be "incremental" and said so explicitly. *See* ¶52 (BMO on March 9, 2021: "the direct buy business is expected to be incremental."). Defendants also assert that the Complaint does not "challenge the Company's statements about the launch of Direct Buy to the public" (MTD 15), but in fact, the Complaint alleges that the reasons provided by Defendants for delaying the launch were misleading and concealed the truth about cannibalization. ¶¶49-53.

Finally, Defendants assert that cannibalization test results are merely "technological difficulties and kinks" that "do not render a company's optimistic statements misleading." MTD 15. But the Company's extensive internal testing for their "transform[ative]" product—which was conducted over the course of years, shared in internal meetings with the Executive Defendants, and discussed by the Executive Defendants in their conference calls with investors—is not a mere "kink." Nor were Defendants' definitive representations about what these tests showed mere "optimistic statements," as discussed in Section 2.e below. *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005), involving an undisputed "new product with [mere] kinks," is inapt.

### c.     The June 2021 Statements Are Actionable

In June 2021, Defendants contend (again) that they were only speaking about current clients. MTD 16. But in fact, the statements that Defendants list in support of this argument specifically discuss "new" clients. ¶60. And again, in June 2021, Defendants specifically cited their internal testing which they falsely said showed the "incrementality" of Direct Buy and Fix as the basis for their denials of cannibalization (¶131). They cited those same tests as what "gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stich Fix"—i.e., attract new customers (¶125). Contrary to Defendants' premature factual assertions, analysts did not understand these statements to be exclusively "related to active Fix customers." ¶59. *Berson v. Applied Signal Tech. Inc.*, 527 F. 3d 982, 987 (9th Cir. 2008) (premature at motion to dismiss to determine market's knowledge "absent undisputed evidence"). Indeed, Defendants' contention that the "new" clients they spoke about in June are different than the "new" clients they argue they were not speaking about at all (MTD 16), simply underscores that Defendants did not make, and investors did not understand, this supposed distinction.

Next, Defendants argue that Plaintiffs' allegations concerning Defendants' internal tests are not sufficiently particularized. MTD 16. Again, this effort fails. As discussed above, the allegations attributed to the FEs are more than sufficiently detailed. In addition, the Complaint expressly alleges that by June 2021 in particular, "there was a clear trend that customer acquisition was dropping and it was the largest source of conversation within Stitch Fix that Freestyle was

cannibalizing Fix." ¶57. Defendants' claim that FE 3's allegations are too "conclusory" (MTD 17) ignores this and more detail in the Complaint. Indeed, FE 3 described the Excel format of the weekly email blasts containing relevant data, the content of the files (top line revenue numbers, breakdowns by customer category, breakdowns of Freestyle vs Fix; plus trends concerning new customer acquisition and customer retention regarding Freestyle), that Lake and Spaulding received those emails, and that they could access the cannibalization data. ¶¶48, 158.

### d.    The September 2021 Statements Are Actionable

In September 2021, Direct Buy, now "Freestyle," had been launched to new customers for a month. ¶62. Yet, Spaulding continued to insist—even in the face of direct questions about cannibalization—that "the knowledge we have of like the newer cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary." ¶134.

Defendants' only argument is that Plaintiffs did not identify any internal testing from around September 2021. MTD 18. That is not true. As the Complaint alleges, Defendants acknowledged that testing continued around and beyond September. For instance, on December 7, 2021, Spaulding said, "We've been testing client onboarding flows," and shared that "as a result of our testing in Q1"—i.e., August to November 2021—"we experienced lower Fix conversion rates than we expected." ¶73; MTD Ex. 25. Lake acknowledged that the Company "was tracking key performance indicators" and "constantly running A/B test[s]." ¶157.

Further, while there is no basis to infer that the testing described by FE 1 or FE 3 abruptly stopped when they left the Company, FE 2's allegations are sufficient. FE 2 left Stitch Fix at the end of the Class Period. ¶43. FE 2 explained that every Friday there was a standing Direct Buy touch base meeting, that he personally attended weekly standing meetings at which he learned about the failure of the beta test, and that the tests conducted prior to the launch of Direct Buy had failed. ¶¶44, 46. FE 2's role placed him adjacent to the Data Science team that tested Direct Buy, to such an extent that he made a presentation explaining the cannibalization data to share with executives. ¶45. Defendants focus on a factual assertion outside the Complaint about when Stitch Fix changed its landing page, but FE 2's critical allegation here is that no one was "surprised" that "there was a crash and burn" with Freestyle "because that is what the testing showed." ¶66. And

his supposed hearsay allegations are "sufficiently reliable, plausible, or coherent" to be considered at the pleading stage. *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 17974627, at *5 (N.D. Cal. Nov. 7, 2022) ("rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."); *cf. Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1009-10 (N.D. Cal. 2018) (conclusory allegation about "information provided"). FE 1 also described onboarding issues well before September 2021. ¶¶40-42.

### e.    Defendants' Remaining Arguments Fail

***Not "Corporate Optimism."*** Defendants contend that their statements referring to Direct Buy as "additive," "incremental," and "complementary" were "vague statements of optimism." MTD 19. But far from "vague," those words conveyed that Direct Buy was not cannibalizing Fix, and that the two combined would "allow us to address many more types of clients" ¶34. Analysts repeatedly fixated on these words to question Stitch Fix executives and to assess Direct Buy and, by extension, the Company. *See* ¶60 (analyst: "[W]hat are you seeing with Direct Buy, is it additive to those purchases[?]"); ¶81 (analyst: "Freestyle can be complementary to the Fix offering . . . [w]e are still believers"); ¶91 (analyst after the truth was revealed noting "concerns around the incrementality of the Freestyle segment and the declining active client base."). This demonstrates that analysts and investors viewed these descriptions as meaningful and material, not vaguely optimistic or puffery. *Forescout*, 63 F.4th at 770-71 ("statements cannot be discounted as mere 'puffery'" where "most of the challenged statements were made in response to specific questions asked by financial analysts"). *Cf. In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("employee relations are good" is a "feel good moniker[]"). Defendants misleadingly highlight the word "complementary" in *In re ECOtality, Inc. Sec. Litig.*, but the Court dismissed that statement based on entirely different, "vaguely optimistic" wording. 2014 WL 4634280, at *9 (N.D. Cal. Sept. 16, 2014). In fact, multiple courts have sustained similar statements to those at issue here. S*upra*, at IV.A.1.

Finally, even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim" when, as here, those statements address specific aspects of a company's operation that the speaker knows to be performing poorly. *Quality Sys.*, 865 F.3d at

1143; *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *12 (N.D. Cal. Nov. 27, 2018).

**Not "Accurate Historical Information."** Defendants are also incorrect to say that Stitch Fix's statements about the number and growth of active Fix clients are inactionable accurate historical information. MTD 19 & 13 n.9. "[S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Thane*, 519 F.3d at 886. Here, Stitch Fix failed to "disclos[e] adverse information that cuts against the positive information." *Arena*, 840 F.3d at 706. Specifically, Stitch Fix's active client disclosures supported the materially misleading conclusion that Direct Buy was "additive," "incremental," and "complementary," when in fact Direct Buy was cannibalizing Fix. ¶¶105-06, 123-24, 129, 137-38. Further, the Complaint specifically alleges why the active client metrics are actionably misleading and how Defendants knew that from their internal test results. *See* ¶¶35, 134; *cf. In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *14 (N.D. Cal. Nov. 23, 2021) (no "specific allegations"); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244-45, 1250 (N.D. Cal. 1998) (statements not false when made); *Irving Firemen's Relief & Ret. Fund v. Uber Technologies,* 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018) (statements about growth projections not actionable).

### B.    The Complaint Adequately Alleges Scienter

Scienter encompasses both intent and "deliberate recklessness." *Arena*, 840 F.3d at 705. Recklessness includes the "fail[ure] to obtain and disclose" corrective information that could be obtained "without extraordinary effort." *Howard v. Everex Sys.*, 228 F.3d 1057, 1064 (9th Cir. 2000). Allegations of scienter need not be a "smoking gun" or "irrefutable"; courts ask whether, on consideration of "*all* of the facts alleged, taken collectively," they are "as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007) (emphasis in original). Accordingly, the inferential tie goes to the plaintiff. *Id.* at 328-39 (plaintiffs are "not forced to plead more than [they] would be required to prove at trial . . . [they] must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference.") (emphasis in original). Plaintiffs "must demonstrate" only "that it is *more likely* than not that the defendant acted with scienter." *Id.* at 329 (emphasis in original). Here, the Complaint alleges a strong inference of Defendants' scienter. ¶¶152-77.

***Knowledge Of and Access To Internal Test Results and Data.*** The Complaint alleges multiple ways that the Executives Defendants had knowledge of or were deliberately reckless in not knowing about the Company's internal test results showing cannibalization. First, Defendants saw, reviewed, and discussed internal testing results, including the initial beta tests and "New Fix Customer Test" showing that Direct Buy was cannibalistic. ¶¶153-55; *see Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230-31 (9th Cir. 2004) ("The most direct way to show [scienter] is via contemporaneous reports or data, available to the party, which contradict the statement."); *In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 888 (9th Cir. 2018) (defendant had recurring meetings discussing the nature and gravity of problems).

Second, Defendants received "daily, weekly," or "constant[]," key performance indicators and test results. Those results were discussed in business review meetings, showed cannibalization, and reflected data points such as client retention, wallet share, average spend per customer, average order value, number of Fixes for new clients, customer churn, and dormant customers. ¶¶156-59; *see Mulderrig v. Ameyris*, 492 F. Supp. 3d 999, 1026-27 (N.D. Cal. 2020) (scienter where executives "review[ed] the revenue numbers monthly or weekly."); *Quality Sys.*, 865 F.3d at 1145 (crediting allegations that defendants saw "weekly or monthly" data).

Third, Defendants had access to a centrally-maintained database, Looker—which had higher-level dashboards tailored for executives—that contained relevant data beyond the above-listed data, such as new customer acquisition and the number of Fix and Direct Buy purchases. ¶¶160-61. Their data scientists had concluded that Direct Buy was cannibalizing Fix, and shared access to the test results with Defendants. ¶162; *see S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) ("actual access to the disputed information" contributes to scienter); *Oracle*, 380 F.3d at 1231 (scienter supported for accessing central database of relevant data).

Fourth, Defendants admitted to knowledge of the test results. ¶36 ("we're running A/B tests all the time"); ¶164 ("we've been doing some testing around what is the best way to introduce direct buy"); *id.* ("in the flight of building and testing right now" and "doing a number of tests."); ¶165 ("constantly running A/B tests."); ¶¶60, 165 (original "A/B test"). *See Oracle*, 380 F.3d at 1231 ("top executives admit to having monitored" the data); *NVIDIA*, 81 F.4th at 939-40 (crediting

CEO statements that "showed himself to be familiar with" the relevant data).

Fifth, Defendants reaffirmed their knowledge of the cannibalization test results when they denied cannibalization and cited the Company's internal test results as the basis for those denials. ¶¶166-69; *see Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) ("active role in communicating to the press regarding" the substance of the frauds makes it "clear that [defendant] is in a position of knowledge"); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) ("specific [statements] in response to questions from analysts and investors" supports scienter); *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012) (crediting statements that "repeatedly dismissed analysts' concerns").

Sixth, FEs explained in particularized detail that Spaulding launched Direct Buy despite knowing about the cannibalization test results and over the objections of the Data Science team to quell investor fervor and save her career. ¶¶170-72; *see NVIDIA*, 81 F.4th at 940 (crediting FE portrayal of CEO as actively involved in new business line); *Forescout,* 63 F.4th at 772 (management's pressure campaign "on [its] own, [is] sufficient" for scienter).

In response, Defendants recycle two of their falsity arguments. MTD 20-21. Defendants' contention that the Complaint's allegations concerning internal testing do not show that Direct Buy cannibalized "current" Fix clients fail because, as discussed above, such allegations are not necessary for falsity or scienter. In any event, the Complaint expressly alleges that the initial beta tests showed cannibalization and that those tests were shared with Lake and Spaulding, based on accounts from FE 1 and FE 3. *See* ¶48. Defendants' argument that the allegations concerning internal testing are not sufficiently particular also fails for the reasons discussed above. Indeed, Defendants admitted to their knowledge of the test results. ¶¶36, 60, 164-65. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) ("failing to precisely specify each fact and date is not fatal" to scienter). Plaintiffs also allege Defendants' knowledge of the cannibalization results from multiple other sources, including the FEs' corroborating accounts of the "Weekly Direct Buy Meetings." ¶¶42, 44, 48.

These allegations are far more specific than those at issue in Defendants' cited cases. *See In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *43-46, *50 (S.D. Cal. Mar. 30, 2005)

(no allegation that defendants received contemporaneous reports contradicting statements); *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) (no allegation that management knew and failed to disclose contradictory information). *Nguyen v. Endologix*, 962 F.3d 405 (9th Cir. 2020) is "unusual" "because both the Supreme Court and the Ninth Circuit have found scienter on fairly similar allegations." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014 at *12 (N.D. Cal. Nov. 4, 2020). Defendants also cite *Wozniak v. Align Technology, Inc.*, 850 F.Supp.2d 1029, 1042 (N.D. Cal. 2012) and *In re Twitter, Inc. Securities Litigation*, 506 F.Supp.3d 867, 888 (N.D. Cal. 2020) for identical propositions, similarly rebutted by the fact that the Complaint contains specific allegations about the data and testing at issue. ¶¶41, 44, 48, 157, 159.

*Spaulding's Motive.* While not required, Defendants had motive. ¶¶173-74. The Company modified Spaulding's performance-based cash bonus such that 20% of the payout would be based on Freestyle's performance. ¶173; *see* ¶¶29-30, 54-56, 62-67, 93-94. This supports a strong inference of scienter because Spaulding was financially motivated to commit fraud—by "growing Freestyle" and concealing that Freestyle was cannibalizing Fix—and would personally benefit from it. ¶173; *see Hatamian*, 87 F. Supp. 3d at 1163 (that a product was "critical" to the defendant's "financial success" contributed to an inference of scienter); *Am. W. Holding* , 320 F.3d at 944 (crediting motive because of defendants' "eligibility for stock options and executive bonuses"). Defendants' blanket rule against motive is unsupported by the caselaw they cite. MTD 24 (citing *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) but omitting bolded language: "a personal profit motive on the part of officers and directors **contemplating a merger** is insufficient"); *see In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (summary judgment ruling based on "uncontradicted deposition testimony" with "credible and wholly innocent explanations for the stock sales.").

*Lake's Motive.* Similarly, Lake sold over $78 million worth of stock during the Class Period, thus profiting from the fraud. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022, 1024 (9th Cir. 2005) (crediting $30 million in stock sales); *Mulderrig*, 492 F. Supp. 3d at 1029-30 (crediting $186,655.55 in stock sales); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (crediting $1,340,000 in stock sales); *cf. City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp.

2d 1045, 1069 (N.D. Cal.) (sales of 2% of stock insufficient). Defendants' argument that a 10b5-1 plans negates motive should be rejected because Lake made the "discretionary choice[]" to "conceal[] the negative information before the sale" and benefit from the sale. *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299 at *14 (N.D. Cal. Jan. 6, 2022); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *22 n.13 (N.D. Cal. June 2, 2020); *cf. Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) (trades prior to negative information not credited toward scienter). Here, Lake sold $49 million between March 8, 2021 and November 18, 2021 (¶10), the precise time when Spaulding was pushing the launch of Direct Buy through despite the negative internal test results and before the truth was revealed to investors. ¶¶43-46. *See Daou*, 411 F.3d at 1022 ("Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.").

     ***Spaulding's Departure.*** Spaulding left the Company less than six months after the end of the Class Period, admitting that she had proven incapable of leading its "ambitious transformation." ¶¶14, 93. Analysts immediately tied Spaulding's departure—which they viewed as involuntary termination—to the failure of Freestyle. ¶94; *see UTStarcom*, 617 F. Supp. 2d at 975-76 (departure "one more piece to the scienter puzzle"); *Plantronics*, 2022 WL 3653333, at *19 (crediting departure "a few months after" key events); *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020) ("uncharacteristic" resignations "weigh against an innocent inference" especially when company acknowledges resignee's mistake). Defendants' cases (MTD 23) involve plaintiffs who failed to allege suspicious circumstances—in some cases referring to benign retirements—unlike Plaintiffs here. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001-02 (9th Cir. 2009) (resignations in proximity to an accounting restatement evaluated by different standard; "uncharacteristic" resignations support scienter); *Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655 at *12 (N.D. Cal. Oct. 12, 2016) ("allegations about resignations and terminations do not appear in the complaint"); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1062-63 (9th Cir. 2014) (failing to connect resignation/retirements to allegations). Defendants' argument that staying on in an advisory role creates a benign inference

is unique to the facts at issue in the case they cite, where, unlike here, the executives' departures were unrelated to the fraud. *Id*.

***Core Operations.*** The core operations doctrine supports a strong inference of scienter because Defendants admitted detailed involvement in the minutia of Stitch Fix's operations, and because it would be absurd to suggest that Defendants were unaware of the performance of the Company's only two business verticals. ¶176. *See Berson,* 527 F.3d at 987-88 (scienter because "high-level managers must have known about the [fraud] because of [its] devastating effect on the corporation's revenue"); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045 (N.D. Cal 2016) (service on committee dedicated to subject matter of fraud sufficient for core operations); *Countrywide*, 588 F. Supp. 2d at 1190 (core operations where "systematic changes . . . came from the top down"); *cf. NVIDIA*, 768 F.3d at 1064 (failure to allege that "at least someone at NVIDIA had knowledge" of flagship product's financial impact). Further, Plaintiffs not only allege that Defendants accessed test results, but that they admitted they actually knew about them. *See S. Ferry*, 542 F.3d at 785 (actual admitted access sufficient for core operations); *Reese,* 747 F.3d at 577 (defendant's statement sufficient for actual access); *Daou*, 411 F.3d at 1022-23 (defendant's knowledge of misconduct supports scienter); *cf. Juniper*, 880 F. Supp. 2d at 1068 (roles as corporate officers insufficient).

***Former Employees***. Defendants again wrongly contend that the FEs are not sufficiently particularized or reliable. But Plaintiffs identify "each confidential witness's job description and responsibilities," titles, and, for FEs 1 and 2, to whom they reported. *Quality Sys*., 865 F.3d at 1145 (finding FEs sufficiently particularized in those circumstances). Further, unlike in *Accuray* and *Intuitive Surgical*, the FEs provide significant detail regarding the extent and frequency of testing, how they knew about it, and how Lake and Spaulding knew about it, as Defendants themselves acknowledged they did. ¶¶36, 42, 48, 60, 67, 155, 161-62, 164-65; *NVIDIA*, 81 F.4th at 938 (crediting FE statements regarding Defendants' knowledge of and access to relevant data without direct allegations of interactions with Defendants); *cf. In re Accuray, Inc. Sec. Litig.*, 757 F.Supp.2d 936, 949 (N.D. Cal. 2010) (no allegation that Accuray collected or defendants saw the data); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014)

(no "allegations linking specific reports…to the executives").

***Holistic Analysis.*** Courts in the Ninth Circuit analyze "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Am. W. Holding*, 320 F.3d at 938; *S. Ferry,* 542 F.3d at 784 ("[F]ederal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."). Defendants' "holistic analysis" ignores and attempts to rewrite the Complaint. As Plaintiffs allege, Spaulding was hired with the principal objective of launching Direct Buy, which Defendants touted would "transform" the Company and which, understandably, generated significant investor interest. Defendants repeatedly told the market that they had viewed test results confirming that Direct Buy was "additive," "complementary," and "incremental" to Fix, and denied cannibalization. In truth, the internal tests revealed that Direct Buy cannibalized Fix. Defendants saw and reviewed these data, received live data, had access to these data, admitted they consumed these data, and held themselves out as knowledgeable about these data. Therefore, Defendants were aware of, or were deliberately reckless in not being aware of, test results revealing that Direct Buy was cannibalizing Fix. Despite these negative test results and warnings from insiders, Spaulding pushed the launch of Direct Buy through because her career depended on it. The launch failed, the Company was ultimately forced to disclose the truth about cannibalization, Spaulding left, and Stitch Fix abandoned Direct Buy precisely because it cannibalized the Fix business.

## C. The Complaint Adequately Alleges a Section 20(a) Claim

Defendants argue only that the Section 20(a) claims against them fail for lack of an underlying primary violation. As explained above, that argument is incorrect. Accordingly, the Complaint adequately alleges a Section 20(a) claim. *See In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015) (allegations that officer defendants signed company's public filings "suffice to state a claim for violation of Section 20(a)").

## V. CONCLUSION

Defendants' motion should be denied, or alternatively, leave to amend granted. *See Daou*, 411 F.3d at 1013 (dismissal without leave to amend improper unless amendment is clearly futile).

Dated: December 22, 2023

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Rebecca E. Boon*
Rebecca E. Boon (*pro hac vice*)
(Rebecca.Boon@blbglaw.com)
Scott Foglietta (*pro hac vice*)
(Scott.Foglietta@blbglaw.com)
William E. Freeland (*pro hac vice*)
(William.Freeland@blbglaw.com)
Brandon A. Slotkin (*pro hac vice*)
(Brandon.Slotkin@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel.: (310) 819-3470

*Counsel for Lead Plaintiffs Retail Wholesale Department Store Union Local 338 Retirement Fund, Retail Wholesale Department Store Union Local 338 Health & Welfare Fund, Retail Wholesale Department Store Union Local 338 General Fund, and Retail Wholesale Department Store Union Local 338 Benefits Trust Fund*