1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION


| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND et al., | 5:22-cv-04893-PCP |
| | April 18, 2024 |
| Plaintiffs, | SAN JOSE, CA |
| vs. | |
| STITCH FIX, INC. et al., | |
| Defendants. | |

BEFORE THE HONORABLE P. CASEY PITTS
UNITED STATES DISTRICT JUDGE

TRANSCRIPT OF MOTION TO DISMISS


A P P E A R A N C E S:

For the Plaintiffs:   REBECCA E. BOON, ESQ.
                      Bernstein Litowitz Berger
                      & Grossmann LLP
                      1251 Avenue of the Americas, 44th Floor
                      New York, NY 10020
                      rebecca.boon@glbglaw.com


For the Defendants    PATRICK EDWARD GIBBS, ESQ.
Stitch Fix, Inc.      Cooley LLP
Katrina Lake          3175 Hanover Street
Elizabeth Spaulding:  Palo Alto, CA 94304
                      pgibbs@cooley.com

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROBIN L. HERRERA, RMR, CRR, CRC
United States Court Reporter
401 West Evans Street
Florence, SC 29501
robin_herrera@scd.uscourts.gov

(Stenotype/Computer-Aided Transcription)


Robin L. Herrera, RMR, CRR, CRC

2

INDEX OF PROCEEDINGS

Defendants' Argument                          4

Plaintiffs' Argument                         26

Defendants' Rebuttal Argument                53

SAN JOSE, CA; THURSDAY, APRIL 18, 2024

ZOOM VIDEOCONFERENCING, SJ08 EVIDENCE COURTROOM

HONORABLE P. CASEY PITTS, PRESIDING

\* \* \*

*(Proceedings commence at 10:16 AM.)*

THE CLERK:  Calling Case Number 22-cv-4893, *Local 338 Fund v. Stitch Fix* on the motion to dismiss.

Will the parties please approach and state their appearances for the record beginning with Plaintiffs' counsel.

MS. BOON:  Good morning, Your Honor.  Rebecca Boon from Bernstein Litowitz for the Plaintiffs.  And I just want to note that Earl Mathurin, the funds administrator for the Local 338 funds, is on the Zoom.  Thank you.

MR. GIBBS:  Good morning, Your Honor. Patrick Gibbs from Cooley for Stitch Fix, Ms. Lake, and Ms. Spaulding.

THE COURT:  Good morning.

MR. GIBBS:  Also at counsel table are my colleagues Brett Jarnett and Amie Simmons also from Cooley.

THE COURT:  Okay.  Great.  So we're here on the motion to dismiss that's been filed by Stitch Fix and the other Defendants; so I will start by hearing from defense counsel.

MR. GIBBS:  Thank you, Your Honor.

DEFENDANTS' ARGUMENT

I know Your Honor typically reads things in great detail in advance; so if the Court has any issues at the top of mind for Your Honor, I'm happy to start there; otherwise, I have my own views about what's important.

THE COURT:  I mean, why don't you start, and I'll ask you questions as we go along.

DEFENDANTS' ARGUMENT

MR. GIBBS:  Sure.  So as the Court knows, Plaintiffs claim that the Defendants misled investors with a series of statements about a new product first called Direct Buy, later called Freestyle, by failing to disclose test results that according to Plaintiffs showed that Direct Buy or Freestyle was, quote, "cannibalizing" the company's existing fixed product.

The theory hinges almost entirely on allegations attributed to three former employees, both as to falsity and *scienter*, and that's where I want to focus this morning, and because the former employees are critical both to falsity and *scienter*, I want to start by talking about the former employees as a category.

In doing that, though, I think it's very important to focus on this concept of cannibalization because if the Court reads all of the challenged statements, essentially in context with the transcripts and letters and other materials that we've provided, it's clear that there are discussions

of two different types of cannibalization because there's two different sets of customers to whom the company rolled out Direct Buy and later Freestyle.

When the company first rolled out Direct Buy, it was only available to existing Fix customers, and the company actually said they expected some amount of cannibalization in the sense that Fix customers might purchase through Direct Buy a product they would have otherwise purchased via a Fix, and so that's a type of cannibalization that the company acknowledged was likely to happen.

The hope was, though, that in the aggregate customers who had both product sets available to them would purchase more from Stitch Fix even if some of it was just switching from Fix to Direct Buy.

Much later in the class period, the company launched the Freestyle product as a customer acquisition tool.  In other words, they made it available to people who were not existing Fix customers, and the concept of cannibalization in that context is very different because it goes to whether customers who come to the company for the first time, nonexisting customers, whether offering them Direct Buy is going to somehow discourage them or hurt the company's efforts to convert them into Fix customers.

We sort of pressed in our briefing as to what type

of cannibalization Plaintiffs are talking about, and in their opposition brief they clarified that they are talking about the latter.

They said at page 2 of their opposition brief they're defining cannibalization as, quote, "Negatively impacting customer acquisition because the company's onboarding process would sacrifice customers who came in for a Fix, were funneled to Direct Buy and then ultimately did not make a purchase or they bought less."  That's Plaintiffs' definition of cannibalization, and I think it's important to have that in mind as we're assessing the former employee allegations.

THE COURT:  I mean, it strikes me that there's some ways you could think of three versions of cannibalization.  I mean, there's the first version you talked about, existing Fix customers and the effect of making Direct Buy available to them.

There is, you know, general sense, new customers to Stitch Fix and whether they go to Fix or to Freestyle and which one they choose.

And then there's the sort of additional question of what Fix is doing -- Stitch Fix is doing at the landing page, you know, the question of steering.  And I think it's, like -- I mean, there's another issue here, which is this issue of steering and what they knew about that issue and

its effect at what time -- right? -- because it could be that the effect of Freestyle or Direct Buy depends on this question of steering customers to one versus the other; right?

MR. GIBBS:  I think so.  As I read the transcripts, though, I think the steering is one example of the way in which the company eventually concluded that the way in which they had rolled out Freestyle to new customers was having a negative impact on conversion rates for the Fix product because if you went to stitchfix.com, the first place you went to was a Freestyle setting --

THE COURT:  Right.

MR. GIBBS:  -- as opposed to Fix, and so it was creating what they call friction.

THE COURT:  Yeah.  And I guess what I'm -- I guess one question to you -- and we can turn to the individual employees and the other issues -- but, I mean, it seems to me at least in paragraph 41 of their complaint they suggest -- they seem to suggest -- you know, they say based on the tests that they report with Former Employee 1 that there was a specific test conducted as to this issue of the effect of steering new customers to Direct Buy versus Fix, and that the effect would be an effect of cannibalization under those circumstances.

So why is that not sufficient to at least raise

some concern that the statements that were made by failing to acknowledge that, you know, the way the company was going to be rolling this out was going to -- you know, they knew that there was going to be something -- a negative effect on the company at the time.

MR. GIBBS:  So I think it doesn't suffice for a number of reasons, but I think the most important of which is if you set everything else aside about particularized facts and personal knowledge and all that kind of thing, recall that the company itself announced in March of 2021 that it was delaying the rollout of the Freestyle product to the new customers because they were still working on the onboarding process; right?  And that's the time frame when FE1 is alleged to have learned about these, quote, "negative test results"; okay?

So even if you assume that those tests are -- they relate to onboarding and they relate to the steering, and they showed something bad, what FE1 doesn't do and cannot do is say the thing they tested in February or March of 2021 and generally the bad results is the same thing they launched.

The company said --

THE COURT:  They did launch, though, with -- I mean, it's acknowledged, the company acknowledged that they launched with this same steering to Freestyle rather than

DEFENDANTS' ARGUMENT

Fix; correct?  They acknowledge the launch page?

MR. GIBBS:  They acknowledge that that's where the initial landing page took you.  That doesn't mean it's the exact same thing that they tested back in February or March of 2021.

And I would submit that it's not reasonable to assume that they tested some version of the steering, some version of the landing page, got negative results, told the market "We're going to delay the rollout so that we can optimize the onboarding process," and then went and launched exactly the same product.  I don't think that's a reasonable inference at all.

THE COURT:  I mean, unless -- I mean, they have noted all the ways in which Defendant Lake in particular had a particular investment in this project and -- you know, and so if there was a theory that sort of regardless of the impact, you know, that one of the corporate leadership was very invested in Freestyle; so they were going to direct people there sort of, you know, test be damned.

That is a theory, and you could -- you know, the question of whether it's plausible based on the allegations they've made of sort of the personal investment in this project, the way in which this was sort of "our baby," I think is the description, and that, you know, turned out to be true, it seems like, and certainly after it was not as

successful as hoped, you know, she did ultimately leave the CEO position; correct?

MR. GIBBS: Yes. And I think you meant to reference Ms. Spaulding.

THE COURT: I'm sorry. Excuse me. She was the founder. Spaulding was the one brought in on Freestyle.

MR. GIBBS: That's correct. And they do articulate that theory. I think there, though, we have a problem with -- first of all, I don't think that theory is plausible because according to their own allegations Ms. Spaulding's success at the company and even her compensation eventually depended in large part on the success of the product. Not just launching the product, but it needed to be a success.

And so I personally think it's not reasonable to infer from that set of circumstances that she had a motive to launch it if she believed it was going to fail.

THE COURT: I mean, unless, again -- unless, you know, if what really is most important here is this question of steering at the outset on the web page.

I mean, you could understand how having your compensation sort of tied to the success of the product that you would have a strong incentive to steer people to that product even if there was a concern about the impact it was going to have on the other product, on the existing product

because, you know, this is my -- we know that my compensation is going to depend upon how well this does.

MR. GIBBS:  How well it does.  Not just steering people to it, but it had to be a success.  It was not a success, obviously.  Like, the initial rollout did not go the way they wanted it to.  It led to negative results for the business as a whole.

I don't think the allegations here support the inference, certainly not a strong inference if we're talking about *scienter* and motive, that she had an incentive to steer customers to Direct Buy even if that was ultimately going to cause the entire launch to be a failure, which I think is what Plaintiffs are saying it was.

THE COURT:  I mean, I guess it's -- in some ways the question I'm thinking through is there -- you know, it may not be pleaded here, is the theory really that there was a -- there was knowledge that this method of rolling out Freestyle -- you know, could they make a claim that there was a knowledge that this method of rolling out the Freestyle product was not going to be the best possible way of doing so, and that there was evidence that there were concerns with that and that was -- they never acknowledged that, you know, there was kind of an omission and the question of whether that was -- you know, there were other statements that would have required them to make that

statement.

We know they don't have an obligation under the most recent Supreme Court case to -- if it's purely an omission, then it's not a claim here, but whether there are -- you know, we'd have to decide whether there are other statements that would have required them to make that acknowledgement.

MR. GIBBS:  I think that's right, and actually that's a separate topic in my mind from the former employees.  I'd like to talk about it for just a moment since Your Honor has raised it.

THE COURT:  Yeah.

MR. GIBBS:  It is very important.  The Supreme Court has now reminded us that there is no freestanding duty for purposes of 10(b)(5) to disclose important things.  The omission has to be something that renders a statement that was actually made in a misleading and in a material way.

And the Ninth Circuit has addressed this issue most prominently in the *Birdie* case where the company made an announcement about a stock buyback program; did not tell shareholders that they were in discussions about a potential sale of the company at a much higher stock price.

I would submit that that set of facts clearly triggers the things that shareholders would like to know, but because the statement about the stock buyback didn't

accurately address the question of whether there were buyout discussions going on, the Ninth Circuit said no duty to disclose that because it doesn't make your statement about the stock buyback program misleading because that statement didn't address the topic of whether there were takeover discussions.

In the same way here, I think Plaintiffs largely just assumed that some negative test results about onboarding and the use of Direct Buy and its impact on Fix necessarily make every statement the company made about Direct Buy over the class period false or misleading, but I don't think that's true.

A lot of what the company said during most of the class period related to how Direct Buy and later Freestyle were performing with existing Fix customers. And a lot of those statements make very clear that what they're saying is in the aggregate customers who have access to both Direct Buy and Fix are spending more with us. And they repeatedly report record new numbers, dollar amounts of revenues per customer, which is exactly what they're talking about.

I don't think the fact that there's some negative test results about how that product might work with new customers, nonexisting customers, renders those statements about how it was working with existing customers false or misleading.

THE COURT:  I mean, what -- here's a question. What is the standard I would apply if it's not clear, you know, if the statements are kind of squishy or ambiguous as to whether they're talking about just existing -- you know, just existing customers versus the general impact on Stitch Fix as a whole and the business?

MR. GIBBS:  Well, the pleading burden is on the Plaintiffs, and it is a burden to plead particularized facts both as to falsity and to *scienter*.  And so I would say if they can't plead facts that make clear that the statement is rendered false or misleading by the undisclosed fact, then they lose.

THE COURT:  But, I guess, what is the underlying obligation?  I think I'm thinking about the underlying -- the question of sort of the underlying obligations rather than the pleading standards.

You know, how do I think about whether an ambiguous statement required clarification?  I think that's what I'm sort of thinking about, you know, because some of these are -- I mean -- and, again, they're investor calls; they're in different contexts.  I understand that they're not necessarily going to be -- you know, it's not necessarily the kind of craft language you would have in a press release.

But if I think that -- you know, is it the

question whether a reasonable investor, you know, could interpret the statement as encompassing the whole of Stitch Fix's business rather than, you know, in the absence of a clarification that it's only about existing customers? Is that the standard?  Do I apply kind of a reasonable investor standard to think about these statements?

MR. GIBBS:  Yes.  I think in terms of interpreting the statements, the Court does need to apply a reasonable investor standard.  I think also it's extremely important to read all of those statements in context.

And I would say -- I would urge the Court, please, to review the underlying source documents because the complaint, in our view, rips some of that language from its context, and then the opposition brief even more so just from its individual words, and there's no sense of context about what's the question that's being answered; what's the complete answer.

I think what the Court will see is in the vast majority of cases where they're using words like incrementality and that sort of thing, specific words that the Plaintiffs say are inconsistent with cannibalization, I think from the context it's quite clear they're talking about how the product is performing with existing Fix customers.

There are some places where the executives even

DEFENDANTS' ARGUMENT

early on express optimism for how Direct Buy and later Freestyle might impact the company more generally, might expand the total available -- total addressable market or TAM, or might help sort of an easier touch point for new customers.

So there are statements that touch on new customers rather than existing customers. But I think if the Court examines those statements very closely, what you'll see, is first of all, they're fairly general. I don't think that necessarily would leave a reasonable investor to think *I'm now going to tell you about every single test result we had when we tested this thing internally.*

I also think they are -- there's sort of longer term, more forward-looking discussions about how Direct Buy might work as a customer acquisition tool are always expressed as opinions: we think, we believe, we hope. That's a different falsity standard.

And I don't think -- even if you take everything as true that they say about the testing, I don't think the existing of -- the existence of some bad tests necessarily makes those statements of optimism or opinions about how this is going to perform many, many months from now when we finally roll it out, to be false or misleading.

Then you've got the additional layer of *scienter*;

DEFENDANTS' ARGUMENT

right?  So even if you assume there are test results and the test results are inconsistent with the statements, it's not enough to say they were aware of some negative test results or test results that were inconsistent with the opinion that they're expressing.

We got all those facts showing that they knew that was false; that they intended to mislead shareholders.  It's not enough to have some information that is in some sense inconsistent with what you're saying.  They have to raise particularized facts showing that the executives spoke with the specific intent to mislead shareholders.

THE COURT:  I think reckless disregard is --

MR. GIBBS:  It does, but the courts routinely say it's recklessness to the point of it's just like intent or, in other words, if they didn't know that their statements were misleading investors it's only because they avoided finding out.  That's the way the courts talk about recklessness; so --

THE COURT:  I guess I'm thinking about different aspects.  I mean, you know, you have to -- they either avoided finding out or they knew it was false.  Now, whether they were saying -- whether they -- you know, I guess that's it.  It's just knowledge of the falsity; right?  There's not some intent -- some purpose beyond making the statement with knowledge and falsity.

MR. GIBBS:  I'm not sure I understand.

THE COURT:  It's mis- -- when you talk about intent to mislead investors, it seems to be focused on, you know, some sort of intended goal as to investors as opposed to just saying they have to have intended -- have knowingly made a statement that was false.

MR. GIBBS:  Yeah.  I guess the way I would put it is they have to know that the statement they're meeting is -- they're making is going to mislead shareholders.

THE COURT:  Right.

MR. GIBBS:  Okay.  Or have acted so recklessly that they knew there were things they didn't know and they just consciously avoided finding out.  That's what I understand recklessness to mean.

But I think sort of preceding all this and where I wanted to start was with the former employees because I think they -- you have to indulge a lot of very, very general allegations and inferences based on something that I -- allegations that don't come close to particularized facts in our view.

So starting with personal knowledge -- right? -- the Ninth Circuit in the *Zucco* case -- that's Z-u-c-c-o, *Zucco Partners* -- laid out a very clear standard for what Plaintiffs have to plead in order for the Court to rely on allegations attributed to former employees and it is not

insignificant. They have to allege particularized facts that the former Employees have personal knowledge of the facts that are attributed to them.

Here, Plaintiffs don't allege any facts showing how customer acquisition testing, the thing they define as cannibalization, was related to the former employees' job responsibilities.

FE1 was a senior manager in product marketing who worked on the Direct Buy launch. There's no allegation that FE1 had any job responsibilities that actually touched on this testing that related to new customer acquisition.

FE2 was a director of men's apparel design. No allegations about the job responsibilities at all or how they related to this testing that's described.

THE COURT: I mean, I guess I'm -- let push back on that a little bit. I mean, they do say that Former Employee 1 worked on Direct Buy launch and so, you know, that -- and had a role and, yes, it was a product marketing role.

I don't know that the standard is that you -- only the individuals who performed the test itself can provide, you know, the evidence that's required. I mean, the question is just, you know, is there a -- as I understand it, it's kind of what you can't do is just have an employee say, "This former employee who somehow worked at the

company," you know, "repeats our allegations," essentially.

MR. GIBBS:  Yeah.

THE COURT:  You need -- I need to be able to conclude that there's a strong, you know, basis for concluding that what this person is saying is true and that -- you know, that it provides particularized facts.

And, I mean, I -- you know, an employee who worked on the launch and was responsible for that and is describing at least in one instance a specific test that was performed, which is in paragraph 41, I'm not -- you know, at least I take that some of the other challenges you make where the -- all we have is that the tests failed or were bad, you know, that's a different question.

But when we're thinking -- at least I'm wondering -- you know, I think I would push back at least on sort of how we deal with Employee 1 and that specific test result that is described in paragraph 41.

MR. GIBBS:  Sure.  Well, we should focus on that, then.  So I take the Court's point.  I don't think the only way to meet the standard is to say that FE1 actually *(audio interference)* the tests or anything like that.  But they do -- they are supposed to meet a standard of personal knowledge, which is the same language we use when we talk about testimony in court; right?

THE COURT:  Yeah.  I don't think it's a hearsay --

I mean, this is hearsay -- right? -- and they can allege hearsay in support of their claims.  So we're not talking about a question of hearsay.

We're really talking about is there enough here to credit this, and does the person have enough personal knowledge of the circumstances to credit what's being reported.

And I think personal knowledge from the reporting of test results in his role as a, you know, product marketing manager responsible for -- partially responsible for the launch of Direct Buy, why is that not enough to conclude that at least what he's saying is -- you know, it's reasonably plausible that that's true?

MR. GIBBS:  Well, I think for lots of reasons, but let me not just continue to push on the same issues that the Court disagrees with me on and focus, again, on two things.

I still think cannibalization is a bit of a conclusion.  It's not a fact; right?  And we've cited the *Founder Networks* case involving the same word in a slightly different context, and that opinion, I think, does a good job of unpacking the ways in which cannibalization can mean different things in different contexts; can have a different extent.  And we don't have any details about how bad it was, exactly what they were testing.

And I just think it's really important the

Freestyle product was not launched to new customers until August of 2021. That's many months after the tests that are described in paragraph 41. There's no facts here alleged to suggest that what they launched to customers was identical to what they tested in February or March of 2021.

And, again, I take the Court's point about motive and it's her baby and all that sort of stuff, but it doesn't make sense if you assume that Ms. Spaulding was just hellbent on directing everything to Freestyle because it was her baby, why -- at exactly the same time that FE1 says, "We got some bad test results about onboarding," in effect -- why would they delay the rollout of the product, tell the market "We're delaying it because we're working on the onboarding process," in other words, we don't have it right yet; we want to get it right, and then launch the same product with the same, you know, evidently defective onboarding process several months later? What was the point of the delay if they weren't actually working on tweaking it to make it work?

They did ultimately say, "We didn't get the landing page right," but that doesn't mean that's the exact same thing they had tested back in February or March of 2021. And I just -- I don't think that sequence of events makes any sense from a holistic standpoint when it comes to *scienter*, or even from a falsity standpoint. If we had more

DEFENDANTS' ARGUMENT

details about exactly what they tested, it might be a different story; right?

I could imagine a world where FE1 knows exactly what they tested and could speak to the question of is that the same thing they ended up launching to customers or not. But in a world where the executives delayed the rollout and said, "This is having a negative impact on our expected revenue for the year because we're pushing out this product we hope is going to drive more revenue," why would they do that if they're just planning to launch the exact same product with all the same features that they just tested and received a negative result from?

I just don't think that makes any sense, and we don't have enough details to accept that set of inferences that don't, in my view on their face, make such sense.

THE COURT:  One question I did have, I think, from your brief.  I mean, I understand the point you've drawn about, you know, the testing at -- prior to the launch of Freestyle and testing after it had actually been launched to customers and what that -- or, you know, results after it's actually been launched to customers.

I mean, it does appear as pleaded, at least in particular in paragraph 41, that there was some limited form of, you know -- and I don't know how they did this, but there's a pleading they were trying to undertake some sort

of testing of the impact of making Freestyle available to new customers and the onboarding process through that; so I think they're -- you know, it's not the case that nothing that is -- at least that's pleaded it seems that -- you know, that it's not the case that there was nothing that was tested for Freestyle launch that had any relevance to the question of, you know, what new customers were going to be doing; correct?

MR. GIBBS:  I understand the point you're making, and I can see the words on the page about new customer Fix, and I can see the allegation that seems to suggest something about directing customers to one or the other.

But I actually think that pretty well illustrates to some extent the limitations; right?  We're having to grope around a little bit to figure out exactly what this person is talking about.  I don't know.

I don't know whether this is something that was actually public facing and that's how they tested it, or they had some lab somewhere with people on computers who were pretend customers.  I don't know.  We don't know; right?  I didn't get to talk to FE1.  I don't know who it is.  You didn't get to talk to him.

So I actually think that's a pretty good -- the questions we're sitting here grappling with are a consequence of the fact that we don't have particularized

facts about these test results.  We don't know exactly what FE1 means when FE1 says whatever they say about this test.  This is exactly why we have the particularity requirement; right?

We're talking about fraud here.  Ms. Spaulding is being accused of fraud, or being accused of talking about a product in positive terms knowing or believing or recklessly believing that it is going to fail.

And that's fine.  I understand that theory, but this is exactly why we have the particularity requirement because I don't -- I can't tell from this what that test was.  I can't tell who was tested.  I can't tell if it was in a real-word scenario; if it was in a laboratory somewhere.  I can't tell whether it was the same landing page they ended up launching.  I can't tell any of that.

I see the words new customer -- new Fix customer test.  I see negatively impact customer acquisition.  I don't know what that means either.  Does that mean a little bit?  Does it mean a lot?  Does it mean negatively impact it in a way that outweighs the upside from Direct Buy?  We don't know.  That's a lack of particularity.

THE COURT:  Okay.  I do want to give -- maybe I'll give you one more minute, but then I do want to give the plaintiffs an opportunity to address the Court.

MR. GIBBS:  Well, let me just -- I think I just

want to finish by going back to the point Your Honor made about the Supreme Court opinion and whether something is, in fact, inconsistent with and renders a statement that was actually made false or misleading.

And, again, I want to urge the Court to please, please go back to the source document.  We've submitted as exhibits to the Fernandez declaration.

And I think to Your Honor's question "How do I interpret a vague statement?"  It's going to depend one by one, and with the limitations of the page limits and such, it's very, very difficult for us to go in and unpack every single one of the dozens and dozens of statements that are challenged.

I would also offer up, though, if there are some that are of particular concern, we would be more than happy to talk about them or submit some supplemental briefing because I just -- it's a lot of statements, and there's a limit to what we can do.

THE COURT:  Okay.

MR. GIBBS:  Thank you, Your Honor.

PLAINTIFFS' ARGUMENT

MS. BOON:  Good morning, Your Honor. Rebecca Boon.

Your Honor, I'm inclined to skip my introductory remarks and just go straight to the first point here, which

essentially is how do we know that the former employees are talking about the same thing that Defendants are talking about?

And I want to go straight there to Former Employee 1. As Your Honor flagged in paragraph 41, Former Employee 1 describes the new customer Fix test as showing cannibalization. She specifically details how what's happening with the onboarding function is that customers who come in for a Fix are being sacrificed to Direct Buy and what happens is they buy less or they don't buy anything.

Your Honor, that is exactly what Defendants disclosed at the end of the class period happened. We have a match. We also have a match with regard to what Defendants actually said.

If I could refer Your Honor, for example, to paragraphs 131 and 134 of the complaint, the company is citing its tests -- and this is to Defendant Spaulding -- to deny cannibalization, to tout the incrementality of Direct Buy on each new cohort of Fix clients. Again, we're talking about the new Fix customer test which is showing cannibalization according to FE1, and then the company is talking about --

THE COURT: And aren't they -- isn't the point if they're Fix -- aren't Fix clients to have gone through the process and become purchasers of Fix so that's -- I mean,

that's their point.  If they're a Fix client, aren't they not the negative result out of this test?

MS. BOON:  Respectfully, Your Honor, no.  And it's really not clear based on what Defendants were saying.  They weren't differentiating between all these different types of clients.  They were making affirmative statements that Direct Buy and Fix were additive, incremental, and complimentary.  They weren't carving anybody out.  They weren't saying --

THE COURT:  That's fine.  They're expanding their spend with us; so that seems to certainly be a statement about existing people who are already purchasing Fix, and the point they're making, are they spending more ultimately because they have the Direct Buy option as opposed to being not?

I mean, that's -- in context, again, it doesn't -- the problem I'm having here, I don't -- you know, I'm not sure this is the best example but, you know, this is not a case where there was a flat-out disclosure of X fact and they said Y fact earlier; right?  We don't have that here.

We don't have "We knew that this -- you know, this product didn't work, and we kept saying that it works in this way and, in fact, it doesn't work in that way at all."  We don't have that circumstance here.  We have a pretty -- we have this slippery language about cannibalization and

what kind of cannibalization we're talking about.

And so where is there a -- you know, is this the best example of a flat-out contradiction between what the former employees testify was shown [verbatim] and what they said?

MS. BOON:  I would submit that is a good example. I have some more examples.  We also have FE2, who is talking about the initial beta test and the second test conducted shortly after that.  We have the company talking about the beta testing, the AB test, and the initial AB test, which is the second test, showing cannibal- -- not showing cannibalization and confirming the product's incremental. We also have --

THE COURT:  All right.  I guess how do we know whose test -- what that cannibalization is about?  I mean, it really depends on who we're talking about in this case, at least on your own terms.  And I think the problem here -- I mean, I think, as your colleague on the other side said, is, you know, a bad -- like, what can we conclude from a bad test, a failed test?

Like, I don't -- I do think that they're right, that the PSLRA requires more detail than that in order to substantiate the claim.  Now, if we were -- if we had -- if we didn't have the PSLRA and we're here under Rule 12(b)(6) alone, you would be in good shape.  But -- perhaps, I mean,

I'm sure they would come up with an argument -- but you'd be in better shape.

The PSLRA does require particularity. You know, I need to know exactly -- or maybe not exactly, but with a fair amount of detail in order to conclude that there is plausibility that these tests were contrary to what -- you know, contradictive of what was said; right?

MS. BOON: Sure.

THE COURT: And I don't know how -- you know, to be frank, how -- what the second or third former employees are saying about the internal testing, what that can provide in that respect because, you know, it seemed very generic. A bad test. A failed test.

I don't know -- if you don't know what the condition is, then you don't know what a failure is. If you don't know what the number -- you know, and may- -- I don't know that you have to provide, you know, the specifics of every outcome of every test, but you can't tell what a bad test is unless you know what the scale will measure and what's good, what's bad; correct?

MS. BOON: Sure. So let me address that. I will concede, Your Honor, that FE1 has the most detailed allegations concerning what's tested.

With regard to what Defendants were saying, they were specifically asked by analysts about what was going to

happen when Direct Buy was launching.  They were answering those questions by making positive statements concerning the tests and concerning the lack of cannibalization among the products.

I understand that Defendants have been focusing on this purported dissention among different types of cannibalization, but during the class period analysts were simply asking about cannibalization.  They were -- Defendant Spaulding was making statements concerning the specific cannibalization question.  And what she was doing is she was denying cannibalization; she was pointing to the company's testing.

As I mentioned, we have FE1's description of the test, I would respectfully submit, being very consistent with what the company disclosed at the end of the class period.  We have FE2 and FE3 --

THE COURT:  I mean, I guess their point is that at that point -- and I guess it's a question of were they asking about what is going to happen in August or what is happening now because, you know, it wasn't available to the public.  It wasn't available to non-Fix users until August 2021.

So to the extent that any of the statements are about what they -- sort of retrospective, we don't have any evidence that those are false; right?  I mean, I think the

evidence does seem to be that with existing customers there was an increase in total spent.

MS. BOON:  Your Honor, that's a disputed factual question.  When they ultimately disclosed the issues, they did disclose in an active user group as well; so I don't agree that there was -- even if we did assume for purposes of this conversation -- which the complaint doesn't allege -- that they were only talking about current clients and they only had tests about what Defendants call prospective clients, the statements in this case would still be actually misleading.  That's the *Arena Pharmaceuticals* case.

You can't tell positive information to the market while concealing the negative.  Defendants were affirmatively talking about these tests.  They were asked about these tests.  They were saying the tests emphatically showed incremental, additive, complimentary, no cannibalization.  They had these tests in their pockets, the new customer Fix test --

THE COURT:  That's the problem.  We have one specific --

MS. BOON:  -- showing negative results --

THE COURT:  -- test which went to -- seems to be limited because it's also hard to conclude is it -- was it truly just a question of how they were going to handle the

onboarding process; right?  I mean, again, this is a problem in terms of what we know is that that test -- you know, that test seems to have been a single -- I mean, we don't know if it's a single test.  We don't know how it fits into the overall universe of tests that were conducted, and it was -- obviously they pointed out it was conducted several months before the actual rollout of the product, and it was specific -- seems to be specific to this question of -- included as part of the condition the steering issue.

And, you know, maybe they were -- they had another test where there weren't questions of steering.  We don't know.  Maybe it was fine when they didn't do the steering, or maybe it was incremental and additive when they still steered to Fix and they just sort of provided an alternative.  We don't know that under any of the pleadings in the complaint; correct?

MS. BOON:  Well, no, Your Honor.  I would say that we do know that the steering issue and the problems getting the steering correct contributed to and ultimately caused the cannibalization and the failure of this entire product line that the company did ultimately disclose at the end of the class period; so the onboarding was essentially a cause of the cannibalization.

With regard to my adversary's comments about how this doesn't make any sense, what happened here is pretty

straightforward. Defendant Spaulding was brought to the company to accelerate the launch of Direct Buy. As Your Honor noted and as we alleged, her compensation depended on it. She was under extreme pressure from the market to accomplish this goal.

Defendants had originally announced in March of 2020 that the product would be rolled out within about two years. Now it's a year later, it's March. They have in their hands, according to FE1, who I would submit is reliable, is detailed -- we described specifically how FE1's marketing role gave her specific information concerning Spaulding interfering in the marketing activities.

We also place FE1 in business review meetings with Defendant Spaulding to discuss the cannibalization data. We have the specifics alleged in the complaint of exactly what data points were shared with the executive defendants, which would reflect these trends, which were ultimately, again, disclosed at the end of the class period.

And we have Spaulding just completely owning this. You know, she's going out to the market. She's telling them "I'm here to bring about pivotal transformation of the company. I'm leading the second founding of the company." She tells investors "Stitch Fix has to change or die." She tells them that launching Direct Buy is like Netflix moving from their DVD era into their streaming era. Her entire

career literally depends on the timing of this launch.

And what happens according -- and I just want to go through briefly the specific timeline of what we have. We have FE2 talking about the beta testing and the second test conducted shortly after that showing cannibalization.

FE2 joined the Direct Buy team around July or August of 2020 prior to the start of the class period. So we have cannibalization tests from the beginning.

We have FE1 describing by February or March multiple tests, not just one test, including -- tests is plural in here. She specifically describes the new Fix customer tests. She describes what was tested. She describes what the impact was.

We have the company then saying in March "We're just trying to get the product right. Everything's fine. There's no cannibalization."

We have FE3, a data scientist, who is in meetings with other data scientists discussing the cannibalization results, specifically confirming that by June the cannibalization testing is clear and being discussed among the data scientists as a significant problem.

And then with respect to Your Honor's question of "Well, how do we know this is a big deal?" We also have every single one of these former employees confirming that the testing showed the product wasn't ready and that

Spaulding launched it anyway. And that's in, I believe, paragraphs 67, 68, and 69 of the complaint.

So in sum, Your Honor, the tests at the outset are showing cannibalization. The tests by February and March are showing cannibalization. Defendants don't come out forward in March and say, "We're delaying the product because our testing on our onboarding function is showing cannibalization."

Instead they say, "We're trying to get the product right. It's just some kinks. It's still additive, incremental, and complimentary. It's going to be fixed soon." The market is reassured by that information. The market specifically observes, including in March, that the company is actively testing to see how Direct Buy is going to perform with non-Fix customers.

There can be no serious question that these tests are occurring before the launch is formally completed. Indeed, that's the whole purpose of conducting the testing.

And with regard to what the market cares about, the market's not saying things like "What are you currently seeing?" or "What are you observing now?" because they only care about this precise moment in time and what the company's seeing with the current clients.

They want to understand is this going to be the second founding of the company? Is this a pivotal

transformation?  Is the Direct Buy launch to new customers going to essentially save Stitch Fix?

And what Defendants are specifically and emphatically telling them is "Based on our testing results, there's no cannibalization.  The products are incremental, additive, complimentary."  That's it.

If it makes sense for the Court, I'd like to move to the former employees for one moment and just talk about their basis for knowledge and a little bit more of the specifics of what they said because I do think that's important here.

So with regard to the test, as Your Honor knows, it's two parts.  We have personal knowledge, reliable, and then we have do -- does what the former employee said support *scienter*.

Here, I respectively submit we have both, and I'll move through this quickly because I think it's apparent from the complaint.  With regard to FE1, he's identified properly, his title, who he reported to, where he was based. We allege how FE1 personally worked on the Direct Buy launch.  We allege how FE1 personally attended business review meetings to discuss the cannibalization test results, which were also attended by Spaulding.  We have FE1 --

THE COURT:  Let me focus you, actually, if you don't mind because --

MS. BOON:  Sure.

THE COURT:  -- it seems to me, as I said before, my major concern with all three of the former employees' reports is the lack of specificity as to the content of the tests.

And I know that that is -- I think that's primarily an issue as to whether they support finding a falsity rather than a finding of *scienter*, but, you know, even assuming that you've established that they have personal knowledge and that to the extent that they're providing support for *scienter*, they've done that.

Why are these specific under the PSLRA?  Why are there allegations -- I mean, and even as to the new -- I mean, the one test we discussed a lot, as pointed out there, we don't know exactly how that test was conducted.  We don't know if they were, you know, one in a thousand visitors to the Stitch Fix home page where they saw the beta test page or whether this is internal.

Why do -- why is what they're reporting sufficient to support the claims under the PSLRA, understanding that this is not -- you know, you may be right that -- you know, that if the claim was -- that there's perfection here and there were not -- there were problems, that that would be a different question.

Now the question we have is a more ambiguous issue

of cannibalization. And, again, we don't know what exactly cannibalization we're talking about and what they're testifying about because we don't have the details of any of the tests.

MS. BOON: Well, Your Honor, I would take you back to 41. We do have details of that test. We explain that it's an internal test. We explain that the data science team at Stitch Fix was in charge of running the test. We explain how they used their framework and methodology around multivariant testing to model what completion looked like through the onboarding function.

We explain how what the test was showing was that the company's onboarding process would sacrifice customers who came in for a Fix were funneled to Direct Buy and then ultimately denied the purchase or they bought less. Direct Buy customers were converting at a lower rate or they would spend less money compared to Fix --

THE COURT: Right. Those were the results, but what were the components? I'm not sure that they used their framework and methodology around multivariant testing, that doesn't -- it's sort of -- it doesn't tell me what was actually tested and how the testing was undertaken.

MS. BOON: Well, I think we can tell from the testing that the test was being conducted on the new Fix customers as FE1 is describing it here. As I mentioned, at

PLAINTIFFS' ARGUMENT

40

the exact same time and even earlier when FE1 is talking about these tests, Defendants are making assurances concerning this precise category of clients with regard to what additional detail do we have.

We have the dia [verbatim] concerning the data, the underlying data that was shared in business review meetings. FE1 provides a very detailed description, paragraph 159, about that data, the average order value, the number of Fixes for new clients who signed up, customer sharing, customers who have been dormant for 12 months.

MS. HERRERA: Slow down.

MS. BOON: FE1 confirms that those -- I apologize. FE1 confirms that those metrics were realtime in the system. Defendants were able to access those. Those metrics were also discussed in the business review meetings with FE1 that Spaulding personally attended.

FE3, our data scientist, also specifically describes the data in the weekly reports was presented to Defendant Spaulding, what format it was in, in the form of weekly email blasts. He describes --

THE COURT: Right. Again, this goes to *scienter* issues. I don't think it goes to the falsity issue that -- to the extent they're relying on them to support falsities. Again, for 2 and 3 I don't think we have any -- we just have sort of bad, failed as to the test results; correct?

Robin L. Herrera, RMR, CRR, CRC

PLAINTIFFS' ARGUMENT

MS. BOON:  Well, no, Your Honor.  I point to the details that FE2 and FE3 provided about which tests, how they learned about them, how they were shared with Defendant Spaulding.  With regard to FE3, the data scientist, he does talk about the specific data reports.  FE2 also mentioned --

THE COURT:  What test results do they -- what are the details of the tests that were bad or that failed?

MS. BOON:  The details of the tests describe -- FE1, obviously we've covered.  With regard to FE2, FE2 describes the initial beta test and the second test shortly after it and how that failed.  Those words, as I mentioned, matched up with Defendants' descriptions of these beta tests.

THE COURT:  What does it mean for it to fail?

MS. BOON:  Well, as FE2 explains, it means that -- by failing, FE2 is talking about those tests showing cannibalization.  That's what FE2 explains in the complaint.  And then FE2 also confirms FE1 and FE3, that the results essentially don't get better.

FE2, who has data analyzing design in FE2's job title, describes how he was personally so concerned with the cannibalization testing data that he created a presentation to share with the C-Suite reflecting those concerns.  We do have details concerning FE2's testing.

PLAINTIFFS' ARGUMENT

With regard to FE3, he describes cannibalization testing, how he learned about it from his fellow data scientists, and how these specific data inputs that were in the Excel spreadsheets and the weekly email blasts that went to the individual defendants touch on these categories of information.

For example, he talks about the new customer acquisition data. The data essentially about what customers bought, where they bought it from, how much they bought. That's also detailed in paragraphs 48 and 152 of the complaint.

FE1 also confirms the specific data points I was mentioning as being shared in the weekly business review meetings that FE1 personally attended and Spaulding occasionally attended.

And then we have in addition to that, kind of right before the launch period we have FE1, FE2, and FE3 confirming -- and this is in paragraphs 62 through 67 in the complaint -- how the problem was essentially growing and not getting better.

So, again, I mean, I think in terms of overarching story here, we have FE2 confirming initial testing that showed cannibalization. We have FE1 confirming by February or March this new Fix customer test and how that showed cannibalization. We have the company telling investors in

Robin L. Herrera, RMR, CRR, CRC

March that they're just trying to get the product right, not disclosing anything about these testing results they have in their hand.  Then in June we have FE3 saying the cannibalization is continuing.

And then we have all three of the former employees specifically talking about how Spaulding had personal knowledge.  They all confirm that Spaulding attended weekly meetings precisely to discuss the testing results.  As FE1 describes it, the meeting was called the weekly Direct Buy testing meeting but also a share-out meeting because the purpose of that meeting was to show Defendant Spaulding results.

And then, again, we have Spaulding pushing the launch forward notwithstanding the cannibalization testing results because that was her entire objective and mission, essentially, as CEO of the company.

THE COURT:  I mean, I just -- again, it seems like we're using cannibalization and, you know, it's un- -- so just maybe clarify for me when you use cannibalization in the complaint, what's the specific meaning of that?

MS. BOON:  Sure.  Cannibalization simply means taking business away from business line A and giving it to business line B.

So in this context what cannibalization means is that Fix customers are coming in and being diverted to

Direct Buy. Maybe they buy in Direct Buy instead of Fix. That's a form of cannibalization. Maybe they don't buy anything. That's also a form of cannibalization.

We have FE1 describing the specific cannibalization with regard to new customer acquisition that was occurring through the onboarding function of the new Fix customers tests. And, again, what she -- how she describes the cannibalization is that I'm coming in to buy Fix. I'm essentially diverted to Direct Buy. I buy less or I don't buy anything; so the Fix product that I came for, I don't buy. That's Direct Buy cannibalizing the Fix business.

We also have FE3, our data scientist, simply describing cannibalization as Freestyle taking the business away from the existing Fix business. So that's what we're talking about when we're talking about cannibalization.

And, again, analysts are asking about cannibalization, potential cannibalization, what are you seeing. Defendants aren't saying, "Whoa, what are you talking about? Are you talking about cannibalization with respect to current clients? Because that's completely different than cannibalization with respect to prospective clients or new clients. And I'm going to disclose to you now that my tests with regard to current clients are showing that everything's going great. But I do have this new Fix customer test and other tests in my package showing that

cannibalization with respect to prospective clients or new clients is actually a problem, and we're trying to figure that out, and it's going to delay the timing of the launch."

None of that occurs here. And I would just -- I would point Your Honor to the *Arena Pharmaceuticals* case, which I think is analogous. That's the case standing for the idea that you can't tout positive information to the market when you have negative information in your hands contradicting those positive statements.

And there it's kind of a similar situation. It involved a drug. Defendants were going out and touting positive animal studies that they said supported the safety of their drug, but they had in their hands what the Court nicknamed the rat study.

And the rat study showed that the drug was causing some cancer in the rats, and Defendants didn't disclose the rat study. And Defendants said, "Well, hey, we had these other tests. They were positive. They were positive animal studies." The Court said, "No, it's actually misleading for you to go out and be touting positive tests when you have this negative rat study."

And here the exact same principle applies. At a minimum, it's actually misleading when analysts are asking you, "What are you seeing? How is the launch going? What are the tests that you're conducting showing?" to say

essentially everything is great and the tests support that, when in truth you have these negative tests showing cannibalization, including with regard to new Fix customers specifically that you don't disclose.

Even Defendants don't dispute that the new Fix customer test is a test that's being conducted on new clients and what's going to happen when they start being exposed to direct buy. Analysts are specifically asking, "What about potential cannibalization? What are you going to see with the launch?" and they don't disclose that.

THE COURT: So I have two questions for you on that front. I mean, I guess one is, is it your sort of understanding of *Arena Pharmaceuticals* that, you know, to avoid -- that when asked about what they're seeing, the only way to avoid sort of an obligation to fully disclose everything that you've ever tested is to say, "We're not going to comment on internal testing"?

MS. BOON: Well, I think that's one way to avoid it. I mean, obviously, you know, established law says that once you start talking about something, you have a duty to disclose the whole truth.

So to the extent that Defendants aren't speaking about it at all, that could potentially be a basis to find they didn't make any misstatements about it. But that's not what we have here. Defendants are asking about it -- excuse

me -- analysts are asking Defendants about it, and Defendants are making affirmative statements about it, and the affirmative statements that they're making are misleading and they're also not disclosing these negative test results that they have. And I think that's the point of *Arena Pharmaceuticals*. You just can't tout the positive and conceal the negative.

So even if Defendants did have positive tests on current clients -- which is nowhere in the complaint -- Your Honor would have to conclude that as a factual issue on the pleading stage. We don't say that. We say the tests were showing cannibalization from the beginning through the end. That's what we consistently say.

But even if you accept Defendants' suggestion and accept -- and I would respectfully submit that it would be inappropriate to do this -- but even if you assume that the current tests are all good and show cannibalization and the complaint doesn't say anything to the contrary, the complaint squarely says that the former employees have these new Fix customer tests in their hands, which are showing that the onboarding issue is a problem; it's showing cannibalization.

I agree -- I will respectfully concede to Your Honor that FE2 and FE3 don't have as many details about the testing as FE1 has, but they do have the data reports

and they do have the specific inputs --

THE COURT:  Right.  I mean, here's the question. Let me ask you this question just like my other question.

MS. BOON:  Sure.

THE COURT:  I mean, if I -- you know, and I'm going to go back and take another look at all the statements carefully, take a look at all the matters carefully.

But if I do conclude you have a PSLRA problem here, would you be able to amend to specify, you know, not just that the tests show cannibalization, but more details about what aspect of cannibalization those tests show and what degree and what it means for those tests to have failed or to be bad and when and where?

I mean, to provide a stronger basis rather than what, you know, I see right now as kind of one -- not quantified, but at least one specified test?  Would that -- is that something that the former employees would be able to provide?

MS. BOON:  Well, Your Honor, I would certainly hope so.  I would have to go back to them and ask, and obviously we would open up our investigation and see what else we can find out.

But, again, I would respectfully submit, Your Honor, that at this point we don't have to have every single fact in detail.  We have to have former employees with

PLAINTIFFS' ARGUMENT

personal knowledge who are reliable, whose allegations, again, considered holistically under the *Tellabs* case, as the Court well knows, support a strong interest of *scienter*. And we're not just relying on one --

THE COURT:  And falsity.

MS. BOON:  That's correct, of course.

THE COURT:  Like, that -- just in reviewing everything, that seems to be the heart of the question.  But the hard question is thinking about these ambiguous statements in terms of relatively sparse details about what the tests showed and whether those together satisfy the quite substantial pleading requirement that Congress imposed on cases like this.

MS. BOON:  May I make a few points to Your Honor briefly?  Thank you.

So I mentioned before we have the new Fix customer test and the representations about the new cohorts of Fix clients.  I would respectfully submit that's a match.

I also mentioned we have FE2 talking about the beta testing, the second test.  We have Defendants Lake and Spaulding talking about the beta testing and the initial AB test and how it didn't show cannibalization and how it still doesn't show cannibalization and this gives them confidence that when the product's launched to new customers there's not going to be any cannibalization.

Robin L. Herrera, RMR, CRR, CRC

We have also have, as Your Honor put it earlier, some squishier statements where --

THE COURT:  Slow down a little bit too for the sake of my court reporter.

MS. BOON:  I apologize.

We also have, as Your Honor mentioned, some of the statements perhaps we can say are squishier in the sense that they don't *(audio interference)* clients or differentiate among clients, they simply say the products are incremental, additive, complimentary.  There's no exception; there's no narrowing to specific clients.

In the documents Defendants submitted to the Court, when you read the statements you can see multiple express representations by the Defendants even in the excerpts that they highlighted to new customers, to customers that we just obtained through a new marketing function, to new cohorts of clients.  There are references, many references to new customers in Defendant's exhibits specifically, and also in the portions of statements that we cite.

I would also add that Defendants in the complaint are making specific statements about these new data or prospective clients, for example.  They're asked about the vision for Direct Buy links, as we can see in the data that it's working.  That was false.  The data was showing it's

not working.

As another example, an analyst asked, "What are you seeing with Direct Buy?  Is it additive to those purchases?  Is it replacing some of the Fixes they otherwise would have ordered?"

Spaulding cites the tests and she says: "If the tests show it was highly, highly incremental and we see all of those signs continuing."  She's not just talking about current clients.  She's talking about those clients continuing.

As another example, we have a question specifically about launching Direct Buy and cold starting people in Direct Buy.  And Spaulding doesn't say, "We have these negative cannibalization tests."  Instead she says, "The combination of Fix and Direct Buy shows that it's strong and incremental."

As a result of all this, I just want to point Your Honor to what the analysts are observing.  Both investors and the market didn't understand Defendants only to be speaking about certain types of clients.  We have as an example paragraph 37 of the complaint.  Direct Buy allows Stitch Fix to expand their wallet share among new/existing customers.

Again, there's no understanding or recognition on the part of the market that this may be true for some

customers and not the others.

Just very quickly, Your Honor, one more point on this.  The Defendants' argument ignores the context in which the statements are made, and I know they accuse me of doing this, but I would respectfully submit that they're the ones doing this.

It's critical under Rule 10(b)(5), it's also critical under the case law.  Analysts, again, are asking generally, they want to know what would happen when Direct Buy was fully launched to the new customers because they're trying to understand the company's trajectory and growth.

The company's conducting its tests on this website precisely to understand how Direct Buy is performing now, how it would perform when it was launched to new customers. Analysts are observing that the company is testing the Direct Buy product and how it's going to affect the rollout to non-Fix customers.

So both the analysts and the Defendants alike viewed any test results the company had about cannibalization as relevant to what's going on right now and relevant to what's going to happen when the product was launched.  And, again, even if, as Defendants argue, which I very much dispute, they're only talking about current clients and my former employees are only talking about tests

on prospective clients, the statements would still be actionably misleading under *NVIDIA* case and the *Arena Pharmaceuticals* case that I mentioned earlier.

THE COURT:  Okay.

MS. BOON:  Thank you, Your Honor.

THE COURT:  Thank you.  I will give defense counsel three more minutes.

DEFENDANTS' REBUTTAL ARGUMENT

MR. GIBBS:  First of all, the *Arena* case does not stand for the proposition that if you say something positive, you have to reveal everything negative.  That's not even close.

In the *Arena* case, there was a direct contradiction between the statement and the undisclosed facts.  The defendants in *Arena* said, "All the animal studies looked good."  There was a rat study that didn't look good.  It's a direct contradiction.  So there's no rule that says if you say positive stuff, you have to disclose the negative stuff.  That's just wrong.

Now, as to the only test where we have any level of detail at all, it's this new Fix customer test.  First of all, I don't concede that that's a customer acquisition test.  I don't know what new Fix customer means.  It might mean a Fix customer who just joined the platform.  We don't know.  There's not enough detail here.  But let's set that

aside.

The only thing we know about the result of that test is it allegedly showed -- this is paragraph 41 -- it showed Direct Buy was going to negatively impact customer acquisition.  Now, I'm not entirely sure what that means either.  I don't know if that means it's going to have a small impact or a big impact.  I don't know whether it means the impact on new customer acquisition is going to be smaller or larger than the benefits of whatever the customers buy through Direct Buy; okay?

But set that aside as well.  It's really important, then, to focus on what the Defendants said on March 8th, 2021, which is the call closest in time to the period where this new Fix customer test was allegedly conducted.

And I just -- I want to note some of the things that they said because I don't think they are remotely inconsistent with the notion that the company had in hand some test results showing that under whatever circumstances were being tested then, it was having a negative impact on customer acquisition.

So, for example, in the transcript of the March 8th, 2021, earnings call, which is Exhibit 14 to the Fernandez declaration, on page 7, Ms. Spaulding says, "We have a solid foundation in place and our development efforts

are largely focused now on expanding the experience for first-time clients.  This includes evolving our client onboarding process and user interface, tightening logistics and operations, and streamlining client style collection information."

On the next page Mr. Jedda says, "We plan to continue testing the product through fiscal Q3 and into Q4 before a full-scale product launch in late fiscal Q4.  This will allow time; also plays a role in our revised guidance."

In the question-and-answer session at page 10, Ms. Spaulding says, "And then in terms of our timing, we're building on 01 product," brand-new product, "and we just want to make sure we really get it right as we roll on."

Now, I don't think those statements, talking in some depth about all of the development efforts that are still going on, all of the testing that is expected to come throughout Q3 and into Q4 before they launch the product, that is not inconsistent with the idea that they may have some negative test results in hand at that point in time.

Now, they didn't say, "We did a new Fix customer test and it showed that it was going to negatively impact customer acquisition."  I don't think that level of detail is required, and because they're still building the product, I think it's absurd to suggest that they should have predicted failure in a product they were telling investors

"We're still building it.  We're still testing to see how to build it the best way we can."

So I don't think that conversation on March 8th, 2021, is even remotely inconsistent with the only even arguably specific fact they've alleged about testing, which is that they had in hand a test that showed bad results under some conditions that we can't identify because it's not in the complaint.

Everything she's saying about continued testing, continued development, working on the onboarding process, fully consistent with the fact that they may have some tests of a preliminary version of the product that didn't come out the way they wanted it to.  Otherwise, they would have launched the product.

That's all I have, Your Honor.

THE COURT:  The motion is submitted.  It's been well argued and briefed, and I will attempt to get a decision out forthwith.

MR. GIBBS:  Thank you.

THE COURT:  Thank you.

THE CLERK:  Court is concluded.

(Proceedings adjourn at 11:21 PM.)

*  *  *

DEFENDANTS' REBUTTAL ARGUMENT

57

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____/s/  Robin L. Herrera_____        April 29th, 2024
Robin L. Herrera, RMR, CRR, CRC       Date
Official Court Reporter


Robin L. Herrera, RMR, CRR, CRC