**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs Retail Wholesale Department Store Union Local 338 Retirement Fund, Retail Wholesale Department Store Union Local 338 Health & Welfare Fund, Retail Wholesale Department Store Union Local 338 General Fund, and Retail Wholesale Department Store Union Local 338 Benefits Trust Fund*

[Additional Counsel Appear on Signature Block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, et al.,<br><br>Lead Plaintiffs,<br><br>v.<br><br>STITCH FIX, INC., et al.,<br><br>Defendants. | Case No. 5:22-cv-04893-PCP<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u> |

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 6

III. PARTIES ..... 6

A. Lead Plaintiffs ..... 6

B. Defendants ..... 7

IV. SUMMARY OF THE FRAUD ..... 8

A. Stitch Fix's Core "Fix" Product ..... 8

B. Stitch Fix Launches A Second Product Line, Called "Direct Buy," And Tells Investors That Direct Buy Will Attract New Clients ..... 9

C. The Company Hires Defendant Spaulding As President And The Market Views The Success Of Direct Buy As Critical To Her Success ..... 10

D. At The Start Of The Class Period, Defendants Launch Direct Buy To Select New Clients And Tout Direct Buy As A "Frictionless Entry Point" To "Acquire" "New Clients" ..... 11

E. In Truth, Defendants Know From Stitch Fix's Internal Testing That Direct Buy Is Not A "Frictionless Entry Point" To "Acquire New Clients," And Is "Cannibalizing" And Will Continue To "Cannibalize" The Core Fix Business ..... 15

F. Defendants Continue To Mislead Investors That Direct Buy Is And Will Attract New Clients, Convert Prospective Clients, And Be "Frictionless" With Fix ..... 26

G. Defendants Partially Reveal The Truth When They Delay The Full Launch Of Direct Buy To New Customers In March 2021, But Continue To Falsely Deny Cannibalization, And Reassure Investors That Direct Buy And Fix Remain "Additive" And "Incremental" ..... 28

H. Defendants' Internal Testing Continues To Reveal That Direct Buy Is Cannibalizing The Fix Business ..... 29

I. Defendant Spaulding Is Named Incoming CEO And The Market Views Her Promotion As Evidence Of Direct Buy's Continued Success ..... 30

J. Defendants' Summer 2021 Testing Continues To Confirm That Direct Buy Is Cannibalistic As Defendants Continue To Falsely Assure Investors That It Is "Incremental" To Fix And Promise To Launch By The End Of The Quarter ..... 31

K. Defendant Spaulding Becomes CEO And Pushes The Direct Buy Launch Through To New Customers, Despite Knowing From Internal Testing That Direct Buy Was Cannibalizing Fix ........ 32

L. Defendants Continue To Falsely Tout Direct Buy As Bringing In "Many New Clients" And As A Driver Of Sustainable Growth ........ 36

V. THE FULL TRUTH EMERGES ........ 37

A. Stitch Fix's December 7, 2021 Earnings Announcement For The First Fiscal Quarter Of 2022 ........ 37

B. Stitch Fix's March 8, 2022 Earnings Announcement For The Second Fiscal Quarter Of 2022 ........ 39

C. Stitch Fix Announces Freestyle-Related Layoffs And Additional Freestyle Cannibalization On June 9, 2022 ........ 41

D. Post-Class Period Developments ........ 43

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 45

A. June 2020: Q3 2020 Disclosures ........ 46

B. June 10, 2020: William Blair Growth Stock Virtual Conference ........ 48

C. December 2020: Q1 2021 Disclosures ........ 49

D. February 10, 2021: Goldman Sachs Technology and Internet Virtual Conference ........ 50

E. March 2021: Q2 2021 Disclosures ........ 51

F. June 2021: Q3 2021 Disclosures ........ 53

G. September 2021: Q4 2021 Disclosures ........ 54

VII. LOSS CAUSATION ........ 56

VIII. ADDITIONAL SCIENTER ALLEGATIONS ........ 60

IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 71

X. THE PRESUMPTION OF RELIANCE ........ 72

XI. CLASS ACTION ALLEGATIONS ........ 73

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........ 75

COUNT I ........ 75

COUNT II ........ 77

XIII. PRAYER FOR RELIEF ........ 78

XIV. JURY DEMAND .......... 79

Court-appointed Lead Plaintiffs Retail Wholesale Department Store Union ("RWDSU") Local 338 Retirement Fund, RWDSU Local 338 Health & Welfare Fund, RWDSU Local 338 General Fund, and RWDSU Local 338 Benefits Trust Fund (collectively, "Lead Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all persons who purchased the common stock of Stitch Fix, Inc. ("Stitch Fix" or the "Company") between June 9, 2020 and June 9, 2022, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on, among other things, the independent investigation of their undersigned counsel. This investigation included, among other things, a review and analysis of: (i) Stitch Fix's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) recordings and transcripts of investor conference calls; (iv) publicly available presentations by Stitch Fix; (v) press releases and media reports; (vi) securities pricing data; (vii) interviews with former Stitch Fix employees; and (viii) other material and data identified herein. Lead Counsel's investigation into the alleged factual allegations is continuing, and many of the relevant facts are known only by Defendants and are exclusively within their custody or control.

## I. INTRODUCTION

1. This case arises from misstatements and omissions by the senior executives of Stitch Fix about a new business line called "Direct Buy" that Defendants and analysts celebrated as the "pivotal transformation" of the Company. Led by its new CEO, Defendant Elizabeth Spaulding, Stitch Fix assured investors that Direct Buy was "additive," "incremental" and "complementary" to its core product, the "Fix," denying "any sort of cannibalization between the two." Defendants further assured that Direct Buy would "attract" and "convert" "new clients" to Stitch Fix. In truth, Defendants knew from extensive internal test results that new clients funneled to Direct Buy were converting to Stitch Fix at a 30-40% lower rate than those directed to the traditional Fix onboarding experience and that those who did convert spent substantially less and

were of lower quality than traditional Fix clients. When the cannibalistic effect of Direct Buy was revealed to investors through multiple partial disclosures, Lead Plaintiffs and the Class suffered significant losses as the Company's market capitalization, inflated by Defendants' misleading statements and omissions, declined from its Class Period high by over $10 billion, or more than 90%.

2. Stitch Fix is a clothing and apparel company whose core product is the "Fix," a box of five items of clothing or accessories curated by the Company's stylists. The Company sends the Fix to its customers who then accept or reject the items in the box, purchase what they decide to keep, return the rest, and pay a styling fee. Client acquisition costs are recouped over the first year only after clients receive and purchase multiple "Fixes." The Company's growth and profitability are therefore heavily dependent on recruiting "quality" clients who are repeat customers that deliver "lifetime value" to the Company.

3. Prior to the start of the Class Period and with much fanfare, Defendants announced that the Company was launching a second product line called "Direct Buy," which would allow customers to shop on the Company's website for specific products. The Company's founder, Defendant Katrina Lake, told investors that Direct Buy would "attract new clients," "convert prospective clients," and be "incremental" to Fix.

4. As part of Defendant Lake's efforts to transform the Company, she brought on Defendant Spaulding—first as President, and later as CEO. Lake told investors that Spaulding's principal objective was to launch Direct Buy and make it a success, a mission that Spaulding readily accepted. As a result, the market closely connected the success of Direct Buy with Defendant Spaulding's success as Stitch Fix's CEO. Defendants promised investors on March 9, 2020, that Direct Buy would be launched to new customers within "the next quarter or two."

5. The Class Period begins on June 9, 2020, the first trading day after Defendants Lake and Spaulding explained that Stitch Fix had launched a Direct Buy "beta" to select new, prospective clients. In connection with the launch, Defendants assured investors that Direct Buy was a "frictionless entry point" that would "more effectively attract new clients" and that Direct Buy "complements our Fix offerings." Defendants repeated these and similar statements

throughout the Class Period. They also repeatedly and emphatically denied that the launch of Direct Buy to new customers would cannibalize Fix in response to direct questions from analysts.

6. In truth, Lead Counsel's investigation confirmed that Defendants knew from extensive internal tests conducted throughout the Class Period that Direct Buy was cannibalizing the Fix business. One former Senior Manager, who personally worked on the Direct Buy launch, confirmed that the first New Fix Customer Test (of three) occurred in June 2020, and the test results showed cannibalization. The Senior Manager explained that the Company defined cannibalization as when customers who were onboarded through Direct Buy bought fewer or no products from Stitch Fix and returned less frequently than Fix-onboarded customers. As the Senior Manager explained, this would "cannibalize our potential for new customers" who would have converted to Stitch Fix, purchased more, and more often, from the Fix experience. The Senior Manager confirmed that the New Fix Customer Test showed that Direct Buy customers purchased less than Fix customers, were less likely to be repeat customers, were of worse quality, and had lower lifetime value to the Company. Indeed, Lead Counsel interviewed a Data Scientist who explained that customers who were onboarded through Direct Buy had a conversion rate that was about <u>30-40% lower</u> than customers who were onboarded through Fix, and that multiple tests were conducted and <u>all</u> of them showed this result. The Data Scientist also confirmed that the Freestyle program that was eventually launched was absolutely fundamentally the same as the program that failed the testing. The Senior Manager independently corroborated both that Direct Buy caused a 30-40% decrease in the conversion rate and that <u>all</u> tests run by the Company of which he was aware showed consistently negative results. The Senior Manager and the Data Scientist described who was tested, the parameters of the tests, which metrics were tested, how the results were quantified, and how Defendant Spaulding and the rest of the C-Suite were informed of these results through Google Slides presentations in recurring meetings and from database access.

7. On March 8, 2021, after at least three internal tests unequivocally demonstrated Direct Buy's cannibalistic effects, the Company told investors that Direct Buy's full launch to all new clients would be "delayed" until the end of the 2021 fiscal year and, as a result, took down the Company's fiscal year 2021 guidance. In response, Stitch Fix's stock declined by 28%. But

Defendant Spaulding mischaracterized the delay as resulting merely from the Company's effort to "get it right" and misleadingly cited to dated testing of Direct Buy with existing clients as evidence that the introduction of Direct Buy to new clients would be "an additive experience" that would allow the Company to broaden its addressable market. One concerned analyst specifically asked Defendant Spaulding about cannibalization, but again, Defendant Spaulding falsely and emphatically denied it, reiterating that Direct Buy was an "additive" experience to Fix.

8. By the summer of 2021, the Company's internal testing continued to reveal that Direct Buy was cannibalizing Fix. Nonetheless, Defendant Spaulding determined to push forward with the full launch of Direct Buy to all new customers precisely because the success of Direct Buy was so critical to her success. For instance, a second former Data Scientist and a former Director who worked with Data Science and Analytics confirmed that Direct Buy was Defendant Spaulding's baby, and described how she pushed the launch of Direct Buy through too fast despite the negative test results reported widely throughout the Company. The first former Data Scientist confirmed that the Data Science group was of the opinion that Direct Buy "is not going to work" and "we should not do this," but that anyone who voiced these opinions to Defendant Spaulding was treated poorly until they were quiet or left the Company.

9. On August 1, 2021, Defendant Spaulding formally became the CEO of Stitch Fix and one week later, on August 9, 2021, she fully launched Direct Buy to all new customers. During her first earnings call as CEO on September 21, 2021, Defendant Spaulding changed the name of Direct Buy to "Freestyle."[1] Defendant Spaulding continued to emphatically deny that there was cannibalization in response to analyst questions, instead touting the "incrementality of these two offerings really being quite complementary."

10. Meanwhile, between June 9, 2020 and June 9, 2022, Defendant Lake converted and sold more than 2.1 million shares of her own personal holdings of Stitch Fix Class B common

[1] As discussed in Section IV.L below, the Company announced that they changed the name of the Direct Buy program to "Freestyle" during their earnings call for the fourth fiscal quarter of 2021, held on September 21, 2021. "Direct Buy" and "Freestyle" are used interchangeably throughout this Complaint.

stock, which had 10x the votes of Class A common stock, for proceeds of nearly $98 million. This is a more than 40% increase from her pre-Class Period sales of approximately $57 million.

11. The market learned the full truth through three additional partial disclosures, beginning on December 7, 2021, when Defendant Spaulding revealed that as a result of the "expansion into Freestyle," the Company "may experience short-term impacts of cannibalization." In response to this disclosure, the price of Stitch Fix stock declined 24%. But Defendants assured investors that the cannibalization problem was speculative and "short-term," that Defendants had already solved the problem, and that the Company would still benefit from "significant new client potential ahead." Analysts accordingly were both surprised by Defendants' revelations and reassured that the Company would be able to resolve the potential cannibalization issue in the short term.

12. Then, on March 8, 2022, Defendant Spaulding shocked investors when she disclosed that the Company was continuing to experience cannibalization that had not been resolved in the short term. Defendant Spaulding revealed what Defendants had long known: the cannibalization or "friction" between Fix and Freestyle customers led to declining customer growth and lower customer spend as less and lower quality Freestyle clients bought little or nothing. As Defendant Spaulding acknowledged, "conversion of new visitors for Fix and Freestyle is not where we want it to be." As a result of these disclosures, the price of Stitch Fix stock declined by 6%.

13. Finally, the full truth was revealed on June 9 and 10, 2022, when Defendant Spaulding announced significant layoffs and disclosed with respect to Freestyle that "the conversion of new visitors was not where we wanted it to be in the second quarter[.]" Shockingly, Defendant Spaulding explained that Stitch Fix had effectively shuttered Freestyle to new customers because of its cannibalization of the Company's core Fix offering. Accordingly, the Company issued yet another downward revision to guidance to account for the death knell of Freestyle as a client acquisition vehicle and growth driver. As a result of these disclosures, the price of Stitch Fix stock declined 27%.

14. In the aftermath of the fraud, Defendant Spaulding was forced to resign from her position as CEO and Stitch Fix effectively abandoned Freestyle as a client acquisition strategy. On January 5, 2023, the Company issued a press release announcing that Defendant Spaulding was not the right person to lead the Company's "ambitious transformation." Further, Defendant Lake, as interim CEO, announced on March 7, 2023 that the Company would "refocus" on the Fix, and that Stitch Fix would no longer think of Freestyle as a "separate business unit" precisely because it "was less effective" as a "customer acquisition vehicle."

## II. JURISDICTION AND VENUE

15. This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

16. This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

17. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c). At all relevant times, Stitch Fix had its principal executive offices located in this District and conducted (and currently conducts) substantial business here. In addition, many of the acts alleged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

18. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

### A. Lead Plaintiffs

19. Lead Plaintiffs RWDSU Local 338 Retirement Fund, RWDSU Local 338 Health & Welfare Fund, RWDSU Local 338 General Fund, and RWDSU Local 338 Benefits Trust Fund are multi-employer pension and benefits funds that provide retirement benefits to retirees in a

variety of industries, including retail supermarkets, pharmacies, healthcare facilities, maintenance facilities, and school monitors and bus drivers. As reflected in the certification previously submitted and attached to Lead Plaintiffs' Initial Complaint (ECF No. 1), Lead Plaintiffs purchased shares of Stitch Fix Class A common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Defendants**

20. Defendant Stitch Fix (the "Company") sells a range of apparel, shoes, and accessories through its website and mobile application. The Company maintains its corporate headquarters at 1 Montgomery Street, Suite 1500, San Francisco, California. Stitch Fix stock trades on the NASDAQ, which is an efficient market, under the ticker symbol "SFIX."

21. Defendant Katrina Lake ("Lake") is the founder of Stitch Fix and has served as the Executive Chairperson of the Company's Board of Directors since August 1, 2021. Defendant Lake previously served as the Company's Chief Executive Officer from its founding in 2011 until August 1, 2021, and again as interim CEO from January 5, 2023 through June 26, 2023. Defendant Lake made misstatements during or in: the Company's June 8, 2020 earnings call and letter to shareholders attached to SEC Form 8-K; the William Blair Growth Stock Virtual Conference, held on June 10, 2020; the Company's December 7, 2020 earnings call and letter to shareholders attached to SEC Form 8-K; the Goldman Sachs Technology & Internet Virtual Conference, held on February 10, 2021; and the Company's March 8, 2021 letter to shareholders attached to SEC Form 8-K.

22. Defendant Elizabeth Spaulding ("Spaulding") was the CEO of Stitch Fix and a member of its Board of Directors from August 1, 2021 through January 4, 2023. Defendant Spaulding stepped down from both positions effective January 5, 2023. She previously served as Stitch Fix's President from January 27, 2020 through July 31, 2021. Defendant Spaulding made misstatements during or in: the Company's June 8, 2020 earnings call and letter to shareholders attached to SEC Form 8-K; the Company's December 7, 2020 earnings call and letter to shareholders attached to SEC Form 8-K; the Company's March 8, 2021, earnings call and letter to

shareholders attached to SEC Form 8-K; the Company's June 7, 2021 earnings call; and the Company's September 21, 2021 earnings call.

23. Defendants Lake and Spaulding are collectively referred to as the "Executive Defendants." The Executive Defendants directly participated in the management of Stitch Fix's operations, had direct supervisory involvement in Stitch Fix's day-to-day operations, and had the ability to control and did control Stitch Fix's statements to investors and financial reporting. The Executive Defendants possessed the power and authority to control the contents of Stitch Fix's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Executive Defendants were involved in drafting, reviewing, publishing, and making the false and misleading statements and omissions alleged herein.

## IV. SUMMARY OF THE FRAUD

### A. Stitch Fix's Core "Fix" Product

24. Based in San Francisco, California, Stitch Fix sells apparel, shoes, and accessories through its website and mobile application.

25. Stitch Fix began with one product line, the "Fix," which is a boxed shipment of five pieces of clothing or accessories curated by the Company's stylists. The stylists determine which clothes to send their customers based on the results of a "style quiz." When the Fix arrives at the customer's residence, the customer chooses which, if any, items to buy, and returns the rest. The customer pays a "styling fee" per Fix, and that fee is then applied to the total cost of the items, if any, that the customer purchases. Customers who purchase all items in the Fix generally receive a discount.

26. As Stitch Fix consistently represented to investors prior to and during the Class Period, its "disciplined" and technology-driven customer acquisition strategy targeted "quality" customers with high "lifetime values" or LTV. This is because it took the Company at least a

"couple of quarters" if not "12 months" of recurring Fix purchases to offset the significant cost of acquiring clients. In other words, Stitch Fix only made money when a customer became a repeat and long-term subscriber to a "Fix" box.

27. Defendants' client acquisition strategy depended on data analysis and internal testing conducted by the "Data Science" or "Algorithms" group. As Defendants told investors, they meticulously tracked client behavior by "cohort," allowing the Company to rely on "proprietary algorithms . . . to predict purchase behavior" and "forecast demand." Again, the success of Stitch Fix's business model depended on repeat long-term customers who would deliver "lifetime value." Indeed, Defendants frequently justified expanding Direct Buy to new clients precisely because, they (falsely) assured, "lifetime values will continue to grow."

**B. Stitch Fix Launches A Second Product Line, Called "Direct Buy," And Tells Investors That Direct Buy Will Attract New Clients**

28. Prior to the Class Period, Defendant Lake touted that while the five-item Fix box format had generated "great value," the Company's platform needed to be "extended much more broadly than this one form factor" in order to improve the Company's growth and profitability. To that end, during the Company's October 1, 2019 earnings call (for the fourth fiscal quarter of 2019[2]), Lake announced that Stitch Fix had developed a second product line, initially referred to as "Shop" or "Direct Buy," and later called "Freestyle." Direct Buy allowed existing customers to shop on the Company's website for specific products, essentially adopting a traditional online retail model enhanced by data science. Direct Buy consisted of four verticals, which the Company rolled out to existing Fix customers and select new, prospective clients in four phases between June 1, 2019 and April 1, 2021: Shop New Colors, Shop Your Looks, Trending For You, and Shop By Category.

29. Starting shortly after its launch and continuing throughout the Class Period, Defendant Lake heralded Direct Buy as a powerful new driver for acquiring new clients. For instance, on October 1, 2019, Defendant Lake emphasized that Direct Buy would attract "new

[2] The Company's fiscal year ends on the Saturday that is closest to July 31 of that year.

clients" because it would "provide [a] new entry point into our business and allow us to customize the ways in which people want to buy and engage with us to address many more types of clients in this space."

30. Analysts were watching closely to see whether Stitch Fix would be able to grow its business as Defendant Lake promised investors, and some analysts expressed concern. For instance, Wells Fargo Securities noted on October 1, 2019 that Direct Buy would "cause some investor angst (as the pivot from the traditional model will likely drive concern over their ability to continue growing their core business)."

### C. The Company Hires Defendant Spaulding As President And The Market Views The Success Of Direct Buy As Critical To Her Success

31. On December 9, 2019, Stitch Fix issued a press release announcing that Defendant Spaulding would join Stitch Fix as President, starting in January 2020, and that her principal mandate was to execute the new Direct Buy strategy, including the launch to new clients. The press release touted Direct Buy as an "exciting new chapter for Stitch Fix" designed to "serve more clients in new and engaging ways" and noted that "Elizabeth will be instrumental in bringing this to life." In another press release issued the same day, Defendant Lake promised that Defendant Spaulding "will help lead us into our next chapter of growth, including the expansion of our customer experience beyond our core Fix offering."

32. Analysts immediately tied Defendant Spaulding's success to Direct Buy's success. For instance, SunTrust Robinson Humphrey echoed Lake's remarks on December 9, 2019, observing that Spaulding would "lead the expansion of Stitch Fix's customer experience beyond the core Fix offering," and celebrating Direct Buy as "transformational."

33. Over the following few months, Defendants continued to tout Direct Buy, and Defendant Spaulding, as the future of Stitch Fix. For instance, on March 9, 2020, Defendant Lake told investors that Direct Buy "is highly complementary to our Fix offering and will play a key role in unlocking additional market opportunity as we seek to attract new clients." Defendant Spaulding, eager to show her immediate impact on the business, promised that Direct Buy would be rolled out to new customers within "the next quarter or two," ahead of plan. As such,

Defendants positioned Direct Buy, and Defendant Spaulding, as driving the "pivotal transformation" and growth of Stitch Fix.

34. Days later, the COVID-19 pandemic shuttered stores, drastically changing retail business models as corporations reacted to new consumer spending trends and merchandise demands. Specifically, the online retail market rapidly expanded as consumers shifted most, if not all, of their discretionary spending online. Defendant Spaulding estimated that "more than $30 billion will rapidly shift online which is three times what we would typically see in one year." Defendants asserted that Stitch Fix—with both Direct Buy and the Fix—was poised to capitalize on this massive economic shift to online shopping. For instance, on April 8, 2020, in direct response to an analyst question about how COVID affected the Company's growth plans, Defendant Lake responded that she believed the pandemic trend of customers' increased online apparel spending would "accelerate," which would position Direct Buy as a "lightweight way to engage people" and "be a good entry point into our model."

**D. At The Start Of The Class Period, Defendants Launch Direct Buy To Select New Clients And Tout Direct Buy As A "Frictionless Entry Point" To "Acquire" "New Clients"**

35. The Class Period begins on June 9, 2020, the first trading day after the Company announced its earnings results for the third fiscal quarter of 2020 and held an earnings conference call. Defendant Lake introduced Defendant Spaulding on the call by explaining that she would "provide an update on all of the exciting progress and momentum we're seeing in Direct Buy as well [as] across our broader company evolution." Defendants Lake and Spaulding then announced that the Company had launched "in early June" "Trending For You," a Direct Buy business line which would allow customers who had not previously purchased a Fix—*i.e.*, prospective or new clients—to purchase through Direct Buy. On the same call, Defendant Spaulding explained that "later this month" they would be offering Direct Buy to "new" clients through a collaboration with a fashion influencer. Spaulding reiterated that the clients Stitch Fix was "targeting" with Direct Buy included "obviously new perspective [*sic*] clients" and "also a large group of clients that have signed up with their style profile but not converted to Fixes."

36. Trending For You, followed days later by the influencer collaboration, marked the initial launch of Direct Buy to new or prospective customers. As Defendants Lake and Spaulding explained in the Company's shareholder letter published June 8, 2020, "To move direct buy towards becoming a new client acquisition vehicle, in June we introduced a beta for a new offering, 'Trending For You,' which removes the purchased item requirement and instead allows men's and women's clients to shop hyper-personalized looks based on their style profile. This change . . . removes the requirement that clients have purchased with us in the past." In other words, Trending For You was available to select customers who had registered a profile with, but had not previously purchased anything from, the Company. As explained below, *infra* at Section IV.E, the Company considered this category of purchasers "new customers" and included this category of customers in its New Fix Customer Tests.

37. On the same call, Defendant Spaulding explained that "later this month, we will launch another collaboration with fashion influencer Katie Sturino, in which we will offer a curated assortment through Direct Buy from which both new and existing women's clients can shop."[3] Spaulding further explained that Stitch Fix had "developed a new onboarding experience, which lays the foundation to onboard future clients directly into all types of Direct Buy experiences."

38. Defendants repeatedly emphasized that Trending For You and the influencer collaboration would fuel new customer acquisition, a cornerstone of the Company's growth strategy to capitalize on the massive shift in consumer behavior resulting from the pandemic. For instance, Defendant Spaulding stated on the June 8, 2020 call that Stitch Fix would "get more than our fair share" of the gold rush from the massive increase in online retail spending because the Company was "planning to capitalize on this market opportunity by accelerating Direct Buy" through Trending For You and its influencer collaboration. Spaulding added that "Trending for You and our influencer collaboration" are "prime examples of how we're adding flexibility to the way clients can experience Direct Buy and to more effectively attract new clients." She added, "In addition, we believe it [Direct Buy] can fuel conversion among clients who'[ve] historically

[3] Unless otherwise stated, emphasis is added and internal citations and punctuation are omitted.

been on the fence." Defendant Lake similarly emphasized, "In particular, given the momentum we've witnessed with Direct Buy in a frictionless entry point we think it represents, we plan to make it accessible to new clients as an acquisition vehicle within the coming months." Later on the call, Spaulding reiterated that Trending for You and the influencer collaboration "both represent ways to be able to bring in new clients without necessarily having that prior purchase experience with us."

39. Defendant Spaulding cited the Company's internal "testing right now with things like Trending for You as I mentioned and the influencer collaboration" as the basis for her conclusion that "pure new clients" were "growth figures of opportunity."

40. Defendants also emphasized that Direct Buy would successfully attract new clients without cannibalizing the Company's Fix business. For instance, Defendant Spaulding stated on June 8, 2020, "We believe Direct Buy provides the lightweight entry point for . . . new clients and complements our Fix offerings[.]" Defendants' shareholder letter, released the same day, repeated this statement. Later on the June 8, 2020 call, when an analyst directly asked "what percent of your overall business" Direct Buy "will approximate over time," Spaulding reassured investors with respect to Fix and Direct Buy, "I think what we're most excited about is to just see that these two offerings are so highly complementary versus any sort of cannibalization between the two."

41. Two days later, at the June 10, 2020 William Blair Growth Stock Virtual Conference, Defendant Lake continued to tell investors that Direct Buy would convert new clients. Defendant Lake stated that Direct Buy "open[s] up incremental market opportunity" because it will "convert people who might be on the fence about Stitch Fix."

42. Analysts were encouraged by these representations that Direct Buy would lead to new customer acquisition, particularly in the face of COVID. For instance, Piper Sandler wrote on June 8, 2020 that they were "raising our estimates as demand is improving faster than we were originally expecting in the depths of CV-19" in part because "Direct Buy supported improvement (tripled Q/Q) and mgmt is leaning into this cost effective tool to grow new adds and re-activate dormant users." They concluded, "SFIX is using this platform as a customer acquisition tool . . . by allowing those w/o past purchases to use." RBC Capital Markets celebrated that "Direct Buy

continu[es] to be incremental to Fixes" and noted that a "good fundamental story" includes Direct Buy "offerings expanded to prospective clients[.]" SunTrust Robinson Humphrey trumpeted that, "SFIX's foray into Direct Buy, particularly around new client acquisition/reactivation, can be transformational over the M/L term" and "[t]urning Direct Buy into an acquisition/re-activation tool is exciting."

43. On June 17, 2020, Stitch Fix announced that they were officially launching their Direct Buy influencer collection to new clients in a blog post titled: "Shop-Katie Sturino Collection: bringing our personalized shopping experience to new clients, no Fix required." In the same post, the Company explained, "this is the first time people completely new to Stitch Fix can self select items from a collection and instantly shop personalized outfit recommendations, no previous purchase or Fix required." To advertise the no-Fix requirement, the Company also tweeted on June 29, 2020 that customers "can buy direct from @stitchfix without scheduling a fix!":



44. Throughout July 2020, Stitch Fix marketed Direct Buy to new clients, including clients who had not purchased a Fix, on Twitter, as illustrated by the July 23, 2020 tweet below which asked, "Did you know you can buy clothes directly from us without getting a Fix?":




45. Thus, by summer 2020, Defendants had launched Direct Buy both to select new or prospective clients who had filled out a style profile but never purchased anything, and select new or prospective clients who had never engaged with Stitch Fix before.

**E. In Truth, Defendants Know From Stitch Fix's Internal Testing That Direct Buy Is Not A "Frictionless Entry Point" To "Acquire New Clients," And Is "Cannibalizing" And Will Continue To "Cannibalize" The Core Fix Business**

46. Defendants' statements that Direct Buy was a "frictionless entry point" that would allow the Company to "attract new clients," "convert people," and expand the Company's addressable market were false and misleading, and omitted material facts. As corroborated by four former employees, repeated testing led by the Data Science or "Algorithms" group unequivocally

demonstrated that new customers channeled to Direct Buy converted at rates 30-40% below traditional Fix clients and that those who did convert spent substantially less and were of lower quality than traditional Fix clients.

47. "Cannibalization" refers to the fact that potential customers did not convert to Stitch Fix because they were onboarded into Direct Buy instead of Fix, or did convert through Direct Buy, but bought substantially less than they would have if they had been onboarded through Fix. As detailed below, at least three statistically significant tests of the Direct Buy experience run on new clients by Stitch Fix's own Data Science group confirmed that Direct Buy was cannibalistic, converting 30-40% less new clients than Fix, and attracting lower-quality shoppers that were worth substantially less and had lower lifetime values than new clients who converted through Fix.

48. Former Employee ("FE") 1[4] was a Senior Manager, Product Marketing at Stitch Fix from July 2019 until April 2021, who was based in the Company's San Francisco office and reported to Neha Masson and later Betsy Dobbin. FE 1 personally worked on the Direct Buy launch, and he confirmed that the Company's test results showed that Direct Buy was cannibalistic. Following this Court's Order on the Motion to Dismiss, Lead Counsel recontacted and reinterviewed FE 1 to obtain more details on the specifics of Stitch Fix's internal tests.

49. According to FE 1, multiple internal tests were done before he left the Company in April 2021 to understand whether Direct Buy would attract new clients, and those test results were very bad. FE 1 learned about these negative test results in February or March 2021 because he was in meetings in which the negative test results came up, and he also heard about it from colleagues. FE 1 confirmed that in February or March 2021, there were very clear test results and the recommendation from Data Science was that Stitch Fix was not ready and the tests did not look good. FE 1 explained that the Data Science team at Stitch Fix ran a test that they referred to internally as the "New Fix Customer Test." According to FE 1, through the New Fix Customer

[4] The terms "Former Employees" and "FE" refer to the former employees of Stitch Fix whose reports are discussed in this Complaint. To preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" in connection with all the Former Employees, regardless of their gender.

Test, the Data Science team would use their framework and methodology around multi-variant testing to model out what completion looked like through the onboarding function. FE 1 confirmed that they understood from the New Fix Customer Test that Direct Buy was going to negatively impact customer acquisition. Specifically, according to FE 1, the Company's onboarding process would sacrifice customers who came in for a Fix, were funneled to Direct Buy, and then ultimately did not make a purchase or they bought less. FE 1 explained that the Direct Buy customers were converting at a lower rate, or they would spend less money, compared to Fix customers.

50. FE 1 further described that the "New Fix Customer Test" was designed because Stitch Fix needed to test and understand how Direct Buy would impact new customers and new customer onboarding. FE 1 stated that the Company viewed "cannibalization" as an onboarding problem: if potential Direct Buy customers bought less or no products from Stitch Fix, the Company would not be able to win those potential customers back, so Direct Buy would "cannibalize our potential for new customers" who would have converted to Stitch Fix or purchased more through the Fix experience.

51. With respect to the timing of the New Fix Customer Test, FE 1 confirmed the "Trending for You" offering that the Company said it introduced in early June 2020 was the Direct Buy experience. FE 1 further confirmed that the New Fix Customer Test first occurring in June 2020 was consistent with his recollection, and that the "Trending For You" "beta" that the Company discussed on June 8, 2020 (excerpted below) was tested as part of the New Fix Customer Test:

> And in an effort to move Direct Buy closer to becoming a client acquisition vehicle, in early June, we introduced a beta for our new offering. This new offering, which we call Trending for You, removes the purchase item requirement and instead allows men's and women's clients to shop hyper-personalized looks based on their style profile.

52. FE 1 explained how the New Fix Customer Test operated, including who the test tested and what the test entailed (*i.e.*, what its parameters were). FE 1 described how the test had two groups: a control group and an experiment or treatment group. According to FE 1, half the people who came in would go to the normal Stitch Fix landing page for the Fix (control group),

while the other half would see Direct Buy as an onboarding path (treatment group). The treatment group filled out a style profile, but would see different visuals and would be asked different questions, and then would be shown a personalized Shop where they could purchase items directly. The control group, on the other hand, was directed to the standard Fix process, in which they fill out a profile and could then schedule their Fix.

53. FE 1 confirmed that the New Fix Customer Test was conducted on new clients, individuals who had not previously ordered a Fix. Selection for the control and treatment groups was randomized. FE 1 clarified the distinction between "net new" clients—which refers to people who have never purchased from Stitch Fix, signed up for an account, or filled out a profile—and "signed-up prospects"—which refers to people who had signed up for an account and filled out a profile, but never scheduled a Fix or made a purchase. According to FE 1, the Company conducted this testing on people who had not purchased anything in the past; therefore, the New Fix Customer Test included and did not differentiate between "net new" clients and "signed-up prospects." FE 1's account is corroborated by Defendant Spaulding's explanation on December 7, 2021 that "signed-up prospects" over 12 months old "behave like pure new prospects."

54. FE 1 further confirmed that the New Fix Customer Test showed that Direct Buy was going to negatively impact customer acquisition. FE 1 explained that the tests evaluated two metrics: lifetime customer value and annual customer value. FE 1 described how, based on a Fix customer's spending habits (*i.e.*, averaging a certain number of purchases per Fix, and scheduling a certain cadence of Fix shipments), the Company can calculate how much they anticipate the customer will spend in a year and in their lifetime. FE 1 confirmed that the test showed that the New Fix Customer Test treatment group (Direct Buy-first) purchased less, and were less likely to return, than the control group (Fix-first). FE 1's understanding was that many treatment condition customers purchased nothing.

55. Further, FE 1 corroborated FE 4's (defined below) account that the New Fix Customer Test treatment group's conversion rate to becoming Stitch Fix customers was about 30-40% lower than the control group, and further confirmed that the test was showing that people who were funneled to Direct Buy first in the experience were purchasing less or purchasing nothing.

FE 1 explained that the Fix experience is a subscription that schedules periodic recurring Fix deliveries. Direct Buy, on the other hand, is just a personalized digital store; consequently, many customers would buy a small handful of items and not return.

56. In short, according to FE 1, the New Fix Customer Test showed that potential clients onboarded through Direct Buy converted about 30-40% less, and that clients who did become Direct Buy customers purchased less than Fix customers and were less likely to purchase from the Company again. FE 1 confirmed that the New Fix Customer Test showed cannibalization as Direct Buy-first prospective customers did not convert at all or bought less and returned to Stitch Fix less frequently than Fix-first customers.

57. FE 1 further confirmed that the New Fix Customer Test's results were statistically significant. Because the volume of traffic to the website is so high, the test was conducted on less than 10% of website visitors. FE 1 assured that this was still enough of a sample size to achieve statistical significance. FE 1 explained that Stitch Fix typically ran its tests this way because they did not know the revenue implications of the experiment, so the Company isolates the test to a small enough amount of traffic to avoid any effect on revenue, but includes a large enough sample to reach statistical significance. FE 1 explained that Data Science knows how many people to include in the test and how long to run the test in order to achieve statistical significance.

58. By way of example, FE 1 said that if one million customers used the site during the test period, the Company may say it only wants 10% involved in the test. FE 1 explained that there would then be 100,000 new customers in the experiment, half of which would get the control treatment and half of which would get the experiment treatment. FE 1 reiterated that the New Fix Customer Test achieved statistical significance. FE 1 further explained that at Stitch Fix, if you do not have statistical significance, the test is null and not valid. FE 1 confirmed that the New Fix Customer Test was valid.

59. With respect to how the test results were quantified and presented to the Defendants, FE 1 confirmed that Defendant Spaulding knew about the results of all the tests. According to FE 1, the Data Science team put together Google Slides decks compiling the details and results of all the tests and showing the standard operating process of how Data Science ran

these tests, including descriptions of the test population figures, the control group, and the Direct Buy group. FE 1 confirmed that the Google Slides decks included actual data, not just the headline result showing that the Direct Buy group converted at a lower rate than the control (Fix) group. FE 1 explained that there was a chart that showed the results of the groups, comparing them side by side with the major data points, such as the conversion rate of the control group and the conversion rate of the experiment group. FE 1 confirmed that the conclusion itself was also displayed on multiple slides as well. For example, a slide would say that "the test result is that Shop [*i.e.*, Direct Buy] is not successful." FE 1 specifically recalled the slides saying something to the effect of "Direct Buy performed poorly relative to the Fix, and therefore we do not recommend moving forward with this." FE 1 confirmed that the data scientists did not recommend moving forward with Direct Buy.

60. FE 1 further confirmed that these decks were reviewed in weekly meetings with Defendant Spaulding. Indeed, FE 1 explained, the entire purpose of those weekly meetings was to inform Defendant Spaulding of the tests and the status moving forward. In addition to Defendant Spaulding, the primary people in these weekly meetings were the lead on the Data Science team who was responsible for the test, some others from Data Science, Product Managers who were focused on Direct Buy, the Strategy team, and the Strategy lead. FE 1 recalled that the weekly meetings were called the "Weekly Direct Buy Meetings" or "Weekly Direct Buy Testing Meetings." They were also called "share-out" meetings, consistent with the purpose of the meetings, which was to share where they were with the current test results and where they were with decisions that needed to be made with respect to experiments. FE 1 worked directly with Shubhi Jain in Data Science who attended the Weekly Direct Buy Testing Meetings, along with his manager. FE 1 confirmed that there was cannibalization testing that was done on Direct Buy for the specific purpose of updating senior management, and the results were presented in those Weekly Direct Buy Testing Meetings.

61. FE 1 further explained that the format of these meetings is that the lead for the Data Science team presents test results to leadership and would explain what the test revealed, test performance, lessons learned, and recommendations. FE 1 reiterated that here, the

recommendation was to not move forward with Direct Buy because it performed poorly compared to the Fix experience. FE 1 confirmed that this would be presented and communicated to Defendant Spaulding.

62. FE 4 was a Data Scientist at Stitch Fix from July 2020 through July 2023, who was promoted to Data Scientist Manager in April 2021, and then in September 2022 became a Data Scientist for Pricing Optimization until leaving the Company. FE 4 confirmed that the Company was testing the impact of Freestyle on new customer conversion to the Fix business. As FE 4 explained, the initial idea was that Freestyle would be a new avenue for growth supplementing the existing Fix business because Stitch Fix's growth was flat or flattening when FE 4 joined the Company. FE 4 confirmed that the hope was that Freestyle would attract new clients and lead to growth, and therefore new clients were the focus of Stitch Fix's testing.

63. FE 4 confirmed FE 1's description of the testing methodology. FE 4 explained that the Company conducted experiments in which, typically, half of Stitch Fix website visitors would be in the experiment group and directed to Freestyle first, and half would be in the control group and directed to Fix first. FE 4 confirmed that these tests were conducted by the Data Science group, which was called the "Algorithms group" internally. FE 4 further confirmed that experiments were conducted in which some of the people who came onto the Stitch Fix website would be directed to Freestyle first as the experiment group and some of the people would go to Fix first as the control group.

64. FE 4 also confirmed what FE 1 stated regarding the test populations and statistical significance. FE 4 confirmed that the populations in the tests would all be new clients, meaning people who had never ordered a Fix before. FE 4 stated that the populations in the tests were certainly large enough to have high confidence in the results.

65. According to FE 4, multiple tests were conducted by the Data Scientists in the Algorithms group and they all showed that if a person who came to the Stitch Fix website was directed to Freestyle first instead of Fix, the conversion rate—or rate at which people became Stitch Fix customers—would drop 30-40%. For example, FE 4 explained, if nothing else changes in the world and Stitch Fix gets 100 new clients per day with the control experience, they would

expect to see that the Freestyle-first experience would lead to only 70 new clients per day. FE 4 learned this from his fellow data scientists who were conducting the tests.

66. FE 4 further confirmed that there were at least three tests conducted: the first test was conducted in summer 2020, and then additional tests were conducted in 2020 and early 2021. The tests consistently showed that Freestyle-first customers converted 30-40% less frequently to Fixes than Fix-first customers. Again, FE 4's understanding of the tests and their results was based on his discussions with the data scientists who were conducting the tests.

67. FE 4 further confirmed that with an effect as large as 30-40%, you do not really need a big population to find out if there is an effect. FE 4 explained that 30-40% was the mean over the course of a few experiments—one test might have an average of 30% and one might have an average of 40%. According to FE 4, error bars may be plus or minus 10%. FE 4's understanding is that with a percentage as large as 30-40% impact on conversion rate if the client was sent to Freestyle first (as these tests had), the Company had confidence that it was a substantially meaningful effect. FE 4 explained the results by confirming that typically, a Freestyle client is "one and done" and does not have as high of a lifetime value as a Fix customer.

68. With regard to the test results, FE 4 explained that the experiments were running through the A/B randomization system, and the results were written into the A/B database as they came in. According to FE 4, once the analysis was completed through the A/B interface, it would be pasted into a Google Docs or Google Slides presentation. FE 4 explained that additional analysis beyond what the standard A/B interface would do may be run after that, and those results would go into the Google Docs/Slides presentation as well. FE 4 confirmed that it is his understanding that Defendant Spaulding had access to those Google Slides presentations in which the results of those tests were quantified and knew about them.

69. FE 4 explained that the executive suite, including Defendant Spaulding and her direct reports, were informed of the results of these tests. He described how within Data Science, there was very clearly the opinion of "this is not going to work." FE 4 confirmed that the message that "we should not do this" was very clear in Data Science, meaning they should not launch Freestyle to new customers because it was going to hurt the Fix conversion rate. According to FE

4, anyone who had the nerve to stand up and say that was treated very poorly by Spaulding until they were quiet or left the Company.

70. Additional former employees interviewed by Lead Counsel confirmed that the Company's internal tests showed that Direct Buy was cannibalizing Fix customers, and that those results were shared with senior management, including the Executive Defendants. FE 2, Director, Men's Apparel Design: Using Data Science & Analytics to Drive Design at Stitch Fix from October 2017 until June 2022 who reported to the Senior Director of Merchandise, Brandon Kettle, joined the Direct Buy team in July or August 2020. Since FE 2 approached design from a data standpoint, he had a lot of interaction with data scientists in his role at the Company. After the Court's Motion to Dismiss Order, Lead Counsel recontacted and re-interviewed FE 2 and FE 2 provided additional details about the testing.

71. According to FE 2, when Stitch Fix launched the initial beta test for Freestyle, the test was going to run for two weeks and after the two weeks, it had failed. FE 2 explained that the Company's business model was based on shipping Fixes. According to FE 2, the purpose of the testing was to determine whether Fix and Freestyle could exist as independent revenue streams, or if they would overlap. Stitch Fix did not want Freestyle to overtake Fix or Fix to overtake Freestyle.

72. FE 2 confirmed that the purpose of the tests he discussed was to determine whether Freestyle was going to bring in more clients and new revenues, or if it would cannibalize the existing Stitch Fix business by taking would-be Fix customers away from Fix. According to FE 2, the main question was whether Freestyle was going to be additive to Fix. FE 2 confirmed that the testing he was informed of was to determine whether Direct Buy was going to cannibalize Fix across Men's and Women's attire; it was looking at Direct Buy across adults in general.

73. FE 2 further confirmed that there was a second beta test that occurred while he was on the Direct Buy team, which he joined in July or August 2020. FE 2 explained that the Product team and Data Science team ran the cannibalization tests, and FE 2 knew that those teams had an internal goal for what successful metrics would look like, looking at issues like conversion, which the test did not meet. The metric was complicated and involved analysis of multiple data points.

FE 2 confirmed that, despite the test failing to hit its success metric due to cannibalization, a decision was made to push forward with Direct Buy anyway.

74. Confirming what FE 1 said, FE 2 explained that lifetime value was a metric that was talked about a lot once Spaulding came in. FE 2 explained that there was a lot of talk about customer acquisition, and it was known that new customers will not be valuable within their first year in the funnel. According to FE 2, there were a lot of conversations about this. FE 2 also recalled a lot of talk about churn and how long people were staying in the model; that was a number they cared about a lot.

75. FE 2 also confirmed what FE 1 stated above regarding the existence of a standing Freestyle touch base meeting every Friday attended by senior management. FE 2 understood that the results of the tests were shown to Defendant Spaulding at that meeting. Early the next week, FE 2 personally found out the results of the tests and that Stitch Fix was nonetheless pushing forward with launching Direct Buy to new customers. Specifically, FE 2 personally attended weekly standing meetings run by the Product Management team that included a group of 7-15 people. During one of these meetings, he learned from a data scientist named Rajeev Jain, who worked on the Direct Buy beta test, that the beta test failed.

76. As noted, Lead Counsel re-interviewed FE 2 in August 2024. FE 2 reconfirmed that there were weekly standing meetings that the Product Management team had with "MGMT," which included Defendant Spaulding and Company CFO Dan Jedda, that occurred on Friday mornings. FE 2 also reconfirmed that he had found out about the failed cannibalization test verbally during an afternoon Zoom meeting.

77. FE 2 had concerns that the beta tests would not go well and would hurt the Company's brand, and he discussed those concerns with the head of Freestyle, Lindsay Ferstandig; Jenny Herr, the Women's trends manager at Stitch Fix; his boss, Kettle; the General Manager of Kids' Merchandise, Carla Feely; the product manager, Allison Barrow; and the Vice President of Women's Merchandise, Samara Fetto-Gee. FE 2 explained that in his role, he had familiarity with the data set that the data scientists were using to test Freestyle. FE 2 confirmed that the data points that the data scientists collected from Freestyle and the data points they collected from Fix did not

line up. FE 2 explained that this data inconsistency presented multiple red flags. Drawing from his graphic design background, he created a presentation showing that this was a problem and he told his direct managers to share it with the C-suite.

78. FE 2 confirmed that cannibalization was a big topic of conversation at Stitch Fix. FE 2 further confirmed that it was clear internally that the initial beta test was a failure. There was a second test shortly after the initial beta test which was either inconclusive or failed as well. According to FE 2, the tests conducted prior to the launch of Freestyle had failed, and the launch was moving forward anyway.

79. FE 2 explained that he was emotionally invested in the outcome of the second beta test conducted on Direct Buy that he had previously described, *supra* at ¶¶70-75, and every day he heard that the test results indicated failure. FE 2 confirmed that this testing was conducted on his workflow (Shop Your Looks, Shop by Color, and Shop by Category). FE 2 recalled employees asking how they could improve Direct Buy, and they were shocked when they heard the Company was moving forward with it anyway.

80. FE 3, a former Data Scientist at Stitch Fix from June 2020 until June 2021 who was responsible for developing one variant of the algorithms used to recommend clothes to customers, confirmed that there were team meetings with data scientists in which cannibalization was discussed. FE 3 heard his fellow data scientists observing that it was obvious from test results as well as continuous customer research conversations that Freestyle was taking customers away from the Company's existing Fix business.

81. FE 3 confirmed that there were routine meetings happening between data scientists and executive leadership, including Defendant Spaulding, regarding the performance of Freestyle. He further confirmed that he received weekly email blasts containing relevant data, which he specifically described as top line revenue numbers and breakdowns by customer category as well as Freestyle versus Fix. The format of this information was similar to an Excel file. According to FE 3, trends concerning new customer acquisition and customer retention in regard to Freestyle would be reflected in those reports. FE 3 confirmed that these weekly email blasts went to Defendant Spaulding and Defendant Lake. He further confirmed that Defendants Spaulding and

Lake had the ability to access data concerning the cannibalization of Fix by Freestyle through the data scientists.

**F. Defendants Continue To Mislead Investors That Direct Buy Is And Will Attract New Clients, Convert Prospective Clients, And Be "Frictionless" With Fix**

82. Despite statistically significant test results confirming that Direct Buy cannibalized Fix by decreasing new client conversion and attracting low quality clients, Defendants continued to tell investors that Direct Buy was, and would continue to attract "high-quality" new clients, "convert" prospective clients, and be "frictionless" with Fix. For example, during the Company's earnings call for its first fiscal quarter of 2021, held on December 7, 2020, Defendant Spaulding said that "our ongoing momentum in direct buy" will allow the Company to "attract high-quality clients, but also to convert our large prospect population that we estimate is in the millions, clients who are at the precipice, but have not yet converted to Stitch Fix." This statement was repeated in the Company's shareholder letter, released the same day. During the same call, Defendant Lake reiterated in response to an analyst question about trends with respect to "new customers," that "what we're seeing is that the two experiences are really additive" and Direct Buy was a "great way" to buy products in a "frictionless way."

83. Defendants continued to cite the Company's own internal test results as the basis for these statements. For instance, on the December 7, 2020 call, Defendant Spaulding was asked for "more insight into the plan to introduce Direct Buy to prospective clients later this year." She responded that the Company was "experiment[ing] with a new sort of introduction and onboarding flow into Stitch Fix" to accommodate the influx of new customers. She explained that the Company was "in the flight of building and testing right now," and "we're always testing things," and they were "beginning to experiment with our prospective client base with our direct buy offering." On the same call, Defendant Lake directly said, in response to a question about what factors the Company would consider in determining when to fully launch Direct Buy to new customers, that "we've been doing some testing around what is the best way to introduce direct buy and like what is the best way for us to actually figure out like this is somebody who should be

on a conversion path to Fixes versus this is somebody that we actually should have into a direct buy first."

84. Analysts were assured by Defendants' representations. The Company's stock price rose from $35.83 at close on December 7, 2020 to $49.89 at close on December 8, 2020. Goldman Sachs described Direct Buy as an "incremental revenue stream," in their December 7, 2020 analyst report. Barclays also wrote on December 7, 2020, that "Direct Buy allows SFIX to expand their wallet share among new/existing customers." Deutsche Bank echoed that sentiment on December 8, 2020, reporting, "We maintain our view that SFIX likely could prove to be one of the biggest beneficiaries of COVID over time, with tailwinds like the accelerated transition to online, continued physical store closures, hyper-personalized discovery processes, as well as the potential [total addressable market] expansion with Direct Buy, all driving elevated growth in the near-to-mid term. . . . we continue to see Direct Buy as a long term driver of top line growth." KeyBanc similarly stated that Direct Buy "unlock[s] significant TAM opportunities" and "this growth should be amplified by the aforementioned strong new client growth."

85. Based on the purported strength of new client growth from Direct Buy, Defendants guided net revenue growth of 12-14% year-over-year in Q2, and full year revenue growth of 20-25% year-over-year. Lake explained that the step change in growth between Q2 and the full year was attributable to the anticipated launch of Direct Buy. Defendant Lake stated that of the "drivers underpinning this outlook[,] most notable is our expectation of further acceleration of our active client growth. While the apparel industry is currently contracting, we expect to take share and drive higher new client sign-ups as the relevance of our model of personalized discovery and convenience grows."

86. Analysts understood that Direct Buy was a key driver of Defendants' increased earnings guidance. For example, Deutsche Bank wrote that "we are not surprised that the company guided to FY21 top line growth of 20% -25%, and with Direct Buy likely fully rolled out during this fiscal year, deliver continued momentum in FY22." J.P. Morgan also attributed the fiscal 2021 guidance to "expansion of Direct Buy to new clients."

**G. Defendants Partially Reveal The Truth When They Delay The Full Launch Of Direct Buy To New Customers In March 2021, But Continue To Falsely Deny Cannibalization, And Reassure Investors That Direct Buy And Fix Remain "Additive" And "Incremental"**

87. On March 8, 2021, Defendants issued a letter to shareholders for the second fiscal quarter of 2021 and held an earnings conference call. During the call, in a partial revelation of the truth, Defendants announced that their full launch of Direct Buy to new customers would be slightly delayed. The Company's CFO, Dan Jedda, stated, "with respect to the delay of our direct buy to non-Stitch Fix clients . . . [w]e plan to roll that out late in Q4 now as we get the product right." Defendant Spaulding reiterated that Stitch Fix would not "introduce direct buy to new clients [until] the end of the fiscal year." Defendant Spaulding cited "evolving our client onboarding process and user interface, tightening logistics and operations, and streamlining client style collection information" as explanations for the delay.

88. Defendants disclosed that the Company had revised its guidance downward because the full launch of Direct Buy to new clients was delayed. Jedda explained on the March 8, 2021 earnings call that because the Company now "plan[s] to continue testing" Direct Buy and would not do a "full scale product launch [until] late fiscal Q4," the Company decreased net revenue guidance. Later on the same call, Jedda reiterated, "the delay of our direct buy to non-Stitch Fix clients" is "a cause for our revised guidance." Truist noted that "contributing to the softer revenue outlook is the delay of the full-scale Direct Buy rollout to the end of F4Q21, which was previously scheduled for earlier in the year." Canaccord similarly observed that "a more measured approach to its direct-buy rollout for new clients contributed to a soft Q3 guide and a slight reduction to its FY21 revenue outlook."

89. In response to the disclosure that the full launch of Direct Buy to new clients was delayed and the resulting takedown of the Company's fiscal 2021 guidance, Stitch Fix stock declined a statistically significant 28%, from a closing price of $68.52 per share on March 8, 2021 to a closing price of $49.23 per share on March 9, 2021, on high volume.

90. However, Defendants were quick to reassure investors and minimize cannibalization concerns surrounding Direct Buy's full expansion to new customers. Defendant Spaulding misleadingly stated, "The momentum and client engagement we've seen <u>increases our</u>

confidence as we look to introduce direct buy to new clients at the end of the fiscal year." Spaulding elaborated that "we expect that direct buy will help drive greater engagement and fuel client acquisition in the years ahead." And, in direct response to an analyst question about cannibalization concerns surrounding Direct Buy's introduction to new clients, Spaulding stated that "similar to the incrementality that we've observed with active Fix clients as they participate in both and seeing that is actually an additive experience. I think we're thinking about it similarly as we bring new consumers onto the platform."

91. Analysts were reassured by Defendant Spaulding's explanations. For instance, on March 8, 2021, Truist reported that "Direct Buy continues to offer compelling upside and TAM expansion, despite the full rollout being pushed further into FY21," explaining that the Direct Buy launch was delayed because "the company continues to test the Direct Buy product before rolling it out to non-Fix customers, in order to ensure a seamless customer onboarding experience." BMO similarly reported, "The delay of the rollout was cited as being more of an effort to make sure the rollout is executed correctly, with a focus on allowing access to a larger assortment in a more personalized way. Related to the impact on fixes, management maintained that the direct buy business is expected to be incremental, allowing for a larger addressable market with a larger platform and to open up more wallet share." Deutsche Bank also agreed, noting that "we do believe that longer-term, Direct Buy . . . can unlock more value for consumers and shareholders." On March 9, 2021, BMO similarly dismissed concerns around the potential cannibalizing effects of Direct Buy, noting that "the delay of the rollout was cited as being more of an effort to make sure the rollout is executed correctly[.]"

**H. Defendants' Internal Testing Continues To Reveal That Direct Buy Is Cannibalizing The Fix Business**

92. Contrary to Defendants' representations to investors that Direct Buy and Fix were "incremental" and "additive," each of the Company's internal tests through March of 2021 unequivocally established that Direct Buy cannibalized the Fix business, reducing conversion rates by 30-40% and attracting lower quality clients.

93. As discussed in depth above, *supra* at Section IV.E, FE 1 explained that he learned about negative test results from the New Fix Customer Test in February or March 2021 showing cannibalization. By the time FE 1 left the Company in March 2021, FE 1 was not aware of any testing suggesting that Direct Buy would work. FE 1 confirmed that it is his understanding that the test results were consistently negative from the summer of 2020 until he left the Company. FE 1 was not aware of any positive tests. FE 4 corroborated what FE 1 said. FE 4 explained that multiple tests were conducted by the Data Scientists in the Algorithms group and they all showed a 30-40% decrease in conversion to the Fix business if customers were directed to Freestyle first. FE 4 further confirmed that there were at least three tests conducted: the first test was conducted in summer 2020, and then additional tests were conducted in 2020 and early 2021. These tests showed the 30-40% conversion rate drop, which FE 1 corroborated. FE 4 also confirmed that the Freestyle program that was eventually launched was absolutely fundamentally the same as the program that failed the testing. Similarly, FE 2, who joined the Direct Buy team in July or August 2020 and left the Company in June 2022, confirmed that he was not aware of any tests showing that there was no cannibalization or any cannibalization test showing a positive result while he was at the Company.

### I. Defendant Spaulding Is Named Incoming CEO And The Market Views Her Promotion As Evidence Of Direct Buy's Continued Success

94. On April 13, 2021, the Company announced that effective August 1, 2021, Defendant Spaulding would be elevated to CEO, as Defendant Lake transitioned to the role of Executive Chairperson. In the press release announcing the transition, the Company stated that "Spaulding is focused on driving the next phase of the company's growth, including the expansion of the next generation of consumer shopping experiences[.]"

95. Analysts interpreted Defendant Spaulding's promotion as further confirmation that Direct Buy was and would continue to be successful. For instance, Truist Securities wrote on April 13, 2021 that Defendant Spaulding "had a positive impact on the company's operations since joining" by "continuing to push for the Direct Buy roll out[.]" Deutsche Bank Research wrote on

the same day that "[s]ince she joined the company, we believe Ms. Spaulding has been the driving force behind expanding Direct Buy[.]"

96. Defendant Spaulding personally acknowledged that she was brought in to lead this "second founding of the Company." For instance, during a May 3, 2021 interview with Bloomberg, Defendant Spaulding stated that she intended to bring about "transformative change" at Stitch Fix, and that companies like Stitch Fix need to "change or die." Indeed, Defendant Spaulding compared Stitch Fix's "shopping feed and that shop experience" to "moving from . . . our DVD era into the streaming era."

### J. Defendants' Summer 2021 Testing Continues To Confirm That Direct Buy Is Cannibalistic As Defendants Continue To Falsely Assure Investors That It Is "Incremental" To Fix And Promise To Launch By The End Of The Quarter

97. In stark contrast to Defendants' rosy statements to investors, Defendants' testing during the summer of 2021 confirmed that Direct Buy was continuing to cannibalize the Fix business. For instance, FE 3 (a former Data Scientist at Stitch Fix) confirmed that by June 2021, there was a clear trend that customer acquisition was dropping and it was the largest source of conversation within Stitch Fix that Freestyle was cannibalizing Fix. Similarly, FE 2, who joined the Direct Buy team in July or August 2020 and left the Company in June 2022, confirmed that he was not aware of any tests showing that there was no cannibalization or any cannibalization test showing a positive result while he was at the Company. FE 4, who did not leave the Company until July 2023, confirmed that multiple tests were conducted by the Data Scientists in the Algorithms group and they all showed a 30-40% decrease in conversion to the Fix business if customers were directed to Freestyle first.

98. Despite knowing from their internal tests that Direct Buy was cannibalistic, Defendants continued to tell the market the opposite. For instance, on June 7, 2021, Stitch Fix held a conference call with analysts and investors to discuss the Company's earnings and operations for its third fiscal quarter of 2021. During that call, Defendant Lake stated that "[t]he success in incrementality that Direct Buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix."

99. During the same call, Defendant Spaulding explained that in March 2021, the Company had launched the fourth phase of Direct Buy, Shop By Category, to existing customers. Defendant Lake also confirmed that, following the previous quarter's delay announcement, Defendants would fully "introduce direct buy to new clients by the end of the quarter."

100. As before, analysts responded positively to Defendants' assurances and were comforted by Defendants' statements that the full launch of Direct Buy to new customers was imminent. For instance, Canaccord Genuity's main takeaway on June 7, 2021 was that "Sti[t]ch Fix's broadening of the direct buy program to new clients is on schedule for late 4Q21" and that "enhanced functionality across both the core Fix offering and direct buy are driving heightened engagement, retention, and AOV, laying the foundation for continued top-line growth and improving profitability." Canaccord Genuity accordingly increased their quarterly and yearly estimates. Also on June 7, Truist Securities remarked that "SFIX's comfortable beat reflects the positive momentum the company is seeing . . . around a new product, Direct Buy (a central piece of the SFIX LT bull thesis, set for general launch in F4Q21) . . . SFIX is set to deliver a strong FY22 . . . ." J.P. Morgan similarly wrote on June 8, 2021 that "SFIX remains on track for a full scale product launch of Direct Buy for new clients at the end of 4QFY . . . ."

### K. Defendant Spaulding Becomes CEO And Pushes The Direct Buy Launch Through To New Customers, Despite Knowing From Internal Testing That Direct Buy Was Cannibalizing Fix

101. On August 1, 2021, Defendant Spaulding formally became the CEO of the Company, and one week later, on August 9, 2021, Stitch Fix launched Direct Buy to new customers. FE 4 confirmed that the Freestyle program that was eventually launched was absolutely fundamentally the same as the program that failed the testing.

102. Lead Counsel's investigation confirmed that Defendant Spaulding pushed the launch through even though the Company's internal testing had consistently revealed cannibalization precisely because the success of Direct Buy was so critical to Defendant Spaulding's personal success. For instance, FE 4 explained that Spaulding's view was that launching Freestyle was necessary for her to succeed at her job, and her mission was to restore rapid start-up growth to Stitch Fix. FE 4 confirmed that it was very clearly Spaulding's decision

to push forward with the launch despite the negative test results. FE 4 further confirmed that he found it frustrating to read some of the press releases related to this case because it was maddening when Spaulding said things like we all agreed to link arms and move forward; "no, we did not." Data Science had said not to launch the product.

103. FE 4 reiterated that Spaulding was getting her marching orders from the Board and Defendant Lake to get this Company growing again. FE 4 explained that the path Spaulding chose was Freestyle, and once she chose that path, she was so fully committed to it that she either did not have or did not see other options.

104. With regard to Spaulding providing any justification to employees for her decision to push forward, FE 4 confirmed that she just emphasized that they needed to "launch and iterate," learn from their experience, and learn fast and break things. FE 4 confirmed, however, that there was no credible plan for how to iterate, and the Company lacked any infrastructure and system for iterating and learning. FE 4 explained that rather, "the plan was built on entitlement and hope." FE 4 confirmed that in all-hands meetings, Spaulding would remark on how they were entitled to their piece of the ecommerce business. FE 4 agreed that Spaulding was brought on to launch Freestyle and that is what she was going to do. FE 4 explained that what Spaulding said at the meeting was, "We deserve our piece of the pie as ecommerce expands."

105. FE 4 reiterated that Spaulding wanted to "grow the Freestyle business at all costs." FE 4 remembered Spaulding claiming publicly that they had "inadvertently" created friction in directing clients to Freestyle first and confirmed that he nearly threw up when he saw the word "inadvertently" because Spaulding was personally trying to add friction to the Fix business. FE 4 explained, "It was very clear from hearing her talk that getting people into Freestyle was the most important thing." FE 4 recalled that he talked to product managers who were looking at onboarding, and anytime anyone proposed that maybe if this is a point where it looks like people will not convert, we should push them to Fix, Spaulding would say no because they needed to push people to Freestyle. According to FE 4, "it was not inadvertent." FE 4 explained Spaulding's view that they needed to push people to Freestyle as hard as possible.

106. FE 4 confirmed what FE 1 said above, *supra* at ¶¶54-56, that typically, a Freestyle client is "one and done" and does not have as high of a lifetime value as a Fix customer. FE 4 explained that a year after launch, FE 4 supervised someone who looked at how the lifetime value of the two compared. FE 4 explained that people who came in as a Freestyle first customer had less than half of the lifetime value a Fix first client had overall.

107. FE 4 recalled that before one of his colleagues left Stitch Fix in 2022, he remarked to FE 4, "I'm really excited to see our data testing database get subpoenaed" because all the data is there. FE 4 explained that this comment was made when lawsuits against the Company came up. FE 4's colleague said that they would love to see the data go into evidence because "it very clearly demonstrated that the people in charge knew what was going to happen." As FE 4 explained, "They had no reason to be surprised" that conversion on Stitch Fix was going to go down rapidly when they implemented Freestyle. FE 4 confirmed that the database that has the test results in it is named "A/B."

108. FE 3 confirmed that it was his understanding from his conversations with fellow data scientists that Freestyle was personal for Defendant Spaulding and that her success depended on its success. Freestyle was the main focus of the Company moving forward. FE 3 confirmed that Freestyle was Defendant Spaulding's baby and she pushed the launch to new customers both too fast and despite the negative testing results that were coming through at the Company.

109. FE 2, described in ¶¶70-79 above as having personal knowledge of the internal testing showing cannibalization, confirmed that even though the Freestyle tests failed and showed cannibalization, and against everyone's judgment and despite questions from employees, Stitch Fix "launched Freestyle before it was ready, and we damaged our brand." FE 2 was told in weekly standing meetings run by the Product Management team that he personally attended, at which the senior director was the top level in attendance, that the tests of Freestyle had failed and that it was decided from above that the Company was still going to push forward with the launch. According to FE 2, a decision came from senior management to move forward with the launch even though the test had failed, and he was very uncomfortable with that. FE 2 confirmed his understanding that Spaulding was aware of the bad test results and she decided to push the launch forward

anyway. According to FE 2, the Company should have made adjustments to Freestyle, but a decision had been made. FE 2 felt that "we were going to be launching something that was setting us up for failure."

110. FE 2 understood based on the standing meetings that he personally attended, and conversations that he had with others at the Company, that Freestyle was one of Defendant Spaulding's babies and she was going after that initiative as CEO. Defendant Spaulding pushed Freestyle forward because Spaulding had a time in her head that they were going to launch it by.

111. FE 2 further confirmed that Stitch Fix changed its landing page to direct everyone to Freestyle. FE 2 was hearing consistently in multiple meetings with different people, including members of the Freestyle group, that this tactic was stopping the Company's growth with Fix clients and that they were not getting the growth they expected in Freestyle. According to FE 2, it was clear internally that "there was a crash and burn that happened." FE 2 explained that there were so many things pointing to Freestyle not doing what they needed it to do and what the Company expected it to do, and those of them who were working on it were not surprised by this because that is what the testing showed.

112. FE 1 confirmed that despite the recommendation from Data Science that the Company was not ready to launch Direct Buy and the tests did not look good, as discussed in ¶¶48-61 above, the response from Defendant Spaulding was that the Company was going to launch anyway. FE 1 understood that Defendant Spaulding was under pressure to get Direct Buy launched. There were multiple instances where Defendant Spaulding had circumvented the Company's Public Relations plan or had talked about Direct Buy ahead of launches in a very leading way, which was frustrating to the Marketing Department. According to FE 1, every time Defendant Spaulding spoke about Direct Buy, her remarks were focused on how we have to do this, this is going to be a game changer, this is going to be the differentiator, and this is where we are going to win. When Defendant Spaulding came in, according to FE 1, part of the expectation was for her to take Direct Buy and accelerate it because the Company knew the Fix model only had so much life left in it to be able to continue and grow at the rate it had and they already saw that Fix growth was slowing. The Company needed something and there was a lot of conviction

from the Defendant Spaulding level and the C-suite level that Direct Buy was going to be it. FE 1 confirmed that Spaulding saw the results of the Company's internal tests, which revealed that Direct Buy was cannibalizing Fix, and it was his understanding that Spaulding pushed the launch through anyway because of these reasons. FE 1 confirmed that Spaulding "just ignored all the data." According to FE 1, Spaulding's attitude was that it does not matter what the test results were, we are moving forward with this and we need to move forward with this.

### L. Defendants Continue To Falsely Tout Direct Buy As Bringing In "Many New Clients" And As A Driver Of Sustainable Growth

113. During her first earnings call as CEO, Defendant Spaulding certified her ownership of the Direct Buy product. On September 21, 2021, Stitch Fix held a conference call with analysts and investors to discuss the Company's earnings and operations for its fourth fiscal quarter of 2021. Defendant Spaulding renamed the product as her first public act as CEO, announcing on the call that "what we have often referred to as direct buy, we have now branded this channel, Stitch Fix Freestyle."

114. Defendant Spaulding also emphasized the success of the Freestyle launch to new clients and continued to emphatically deny cannibalization and maintain that Freestyle effectively converted new clients in response to analyst questions. For instance, during the call, an analyst from MKM Partners asked, "in the past you've talked about low cannibalization, but I'm just curious to get the updated thoughts." Defendant Spaulding responded by touting the Company's "new onboarding experience" and "<u>many new clients coming in through this new Freestyle experience</u>." Then, Spaulding stated as to the "specific cannibalization question, maybe two thoughts to offer. One is just we think that revenue per active client that we shared and the knowledge that we have of like the <u>newer cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary</u>." Defendant Spaulding went on to add, "I think we see solid growth in both sides of the business in the coming year." In a similar exchange, Defendants were explicitly asked for "any initial learnings on [] the Freestyle uptake since the public launch." In response to that specific question, Defendant Spaulding misleadingly

touted stale revenue metrics for current clients while omitting any reference whatsoever to known, negative test results regarding Direct Buy's launch to new customers.

115. Defendants' complete failure to disclose known, negative test results that undermined their otherwise positive statements convinced analysts that Direct Buy was a success that would aid client acquisition and revitalize Stich Fix's growth. For instance, Wells Fargo observed on September 21, 2021, "we expect [Freestyle] may help drive customer growth looking out." J.P. Morgan similarly reported that "we expect active client growth in 1H to be similar to 4Q levels before accelerating in 2H as SFIX grows Freestyle brand awareness." William Blair reported on September 22, 2021, that "We believe there is significant opportunity for growth in Freestyle, particularly in the upcoming holiday season when the company will be subject to the gift-related demand surge for the first time." An analyst with Wedbush candidly reported that "the personalized Freestyle product offering is a far more compelling business model, as it solves issues both with the traditional Fix business (people want to actually pick their own clothes) and with other e-commerce platforms (which offer an overwhelming number of options to shoppers)."

116. Analysts also recognized that Defendant Spaulding was instrumental to the success of Freestyle. For instance, on October 1, 2021, Lane Research explained, "With SFIX essentially doubling down on its big bet [*i.e.*, Freestyle], investors should note the increased burden on its new senior management team, particularly incoming CEO Elizabeth Spaulding, to execute on this pivotal transformation of the company."

## V. THE FULL TRUTH EMERGES

### A. Stitch Fix's December 7, 2021 Earnings Announcement For The First Fiscal Quarter Of 2022

117. Although Defendants knew from their internal test results that Freestyle was cannibalizing the existing Fix business, Defendants continued to mislead investors. As discussed above, Defendants told investors that Freestyle would "more effectively attract new clients" and convert people who might be on the fence about Stitch Fix," and that Freestyle and Fix were "incremental," "additive," and "so highly complementary," when in fact, Freestyle was cannibalizing Fix.

118. Defendants were eventually forced to reveal the rest of the truth. On December 7, 2021, after the market closed, Stitch Fix announced lower than anticipated net client additions, a net loss of $1.8 million and diluted loss per share of $0.02 for its first fiscal quarter of 2022 and cut its full-year revenue projections. That same day, during a conference call with analysts and investors to discuss the Company's earnings and operations for the quarter, Defendant Spaulding acknowledged for the first time that as a result of the "expansion into Freestyle," the Company "may experience short-term impacts of cannibalization." Defendant Spaulding further stated that "in the short-term, people are making a trade-off between do I want to try Fix, do I want to try Freestyle." Spaulding continued, "I think we acknowledge in onboarding we may be distracting some of those clients with shopping in Freestyle when in reality they just want the support of a stylist," and "we experienced lower Fix conversion rates than we expected."

119. As a result of this disclosure, the price of Stitch Fix stock declined by $5.97 per share, or nearly 24%, from a closing price of $24.97 per share on December 7, 2021, to a closing price of $19.00 per share on December 8, 2021, on high trading volume.

120. Defendants falsely maintained, however, that the cannibalization problem was merely possible and "short-term." Further, Defendant Spaulding claimed that this problem would be fixed rapidly, and repeatedly assured investors that "we've already made some adjustments on that," or "we've already made some adjustments as we've entered into Q2 and just more learning to just make it, frankly, a lot easier for new clients that want to get shopping right away to get into that experience as quickly as possible."

121. Defendants also continued to falsely assure investors that the conversion issues were just another bump on the road and that Freestyle's growth opportunity could still be realized. On the December 7, 2021 earnings call, Defendant Spaulding stated, "We see significant new client potential ahead as Freestyle enables us to access a greater share of shopping occasions and has opened up new marketing channels for Stitch Fix to drive user acquisition." Defendant Spaulding similarly represented that "the combination of Fix and Freestyle demonstrates the potential of our future ecosystem as we observe behaviors of our existing and new clients." Spaulding added in response to an analyst question that Stitch Fix had "seen some accelerated

performance" among "clients who have signed up historically with Stitch Fix but not converted to a Fix," and "we're excited with what we're seeing and see opportunity to just have more to offer to that client base with the opening up of Freestyle. So I think it still represents a somewhat untapped opportunity and as we continue to expand the client experience."

122. Analysts accordingly were both surprised by Defendants' revelations and reassured that the Company would be able to fix the potential for cannibalization in the short term. For instance, Truist Securities wrote on December 7, 2021 that Freestyle's launch suffered from "transitory issues, which should start abating in F2H22," but believed that "Freestyle can be complementary to the Fix offering[.]" J.P. Morgan similarly observed on December 8, 2021 that "Freestyle [is] very successful but going through some growing pains & complicating the client onboarding process."

**B. Stitch Fix's March 8, 2022 Earnings Announcement For The Second Fiscal Quarter Of 2022**

123. On March 8, 2022, after the market closed, Stitch Fix reported earnings for its second fiscal quarter of 2022, offered a weak outlook for its third fiscal quarter of 2022, and cut its guidance for the full year. During the Company's earnings conference call held after hours on the same day, Defendant Spaulding attributed the guidance cut to continued cannibalization that had not been fixed during the short-term. Specifically, Defendant Spaulding acknowledged that "conversion of new visitors for Fix and Freestyle is not where we want it to be." She explained that "in our efforts to launch and promote Freestyle, we chose to direct visitors coming to stitchfix.com towards the Freestyle experience. It is important to note that stitchfix.com is the primary landing page for customers interested in ordering a Fix. Therefore, in leading clients to the Freestyle experience first, we inadvertently created friction for those seeking a Fix." Thus, Defendant Spaulding confirmed that the Company steered clients to Freestyle first and suffered the very consequences that the Company's internal testing showed with statistical certainty, as corroborated by FE 1, FE 2, and FE 4, leading to a decrease in client conversion and retention of lower quality clients.

124. Defendant Spaulding directly connected these events to the reduction in the Company's earnings outlook, stating, "The lower net client adds we have experienced in the first half of the year have impacted our revenue and are driving our revised outlook for the back half due to the compounding nature of fewer new clients buying." Company CFO Dan Jedda further explained that, "revenue for the quarter was largely impacted by client conversion as we iterate on new acquisition and onboarding methods."

125. As a result of this disclosure, the price of Stitch Fix stock declined by $0.67 per share, or 6%, from a closing price of $11.01 per share on March 8, 2022, to a closing price of $10.34 per share on March 9, 2022 on high trading volume.

126. Given the cannibalistic conversion and "friction" issues created by Freestyle, Defendant Spaulding also disclosed that the Company had begun directing stitchfix.com traffic to "a clear and easy Fix onboarding path" that would "boost new fixed client conversion over time." Spaulding reassured investors, however, that this "change in onboarding flow should not be taken as a change in our long-term vision for Freestyle." Indeed, Spaulding elaborated that the change would only affect traffic to stitchfix.com, which was "the primary landing page for customers interested in ordering a Fix." In response to an analyst question about the "root cause" of the onboarding issue, Defendant Spaulding responded that the Company is now "where we want to be" because Defendants "reverted in many ways to make it easy to get directly to that Fix. And then we're doing a bunch of other things right now in parallel to make it an even lower friction experience for our clients." Defendant Spaulding insisted that, "we are confident in our long-term strategy and we're seeing clear signals that we are taking the right steps for the future of the business. We believe the combination of Fix and Freestyle demonstrates the potential of our future ecosystem as we observe behaviors of our existing and new clients." She also reassured investors that Defendants were "very confident that we're acquiring very high quality clients," and Defendant Spaulding later told an analyst that, "as we continue to scale the business, we believe that [Freestyle] can be a very profitable business over time."

127. Therefore, analysts believed that the cannibalization problem was largely resolved as the Company had reverted to a Fix-first onboarding path, easing the cannibalization problem.

For instance, Truist Securities noted on March 8, 2022, "Freestyle can be complementary to the Fix offering, as clients tend to seek out more intent-based categories that may not work as well in a Fix . . . [w]e are still believers in the LT story of an expanded TAM via Freestyle[.]" Lane Research explained on March 9, 2022, "Since we believe this channel conflict is entirely self-inflicted, likewise, we believe it can be self-remedied, the result of which could be an important catalyst for the stock." J.P. Morgan concluded on March 9, 2022 that they "are believers in the Freestyle product, which we think is complementary to the Fix biz[.]"

**C. Stitch Fix Announces Freestyle-Related Layoffs And Additional Freestyle Cannibalization On June 9, 2022**

128. On June 9, 2022, as first reported by CNBC during trading hours, Defendant Spaulding emailed all Company employees, informing them that Stitch Fix had determined to reduce its workforce by 15% "[i]n light of our recent business momentum and an uncertain macroeconomic environment." As Defendant Spaulding explained, "We've taken a renewed look at our business and what is required to build our future," and this decision, Spaulding said, "was one needed to make to position ourselves for profitable growth."

129. As a result of this disclosure, the price of Stitch Fix's stock declined by $0.91 per share, or approximately 10%, from a closing price of $8.69 on June 8, 2022 to a closing price of $7.78 on June 9, 2022, on high trading volume.

130. Later that day, Defendants finally revealed the full extent of their fraud. After the close of trading on June 9, 2022, the Company issued an earnings announcement press release, SEC Form 8-K, and SEC Form 10-Q. The Form 10-Q, signed by Defendant Spaulding, stated "We had 3,907,000 and 4,107,000 active clients as of April 30, 2022, and May 1, 2021, respectively, representing year-over-year decline of 4.9%. The decline in active clients was driven by client conversion challenges and lower site traffic. We experienced weaker-than-expected conversion of new clients due to onboarding friction[.]"

131. During the Company's after-hours earnings call, Defendant Spaulding further disclosed that "[the] conversion of new visitors was not where we wanted it to be in the second quarter[.]" In recognition of the fact that new clients converted less frequently in the Freestyle-

first experience than the previous Fix-first experience, the Company completely backtracked from Freestyle, making it nearly impossible for a new client to purchase from Freestyle without first ordering a Fix. As Defendant Spaulding explained, to address the cannibalization problem, "we began directing all stitchfix.com traffic to a simplified Fix first onboarding path. Now clients entering through stitchfix.com are directed to schedule a Fix upon completing a style profile. After scheduling, their Freestyle shop is unlocked." However, Defendant Spaulding concluded, "we are still not yet at our desired conversion model. In addition, overall new client traffic to our website was down in Q3 . . . . [B]oth factors, conversion and traffic, ultimately played a role in the 3% decline in our total active client counts quarter-over-quarter." Spaulding added that "approximately 20% of Freestyle first customers come back and purchase again within 30 days." This figure lies in stark contrast to the "80%" of "first-time Fix clients" that Spaulding previously explained "purchased at least one item and shared that they look forward to their second Fix, which is a strong indicator of future client engagement." In other words, Freestyle-first customers were of lower quality and had lower lifetime values than Fix-first customers.

132. Additionally, Jedda issued new downward revisions to guidance: "we expect net revenue in the range of $485 million to $495 million, representing a year-over-year decline of 15% to 13%. . . . we expect Q4 adjusted EBITDA in the range of negative $30 million to negative $25 million or EBITDA margins of negative 6% to negative 5% of net revenue. This guidance assumes that net active clients will be slightly down quarter-over-quarter." That quarter, the Company posted an EBITDA of negative $36 million, missing the consensus of negative $27 million.

133. As a result of these disclosures, the price of Stitch Fix stock declined by $1.44 per share, or nearly 19%, from a closing price of $7.78 per share on June 9, 2022, to a closing price of $6.34 per share on June 10, 2022 on high trading volume.

134. Analysts were shocked at Defendants' revelation that they could not resolve the Freestyle cannibalization issue, resulting in significant losses for the Company. For instance, Wells Fargo reported on June 9, 2022 that "user retention challenges [were] evident in 3Q results," losses were "accelerating," and they were wary that "[n]o guidance was given on when active users

(and subsequently, revenue) could swing back to growth." (Emphasis in original.) Wells Fargo subsequently decreased their price target by 25%.

135. Morgan Stanley similarly wrote on June 10, 2022 that "the most surprising thing we learned was management's decision to direct all customers to create and schedule a Fix delivery before being able to shop Freestyle . . . effectively eliminating the bull case until further notice." Accordingly, Morgan Stanley noted that "Freestyle does not appear to be the unlock once perceived by the market," and the Company could expect "limited upside from Freestyle and further declines in the Fix business." Morgan Stanley cut their price target by 44%.

136. Telsey Advisory Group wrote on June 10, 2022 that "adjusted EBITDA missed guidance by a siz[e]able margin and the fourth quarter EBITDA guide disappointed as well." In the same report, Telsey wrote that the Company's layoffs were "yet another major move by the company following significant shifts in both management and strategy over the last year. Since last August when founder and former-CEO Katrina Lake transitioned to the role of Executive Chairperson, there has also been a substantial shift in strategy, with SFIX introducing the direct-buy Freestyle program. While we expected this additional channel to expand the company's addressable market and drive incremental revenue, it has proven difficult to roll out without adding friction to the onboarding of new Fix customers." Telsey lowered their price target by approximately 29%.

137. On June 10, 2022, William Blair similarly noted their "concerns around the incrementality of the Freestyle segment and the declining active client base . . . . The biggest risk is around the company's ability to acquire and convert new customers[.]"

**D. Post-Class Period Developments**

138. Four distinct post-class period events confirm that Freestyle cannibalized Fix and that Defendant Spaulding's push to launch Freestyle notwithstanding the Company's extensive internal test results revealing cannibalization was a complete failure.

139. First, on September 30, 2022, Retaildive reported that "Stitch Fix is once again requiring potential customers to sign up for its styling service and order a box of clothing curated by a stylist in order to shop its 'Freestyle' e-commerce site." In other words, Defendants confirmed

that they had again fully shuttered Freestyle to new customers. The article elaborated, "The prerequisite was reinstituted a few weeks ago, according to an employee who requested anonymity because they aren't authorized to discuss company details. A Stitch Fix spokesperson declined to confirm when the change was made or comment on why." The article explained that the basis for the undisclosed change was that "Freestyle was supposed to bolster the company's total addressable market, but almost immediately began to cannabilize [*sic*] the box business."

140. Second, Freestyle's failure led to the end of Defendant Spaulding's tenure at Stitch Fix. On January 5, 2023, the Company issued a press release announcing that Defendant Spaulding would "step down as CEO." Defendant Spaulding acknowledged in that press release that she was not the right person to lead Stitch Fix on its "ambitious transformation," and that her Freestyle initiative had taken the Company into the red: "in the immediate term, the focus for the team is squarely on creating a leaner, more nimble organization to set the company up for a return to profitability." Defendants announced that Defendant Lake, former CEO and Executive Chairperson, would replace Defendant Spaulding as CEO on an interim basis—the lack of a ready replacement for Defendant Spaulding suggests that she was asked to leave.

141. Analysts were not surprised that the poor performance of Defendant Spaulding, and her Freestyle initiative, led to her departure. For example, Wedbush explained on January 5, 2023, that "Ms. Spaulding was given the CEO seat to spearhead the transition of the business model away from one focused on the legacy 'Fix' offering (a 'mystery box' of 5 items sent to a customer sight-unseen), and towards a business model diversified between 'Fix' and the newer 'Freestyle' offering (more akin to a traditional e-commerce model, with more personalization). However, the transition has been very rocky, due to both macro factors and internal missteps." William Blair also noted on the same day, "The announcement is not surprising given Stitch Fix's challenging performance under Spaulding's tenure as CEO, including the company's failed strategy around its direct business[.]" Also on the same day, Barclays further highlighted the Company's "self-induced missteps (*e.g.*, . . . Fix vs. Freestyle onboarding flow mishaps)." Barclays acknowledged that Defendant Spaulding was, effectively, fired, concluding that "we're not entirely surprised that

the Board opted to make a change." On the same day, J.P. Morgan similarly wrote that "Elizabeth's departure does not come as a surprise[.]"

142. Third, and contemporaneous with Defendant Spaulding's firing, the Company sent a letter to employees explaining that they would cut approximately another 20% of their salaried staff. This further cost cutting was necessary to return the Company to profitability after Freestyle had cannibalized the Company's core Fix business.

143. Finally, Defendant Lake, in her role as interim CEO, announced that Stitch Fix intended to move away from Freestyle entirely. On March 7, 2023, Defendant Lake announced that the Company would "refocus" on the Fix, and that Stitch Fix would no longer think of Freestyle as a "separate business unit" because it "was less effective" as a "customer acquisition vehicle." Defendant Lake elaborated that "marketing Freestyle first wasn't as effective as what we had done historically in Fixes, but it also actually made it harder for us to be able to be acquiring people into the Fix channel." Defendant Lake reiterated on June 7, 2023 that after "a full analysis of our network strategy," Stitch Fix was determined to "refocus[] on our core Fix business." Defendant Lake explained that this was because of high "dormancy" or "churn rates" – meaning that Freestyle-first clients purchased less and less frequently. Lake added that Freestyle-first "clients did not generate the same level of engagement and revenue delivery" compared with Fix clients. In other words, Defendant Lake acknowledged that Freestyle-first clients cannibalized Fix clients during the Class Period because they converted at lower rates and were of lower quality – precisely what Stitch Fix's internal testing showed.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

144. Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions. Specifically, Defendants represented to investors that Direct Buy was and would be "additive," "incremental" and "complementary" to its core product, the "Fix," by converting new clients to the Stitch Fix platform. In truth, Defendants knew that Direct Buy was cannibalizing Fix during onboarding because Stitch Fix's internal testing showed that if a prospective consumer was directed to Direct Buy first instead of Fix, the conversion rate or rate

at which a prospective consumer became a Stitch Fix customer would drop 30-40%. The same internal tests also revealed that prospective consumers who did convert to Stitch Fix through onboarding first in Direct Buy had less than half the lifetime value of a client who onboarded first through Fix as such Direct Buy-first clients were of lower quality and bought less and less frequently than Fix-first clients.

**A. June 2020: Q3 2020 Disclosures**

145. On June 8, 2020, Stitch Fix filed a Letter to Shareholders with the SEC on Form 8-K, signed by Defendants Lake and Spaulding (the "June 2020 Letter to Shareholders"), and held an earnings conference call for the third fiscal quarter of 2020. During that call, Defendant Lake stated, "given the momentum we've witnessed with Direct Buy in a frictionless entry point we think it represents, we plan to make it accessible to new clients as an acquisition vehicle in the coming months."

146. The statements identified in ¶145 were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Lake to state that Direct Buy was a "frictionless entry point" that would be an "acquisition vehicle" for "new clients." In truth, Defendants' own statistically valid test results showed that Direct Buy was cannibalizing Fix customers and creating "friction" in the onboarding process such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality. Further, in making representations about Direct Buy as a "frictionless entry point" that would be an "acquisition vehicle" for "new clients," a reasonable investor would have understood Defendant Lake to be speaking about prospective or new clients.

147. Furthermore, both the June 2020 Letter to Shareholders and Defendant Spaulding on the June 8, 2020 earnings call stated, "We believe Direct Buy provides the lightweight entry point for both existing and new clients and complements our Fix offerings[.]"

148. The statements identified in ¶147 were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants Lake and Spaulding to state that Direct Buy was a "lightweight entry point for . . . new clients" and "complements our Fix offerings." In truth, Defendants' own statistically valid test results showed that Direct Buy was

cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality and therefore did not "provide[] a lightweight entry point . . . for new clients" or "complement" the Fix business. Further, in making representations about "new clients," a reasonable investor would have understood Defendants Lake and Spaulding to be speaking about prospective or new clients.

149. Defendant Spaulding also stated, on the June 8, 2020 call, that "Trending for You and our influencer collaboration are prime examples of how we're adding flexibility to the way clients can experience Direct Buy and to more effectively attract new clients. In addition, we believe it can fuel conversion among clients who's [*sic*] historically been on the fence." The June 2020 Letter to Shareholders also said that Trending for You and the influencer collaboration "are prime examples of how we're adding flexibility to the direct buy experience to more effectively attract new clients over time."

150. The statements identified in ¶149 were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants Lake and Spaulding to state that Direct Buy would "more effectively attract new clients" and for Defendant Spaulding to state that Direct Buy would "fuel conversion." In truth, Defendants' own statistically valid test results showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality and therefore did not "more effectively attract new clients" or "fuel conversions." Further, in making representations about "Trending for You," which referred to the beta launch of Direct Buy to new clients, as well as "attract[ing] new clients" and "fuel[ing] conversion" among "clients" who have "historically been on the fence," a reasonable investor would have understood Defendants Lake and Spaulding to be speaking about prospective or new clients.

151. Later on the same June 8, 2020 call, in response to a question from a KeyBanc analyst who asked "what percent of your overall business do you think [Direct Buy] will approximate over time," Defendant Spaulding responded, "And so, what gets us so excited about what we're seeing with Direct Buy is we're clearly meeting a very complementary set of needs relative to what our Fixes offer us to address. And allows us we believe to cover the full

addressable market of apparel spending. And so, while this distinction of share of wallet gain and sort of the mix of those two is something we'll talk about for the next few quarters. I would imagine that over time there's just going to be a total blurring between services that are more engaged with filing support versus areas where consumers can shop and engage any time that they want to. I think what we're most excited about is to just see that these two offerings are so highly complementary versus any sort of cannibalization between the two."

152. The statements identified in ¶151 were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to state that Direct Buy and Fix were now and would continue to be "over time" "highly complementary versus any sort of cannibalization between the two," and that together, they "allow[]" Stitch Fix "to cover the full addressable market." In truth, Defendants' own statistically valid test results showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality, and therefore that there was "cannibalization between the two," that Direct Buy and Fix were not "complementary" or "highly complementary," and that Direct Buy would not allow Stitch Fix "to cover the full addressable market." Further, in making representations about "the full addressable market" and the "blurring" of the two business lines "over time," in response to a question about what percent of the business Direct Buy would "approximate over time," a reasonable investor would have understood Defendant Spaulding to be speaking about prospective or new clients.

**B. June 10, 2020: William Blair Growth Stock Virtual Conference**

153. On June 10, 2020, Defendant Lake attended the William Blair Growth Stock Virtual Conference on behalf of Stitch Fix. At the conference, in response to a question from a William Blair analyst regarding whether Direct Buy was "an incremental [average order value] opportunity or a way to acquire new customers," Defendant Lake responded, "And so what we believe is like all of these steps open up incremental market opportunity, even now with direct buy what we're able to do is to be able to convert people who might be on the fence about Stitch Fix." Lake reiterated, "And to answer your question briefly around like is this just incremental to current clients or is this something we can use more of, I think we've seen it's both opening up more wallet

opportunity but we also think that this is something that's going to be able to open up more TAM and be able to get people who might have been on the fence about Stitch Fix over and really address lots of different types of shopping needs through this capability."

154. The statements identified in ¶153 were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Lake to state that Direct Buy would "open up incremental market opportunity," and was "able to convert people who might be on the fence." In truth, Defendants' own statistically valid test results showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality. Further, in making representations about converting people who were "on the fence," in response to a question about "acquir[ing] new customers," a reasonable investor would have understood Defendant Lake to be speaking about prospective or new clients.

**C. December 2020: Q1 2021 Disclosures**

155. On December 7, 2020, Stitch Fix filed a Letter to Shareholders with the SEC on Form 8-K, signed by Defendants Lake and Spaulding (the "December 2020 Letter to Shareholders"), and held an earnings conference call for the first fiscal quarter of 2021. During the call, Defendant Spaulding said that "our ongoing momentum in direct buy" will allow the Company to "attract high-quality clients, but also to convert our large prospect population that we estimate is in the millions, clients who are at the precipice, but have not yet converted to Stitch Fix." This statement was repeated in the December 2020 Letter to Shareholders.

156. The statements in ¶155 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants Lake and Spaulding to state that Direct Buy would allow the Company to "attract high-quality clients" and "also to convert our large prospect population," including "clients who are at the precipice, but have not yet converted to Stitch Fix." In truth, Defendants' own statistically valid test results showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality. Further, in making representations about "attract[ing] high-quality clients" and "converting our large prospect population" including clients

who "have not yet converted to Stitch Fix," a reasonable investor would have understood Defendants Lake and Spaulding to be speaking about prospective or new clients.

157. During the December 7, 2020 call, a Goldman Sachs analyst asked about "the combination of direct buy and the trends that you're seeing in keep rates," including "new customers versus old customers in terms of trends." In response, Defendant Lake stated, "At a high level, honestly, I mean, what we're seeing is that the two experiences are really additive[.]" Defendant Lake concluded her answer by stating that "direct buy and Fixes will allow us – the kind of combination of those two things will allow us to address many more types of clients and what we're realizing in [*sic*] it's really also it's unlocking, I think, both client opportunity but also pretty significantly on the wallet share opportunity side where if you're looking for a down jacket to eat outside, as an example, you'd actually love to buy that through Stitch Fix in a more frictionless way, and on direct buy it's going to be a great way to do that."

158. The statements identified in ¶157 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Lake to state that the Fix and Direct Buy "experiences are really additive," that "the combination of those two things will allow us to address many more types of clients," and that Direct Buy would permit purchasing "in a more frictionless way." In truth, Defendants' own statistically valid test results showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality and thus, the experiences were not "additive," Direct Buy was not causing Stitch Fix to "address many more types of clients," and purchasing through Direct Buy was not "frictionless" with Fix. Further, in making representations about "many more types of clients," "client opportunity," and "buy[ing] that through" and "on Direct Buy" in response to a question about trends for "new customers," a reasonable investor would have understood Defendant Lake to be speaking about prospective or new clients.

### D. February 10, 2021: Goldman Sachs Technology and Internet Virtual Conference

159. On February 10, 2021, Defendant Lake attended the Goldman Sachs Technology and Internet Virtual Conference on behalf of Stitch Fix. During the conference, a Goldman Sachs

analyst asked Defendant Lake, "what is the vision for direct buy and how has the offering evolved over the last year or so since you started rolling it out?" In response, Defendant Lake stated, "I think this really is one of the most exciting things that I've had the privilege of getting to work on because it's one of those initiatives that is both really powerful and <u>we can see in the data that it's working</u>. And at the same time there's still so much opportunity."

160. The statement identified in ¶159 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Lake to state with respect to Direct Buy that "we can see in the data that it's working." In truth, Defendants' own statistically valid test results, *i.e.*, the "data," showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality. Further, in making representations about "the data" Stitch Fix had in response to a question about the "vision for direct buy," which included the launch of Direct Buy to prospective or new clients, a reasonable investor would have understood Defendant Lake to be speaking about the data she had at the time, including the data for prospective or new clients.

161. Furthermore, Defendant Lake's statement identified in ¶159 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout that "we can see in the data that it's working," Defendant Lake was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results (*i.e.*, the "data") showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality.

**E. March 2021: Q2 2021 Disclosures**

162. On March 8, 2021, Stitch Fix filed a Letter to Shareholders with the SEC on Form 8-K, signed by Defendants Lake and Spaulding (the "March 2021 Letter to Shareholders"), and held an earnings call for the second fiscal quarter of 2021. The March 2021 Letter to Shareholders stated that Direct Buy "is delivering <u>incremental</u> lifetime value." Further, Defendant Spaulding said in the March 8, 2021 earnings call that "[t]his <u>incrementality</u> gives us more optimism to believe that <u>as our direct buy offering expands, client lifetime values will continue to grow</u>."

163. The statements identified in ¶162 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendants Lake and Spaulding to state that Direct Buy was "delivering incremental lifetime value" and cite "[t]his incrementality" between Direct Buy and Fix as the basis for their belief that "as our direct buy offering expands, client lifetime values will continue to grow." In truth, Defendants' own statistically valid test results showed that Direct Buy was not "incremental" but was instead cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality and had lower lifetime values than Fix clients. Further, in making representations about "incrementality" and "client lifetime values" "as our direct buy offering expands," a reasonable investor would have understood Defendants to be speaking about prospective or new clients.

164. On the same March 8, 2021 earnings call, Defendant Spaulding represented, "The momentum and client engagement we've seen increases our confidence as we look to introduce direct buy to new clients at the end of the fiscal year." Spaulding elaborated, "Our goal is to help clients begin their journey with Stitch Fix in the best possible way, starting with either Fix or direct buy as soon as they enter our ecosystem, and we expect that direct buy will help drive greater engagement and fuel client acquisition in the years ahead." And, in direct response to an analyst question about cannibalization concerns surrounding Direct Buy's introduction to new clients, Spaulding stated that "similar to the incrementality that we've observed with active Fix clients as they participate both and seeing that is actually an additive experience. I think we're thinking about it similarly as we bring new consumers onto the platform."

165. The statements identified in ¶164 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to tout Defendants' increased confidence in Direct Buy as a client acquisition vehicle and to compare the purported "incrementality" and "additive experience" of Direct Buy for existing Fix clients with new Direct Buy clients. It was also materially false and misleading for Spaulding to state that "starting" clients in Direct Buy would "fuel client acquisition." In truth, Defendants' own statistically valid test results showed that Direct Buy was not "incremental" or "additive" but was

instead cannibalizing Fix customers such that clients who "started" in Direct Buy converted at rates 30-40% below Fix clients and were of significantly worse quality. Further, in making representations about introducing "direct buy to new clients," bringing "new consumers onto the platform," and "starting" clients with "Direct Buy as soon as they enter our ecosystem," a reasonable investor would have understood Defendant Spaulding to be speaking about prospective or new clients.

166. Furthermore, Defendant Spaulding's statement identified in ¶164 above was also at a minimum materially misleading and omitted material facts. In direct response to an analyst question about cannibalization of new clients, Spaulding made positive representations about "active clients." The Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality.

**F. June 2021: Q3 2021 Disclosures**

167. On June 7, 2021, Stitch Fix held an earnings conference call for the third fiscal quarter of 2021. During the call, Defendant Spaulding stated, "The <u>success in incrementality that direct buy has demonstrated to date</u> gives us high conviction that our personalized shopping experience will <u>significantly broaden the appeal and reach of Stitch Fix</u>."

168. The statement identified in ¶167 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to tout the "success in incrementality that direct buy has demonstrated to date," as the basis for Defendants' "conviction" that Direct Buy "will significantly broaden the appeal and reach of Stitch Fix." In truth, Defendants' own statistically valid test results showed that Direct Buy was not "incremental" and would not "significantly broaden the appeal and reach of Stitch Fix," but was, instead, cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality. Further, in making representations about

"broadening the appeal and reach of Stitch Fix," a reasonable investor would have understood Defendant Spaulding to be speaking about launching Direct Buy to prospective or new clients.

169. Furthermore, Defendant Spaulding's statement identified in ¶167 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout the "success in incrementality that direct buy has demonstrated to date," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality.

**G. September 2021: Q4 2021 Disclosures**

170. On September 21, 2021, Stitch Fix held an earnings conference call for the fourth quarter of fiscal year 2021. During the call, an analyst from MKM Partners asked about "how you're thinking about growth of the Fix business as your Freestyle business ramps" to new customers and how "in the past you've talked about low cannibalization." In response, Defendant Spaulding stated with respect to "our new onboarding experience" that "what we would anticipate over time is many new clients coming in through this new Freestyle experience, but then finding their way to certain use cases and occasions that a Fix is really a great experience to add on to and vice versa continuing to see clients also enter through [the] Fix business." Defendant Spaulding then answered "the specific cannibalization question," by stating that "we think that revenue per active client that we shared and the knowledge we have of like the newer cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary. . . . [W]e see solid growth in both sides of the business in the coming year."

171. The statement identified in ¶170 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to state that it did not matter whether clients came in first "through this new Freestyle experience" or "the Fix business," and that with respect to "our new onboarding experience," "many new clients [were and would be] coming in through this new Freestyle experience." It was also materially false and misleading for Defendant Spaulding to state in response to the "specific cannibalization question"

that Freestyle and Fix provided "real strength and incrementality," and that the two offerings were "quite complementary," and would support "solid growth in both sides of the business." In truth, Defendants' internal test results showed that Freestyle was cannibalizing Fix customers such that clients who came in first through the "Freestyle experience" converted at rates 30-40% below clients who "enter through Fix business" and were of significantly worse quality, and Freestyle was therefore neither "incremental[]" nor "complementary" to Fix and did not support the Company's "solid growth." Further, in making representations about "new clients coming in through this new Freestyle experience" and "newer cohorts of clients" in response to a question about growth as the "Freestyle business ramps" fully to new customers, a reasonable investor would have understood Defendant Spaulding to be speaking about prospective or new clients.

172. Furthermore, Defendant Spaulding's statement identified in ¶170 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout that Freestyle and Fix provided "real strength and incrementality," and that the two offerings were "quite complementary," which would lead to "solid growth," the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Freestyle was cannibalizing Fix customers such that Freestyle clients converted at rates 30-40% below Fix clients and were of significantly worse quality.

173. During the same call, in direct response to an analyst question asking for a "Freestyle update since the public launch" to "new customers," Defendant Spaulding declined to share any data and instead touted that the "<u>continued enhancement of what we're doing with Freestyle</u>" is "<u>demonstrated by our revenue per active client crossing that $500 mark.</u>"

174. The statement identified in ¶173 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Spaulding to tout the "continued enhancement" of Freestyle and stale revenue metrics as supporting the success of Freestyle's launch to new customers. In truth, Defendants' internal test results showed that Freestyle was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality. Further, in making representations about

"what we're doing with Freestyle" in response to a question about the launch to "new customers," a reasonable investor would have understood Defendant Spaulding to be speaking about prospective or new clients.

175. Furthermore, Defendant Spaulding's statement identified in ¶173 above was also at a minimum materially misleading and omitted material facts. Having chosen to tout the success of Freestyle's introduction to new clients by relying on stale revenue data, the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that Direct Buy was cannibalizing Fix customers such that Direct Buy clients converted at rates 30-40% below Fix clients and were of significantly worse quality.

## VII. LOSS CAUSATION

176. The fraud alleged herein was the proximate cause of the economic loss suffered by Lead Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (*i.e.*, stock price declines) described herein. *See, e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

177. During the Class Period, Lead Plaintiffs and the Class members purchased or otherwise acquired Stitch Fix common stock at artificially inflated prices, and were damaged thereby when the price of Stitch Fix common stock declined in response to the partial disclosures. Throughout the Class Period, the price of Stitch Fix common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Stitch Fix common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which occurred after trading hours on March 8, 2021, December 7, 2021, and March 8, 2022, and both during trading and after trading hours on June 9, 2022. These disclosures reduced the amount of inflation in the price of Stitch Fix's publicly traded stock, causing economic injury to Lead Plaintiffs and other members of the Class.

178. Specifically, after the market closed on March 8, 2021, Defendants issued a letter to shareholders for the second fiscal quarter of 2021 and held an earnings conference call. During

the call, in a partial revelation of the truth, Defendants announced that their launch of Direct Buy to new customers would be slightly delayed. Jedda stated, "with respect to the delay of our direct buy to non-Stitch Fix clients . . . [w]e plan to roll that out late in Q4 now as we get the product right." Explaining the delayed launch, Defendant Spaulding cited "evolving our client onboarding process and user interface, tightening logistics and operations, and streamlining client style collection information." Defendants admitted that the delay in fully launching Direct Buy resulted in the Company revising its guidance. Jedda explained on the March 8, 2021 earnings call that because the company "plan[s] to continue testing" Direct Buy and would not do a "full scale product launch [until] late fiscal Q4," the company decreased net revenue guidance. He reiterated in response to an analyst question, "the delay of our direct buy to non-Stitch Fix clients" is "a cause for our revised guidance." He also said that, due to not knowing "the precise timing of product launches, we'll hold off on providing full-year adjusted EBITDA guidance at this time." Truist noted that "contributing to the softer revenue outlook is the delay of the full-scale Direct Buy rollout to the end of F4Q21, which was previously scheduled for earlier in the year." Canaccord similarly observed that "a more measured approach to its direct-buy rollout for new clients contributed to a soft Q3 guide and a slight reduction to its FY21 revenue outlook."

179. In response to the disclosure that Direct Buy was delayed and the related takedown of the Company's fiscal 2021 guidance, Stitch Fix stock declined a statistically significant 28%, from a closing price of $68.52 per share on March 8, 2021 to a closing price of $49.23 per share on March 9, 2021, on high volume.

180. After the market closed on December 7, 2021, Stitch Fix held an earnings call to discuss the Company's results for the first fiscal quarter of 2022. Defendant Spaulding disclosed that "as a result of the expansion into Freestyle," the Company "may experience short-term impacts of cannibalization." Defendant Spaulding further explained that "in the short-term, people are making a trade-off between do I want to try Fix, do I want to try Freestyle." Defendant Spaulding continued, "I think we acknowledge in onboarding we may be distracting some of those clients with shopping in Freestyle when in reality they just want the support of a stylist," and "we experienced lower Fix conversion rates than we expected."

181. Stitch Fix's disclosures caused the Company's stock price to decline by $5.97 per share, or nearly 24%, from a closing price of $24.97 per share on December 7, 2021, to a closing price of $19.00 per share on December 8, 2021, on high trading volume.

182. Then, after the market closed on March 8, 2022, Stitch Fix held an earnings call to discuss the Company's results for the second fiscal quarter of 2022. Defendant Spaulding acknowledged, "In our efforts to launch and promote Freestyle, we chose to direct visitors coming to stitchfix.com towards the Freestyle experience . . . in leading clients to the Freestyle experience first, we inadvertently created friction for those seeking a Fix." Defendant Spaulding reiterated, "We believe that we created friction when we introduced Freestyle to the landing page, given the intent of the majority of those clients coming to our site was for a Fix." Defendant Spaulding further revealed that "conversion of new visitors for Fix and Freestyle is not where we want it to be." Defendant Spaulding explained that, as a result, "The lower net client adds we have experienced in the first half of the year have impacted our revenue and are driving our revised outlook for the back half due to the compounding nature of fewer new clients buying."

183. Thus, the March 8, 2022 disclosures further revealed to the market that Freestyle was cannibalizing Fix and that the Company had not succeeded in implementing its solution to the problem in the short-term, but rather continued to experience "friction" between Freestyle and Fix, including in the client onboarding process.

184. As a result of this disclosure, the price of Stitch Fix stock declined by $0.67 per share, or 6%, from a closing price of $11.01 per share on March 8, 2022, to a closing price of $10.34 per share on March 9, 2022, on high trading volume.

185. Last, on June 9, 2022, Defendants announced additional Freestyle cannibalization and significant layoffs. During trading hours as first reported by CNBC, Defendant Spaulding emailed all Company employees, informing them that Stitch Fix had determined to reduce its workforce by 15% "[i]n light of our recent business momentum and an uncertain macroeconomic environment." As Defendant Spaulding explained, "We've taken a renewed look at our business and what is required to build our future," and this decision, Spaulding said, "was one we needed to make to position ourselves for profitable growth."

186. As a result of this disclosure, the price of Stitch Fix's stock declined by $0.91 per share, or approximately 10%, from a closing price of $8.69 on June 8, 2022 to a closing price of $7.78 on June 9, 2022, on high trading volume.

187. Later that day, Defendants finally revealed the full extent of their fraud. After the close of trading on June 9, 2022, the Company issued an earnings announcement press release, SEC Form 8-K, and SEC Form 10-Q, and held an earnings conference call. The Form 10-Q, signed by Defendant Spaulding, stated, "We had 3,907,000 and 4,107,000 active clients as of April 30, 2022, and May 1, 2021, respectively, representing year-over-year decline of 4.9%. The decline in active clients was driven by client conversion challenges and lower site traffic. We experienced weaker-than-expected conversion of new clients due to onboarding friction[.]"

188. During the Company's earnings call, Defendant Spaulding further disclosed that "[the] conversion of new visitors was not where we wanted it to be in the second quarter[.]" To address this problem, Defendant Spaulding explained that "we began directing all stitchfix.com traffic to a simplified Fix first onboarding path. Now clients entering through stitchfix.com are directed to schedule a Fix upon completing a style profile. After scheduling, their Freestyle shop is unlocked." However, Defendant Spaulding concluded, "we are still not yet at our desired conversion model. In addition, overall new client traffic to our website was down in Q3. . . . [B]oth factors, conversion and traffic, ultimately played a role in the 3% decline in our total active client counts quarter-over-quarter."

189. As a result of these disclosures, the price of Stitch Fix stock declined by $1.44 per share, or nearly 19%, from a closing price of $7.78 per share on June 9, 2022, to a closing price of $6.34 per share on June 10, 2022, on high trading volume.

190. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the existing artificial inflation of the price of Stitch Fix common stock. It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Thus,

the stock price declines described above were directly or proximately caused by Defendants' false and misleading statements and/or omissions.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

191. Numerous facts, in addition to those discussed above, raise a strong inference that Defendants knew or were deliberately reckless in not knowing that their Class Period misrepresentations were false or misleading when made.

192. First, Defendants saw and reviewed contemporaneous data and information that contradicted Defendants' false and misleading statements. The Executive Defendants received reports and attended presentations showing the negative results of the Company's internal cannibalization testing, and the Executive Defendants discussed those results in Company meetings. Defendants concealed these internal testing results from investors and misled investors concerning the test results and the issues addressed by the testing, which supports a strong inference of scienter.

193. Defendants knew about the negative test results. As confirmed by multiple former employees, including FE 1, FE 2, FE 3, and FE 4, Stitch Fix conducted internal testing, which revealed that Direct Buy was cannibalizing Fix, and those test results were shared with the Executive Defendants during the Class Period. As discussed in Sections IV.E and IV.K above, FE 1, FE 2, FE 3, and FE 4 confirmed that those test results were shared with Defendant Spaulding in Google Slides presentations and/or during routine and weekly meetings.

194. FE 1 explained that the entire purpose of those weekly meetings was to inform Defendant Spaulding of the tests, including the New Fix Customer Test. FE 1 was personally in meetings in which the negative test results were discussed, and he also heard about the negative results from colleagues. FE 1 confirmed that this information would be presented and communicated to Defendant Spaulding, recounting that the test results were reviewed in the Weekly Direct Buy Meetings with Defendant Spaulding. FE1 further identified other meeting participants—such as key business leaders from Data Science, Product Managers, and Strategy—and reiterated that the purpose of these meetings was to share these cannibalization results with business leaders. FE 1 explained that the format of these meetings is that the lead for the Data

Science team presents the results to leadership and would say here is what the test revealed, here is the performance of the tests, here is what we learned, and our recommendation is that we do not recommend moving forward with Direct Buy because it performed really poorly compared to the Fix experience. FE 1 confirmed that this would be presented and communicated to Defendant Spaulding.

195. FE 2 further confirmed that there was a standing Freestyle touch base meeting every Friday attended by senior management and he understood that the results of the tests were shown to Defendant Spaulding at that meeting. FE 2 reconfirmed that there were weekly standing meetings that the Product Management team had with "MGMT," which included Spaulding and Company CFO Dan Jedda, occurred on Friday mornings. Further, FE 2 himself created a presentation describing his concerns with the data from Freestyle and the data from Fix not lining up, and he told his direct managers to share it with the C-suite.

196. FE 3 further confirmed that executive leadership, including Defendant Spaulding, held routine meetings with data scientists who ran the internal tests regarding the performance of Freestyle. The purpose of those meetings was for Defendant Spaulding to understand the results of the various testing, including cannibalization testing, around Freestyle.

197. FE 4 also confirmed that the executive suite, including Spaulding and her direct reports, were informed of the results of the tests. FE 4 explained that the experiments were running through the A/B randomization system, and the results were written into the A/B database as they came in. According to FE 4, once the analysis was completed through the A/B interface, it would be pasted into a Google Docs or Google Slides presentation. FE 4 confirmed that it is his understanding that Spaulding had access to those Google Slides presentations in which the results of those tests were quantified and knew about them. FE 4 further confirmed that the executive suite, including Spaulding and her direct reports, were informed of the results of these tests.

198. <u>Who the tests tested</u>. FE 1, FE 2, and FE 4 confirmed that the Company was testing the impact of Freestyle on conversion of new customers to the Fix business. FE 1 and FE 4 explained that Stitch Fix considered a potential customer a "new client" if they had not previously ordered a Fix, and that this group was tested as part of the New Fix Customer Tests. FE 1 further

explained that the test was conducted on new customers, people who had not yet ordered from Stitch Fix. FE 2 confirmed that the purpose of the tests he discussed was to determine whether Freestyle was going to bring in more clients and new revenues, or if it would cannibalize the existing Stitch Fix business by taking would-be Fix customers away from Fix. Similarly, FE 1 explained that the Company's concern was that potential customers would not convert or would convert at a lower rate and purchase less items and not come back, which would cannibalize the potential for them to come back and purchase more through the Fix experience. FE 1 confirmed that this type of cannibalization was what the New Fix Customer Test showed was occurring. FE 4 also confirmed that the Company was testing the impact of Freestyle on conversion to the Fix business. FE4 confirmed that the hope was that Freestyle would attract new clients and the big change being tested was how it would do with new clients.

199. The statements from FE 1, FE 2, and FE4 are corroborated by Defendants' descriptions of what they were testing for during the Class Period. For instance, on December 7, 2020, when an analyst asked Defendant Lake what was the "key factor" she was looking for in Defendants' tests before fully launching Direct Buy to new clients, she explained that they were testing "conversion," "onboarding," how to "get the right people into the right conversion path," and how that effected customer lifetime value. As discussed in Section VI above, while Defendants said they were testing, they did not disclose the statistically significant test results they had showing the true negative cannibalization effect of Direct Buy and instead continued to mislead investors.

200. Tests, parameters, and quantification of results. FE 1, FE 2, FE 3, and FE 4 further described the methodology, output, and related recommendation from data scientists regarding these negative tests results that were shared with Defendants.

201. FE 4 said that the first test was conducted in summer 2020, and FE 1 confirmed that the Company's June 8, 2020 statement regarding the Trending For You "beta" referred to the New Fix Customer Test and that the New Fix Customer Test first occurring in June 2020 was consistent with FE 1's recollection. FE 4 further confirmed that additional tests were conducted in 2020 and early 2021, and FE 2 independently corroborated that there was a second beta test that

occurred while he was on the Direct Buy team, which he joined in July or August 2020. FE 2 left the Company in June 2022 and further confirmed that he was not aware of any tests showing that there was no cannibalization or any cannibalization test showing a positive result while he was at the Company. In addition, FE 1 explained that by the time he left the Company in March 2021, he was not aware of any testing suggesting that Direct Buy would work. FE 1 confirmed that it is his understanding that the test results were consistently negative from the summer of 2020 until he left the Company. FE 1 was not aware of any positive tests. Similarly, FE 4 confirmed that multiple tests were conducted by the Data Scientists in the Algorithms group and they all showed a 30-40% decrease in conversion to the Fix business if customers were directed to Freestyle first. FE 4 confirmed that the Freestyle program that was eventually launched was absolutely fundamentally the same as the program that failed the testing.

202. FE 1 and FE 4 explained how the experiments were organized into control and treatment groups and what each group experienced as part of the test. FE 1 explained that the treatment group was exposed to a different onboarding experience in which they were onboarded directly into the Direct Buy experience. The treatment group still filled out a profile, but the visuals and the questions they were asked were different. FE 1 explained that the treatment group was then shown a personalized Shop where they could purchase items directly. The control group, on the other hand, was directed to the standard Fix process, in which they fill out a profile and could then schedule their Fix. FE 4 further confirmed that experiments were conducted in which some of the people who came onto the Stitch Fix website would be directed to Freestyle first as the experiment group and some of the people would go to Fix first as the control group.

203. FE 1 and FE 4 also confirmed that these test results were statistically significant. FE 1 detailed how the Company randomly selected enough potential customers to be in the control and treatment groups and ran the tests for a sufficiently long time to reach statistical significance. FE 1 reiterated that with the New Fix Customer Test, they did get statistically significance results. FE 1 further explained that at Stitch Fix, if you do not have statistical significance, the test is null; it is not a valid test. FE 1 confirmed that the New Fix Customer Test was a valid test. FE 4 further confirmed that the test populations were large enough to have high confidence in the results, and

that with an effect as large as 30-40%, the Company could say with high confidence that there is a substantial, meaningful effect on conversion rates.

204. FE 1, FE 2, FE 3, and FE 4 also confirmed the tests' results. FE 4 stated that that the New Fix Customer Test treatment group's conversion rate to becoming Stitch Fix customers was about 30-40% lower than the control group, which FE 1 independently corroborated. FE 4 explained that the tests showed that if a person who came to the Stitch Fix website was directed to Freestyle first instead of Fix, the conversion rate—or rate at which people became Stitch Fix customers—would drop 30-40%. FE 4 elaborated that if you compared the test population to the control/legacy experience population, the population who was directed to Freestyle converted 30-40% less often. FE 1 corroborated those results, and further confirmed that the test was showing that people who were funneled to Direct Buy first in the experience were purchasing less or purchasing nothing. FE 3 confirmed that it was obvious from test results as well as continuous customer research conversations that Freestyle was taking customers away from the Company's existing Fix business. FE 1 further confirmed that the New Fix Customer Test showed that Direct Buy customers purchased less than Fix customers and were less likely to come back again.

205. FE 1 explained that the Data Science team put together Google Slides decks which included the numbers for test population, the control group, and the Direct Buy group, as well as the impact of the test, the actual data from the tests, a chart comparing the results of the group side by side with the major data points, such as the conversion rate of the control group and the conversion rate of the experiment group. FE 1 specifically recalled the slides saying something to the effect of "Direct Buy performed poorly relative to the Fix, and therefore we do not recommend moving forward with this." FE 1 confirmed that the data scientists did not recommend moving forward with Direct Buy. FE 1 confirmed that Spaulding "just ignored all the data." According to FE 1, Spaulding's attitude was that it does not matter what the test results were, we are moving forward with this and we need to move forward with this. FE 4 similarly confirmed that despite the failure of the tests and recommendation of the Data Science team, the decision was made to push forward with Direct Buy anyway.

206. Second, Stitch Fix tracked live data showing that Direct Buy was cannibalizing Fix, and the Executive Defendants received this real-time information reflecting cannibalization in weekly reports, which supports a strong inference of scienter.

207. For instance, on February 10, 2021, Defendant Lake told investors that the Company was tracking key performance indicators, or "KPIs," on a "daily, weekly basis," and was "constantly running A/B test[s]." Those KPIs included client retention, wallet share, and average spend per customer.

208. FE 3 confirmed that he received weekly email blasts with specific data such as top line revenue numbers and breakdowns by customer category as well as Freestyle versus Fix. The format of this information was similar to an Excel file. According to FE 3, trends concerning new customer acquisition and customer retention in regard to Freestyle were reflected in those reports. FE 3 confirmed that these weekly email blasts went to Defendants Spaulding and Lake.

209. FE 1 also confirmed that the Company followed the average order value and the number of Fixes for new clients who signed up. FE 1 explained that Stitch Fix also tracked customer churn, or those customers who had been dormant for 12 months. FE 1 further confirmed that the metrics were real-time in the systems, and reports were generated weekly. FE 1 confirmed that these reports and numbers were discussed and shared in business review meetings that he personally attended and that Defendant Spaulding occasionally attended.

210. Third, the Executive Defendants had access to the relevant data showing that Direct Buy was cannibalizing Fix through the Company's internal Looker system and through the data scientists who maintained the test results, which supports a strong inference of scienter.

211. FE 1 explained that specific data such as customer acquisition, new customer acquisition, week-over-week churn, the number of Fixes, and the number of Direct Buy purchases, were all readily available to Company employees in Looker. The Company also maintained an executive dashboard view that was built for executives within Looker. The Looker system included the data that was shared in the weekly business review meetings that FE 1 personally attended and that Defendant Spaulding occasionally attended. Anyone at the Company could access the business review reports stored on the Looker system at any time, including the C-Suite.

FE 2 confirmed that the Company used Looker to make more complex dashboards that employees could share across areas. The C-Suite could look at these high-level Looker dashboards any time they wanted.

212. FE 4 also explained that the experiment results were written into the Company's A/B database as they came in. FE 4 said that the A/B database has information about each client, including metrics about their interactions with the Company, such as whether the client signed up for a Fix, what the client's 90-day revenue contribution to the Company is, and what the client's 90-day contribution margin is. FE 4 explained that the user interface tool would analyze the experiment, showing the number of people assigned to the treatment and control conditions, and outcome statistics. This information was presented in a webpage format. According to FE 4, basically the entire Company (with the exception of stylists) had access to this database. FE 4 said that the results from the A/B database were pasted into the Google Slides decks discussed above, *supra* at ¶¶68-69, 197, and confirmed that it is his understanding that Spaulding both had access to those Google Slides presentations in which the results of those tests were quantified, and knew about them.

213. FE 4 recalled that before one of his colleagues left Stitch Fix in 2022, he remarked to FE 4, "I'm really excited to see our data testing database get subpoenaed" because all the data is there. FE 4 explained that this comment was made when lawsuits against the Company came up. FE 4's colleague said that they would love to see the data go into evidence because "it very clearly demonstrated that the people in charge knew what was going to happen." As FE 4 explained, "They had no reason to be surprised" that conversion on Stitch Fix was going to go down rapidly when they implemented Freestyle. FE 4 confirmed that the database that has the test results in it is named "A/B."

214. FE 1 and FE 3 further confirmed that Defendants Spaulding and Lake had the ability to access data concerning the cannibalization of Fix by Freestyle through the data scientists. Indeed, FE 3 confirmed that fellow data scientists observed that it was obvious from test results as well as continuous customer research conversations that Freestyle was taking customers away from the Company's existing Fix business.

215. Fourth, the Executive Defendants spoke to investors and securities analysts regarding Direct Buy's cannibalization of Fix and the Company's internal test results, claiming comprehensive personal knowledge of this topic. The fact that the Executive Defendants held themselves out to investors and analysts as knowledgeable about the Company's internal tests and what they showed about cannibalization supports a strong inference of scienter.

216. Defendants openly and frequently discussed the tests, and the test results, with investors during the Class Period. For example, on the June 8, 2020 earnings call, Defendant Spaulding cited the Company's internal "testing right now with things like Trending for You" as the basis for her conclusion that "pure new client[s]" were "growth figures of opportunity." Additionally, on the December 7, 2020 earnings call, Defendant Lake told investors that "we've been doing some testing around what is the best way to introduce direct buy[.]" Similarly, when an analyst from Needham & Company asked for "more insight into the plan to introduce Direct Buy to prospective clients later this year," Defendant Spaulding responded that the Company was "experiment[ing] with a new sort of introduction and onboarding flow into Stitch Fix" to accommodate the influx of new customers. She also responded that the Company was "in the flight of building and testing right now," "we're always testing things," and the Company was specifically "beginning to experiment with our prospective client base with our direct buy offering." Later on the same call, Defendant Lake reiterated that Stitch Fix had "been doing some testing around what is the best way to introduce Direct Buy and like what is the best way for us to actually figure out like this is somebody who should be on a conversion path to Fixes versus this is somebody that we actually should have into a direct buy first."

217. Fifth, the Executive Defendants specifically denied that Direct Buy was cannibalizing Fix, including in response to analyst questions, and they cited the Company's internal test results as the basis for those denials or instead cited stale or inapposite metrics, which supports a strong inference of scienter.

218. For instance, on the June 8, 2020 earnings call, when an analyst directly asked "what percent of your overall business" Direct Buy "will approximate over time," Spaulding reassured investors with respect to Fix and Direct Buy, "I think what we're most excited about is

to just see that these two offerings are so highly complementary versus any sort of cannibalization between the two."

219. As another example, during the March 8, 2021 earnings call, an analyst from Piper Sandler specifically asked Defendant Spaulding whether the Direct Buy roll out to first-time clients could "potentially cannibaliz[e] the existing Fix business?" In response, Defendant Spaulding falsely and emphatically denied cannibalization, representing that the Company was "seeing that [Direct Buy] is actually an additive experience. I think we're thinking about it similarly as we bring new consumers onto the platform."

220. As another example, during the September 21, 2021 earnings call, an analyst from MKM Partners asked, "in the past you've talked about low cannibalization, but I'm curious to get the updated thoughts." Defendant Spaulding responded by touting the Company's "new onboarding experience" and "many new clients coming in through this new Freestyle experience." She then continued, as to the "specific cannibalization question, maybe two thoughts to offer. One is just we think that revenue per active client that we shared and the knowledge that we have of like the new cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary." Defendant Spaulding went on to say, "I think we see solid growth in both sides of the business in the coming year."

221. Sixth, the fact that Defendant Spaulding pushed the launch of Direct Buy to new customers through when she knew that the Company's internal tests revealed that Direct Buy was cannibalizing Fix supports a strong inference of scienter.

222. As described above in ¶¶48-61, 93, 112, FE 1 confirmed that despite the recommendation from Data Science that the Company was not ready to launch Direct Buy and the fact that the tests did not look good, and that the data showed that Direct Buy customers were converting at a lower rate, or they would spend less money, compared to Fix customers, the response from Defendant Spaulding was that the Company was going to launch anyway. FE 1 confirmed that Spaulding saw the results of the Company's internal tests which revealed that Direct Buy was cannibalizing Fix, and it was his understanding that Spaulding pushed the launch through anyway because of these reasons. FE 1 confirmed that Spaulding "just ignored all the

data." According to FE 1, Spaulding's attitude was that it does not matter what the test results were, we are moving forward with this and we need to move forward with this.

223. FE 3 corroborated FE 1's account. FE 3 explained that it was his understanding from his conversations with fellow data scientists that Freestyle was personal for Defendant Spaulding, that her success depended on its success, and that Spaulding pushed the launch to new customers too fast despite the negative testing results that were coming through at the Company. FE 2 also understood based on the standing meetings that he personally attended and conversations that he had with others at the Company that Freestyle was one of Defendant Spaulding's babies and she was going after that initiative as CEO. He reiterated that even though the Freestyle tests failed and showed cannibalization, and against everyone's judgment and despite questions from employees, Stitch Fix "launched Freestyle before it was ready, and we damaged our brand." FE 2 confirmed his understanding that Spaulding was aware of the bad test results and she decided to push the launch forward anyway because she had a time in her head that they were going to launch it by.

224. FE 4 corroborated the accounts of FE 1 and FE 3 and provided additional detail. FE 4 explained that Spaulding's view was that launching Freestyle was necessary for her to succeed at her job, and her mission was to restore rapid start-up growth. FE 4 reiterated that Spaulding was getting her marching orders from the Board and Lake to get this Company growing again. FE 4 explained that the path Spaulding chose was Freestyle, and once she chose that path, she was so fully committed to it that she either did not have or did not see other options. FE 4 agreed that Spaulding was brought on to launch Freestyle and that is what she was going to do.

225. FE 4 stated that Spaulding did not provide any justification to employees for her decision to push forward; she just emphasized that they needed to "launch and iterate," learn from their experience, and learn fast and break things. FE 4 confirmed, however, that there was no credible plan for how to iterate, and the Company lacked any infrastructure and system for iterating and learning.

226. FE 4 reiterated that Spaulding wanted to "grow the Freestyle business at all costs." FE 4 remembered Spaulding claiming publicly that they had "inadvertently" created friction in

directing clients to Freestyle first and confirmed that he nearly threw up when he saw the word "inadvertently" because Spaulding was personally trying to add friction to the Fix business. FE 4 explained, "It was very clear from hearing her talk that getting people into Freestyle was the most important thing." FE 4 recalled that he talked to product managers who were looking at onboarding, and anytime anyone proposed that maybe if this is a point where it looks like people will not convert, we should push them to Fix, Spaulding would say no because they needed to push people to Freestyle. According to FE 4, "it was not inadvertent." FE 4 explained Spaulding's view that they needed to push people to Freestyle as hard as possible.

227. FE 4 further confirmed that the Freestyle program that was eventually launched was absolutely fundamentally the same as the program that failed the testing, and that anyone who had the nerve to stand up and say that was treated very poorly by Spaulding until they were quiet or left the Company.

228. Seventh, while Plaintiffs need not allege any motive to plead scienter, Defendant Lake capitalized on her materially false and misleading statements and omissions to investors by disposing of personally-held shares at artificially inflated prices. During the Class Period, Defendant Lake reaped millions of dollars from converting her own personal holdings of Class B common stock, with 10x the voting power of Class A common stock, and selling the converted Class A stock while simultaneously being aware of Freestyle's cannibalization of Fix. As negative facts about Freestyle's cannibalization of Fix accumulated, Defendant Lake sold approximately $97,947,358 worth of Company stock.[5] By contrast, Defendant Lake sold $57,110,631 worth of stock in the two years preceding the Class Period. Based on Defendant Lake's Schedule 14A, filed with the SEC in the month prior to the start of the Class Period, Defendant Lake sold approximately 19.1% of her holdings during the Class Period.

229. Eighth, on January 5, 2023, Stitch Fix announced the departure of Defendant Spaulding, effective that day. This departure occurred less than six months after the end of the

[5] While Defendant Lake's sales were purportedly made pursuant to a 10b5-1 trading plan, contrary to customary practice and current reporting requirements, Defendant Lake's filings with the SEC on Form 4 omit the date her trading plans were entered.

Class Period, when Defendants disclosed the full extent of the truth as the Company revealed that Freestyle was cannibalizing the Fix business, and suggests that Defendant Spaulding's departure was associated with the alleged misconduct described in the Complaint.

230. Finally, the core operations doctrine supports a strong inference of scienter for two reasons. First, as discussed in ¶¶206-216 above, the Executive Defendants admitted detailed involvement in the minutia of Stitch Fix's operations, including data monitoring and the Company's internal testing which revealed cannibalization. Second, the fact that Direct Buy was cannibalizing Fix was of such prominence that it would be absurd to suggest that the Executive Defendants were without knowledge of the matter. As set forth in Sections IV.C and IV.I above, Defendants touted Freestyle as the entire future of the Company and Defendant Spaulding was specifically brought in as President and CEO to lead that effort.

231. The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Defendants' scienter.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

232. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. The misstatements complained of herein were historical statements or statements of purportedly current facts and conditions existing at the time or prior to when the statements were made.

233. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see* Sections IV and VI, *supra*), then-existing facts contradicted Defendants' statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was insufficient to insulate Defendants from liability from their materially untrue and misleading statements.

234. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking

statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and the statement was authorized or approved by an executive officer of Stitch Fix who knew that the statement was false or misleading when made.

## X. THE PRESUMPTION OF RELIANCE

235. The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Stitch Fix's common stock was efficient for the following reasons, among others:

a. Stitch Fix's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

b. Stitch Fix's common stock traded at high weekly volumes;

c. As a regulated issuer, Stitch Fix filed periodic reports with the SEC;

d. Stitch Fix was eligible to file registration statements with the SEC on Form S-3;

e. Stitch Fix regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

f. Stitch Fix was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace;

g. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Stitch Fix common stock; and

h. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Stitch Fix common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

236. As a result of the foregoing, the market for Stitch Fix's common stock reasonably promptly digested current information regarding Stitch Fix from all publicly available sources and reflected such information in the price of Stitch Fix's common stock. All purchasers of Stitch Fix common stock during the Class Period suffered similar injury through their purchase of Stitch Fix common stock at artificially inflated prices, and a presumption of reliance applies.

237. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose that Freestyle was cannibalizing Fix—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material, *i.e.*, that a reasonable investor might have considered the omitted facts important in making investment decisions. Given the importance of the Fix business to Stitch Fix, as set forth above, that requirement is satisfied here.

## XI. CLASS ACTION ALLEGATIONS

238. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Stitch Fix common stock from June 9, 2020 through June 9, 2022, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families,

and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

239. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Stitch Fix common stock was actively traded on the NASDAQ Stock Market. As detailed in the Company's November 4, 2021 proxy materials, the later of the two sets of proxy materials the Company filed during the Class Period, there were approximately 83 million shares of Stitch Fix Class A common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are least hundreds-of-thousands of members of the Class. Class members who purchased Stitch Fix common stock may be identified from records maintained by Stitch Fix or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

240. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

241. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Lead Plaintiffs have no interests that conflict with the interests of the Class.

242. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a. Whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

b. Whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

c. Whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

d. Whether the members of the Class have sustained damages, and the proper measure of damages.

243. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)

244. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

245. This Count is asserted on behalf of all members of the Class against Stitch Fix and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

246. During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew were, or they deliberately disregarded as, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

247. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts,

practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Stitch Fix common stock during the Class Period.

248. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Stitch Fix common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Stitch Fix's knowledge of test results indicating Freestyle was cannibalizing the Fix business; (b) artificially inflate and maintain the market price of Stitch Fix common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase Stitch Fix common stock at artificially inflated prices and suffer loss when the true facts became known.

249. Stitch Fix and the Executive Defendants are all liable for all materially false and misleading statements made during the Class Period, as alleged above.

250. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Stitch Fix stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

251. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Stitch Fix common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Stitch Fix common stock at the prices they paid, or at all, if they

had been aware that the market price had been artificially and falsely inflated by these Defendants' materially misleading statements.

252. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Stitch Fix common stock during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**(Against The Executive Defendants)**

253. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

254. This count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

255. The Executive Defendants acted as controlling persons of Stitch Fix within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

256. By reasons of their high-level positions of control and authority as the Company's most senior officers, the Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Stitch Fix during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

257. Each of the Executive Defendants spoke to investors on behalf of the Company during the Class Period. Therefore, each of the Executive Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Stitch Fix during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

258. By virtue of their positions as controlling persons of Stitch Fix and as a result of their own aforementioned misconduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired Stitch Fix securities. As detailed above, during the respective times, the Executive Defendants served as officers and/or directors of Stitch Fix.

259. As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchase or acquisition of Stitch Fix common stock.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

260. Lead Plaintiffs hereby demand a trial by jury.

Dated: September 13, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*<u>/s/ Rebecca E. Boon</u>*
Rebecca E. Boon (*pro hac vice*)
(rebecca.boon@blbglaw.com)
Scott R. Foglietta (*pro hac vice*)
(scott.foglietta@blbglaw.com)
Alec T. Coquin (*pro hac vice*)
(alec.coquin@blbglaw.com)
Brandon A. Slotkin (*pro hac vice*)
(brandon.slotkin@blbglaw.com)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs Retail Wholesale Department Store Union Local 338 Retirement Fund, Retail Wholesale Department Store Union Local 338 Health & Welfare Fund, Retail Wholesale Department Store Union Local 338 General Fund, and Retail Wholesale Department Store Union Local 338 Benefits Trust Fund*