**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs Retail Wholesale
Department Store Union Local 338
Retirement Fund, Retail Wholesale
Department Store Union Local 338 Health
& Welfare Fund, Retail Wholesale
Department Store Union Local 338 General
Fund, and Retail Wholesale Department
Store Union Local 338 Benefits Trust Fund*

[Additional Counsel Appear on Signature Block]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> STITCH FIX, INC., et al., <br><br> Defendants. | Case No. 5:22-cv-04893-PCP <br><br> **LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> <u>CLASS ACTION</u> <br><br> Date: March 20, 2025 <br> Time: 10:00 AM |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   STATEMENT OF FACTS .........................................................................................2

    A.    Spaulding Leads the "Pivotal Transformation" to Direct Buy ...............................2

    B.    Defendants Launch Direct Buy To Select "New" Clients ........................................3

    C.    Repeated Internal Testing of Direct Buy Reveals Cannibalization To Defendants ...............................................................................................................3

    D.    Defendants Delay The Full Launch Of Direct Buy ..................................................7

    E.    Direct Buy Formally Launches And Continues to Cannibalize Fix ........................7

    F.    The Full Truth Concerning Direct Buy's Cannibalization Of New Clients Is Revealed And Spaulding Is Fired ...........................................................................7

III.  LEGAL STANDARD .................................................................................................8

IV.   ARGUMENT ..............................................................................................................8

    A.    The Complaint Adequately Alleges Falsity .............................................................8

        1.    Defendants' Statements Were False and Misleading..................................9

        2.    Defendants' Arguments Fail .....................................................................11

            a.    Defendants' False Statements Concerned The Same "New Clients" That The Company Was Testing ..........................11

            b.    The Safe Harbor Does Not Insulate Defendants From Liability ................................................................................13

            c.    Defendants' Other Falsity Challenges Fail ...................................16

        3.    Defendants' Misleading Statements Were Not Puffery.............................19

    B.    The SAC Alleges A Strong Inference Of Scienter .................................................20

    C.    Plaintiffs' 20(a) Claim Is Adequately Pled............................................................25

V.    CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Accelr8 Tech. Corp. Sec. Litig.*,
    147 F. Supp. 2d 1049 (D. Colo. 2001)...............................................................................10

*In re Allied Nevada Gold Corp. Sec. Litig.*,
    743 F. App'x 887 (9th Cir. 2018) .....................................................................................21

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ................................................................................................8

*Azar v. Yelp, Inc.*,
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .................................................................20

*Baker v. Twitter, Inc.*,
    2023 WL 6932568 (C.D. Cal. Aug. 25, 2023)...................................................................16

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .......................................................................................23, 24

*In re BioMarin Pharm., Inc. Sec. Litig.*,
    2022 WL 164299 (N.D. Cal. Jan 6, 2022) ........................................................................24

*In re BofI Holding*,
    2017 WL 2257980 (S.D. Cal. May 23, 2017)....................................................................19

*Bond v. Clover Health Invs., Corp.*,
    587 F. Supp. 3d 641 (M.D. Tenn. 2022)............................................................................13

*Brendon v. Allegiant Travel Co.*,
    412 F. Supp. 3d 1244 (D. Nev. 2019) ...............................................................................23

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018) ...............................................................2, 10, 11, 13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .............................................................................................20

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ...................................................................15

*City of Warren Gen. Emps. Ret. Sys. v. Teleperformance SE*,
    2024 WL 2320209 (S.D. Fla. May 22, 2024) ....................................................................23

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
    22 F.4th 1 (1st Cir. 2021)..................................................................................2, 10, 15, 18

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ...................................................................................15

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................16

*Curran v. Freshpet, Inc.*,
   2018 WL 394878 (D.N.J. Jan. 12, 2018) ..............................................................................14

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ..............................................................................................19

*In re Daou Sys. Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ..............................................................................................25

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014).....................................................................................11

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ..............................................................................................9, 10

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ................................................................................................8

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)........................................................................23

*Fecht v. The Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ..............................................................................................9, 11

*In re Fibrogen, Inc.*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022)....................................................................23, 24

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ................................................................................................8

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) .........................................................................15, 19, 20, 22

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019)............................................................................19

*Hatamian v. Advanced Micro Devices, Inc.*,
   87 F. Supp. 3d 1149 (N.D. Cal. 2015)...................................................................................23

*Homyk v. ChemoCentryx, Inc.*,
   2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ..................................................................11, 16

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005)....................................................................................15

*Khoja v. Orexigen Theraps, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..................................................................8, 9, 13, 17

*In re LDK Solar Sec. Litig.*,
2008 WL 4369987 (N.D. Cal. Sept. 24, 2008) ..........................................................25

*Loftus v. Primero Mining Corp.*,
230 F. Supp. 3d 1209 (C.D. Cal. 2017) ..................................................................14

*Loritz v. Exide Techs.*,
2014 WL 4058752 (C.D. Cal. Aug. 7, 2014)............................................................17

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012)....................................................................14

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ....................................................................................9

*Mulligan v. Impax Lab'ys Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ......................................................................23

*NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*,
2017 WL 4453561 (D. Or. Oct. 3, 2017)..................................................................15

*No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Co.*,
320 F.3d 920 (9th Cir. 2003) ..............................................................................8, 25

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...........................................................................21, 22

*Okla. Firefighters Pension & Ret. Sys. v. SNAP Inc.*,
2024 WL 5182634 (9th Cir. Dec. 20, 2024)........................................................21, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................................................................9, 11

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2002) ........................................................24

*Police & Fire Ret. Sys. of the City of Detroit v. Crane*,
87 F. Supp. 3d 1075 (N.D. Cal 2015) .....................................................................23

*In re Qualcomm Inc. Sec. Litig.*,
2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .........................................................23

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..........................................................8, 16, 20, 22

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) ...............................................................14, 18

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .......................................................................22

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) ...........................................................................15, 16

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..............................................................................................25

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) .....................................................................................9, 18, 20

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) ..........................................................................13, 17

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) ...................................................................................25

*Tellabs v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)........................................................................................................20, 25

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................................................................24

*In re VeriFone Holdings, Inc., Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ...............................................................................................20

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .............................................................................19

*In re WageWorks, Inc., Sec. Litig.*,
    2020 WL 2896547 (N.D. Cal. June 1, 2020)........................................................................24

*Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*,
    2012 WL 3835078 .................................................................................................................16

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) .................................................................................................19

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ..................................................................................22

*In re Wireless Facilities, Inc. Sec. Litig.*,
    2007 WL 9667131 (S.D. Cal. May 7, 2007)............................................................................9

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .........................................................................................14, 15

**STATUTES AND RULES**

Securities Exchange Act of 1934:

15 U.S.C. §78j(b) ....................................................................................................1

15 U.S.C. §78t(a) ....................................................................................................1

15 U.S.C. § 78u-5(c)(1)(A) ....................................................................................15

Fed. R. Civ. P.:

Rule 9(b) ................................................................................................................20

**MEMORANDUM OF POINTS AND AUTHORITIES**

Lead Plaintiffs hereby oppose Defendants' motion to dismiss (ECF No. 91).[1]

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Complaint alleges facts that, considered holistically, state claims under §10(b) and §20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a).

**I.      INTRODUCTION**

In the Court's decision on the first motion to dismiss (ECF No. 81, the "Order"), the Court judicially noticed that "Direct Buy was available *only* to existing Fix clients . . . and did not become available to *new* Stitch Fix customers until August 2021." *Id.* at 5. The Court reasoned that "as Stitch Fix notes, the purportedly misleading statements from before August 2021 identified by plaintiffs necessarily addressed only the effect of Direct Buy on existing clients," and thus, were not false. *Id.* The Complaint remedies this in two ways. First, it alleges, based on Defendants' own statements, snapshots of Defendants' marketing materials, and confirmation from FE 1 and new FE 4 (Data Scientist during the Class Period), that Direct Buy was launched to select new and prospective clients in June 2020. Second, the Complaint identifies Defendants' false statements from June 2020 through September 2021 that are about new and prospective clients, and it expressly alleges why a reasonable investor would understand those statements to be about new and prospective clients.

The Complaint also recounts critical new details from three former employees ("FEs") who each describe the statistically significant test results Defendants had in hand that contradicted their statements about Direct Buy's success with new clients starting in June of 2020. Consistent with the Order, the FEs detail "who the tests tested, what the tests entailed (e.g., what its parameters were), [and] how the results were quantified." Order at 7. Specifically, at least three statistically significant tests of the Direct Buy experience starting in early June 2020 run on new clients by

---

[1] Unless otherwise indicated, all emphasis in quotations is added and internal citations are omitted. References to the Complaint or ¶__ are to Lead Plaintiffs' Second Amended Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 88. Reference to Br. __ are to Defendants' Motion to Dismiss the Second Amended Class Action Complaint. ECF No. 91.

Stitch Fix's Data Science group confirmed that Direct Buy was cannibalistic, converting <u>30-40% less new clients than Fix</u>, and attracting lower-quality clients that had <u>half</u> of the lifetime value of new clients who converted through Fix. As alleged, "cannibalization" in this context refers to the fact that potential customers did not convert to Stitch Fix because they were onboarded into Direct Buy instead of Fix, or did convert through Direct Buy, but bought substantially less than they would have if they had been onboarded through Fix. The FEs also establish the lack of **any** positive Direct Buy test during the Class Period.

In response, Defendants largely ignore the new allegations in the Complaint, and instead make impermissible, implausible, and premature factual assertions. Defendants attempt to argue that their statements only concern current customers, but this is incorrect and contradicts the inferences to which Plaintiffs are entitled on a pleading motion. Defendants also contend that the statements are inactionable as forward-looking or puffery. However, as detailed below, the statements are specific, discuss present facts and currently-held beliefs, and the words used by Defendants were credited by analysts, underscoring their materiality.

Courts have sustained similar claims for securities fraud. *See City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1041 (N.D. Cal. 2018) (statements that we are "extremely encouraged by the early results we are seeing" and that defendants' new product line was "trending to add significant incremental revenues" misleading given undisclosed contrary facts); *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 5 (1st Cir. 2021) (statements concerning new software solution actionable where all pre-launch testing failed and employees reported that "the product was not ready and should not be running").

As to scienter, the new FE allegations provide the particularity that the Order found was lacking by detailing the specifics of the tests and how Defendants knew about them. Nothing more is required at the pleading stage.

## II.     STATEMENT OF FACTS

### A.     Spaulding Leads the "Pivotal Transformation" to Direct Buy

Stitch Fix originally had one product: the "Fix," a boxed shipment of five pieces of clothing curated by stylists. ¶25. In October 2019, the Company launched a second product line: "Direct

Buy," which would allow customers to shop on the Company's website for specific products. ¶28. Company founder Defendant Katrina Lake told investors that Direct Buy would "attract new clients," "convert prospective clients," and be "incremental" to Fix. ¶¶35, 38, 41. To lead this "pivotal transformation," Lake brought on Defendant Elizabeth Spaulding—first as President, ¶¶31-33, and later as CEO, ¶¶94-96. Lake told investors that Spaulding's principal objective was to launch Direct Buy to new clients and "lead us into our next chapter of growth." ¶31.

**B.      Defendants Launch Direct Buy To Select "New" Clients**

At the start of the Class Period, on June 8, 2020, Lake and Spaulding announced the launch "in early June" of "Trending For You," a Direct Buy business line targeted at new and prospective customers who had never purchased a Fix. ¶35. Spaulding also announced that the Company would offer Direct Buy to "new clients" through a collaboration with a fashion influencer later in June, "targeting . . . obviously new perspective [sic] clients." *Id*. In Defendants' own words, they "remove[d] the requirement that clients have purchased with us in the past." ¶36. This marked the launch of Direct Buy to select new and prospective clients. ¶¶35-45. In the following days, analysts highlighted that Direct Buy had launched to new clients, describing the platform as a "cost effective tool to <u>grow new adds</u> and re-activate dormant users." ¶42. RBC noted that Direct Buy "offerings expanded to <u>prospective clients</u>[.]" *Id.*  SunTrust reported that Stitch Fix's "foray into Direct Buy, <u>particularly around new client acquisition/reactivation</u>, can be transformational." *Id*.

**C.      Repeated Internal Testing of Direct Buy Reveals Cannibalization To Defendants**

In truth, Defendants knew from internal tests conducted throughout the Class Period that Direct Buy was cannibalizing Fix. "Cannibalization" refers to the fact that potential customers did not convert to Stitch Fix because they were onboarded into Direct Buy instead of Fix, or did convert through Direct Buy, but bought substantially less than they would have if they had been onboarded through Fix. ¶47. The Complaint's new FE allegations detail at least three statistically significant tests of Direct Buy starting in early June 2020, which were run on new clients by Stitch Fix's Data Science group. These tests demonstrated that Direct Buy was cannibalistic because it was converting 30-40% less new clients than Fix, and attracting lower-quality shoppers that were

worth substantially less and had lower lifetime values than new clients who converted through Fix. ¶¶46-47; 204. The new and cross-corroborating FE allegations describe in detail when the tests were run, "who the tests tested, what the tests entailed (e.g., what its parameters were), or how the results were quantified," as well as how those results (and related recommendations) were communicated to Defendants. *See* Order at 7. The new FE allegations are from FE4, a Data Scientist employed by Stitch Fix from July 2020 through July 2023, as well as FE1 and FE2.

***When the tests were run***. FE 4 recalled at least three tests: the first in summer 2020 and additional tests in 2020 and early 2021. ¶66. FE 1 confirmed that the New Fix Customer Test first occurred in June 2020. ¶51. FE 2 recalled that the second beta test occurred while he was on the Direct Buy team, which he joined in July or August 2020. ¶73. FE 4 also confirmed that the Freestyle program that was eventually launched was absolutely fundamentally the same as the program that failed the testing. ¶93.

***Who the tests tested.*** FEs 1, 2 and 4 confirmed that the "New Fix Customer Test" was run on new and prospective clients, and that "Trending for You," which was launched to new customers in June 2020, was part of the Direct Buy experience and was included in the "New Fix Customer Test." ¶¶51, 53; 62-64; 72; 198-99. FE 1 explained the distinction between "net new" clients—which refers to people who have never purchased from Stitch Fix, signed up for an account, or filled out a profile—and "signed-up prospects"—which refers to people who had signed up for an account and filled out a profile, but never scheduled a Fix or made a purchase. ¶53. According to FE 1, this testing did not differentiate between "net new" clients and "signed-up prospects"; it tested both. *Id.*

***Test parameters and results.*** FEs 1 and 4 described the testing as having control and experiment groups, they detailed who was in each of the groups, and they recounted how the groups were each funneled through different onboarding paths. ¶¶52; 63. FEs 1, 2, and 4 explained that the tests evaluated two metrics: lifetime customer value and annual customer value. ¶¶54; 73-74; 106. According to FE 1, the New Fix Customer Test showed that potential clients onboarded through Direct Buy converted about 30-40% less, and that clients who did become Direct Buy customers purchased less than Fix customers and were less likely to purchase from the Company

again. ¶66 (FE 4 described the same, based on discussions with data scientists). FE 4 added that that 30-40% was the mean over the course of a few experiments, with error bars of plus or minus 10%, such that the Company had confidence that it was a substantially meaningful effect. ¶67. FEs 1 and 4 confirmed that the New Fix Customer Test showed cannibalization, which means that Direct Buy-first customers did not convert at all or bought less and returned to Stitch Fix less frequently than Fix-first customers. ¶¶56; 65; *see also* ¶6. FEs 1 and 4 further confirmed that the New Fix Customer Test's results were statistically significant. ¶¶57-58; 64. FE 4 explained that the experiments were running through the A/B randomization system, and the results were written into the A/B database as they came in. ¶68. *See also* ¶¶200-03.

*Defendants move forward over objections of Data Scientists.* FE 4 described how within Data Science, there was very clearly the opinion of "this is not going to work" and "we should not do this," meaning that they should not launch Freestyle to new customers because it was going to hurt the Fix conversion rate. ¶69; *see* ¶80 (FE 3 describing same). According to FE 4, anyone who had the nerve to stand up and say that was treated very poorly by Spaulding until they were quiet or left the Company. ¶69. FE 4 confirmed that it was very clearly Spaulding's decision to push forward with the launch even though Data Science said not to launch the product. ¶¶102-04. FE 4's colleague said that they would love to see the data go into evidence because "it very clearly demonstrated that the people in charge knew what was going to happen." ¶107. FE 1 confirmed that Spaulding "just ignored all the data." ¶112. FE 2 explained that the Product team and Data Science team ran the cannibalization tests, and FE 2 knew that those teams had an internal goal for what successful metrics would look like, looking at issues like conversion, which the test did not meet. ¶73. FE 2 confirmed that, despite the test failing to hit its success metric due to cannibalization, a decision was made to push forward with Direct Buy anyway. *Id*. No FE recounts or recalls a positive test of Direct Buy during their tenures at the Company. ¶93.

*Defendants knew their public statements were false when made*. As confirmed by multiple former employees, the negative test results were shared with Defendants during the Class Period in Google Slides presentations and/or during routine and weekly meetings. ¶193; *see* ¶¶192-205. FEs 1 and 2 confirmed that this information would be presented and communicated to

Spaulding by Data Science, recounting that the test results were reviewed in the Weekly Direct Buy Meetings with Spaulding, and that the purpose of those meetings was to share the cannibalization results with the Company's leaders. ¶¶194-95. FE 3 confirmed that Spaulding held routine meetings with data scientists who ran the internal tests regarding the performance of Freestyle in order to understand the results of the various testing. ¶196. FE 4 also confirmed that Spaulding was informed of the test results. FE 4 explained that the experiments were running through the A/B randomization system, and the results were written into the A/B database as they came in. According to FE 4, once the analysis was completed through the A/B interface, it would be pasted into a Google Docs or Google Slides presentation. FE 4 confirmed that Spaulding had access to those Google Slides presentations in which the results of those tests were quantified and that Spaulding knew about them. FEs 1 and 4 further confirmed that the executive suite, including Spaulding and her direct reports, were informed of the test results. ¶¶197; 205. FE 1 specifically recalled the slides saying something to the effect of "Direct Buy performed poorly relative to the Fix, and therefore we do not recommend moving forward with this." ¶205; *see id*. (describing the metrics and results on the Slides, and how the information was presented).

Defendants also knew their statements were false because they tracked live data showing that Direct Buy was cannibalizing Fix, ¶205, and through the internal Looker system and A/B database. ¶¶210-13. This information was also presented at meetings attended by Spaulding. *Id.* Spaulding ignored these data and related recommendations because her career depended on launching Direct Buy and she was out of time.  ¶¶102-12, 224-27.

Despite their knowledge that Direct Buy was cannibalistic, at the start of the Class Period, Defendants falsely represented that Direct Buy was a "frictionless entry point" that would be an "acquisition vehicle." ¶145. Spaulding stated on June 8, 2020 that Trending for You and the influencer collaboration were examples of how the Company would "more effectively attract new clients[,]" and that Direct Buy could "fuel conversion among clients who's [sic] historically been on the fence." ¶149; *see* ¶151 ("the two offerings are so highly complementary versus any sort of cannibalization between the two"). On December 7, 2020, Lake represented that "the two experiences are really additive[,]" and "will allow us to address many more types of clients and

what we're realizing in [sic] <u>it's really also it's unlocking, . . . client opportunity</u> . . . ." ¶157.

On February 10, 2021, after at least three internal tests unequivocally demonstrated Direct Buy's cannibalistic effects, Lake told investors, "<u>we can see in the data that it's working</u>." ¶159.

**D.    Defendants Delay The Full Launch Of Direct Buy**

On March 8, 2021, the Company announced that the full launch of Direct Buy would be "delayed" until the end of the fiscal year because of the need for "continue[d] testing." ¶¶87-88. This resulted in a downward revision to guidance and a staggering 28% decline in the Company's share price. ¶¶89, 179. Spaulding falsely assured investors, "The momentum and client engagement we've seen increases our confidence as we look to introduce direct buy to new clients at the end of the fiscal year." ¶90. On the same day, Spaulding falsely touted that Direct Buy and Fix were "<u>incremental</u>," that "<u>as our direct buy offering expands, lifetime values will continue to grow</u>," and that Direct Buy would "<u>fuel client acquisition</u>." ¶¶162-66. The market noted that the guidance takedown was the result of the delayed launch, but analysts were reassured by Spaulding's explanations and affirmative misrepresentations. ¶91.

**E.    Direct Buy Formally Launches And Continues to Cannibalize Fix**

On August 1, 2021, Spaulding became the CEO of Stitch Fix, and just one week later on August 9, 2021, she formally launched Direct Buy to all new customers. ¶101. As FE 4 confirmed, this was the same program that had repeatedly failed internal cannibalization testing. *Id.*; *see* ¶93.

On September 21, 2021, with nearly two additional months of data in hand, Spaulding responded to an analyst question about "how you're thinking about growth of the Fix business as your Freestyle business ramps" to new customers and how "in the past you've talked about low cannibalization," by stating, "we think that revenue per active client that we shared and <u>the knowledge we have of like the newer cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary</u>." ¶170.

**F.    The Full Truth Concerning Direct Buy's Cannibalization Of New Clients Is Revealed And Spaulding Is Fired**

The market learned the full truth through three additional disclosures, beginning on December 7, 2021, and ending on June 10, 2022. Each revealed incremental information about the

"friction" between Freestyle and Fix and the negative impacts of that "cannibalization." As a result, the price of Stitch Fix stock declined by $7.55 per share. ¶¶180-89. On January 5, 2023, the Company disclosed that Spaulding would "step down as CEO." ¶140. Then, on June 7, 2023, Lake shuttered Direct Buy, acknowledging that Freestyle-first clients cannibalized Fix clients during the Class Period because they converted at lower rates and were of lower quality – precisely what the Company's internal testing showed. ¶143.

## III. LEGAL STANDARD

Courts evaluating motions to dismiss securities class action complaints must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). "[A] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 698 (9th Cir. 2021). A plaintiff "need not prove its case at the outset . . . [but] has to provide a narrative of fraud—facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). A court evaluating a motion to dismiss is "not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (reversing dismissal).

Defendants rely on 12 documents that are not cited in the Complaint. *See* DX 1, 3, 4, 8, 10, 12, 16, 18, 20, 21, 29, 30. This is improper as a matter of law and Defendants' arguments based on these extrinsic documents should be rejected. *See Khoja v. Orexigen Theraps, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). It is also improper for Defendants, as they do here, to ask the Court to judicially notice documents for the truth of the matter asserted. *See id.* By relying on materials outside of the Complaint, Defendants effectively concede that fraud has been adequately pled.

## IV. ARGUMENT

### A. The Complaint Adequately Alleges Falsity

A statement is false if it is an "untrue statement of a material fact." *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Co.*, 320 F.3d 920, 932 (9th Cir. 2003). "Even

if a statement is not false, it may be misleading if it omits material information," *Khoja v. Orexigen Theraps, Inc*, 899 F.3d 988, 1008-09 (9th Cir. 2018), or "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023). "[O]nce defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against [it]." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).

It is well-established that "statements literally true on their face may nonetheless be misleading . . . in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-87, 190-91 (2015) ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor," who "understands a statement in its full context."). This "is a mixed question to be decided by the trier of fact." *Fecht v. The Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). A court need only identify a single misrepresentation or omission to satisfy falsity. *In re Wireless Facilities, Inc. Sec. Litig.*, 2007 WL 9667131, at *17 (S.D. Cal. May 7, 2007).

### 1. Defendants' Statements Were False and Misleading

Throughout the Class Period, which begins when Direct Buy was first launched to select new customers in June 2020 (¶35), Defendants represented to investors that Direct Buy was and would be "additive," "incremental" and "complementary" to its core product, the "Fix," denying "any sort of cannibalization between the two." *See, e.g.*, ¶¶40, 90, 151. Defendants further assured that Direct Buy would "attract" and "convert" "new clients" to Stitch Fix, and that they could "see in the data that it's working." ¶¶38, 159. In truth, Defendants knew from extensive internal test results that new clients funneled to Direct Buy were converting at a 30-40% lower rate than those directed to Fixes, and that those who did convert spent substantially less and were of lower quality than traditional Fix clients. *See* Section II.C.

Defendants made a series of detailed and specific statements that contradicted the true facts:

• On June 8, 2020, Lake stated that Direct Buy was a "<u>frictionless entry point</u>" that would be an

"acquisition vehicle" for "new clients." Spaulding stated that Direct Buy was an example of how the Company was adding flexibility to "<u>more effectively attract new clients</u>" and that the Fix and Direct Buy were "so <u>highly complementary</u> versus <u>any sort of cannibalization between the two</u>." ¶¶145, 149, 151.

- On December 7, 2020, Spaulding stated that Direct Buy would allow the Company to "<u>attract high-quality clients</u>," ¶155, when, in truth, Direct Buy clients were of lower quality than traditional Fix clients and had half the lifetime value of those traditional Fix clients, ¶106. *See* ¶¶26-27.

- On February 10, 2021, just prior to the planned full scale launch of Direct Buy and after at least three rounds of negative test results (¶49), Lake stated that "<u>we can see in the data that it's working</u>." ¶159.

- On March 8, 2021, in direct response to an analyst question about cannibalization concerns surrounding Direct Buy's introduction to new clients, Spaulding stated that "<u>similar to the incrementality</u> that we've observed with active Fix clients as they participate [in] both and seeing that is actually <u>an additive experience</u>. I think <u>we're thinking about it similarly</u> as we bring <u>new consumers</u> onto the platform." ¶164.

- On September 21, 2021, after the full scale launch of Direct Buy, in direct response to an analyst question about "how you're thinking about growth of the Fix business as your Freestyle business ramps" to <u>new</u> customers and how "in the past you've talked about low cannibalization," Spaulding stated "<u>we think that revenue per active client that we shared and the knowledge we have of like the newer cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary</u>. . . . [W]e see solid growth in both sides of the business in the coming year." ¶170.

These statements were false or, at minimum, materially misleading because they created an "impression of a state of affairs" that "differ[ed] in a material way from" the reality that Direct Buy was cannibalizing Fix by attracting fewer clients of lesser value that were not incremental to revenue. *See NVIDIA*, 81 F.4th at 934-36 (misleading response to analyst question about "cannibalization" actionable); *RH*, 302 F. Supp. 3d at 1041-42 (statements that we are "extremely encouraged by the early results we are seeing" and that defendants' new product line was "trending to add significant incremental revenues" misleading in light of undisclosed contrary facts); *Carbonite*, 22 F.4th at 5, 7 (statements that product "improves our performance for backing up virtual environments and makes us really competitive" and that "we have put something out that we think is just . . . a super strong product" misleading where all pre-launch testing failed and employees reported that "the product was not ready and should not be running"); *In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F. Supp. 2d 1049, 1054 (D. Colo. 2001) (overstatement of product's "capabilities" and "potential market" actionable for failure to disclose that product did not work);

*In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 331-32 (S.D.N.Y. 2014) (comparison misleading due to contrary data); *Price Co.*, 70 F.3d at 1081 (optimistic statements about financial future based on expansion of operations were actionable where the expansion had failed); *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *11 (N.D. Cal. Feb. 23, 2023) (statement touting clinical trial data misleading where "FDA had informed Defendants the trial results would not support such conclusions").

### 2.   Defendants' Arguments Fail

#### a.   Defendants' False Statements Concerned The Same "New Clients" That The Company Was Testing

To start, Defendants contend that six statements addressed in the Order should be dismissed because the statements are about existing Fix customers and the testing was about prospective customers. Br. 11. This argument fails for three reasons. First, the Court's reasoning in the Order was based, in substantial part, on Defendants' factual assertion that Direct Buy was not launched to new or prospective clients until after Defendants' statements were made. *See* Order at 5. However, as alleged, by June 2020, Defendants had launched Direct Buy to select new or prospective clients. ¶¶35-45. All the false and misleading statements at issue were made between June 2020 and September 2021. ¶¶157, 159, 162, 167, 170.

Second and relatedly, Defendants' argument ignores the context in which the statements were made, including that they were made after Defendants launched Direct Buy to select new or prospective clients. *See Omnicare*, 575 U.S. at 186-87, 190 ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor," who "understands a statement in its full context."); *RH*, 302 F. Supp. 3d at 1042 (statements actionably false where defendants' characterization of statements "fails to take into account the import of context").

Third, the Complaint expressly alleges the reasons why a reasonable investor would have understood each false statement "in its full context" to be about new or prospective clients:

- December 7, 2020 (¶157): "in making representations about 'many more types of clients,' 'client opportunity,' and 'buy[ing] that through' and 'on Direct Buy' in response to a question about trends for 'new customers,' a reasonable investor would have understood Defendant Lake to be speaking about new or prospective clients." ¶158. *See also* ¶84 (analyst writing on

12/7/20 that "Direct Buy allows SFIX to expand their wallet share among new/existing customers").

- February 10, 2021 (¶159): "in making representations about 'the data' Stitch Fix had in response to a question about the '<u>vision for direct buy</u>,' which included the launch of Direct Buy to prospective or new clients, a reasonable investor would have understood Defendant Lake to be speaking about the data she had at the time, including the data for prospective or new clients." ¶160.

- March 8, 2021 (¶162): "in making representations about 'incrementality,' and 'client lifetime values' '<u>as our direct buy offering expands</u>,' a reasonable investor would have understood Defendants to be speaking about prospective or new clients." ¶163.

- June 7, 2021 (¶167): "in making representations about '<u>broadening the appeal and reach of Stitch Fix</u>,' a reasonable investor would have understood Defendant Spaulding to be speaking about launching Direct Buy to prospective or new clients." ¶168.

- September 21, 2021 (¶170): "in making representations about '<u>new clients</u> coming in through this new Freestyle experience' and '<u>newer cohorts of clients</u>' in response to a question about growth as the '<u>Freestyle business ramps</u>' fully to new customers, a reasonable investor would have understood Defendant Spaulding to be speaking about prospective or new clients." ¶171.

Likewise, the three additional statements that Defendants contend are exclusively about "existing" clients, are not. Defendants argue that "what we're seeing" in June 2020 "does not address the impact on prospective clients because that functionality had not launched yet." Br. 12 (citing Order at 5). However, the Order did not have the benefit of the new allegations in the Complaint which explain that, in fact, Direct Buy was launched to select new and prospective clients in early June 2020. ¶¶35-45. This argument also completely ignores allegations explaining why a reasonable investor would have understood Spaulding to be speaking about prospective or new clients. *See* ¶152 ("in making representations about 'the full addressable market' and the 'blurring' of the two business lines 'over time,' in response to a question about what percent of the business Direct Buy would 'approximate over time,' a reasonable investor would have understood [] Spaulding to be speaking about prospective or new clients.").

Defendants next contend that the March 8, 2021 statement only discussed "active Fix clients," but this is also not true. Again, as alleged, "in making representations about introducing 'direct buy to new clients,' bringing 'new consumers onto the platform,' and 'starting' clients with 'Direct Buy as soon as they enter our ecosystem,' a reasonable investor would have understood Defendant Spaulding to be speaking about prospective or new clients." ¶165.

Similarly, Defendants argue that their September 21, 2021, statement was about revenue per active client in Q4 2021 "when Direct Buy was only available to existing clients." Br. 12. But again, Direct Buy was <u>not</u> only available to existing clients in Q4 2021. ¶¶35-45. Indeed, even a document improperly submitted by Defendants for the truth of the matter asserted (DX 6) contradicts this argument, as it defines "active client," at the time the September 21, 2021 statement was made, to include clients onboarded through Direct Buy. *Id.* at 12. Further, the "full context" is that an analyst asked for a "'Freestyle update since the public launch' to 'new customers.'" ¶173. As alleged, "in making representations about 'what we're doing with Freestyle' in response to a question about the launch to 'new customers,' a reasonable investor would have understood Defendant Spaulding to be speaking about prospective or new clients." ¶174.

Defendants' disregard of these and other allegations and the "full context" of their false statements is improper as a matter of law, and it does not warrant dismissal of any of the challenged statements. *See Khoja*, 899 F.3d at 1014 ("fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage"); *RH*, 302 F. Supp. 3d at 1042 (rejecting defendants' characterization of their statements for failure to "take into account the import of context"); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 669 (M.D. Tenn. 2022) ("The court must look at the statements made, as well as their context, to develop a sufficient understanding of what the statements meant and how they reasonably would have been construed."). At most, these arguments raise premature factual disputes. *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1131-32 (N.D. Cal. 2020) ("Court must adopt Plaintiff's interpretation" because the Court "may not resolve any disputes about the actual meaning of the statement in this procedural posture.").

**b.    The Safe Harbor Does Not Insulate Defendants From Liability**

Next, Defendants contend that their remaining nine false statements must be dismissed because they are protected by the "safe harbor." This argument also fails for several reasons.

First, the statements at issue are not forward-looking. As summarized directly below, each statement "contains an express or implied concrete assertion concerning a specific current or past

fact." *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 736 (N.D. Cal. 2022) (quoting *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021)) (safe harbor does not apply to statements "about what has happened before and about the current state of affairs"). The fact that statements "may appear to have language that contemplates the future" does not mean that they are forward-looking if they "simply describe the present." *Id.* at 737. Here, Defendants' present tense statements contained concrete assertions, described historical facts, and stated current beliefs based on those facts, and are not protected:

- ¶145 – "the momentum <u>we've witnessed</u> with Direct Buy in a frictionless entry point <u>we think it represents</u>";

- ¶147 – "We believe Direct Buy <u>provides</u> the lightweight entry point for both existing and new clients.";

- ¶149 – "Trending for You and our influencer collaboration <u>are</u> prime examples of how we're adding flexibility to the way clients can experience Direct Buy and to <u>more effectively attract new clients</u>. In addition, <u>we believe it can fuel conversion</u> among clients who's [sic] historically been on the fence.";

- ¶153 – in response to a question from an analyst regarding whether Direct Buy was "a way to acquire new customers," Lake responded, "And so what we believe is like <u>all of these steps</u> open up incremental market opportunity, <u>even now</u> with direct buy what <u>we're able</u> to do is to be able to convert people who might be on the fence about Stitch Fix." Lake reiterated, "And to answer your question briefly around like is this just incremental to current clients or is this something we can use more of, I think <u>we've seen</u> it's <u>both</u> . . . .";

- ¶155, Br. 13 – "we believe . . . our ongoing momentum in direct buy";

- ¶162, DX 15 at 6 – "We have also found that clients <u>we have acquired</u> through paid marketing channels in the past few quarters are actively engaging with direct buy and <u>are</u> delivering higher early lifetime values than previous cohorts . . . . This incrementality <u>gives</u> us more optimism to ***believe*** . . .";

- ¶164 – "The momentum and client engagement <u>we've seen</u> . . ."; and

- ¶170 – "what we would anticipate" describes a currently expected outcome.

Second, the safe harbor does not apply to omissions of present fact. *See Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1125-26 (S.D. Cal. 2012); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018); *Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1225 (C.D. Cal. 2017) ("[B]ecause . . . the way in which Primero's representations about future tax projections were misleading was by omitting already-existing historical facts, the Court finds that these representations are not protected by the safe harbor provisions."). This is true,

"regardless of whether the statements thereby rendered misleading were forward-looking." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013).

The Complaint alleges that Defendants failed to disclose that their statistically significant test results showed that Direct Buy was cannibalizing Fix customers. ¶¶46-81, 92-93, 97-112. This is an omission of present fact, and the safe harbor does not apply. In *Wochos*, the Ninth Circuit found that a "mere declaration of the year-end goal" was protected where Defendants did not describe any "concrete circumstances" that had already occurred." Br. 14 (citing 985 F.3d at 1192). Here, Defendants' false and misleading statements are not about whether they are on schedule to achieve a goal in the future; they are about the nature of the Direct Buy product itself, whether it was and would continue to "attract new clients," and what Defendants were "seeing in the data" they had at the time they spoke to investors.

Defendants next contend that their statements of opinion, such as we "believe," are transformed into forward looking statements by virtue of their own disclaimers. Br. 14. This is baseless, as "[e]ven if all forward-looking statements express a present belief about a future event, all present beliefs are not forward-looking statements." *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, 2017 WL 4453561, at *11 (D. Or. Oct. 3, 2017). *See Carbonite*, 22 F.4th at 8 (using "present tense to describe [] beliefs about the then-existing status of a product that the company had already 'put out' into the market" is not forward-looking). *In re Copper Mountain Sec. Litig.* supports the proposition. 311 F. Supp. 2d 857, 881 (N.D. Cal. 2004) (determination of whether a statement is forward looking belongs to "a reasonable investor" who can "ascertain which statements are projections").

Fourth, even if Defendants' statements were forward looking, they were not accompanied by "meaningful cautionary language." 15 U.S.C. § 78u-5(c)(1)(A). To be "meaningful," cautionary language must "discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil." *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005); *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1053-54 (N.D. Cal. 2018) ("extensive lists of important risk factors" not meaningful where they did not address the issue at heart of plaintiffs' claims); *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 780

(9th Cir. 2023) ("this language is not 'meaningful' because it amounts to only a boilerplate listing of generic risks and does not mention the specific risk to which Forescout had been alerted . . . .").

Defendants have the burden to show that the "cautionary language was not boilerplate and conveyed substantive information." *Baker v. Twitter, Inc.*, 2023 WL 6932568, at *7 (C.D. Cal. Aug. 25, 2023). Here, the generic risks listed in Defendants' SEC filings were themselves misleading because they failed to convey that these risks had already materialized. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"); *Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *4 (similar). Defendants knew that each successive test of Direct Buy unequivocally confirmed that it was cannibalizing Fix and attracting lower quality clients. *See* Section II.C-D.; *see ChemoCentryx, Inc.*, 2023 WL 3579440, at *17 (no safe harbor where "allegedly forward-looking statements highlight evidence . . . available to Defendants at the time the statements were made"). Regardless, whether the cautionary language was sufficiently meaningful presents questions of fact inappropriate for determination now. *See Rodriguez*, 325 F. Supp. 3d at 1053-54 ("premature to decide whether Safe Harbor immunize[d]" defendants).

Finally, Defendants' forward-looking statements are actionable because Defendants had actual knowledge that their statements were false when made, as discussed in Section IV.B. below. *See Quality Sys.*, 865 F.3d at 1149.

### c.     Defendants' Other Falsity Challenges Fail

***June and December 2020 Statements***. First, Defendants wrongly contend that these statements are not misleading because Defendants had no internal test results when they were made. Br. 16. But Spaulding stated on June 8, that Trending For You had launched "in early June," ¶35, and cited internal "testing right now" as the basis for her conclusion that "pure new clients" were "growth figures of opportunity," and that Direct Buy was a "frictionless entry point." ¶¶38-39, 145. Days later, Lake stated that "even now with direct buy" Defendants were "able to convert people who might be on the fence about Stitch Fix." ¶153. FE 1 confirmed that "Trending for You" was the Direct Buy experience and that the test occurred *in* June 2020. ¶51. FE4 corroborated that

the first test was conducted in summer 2020. ¶66. FE4 reported that the results were written into the A/B database <u>as they came in</u>. ¶68. FEs 2 and 4 further confirmed that there were additional tests in 2020, which Defendants necessarily had in hand by December. *See* ¶¶ 66, 73.

Second, Defendants attempt to rewrite their own statements by claiming that "frictionless entry point" does not refer to the onboarding process, but instead to "decreased friction in buying individual pieces of clothing." Br. 16-17. But the "entry point" to Direct Buy was to onboard as a new customer. ¶52. FE 1 specifically confirmed that the Company was testing for cannibalization in onboarding in June 2020, that these tests included "Trending for You," and that the tests were negative and showed cannibalization. ¶¶49-56. Defendants told investors that they were testing "onboarding" to "get the right people into the right conversion path." ¶199. They also acknowledged the relationship between "friction" and onboarding when they eventually disclosed that, in onboarding, they "inadvertently created friction for those seeking a Fix." ¶123. As alleged, this statement confirmed that Defendants steered clients to Freestyle first and suffered the very consequences – friction – that internal testing had showed with statistical certainty, as corroborated by FEs 1, 2 and 4. *Id*. At most, Defendants' attempt to raise a factual dispute about what "frictionless" means should be rejected as premature at the pleading stage. *Align*, 485 F. Supp. 3d at 1131-32; *Khoja*, 899 F.3d at 1014; *Loritz v. Exide Techs.*, 2014 WL 4058752, at *6-8 (C.D. Cal. Aug. 7, 2014) (dispute over statement's meaning is a "question for the trier of fact").

***February, March, and June 2021 Statements, ¶¶159, 162, 164, 167.*** First, Defendants claim that "the alleged negative internal tests are not inconsistent with Defendants' statements" because they "did not address, mention, or discuss internal testing about Direct Buy's impact on prospective customers." Br. 17. This is a red herring. The statements were false because Defendants made affirmative representations about Direct Buy that were contradicted by their internal test results. While not required, they also did discuss Direct Buy's internal testing, including when, in response to a question about "the vision for direct buy," Lake said, "<u>we can see in the data</u> that it's working." ¶159. In reality, what Lake saw "in the data" was that it was <u>not</u> working because Direct Buy was cannibalizing Fix. ¶160. As alleged, "a reasonable investor would have understood Defendant Lake to be speaking about the data she had at the time, including the

data for [] new clients." *Id.*

Second, cherry-picking a single statement from FE2 (which omits "Data" from his job title and the allegation that he worked on Direct Buy), Defendants claim that the Complaint does not specify internal metrics for a successful test. Br. 17-18. In fact, the new FE allegations, particularly from FE 1 and FE 4, meticulously detail how the tests operated, the results showing a 30-40% lower conversion rate and half the lifetime value of Fix clients, that these results were statistically significant, and the conclusion by Data Science, based on these results, that Direct Buy was a failure. ¶¶49-56; 62-67. Indeed, the FEs uniformly corroborate that *every* Direct Buy test failed. ¶204. These facts are far more specific than the facts at issue in Defendants' cited cases. Br. 17.

Third, Defendants argue that data scientists' unwavering recommendation not to fully launch Direct Buy was a mere "disagreement with management" and cannot support fraud. Br. 18. Not so. Courts routinely credit similar allegations. *See, e.g.*, *Carbonite*, 22 F.4th at 10 ("it does not require a PhD to know that a product cannot be 'super strong' if it has never once done what it is supposed to do . . . . Carbonite employees working on VME had reported internally before the launch that the product was not ready for market. And the trial runs for VME . . . had allegedly produced not one successful backup."); *Arena*, 840 F.3d at 708 (statements touting testing were misleading for omitting FDA concerns); *QuantumScape*, 580 F. Supp. 3d at 732 (statements about testing process and product's readiness actionable). Contrary to Defendants' argument, there was no "dispute among reasonable persons": rather, all the data scientists agreed on what all the tests showed. *See* ¶204. Further, when Defendants delayed the launch, they continued to make false and misleading statements, which included denying cannibalization. ¶¶162-66.

***September 2021 Statements, ¶¶170; 173.*** Defendants next assert that there is no allegation of "any internal testing or data on Freestyle performance from around September 2021, much less what it showed." Br. 18-19. Defendants are wrong. FE 2, who left the Company in June 2022, confirmed that he was not aware of <u>any tests</u> showing that there was no cannibalization or any cannibalization test showing a positive result while he was at the Company. ¶201. FE2's allegations, which are corroborated by FEs 1 and 4, ¶201, establish that Spaulding was aware of the bad test results (as there were *only* bad test results) when she decided to launch Freestyle in

August of 2021. *See, e.g*, ¶109. FE 4, who left the Company in July 2023, confirmed that the Freestyle program that was eventually launched was absolutely fundamentally the same as the program that failed the testing. ¶201. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 (9th Cir. 2022), Br. 19, is inapposite, as plaintiffs there sought an inference that defendants knew of a software bug in June of 2019 based *solely* on statements made about the existence of the bug in August of 2020. Plaintiffs require no such timing inference here, though such inferences are routinely allowed. *See, e.g.*, *In re BofI Holding*, 2017 WL 2257980, at *11 (S.D. Cal. May 23, 2017) (plaintiff is entitled to the "reasonable inference that no changes had been made in the interim."). And regardless, even a "lack of contemporaneous testing during the Class Period is not dispositive." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *18 (D.N.J. Dec. 27, 2019).

### 3.      Defendants' Misleading Statements Were Not Puffery

Defendants next contend that their statements referring to Direct Buy as "frictionless," "incremental," and "complementary" were "vague statements of optimism." Br. 19. But far from "vague," those words conveyed that Direct Buy was not cannibalizing Fix, and that the two combined would "allow us to address many more types of clients," as well as generate "incremental" revenues. ¶¶157-58. Analysts repeatedly fixated on these very words to assess Direct Buy and, by extension, the Company. *E.g*., ¶136 ("While we expected this additional channel to . . . drive incremental revenue, it has proven difficult to roll out without adding friction to the onboarding of new Fix customers."); ¶137 ("concerns around the incrementality of the Freestyle segment"). This demonstrates that the market viewed these descriptions as meaningful and material, not vaguely optimistic or puffery. *See Glazer*, 63 F.4th at 770-71 ("statements cannot be discounted as mere 'puffery'" where "most of the challenged statements were made in response to specific questions asked by financial analysts"). *Cf. In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111 (9th Cir. 2010) ("employee relations are good" is a "feel good moniker[]"). By contrast, Defendants' cited authority involved different words, statements that were not contradicted by undisclosed facts, or true statements. *See* Br. at 19.

Defendants must not be permitted to isolate phrases and take them out of context because this is not how materiality is analyzed. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices,*

*& Prods. Liab. Litig.*, 2017 WL 66281, at \*17 (N.D. Cal. Jan. 4, 2017) (courts must not "assess the statements . . . in a vacuum"). Finally, even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim" when, as here, those statements address specific aspects of a company's operation that the speaker knows to be performing poorly. *Quality Sys.*, 865 F.3d at 1143; *Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*12 (N.D. Cal. Nov. 27, 2018).

Defendants contend in a footnote that their statements of opinion are inactionable because they lack objectively verifiable facts. Br. at 19 n.11. But that is not the standard for evaluating opinion statements: such statements are actionable where plaintiffs allege that "there is no reasonable basis for the belief, or . . . the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *see also Glazer*, 63 F.4th at 779 ("Even if Forescout's executives sincerely believed that the merger would still close as planned, Forescout's May 11 statement [about when the merger would close] did not fairly align with the information in the issuer's possession at the time"). That is precisely what Plaintiffs allege here.

**B.     The SAC Alleges A Strong Inference Of Scienter**

"Scienter can be established by intent, knowledge, or certain levels of recklessness." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); *Arena*, 840 F.3d at 705 ("deliberate recklessness" suffices). The "inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences," but "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007). A tie goes to the plaintiff, who must only show "that it is more likely than not that the defendant acted with scienter." *Id.* at 328-29.

The Court previously found a lack of scienter here because the test results were "otherwise not pleaded with particularity under Rule 9(b)." Order at 9-10. As detailed above and summarized below, the new allegations are sufficiently particularized.

***Defendants Reviewed The Test Results And Knew Those Results Showed Cannibalization.*** FEs 1-4 affirm that Stitch Fix conducted internal testing throughout the Class

Period that showed Direct Buy's cannibalizing effects, and that the results of those internal tests were shared with *and explained to* Defendants. ¶¶193-97. FE 1 described how the entire purpose of weekly meetings was to inform Spaulding of the tests, which included the New Fix Customer Test that showed that Direct Buy was cannibalizing Fix. ¶194. FE 2 similarly stated that there was a standing meeting each Friday where the results of these tests were presented to Spaulding. ¶195. He personally learned about the results presented to Spaulding at a Product Management meeting that he attended early the following week. ¶75. During one of these meetings, FE 2 learned from Rajeev Jain, a data scientist who worked on the Direct Buy beta test, that the beta test failed. *Id.* FEs 3 and 4 further corroborated that Spaulding held routine meetings with the data scientists who conducted the internal tests to review the test results. ¶¶196-97; *see* ¶205. The FEs also described the test results that were shared in these meetings, the Google Slides format, and the contents of the Slides, including actual data, the results, and what the presentation looked like. *See* ¶¶59-61, 68. FE 1 specifically recalled that one of the Google Slides said "the test result is that Shop [i.e., Direct Buy] is not successful" and that "Direct Buy performed poorly relative to the Fix, and therefore we do not recommend moving forward with this." ¶59. Stitch Fix also tracked live data showing that Direct Buy was cannibalizing Fix, and Defendants received this real-time information in weekly reports. ¶¶206-09.

In the Ninth Circuit, "the most direct way to show [scienter] is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *In re Allied Nevada Gold Corp. Sec. Litig.,* 743 F. App'x 887, 888 (9th Cir. 2018) (scienter where defendant had recurring meetings discussing problems). Here, the fact that Defendants contemporaneously received and reviewed test results showing that Direct Buy was cannibalizing Fix supports a strong inference of scienter. *See Okla. Firefighters Pension & Ret. Sys. v. SNAP Inc.*, 2024 WL 5182634, at *2-3 (9th Cir. Dec. 20, 2024) (personal knowledge of meetings with defendants supports scienter; "actual access" to disputed facts independently sufficient to establish scienter).

Defendants also had access to data showing that Direct Buy was cannibalizing Fix through the Company's internal Looker system, as affirmed by FEs 1, 3 and 4. ¶¶210-14. While the

Complaint does not rely on access to data alone (*see* Order at 10), these facts contribute to the inference. *See Oracle,* 380 F.3d at 1231 (crediting access to central database of relevant data); *Glazer*, 63 F.4th at 773 (scienter "bolstered" by defendant's "access to information about the sales pipeline . . . through internal reports and . . . revenue platform used to track deals.").

*FEs Are Reliable And Corroborate Each Other.* Defendants principally contend that the FEs are not sufficiently particularized or reliable. Br. 21-22; 17 n.9. But the Complaint alleges "each confidential witness's job description and responsibilities," titles, and, for FEs 1 and 2, to whom they reported. *Quality Sys.,* 865 F.3d at 1145. It also expressly details, for each FE, how they knew about the negative test results that were shared with Defendants. FE 1 personally worked on the Direct Buy launch, he was personally in meetings where the negative test results were discussed, he heard about them from colleagues, and he saw the Google Slides from the Data Science team reflecting the test results. ¶¶194, 205. FE 4, a Data Scientist, had personal knowledge of the testing conducted by the Data Science group (¶¶62, 65), and he corroborated FE 1's account of the testing and test results, including that the results were pasted into Google Slides decks that were shared with Spaulding. ¶¶197, 212. FE 2, who had "Data and Analytics" in his job title (¶70), explained how the testing was conducted on his own workflow, and he corroborated FEs 1 and 4's accounts of the weekly standing meetings with Spaulding to discuss the cannibalization test results. ¶76; *see Glazer*, 63 F.4th at 771 (FE's "title alone" indicated relevant involvement). FE 3, also a Data Scientist, described how he personally received weekly email blasts with relevant data that were shared with Spaulding and Lake. ¶81.

This is more than sufficient to establish particularity and reliability. *See Quality Sys.*, 865 F.3d at 1145 (crediting FE allegations "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."); *Weston v. DocuSign*, Inc., 669 F. Supp. 3d 849, 881-85 (N.D. Cal. 2023) (accepting FE allegations because the complaint provided "sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge"); *Roberts v. Zuora, Inc.,* 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (crediting FE allegations based on "personal knowledge" as "a direct result of their

positions"); *Mulligan v. Impax Lab'ys Inc.*, 36 F. Supp. 3d 942, 963 (N.D. Cal. 2014) ("The question [] is whether Plaintiffs have properly alleged facts suggesting that the confidential witnesses have personal knowledge about the incidents they address."). The fact that the FE accounts "corroborate each other" "further supports the reliability of their statements." *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018); *see Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (FEs corroborated "so many daily and weekly meetings" to discuss production problems). Contrary to Defendants' argument, a lack of "direct contact" or "specific discussions" does <u>not</u> "negate any inference of scienter." Br. 21-22. Defendants' authorities simply say that scienter cannot be inferred from former employees who had no basis to opine about defendants' knowledge. Not so here. As the Ninth Circuit has made clear, FEs need only be "in a position to infer" or "reasonably deduce" the relevant facts. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

***Several Other Indicia Support A Strong Inference Of Scienter.*** First, Defendants do not challenge that their own statements (¶¶215-16), which include denials in response to questions (¶¶217-20) and evasive answers (¶164), support scienter. *See In re Fibrogen, Inc.*, 2022 WL 2793032, at *23-24 (N.D. Cal. July 15, 2022) ("specific answers to specific questions" regarding the cause of action "suggest that Defendants knew their importance yet consciously attempted to give a favorable impression while hiding their manipulation and unfavorable analyses"); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) ("specific [statements] . . . in response to questions from analysts and investors" contributed to a strong scienter inference); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019) ("absurd to suggest" no knowledge when defendants' responses to questions suggest familiarity with issues); *City of Warren Gen. Emps. Ret. Sys. v. Teleperformance SE*, 2024 WL 2320209, at *19 (S.D. Fla. May 22, 2024) ("nonresponsive" and "evasive" answers support scienter).

Second, the fact that Spaulding retaliated against anyone who said that Direct Buy testing failed (¶69) supports scienter. *See Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1085 (N.D. Cal 2015) (allegations that employees were "subsequently demoted or terminated" after speaking up supported scienter).

Third, Spaulding's suspiciously timed departure supports scienter: it was less than six months after the end of the Class Period and because she had proven incapable of leading the Company's "ambitious transformation." ¶¶140-41. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (departure "one more piece to the scienter puzzle"); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *19 (N.D. Cal. Aug. 17, 2002) (crediting departure "a few months after" key events); *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020) ("uncharacteristic" resignations "weigh against an innocent inference" especially when company acknowledges resignee's mistake). Defendants' authority (Br. 23) supports Plaintiffs' position, involves no allegations about resignations at all, and/or involves allegations that were not connected to the fraud.

Fourth, the core operations doctrine supports an already strong inference of scienter because it would be absurd to suggest Defendants were unaware of tests on a "transformational" product. ¶230. *See Berson,* 527 F.3d at 987-88 ("high-level managers must have known about the [fraud] because of [its] devastating effect on the corporation's revenue"); *In re Fibrogen, Inc.*, 2022 WL 2793032, at *15-16 (N.D. Cal. 2022) (core operations for "flagship product"); *SNAP Inc.*, 2024 WL 5182634 at *2-3 ("absurdity" core operations test independently established scienter).

Finally, Lake's insider stock sales support scienter. ¶228. Consistent with the Order, the Complaint alleges that Lake sold $97 million of stock during the Class Period—approximately 19% of her holdings[2]—and only $57 million of stock in the two years prior to the start of the Class Period. ¶228; Order at 10. 10b5-1 plans do not negate motive, *see In re BioMarin Pharm., Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan 6, 2022), and in any event, a good faith defense

---

[2] Defendants challenge Plaintiffs' calculations in two footnotes (Br. 24, ns.13 & 14), but this effort fails. First, they argue that Lake did not sell super voting Class B shares during the Class Period because her voting power increased. But in fact, Lake did sell, as evidenced by the fact that her Class B holdings <u>decreased</u> by 1,328,752 shares between 2020 and 2022. *Compare* DX 29 (2020: 11,337,275 Class B shares) *with* DX 30 (2022: 10,008,523 class B shares). Lake's voting power only increased because, as the proxy statements show, a Stitch Fix Director and his firm sold more than 25 million Class B shares. If anything, this massive cashout by an insider during the Class Period supports scienter. Plaintiffs properly calculated the percentage of Lake's holdings sold by dividing her reported holdings as of October 19, 2020, DX29, by her Class Period sales.

is premature on a motion to dismiss. *See Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 & n.5 (D. Nev. 2009).

All of these allegations support a strong inference of scienter under this Court's holistic review. *Tellabs*, 551 U.S. at 326; *Am. W. Holding*, 320 F.3d at 938; *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[F]ederal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."). This case is about a new CEO charged with launching a product that she promised would "transform" the Company and her career. Defendants told investors that Direct Buy was and would continue to "attract new" and "high-quality" clients and "fuel conversion," and that "the data" they saw supported those conclusions, when, in fact, internal test results revealed that the opposite was true. Defendants contend, based on extrinsic documents (*e.g.*, DX 4), that the Company had an innocuous policy of "launch and learn," but the issue in this securities fraud case is that Defendants did not disclose <u>what they learned</u> through extensive internal test results; instead, they made false and misleading representations to investors. Spaulding pushed the launch through, notwithstanding unanimous objections from Data Science and the negative test results she knew about, because investors expected it and her career would suffer from any further delay.

### C.     Plaintiffs' 20(a) Claim Is Adequately Pled

Because the Complaint states a primary violation, "control person" claims are adequately alleged. *In re LDK Solar Sec. Litig.*, 2008 WL 4369987, at *12 (N.D. Cal. Sept. 24, 2008).

## V.     CONCLUSION

As the Complaint adequately alleges falsity and scienter and Defendants challenge no other elements of Plaintiffs' claims, Defendants' motion to dismiss should be denied, or alternatively, leave to amend should be granted. *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005).

Dated: December 23, 2024                          Respectfully submitted,

                                                                **BERNSTEIN LITOWITZ BERGER**
                                                                **  & GROSSMANN LLP**
                                                                */s/ Rebecca E. Boon*
                                                                Rebecca E. Boon (*pro hac vice*)
                                                                (Rebecca.Boon@blbglaw.com)

Scott Foglietta (*pro hac vice*)
(Scott.Foglietta@blbglaw.com)
Alec T. Coquin (*pro hac vice*)
(Alec.Coquin@blbglaw.com)
Samuel Coffin (*pro hac vice forthcoming*)
(Samuel.Coffin@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

and

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel.: (310) 819-3470

*Counsel for Lead Plaintiffs Retail Wholesale Department Store Union Local 338 Retirement Fund, Retail Wholesale Department Store Union Local 338 Health & Welfare Fund, Retail Wholesale Department Store Union Local 338 General Fund, and Retail Wholesale Department Store Union Local 338 Benefits Trust Fund*