**Pages 1 - 45**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable P. Casey Pitts, Judge

| | | |
|---|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, et al. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | **NO. C 22-04893 PCP** |
| STITCH FIX, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

San Jose, California
Thursday, March 27, 2025

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

<u>**APPEARANCES**</u>:

For Plaintiffs:

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLO
1251 Avenue of the Americas - 44th Floor
New York, New York   10020
**BY:  REBECCA E. BOON, ATTORNEY AT LAW
ALEC T. COQUIN, ATTORNEY AT LAW**

For Defendants:

COOLEY LLP
3175 Hanover Street
Palo Alto, California   94304
**BY:  PATRICK E. GIBBS, ATTORNEY AT LAW
AMIE L. SIMMONS, ATTORNEY AT LAW
BRETT DE JARNETTE, ATTORNEY AT LAW**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
U.S. District Court - Official Reporter

**Thursday - March 27, 2025**                                    **10:01 a.m.**

P R O C E E D I N G S

---oOo---

THE CLERK:  Calling case number 22-CV-4893, Retail Workers Local 338 Retirement Fund versus Stitch Fix on today for the motion to dismiss.

Will the parties please approach the podiums and state your appearances for the record beginning with Plaintiff's Counsel.

MS. BOON:  Good morning, Your Honor, Rebecca Boon from Bernstein Litowitz for the Plaintiffs, and with me is my colleague Alec Coquin.

THE COURT:  Good morning.

MR. GIBBS:  Good morning, Your Honor, Patrick Gibbs from Cooley for Ms. Lake, Ms. Spaulding and Stitch Fix.  And with me at counsel table are my colleagues from Cooley, Brett De Jarnette and Amie Simmons.

THE COURT:  Good morning.  So, we are here on Stitch Fix's motion to dismiss the amended -- second amended complaint.  So, I will hear from Stitch Fix to begin with.

MR. GIBBS:  Thank you.  Good morning again, Your Honor, Patrick Gibbs from Cooley on behalf of the Defendants.

If I may, Your Honor, I have a few things I wanted to point out; but I know from last time that the Court has

probably read through everything and may very well have some questions.  So, if there are issues on Your Honor's mind that we should just get to, I'm more than happy to do that.  If not, I have a few points I did want to make.

**THE COURT:**  Let me -- I mean, the question that is primarily on my mind, I understand that in the amended complaint the Plaintiffs have now set forth I think a more detailed explanation of what they think the internal testing showed, as I understand it, which is that when individuals who had not previously purchased items from Stitch Fix came to the website and were either given the option of -- you know, the traditional option of only being directed toward Fix or they were given the option of Direct Buy or ultimately Freestyle; that the individuals who were given the option of Direct Buy converted -- made purchases at a lower rate and ultimately spent less money suggesting that those were -- that the better business option at that point at least would be to continue to make only Fix available to people.

And, you know, at least one -- you know, I'm looking at, for example, the March 8th, 2021, statement includes the statement that We found the clients we have acquired through Fix's marketing channels in the past few quarters are actively engaging with Direct Buy and are delivering higher early lifetime values than previous cohorts.

I mean, isn't that intention with evidence showing that

the individuals -- these individuals coming in who are directed to Direct Buy are not delivering higher early lifetime values as it were; that they were, as they say, lower quality customers.  They are converting at a lower rate and spending less money.

**MR. GIBBS:**  I don't think it is, Your Honor, because that March 8th, 2021, statement like we think all of the other challenged statements is communicating a couple things.  One, to the extent that it is talking about historical results, it is talking about the features of Direct Buy that have up until that point in time only been made available to existing clients.

And so, just the fact that they are talking about clients who were acquired through paid marketing channels, that's not the same thing as the thing that the Plaintiffs claim ultimately caused the problem which was changing the landing page so that people who were entirely new to Stitch Fix who came to stitchfix.com were directed to Freestyle which is another way of referring to Direct Buy.

**THE COURT:**  Right, but although there were some people as part of this testing, right, who hadn't -- who are not yet Fix customers who were given the option of going directly to -- even though it hadn't been launched fully to the public yet, my understanding is that this test -- the way this testing worked is that some set of people were given that option.

**MR. GIBBS:** That is what the complaint says about the internal testing, but that's different from the product launch and what I'm say -- what I'm trying to make clear is that the statements on the March 8th earnings call, like the other challenged statements, is part of a broader discussion about how the business is going. And in that context, it is clear that when they are talking about how Direct Buy is performing, they are talking about how it is performing in the market meaning as it has been released up until that point in time only to existing clients.

**THE COURT:** Okay. I mean, I guess -- it just -- it does seem like they have -- you know, obviously there is a number of different statements that they have added to the complaint and, you know, I guess -- even starting with the December 2020 statement what we are seeing is the two experiences are really additive.

I mean, it could -- at least arguably isn't that misleading in the context of evidence that, you know, that essentially the business would be doing better not making Direct Buy available to -- directly available to non-Fix customers?

**MR. GIBBS:** Again, I don't think so. And this is where I think the briefing is a bit of a challenge, I will admit, because there were so many statements at issue; and the statements are all part of fairly lengthy paragraphs discussing

the business.  And I will admit, I struggled myself as I was reading the briefing.

I went back to the declaration that we submitted with all of the transcripts -- and I hesitate to hold up such a big binder to Your Honor -- but I found it extremely useful to read the statements in context because I think what becomes crystal clear -- and I'm happy to drill down on any particular statement that's of interest -- but overall what becomes clear is beginning in 2019 and then entering into and through the class period, the company is over time introducing -- Direct Buy is a little bit misleading because what they are introducing is a series of different features, all of which are lumped under this Direct Buy umbrella.

So, they introduce buy it again.  They introduce Complete Your Looks.  They introduce Trending For You.  They introduce categories.  Each of these things over the course of the class period is being made available to existing clients.  And what's clear is, as they are doing that, the company is observing and reporting out actual financial results that show that the two things as they are currently in operation in the market are complimentary and are additive.

In other words, as they are releasing each of these new features of Direct Buy to existing clients, they are observing significant gross in active clients.  They are observing significant growth in spending per client, and they are

observing and they are reporting other -- other aspects of engagement for these clients that they interpret to mean that the two product offerings are complimentary because what they are seeing is after releasing buy it again, complete your looks, whatever, to existing clients, they are seeing clients continue to sign up.  They are seeing clients spend more money. They are seeing clients come back more often and buy more products.

And so, that's the context in which they make all of these statements about the offerings being complimentary or about Direct Buy, this bundle of features, being additive to the business.  And I don't think those statements are challenged as a description of what has been observed so far in the market. That is, with those features having been released to active clients or existing clients.

The question is whether internal tests of yet a different feature, which has not yet been made available to the public; namely, switching the landing page so that first time visitors to stitchfix.com will be directed to Direct Buy/Freestyle rather than Fix, whether that is also going to be additive.

And because the company in each of these statements -- again, if you read them in context, they are not talking about internal testing.  They are not talking in historical terms about this long-term goal of making Direct Buy available to people who are not yet clients of Stitch Fix.

In fact, when they talk about that feature -- and they do talk about it in several of the challenged statements -- they talk about it in a way that makes clear that they haven't launched it yet.  It makes clear that they are still working on it.  And I think one critical inflexion point here is the March 2021 earnings call because that's the call where they discuss the fact that the launch of this -- the last stage of the Direct Buy project, this making the landing page so that visitors to stitchfix.com who are not yet clients will be directed to Direct Buy rather than to a Fix, they delayed that project; and they go into a fair amount of detail about all of the things that they are then working on, the reason why the launch of that feature has been delayed in a way that makes clear they are not purporting to say that that feature is completed; that it is ready for launch; that they have perfected it.

In fact, the mere fact that they delayed it and said "we are still working on it," in my view, is fully consistent with the fact that they have made -- have had some internal tests that didn't get to where they wanted to go.  So -- and that's why there is a timing point here that's critical.  I agree with Your Honor, the Plaintiffs have added a fair amount of detail about the internal testing.

What we still don't have, though, is any set of particularized factual allegations about what testing showed

after that delay in March of 2021.  If you really drill down into the allegations about the internal testing, the only real timing information you have got in there is there were some testing in or around June or summer of 2020, which is a full year before this feature was launched.  There are some allegations about testing that happened in late 2020, early 2021 and -- which is before the delay in the product launch; and then there is some allegations about a former employee who saw results of tests in February or March of 2021.  That's where the detail stops.

So, we don't see in the complaint anything that would tell us about -- that would tell us what the company was seeing in its testing of this feature after they delayed the launch and before they actually launched the product.

And so, I think the fact that a product, which was still in development whose development -- whose release was actually delayed and announced by the company -- precisely because they said they were still working on the product -- it wasn't finished yet, I don't think that paints a misleading picture of the business when compared with allegations that they had some internal testing which preceded that delay that were negative.

**THE COURT:**  So, let me -- so, with respect to -- I mean, you know, obviously in March 2021, you know, there are expressions of confidence and expectations that are -- that are expressly based on the momentum and client engagement we have

seen and they are directly in relation to discussing direct -- the launch of Direct Buy to new clients.

You know, at least it seems at least plausible that the -- that having that confidence or expectation at the time would be misleading if the test showed that they -- that, in fact, making Direct Buy available -- every test they have done so far -- at least the testing they have done so far, which has been described, showed that launching Direct Buy to new clients would not be -- would not increase momentum or client engagement, which seems to be the argument about what the test showed.

So, you know, if I do think that is the -- is the only argument here really -- that these are forward looking statements so they fall within the safe harbor -- or is there another basis for saying that these statements are not actionable?

**MR. GIBBS:** Well, I think there is a -- the lines between the arguments get a little unclear. I think safe harbor applies because they are talking about what they expect for a product that has not yet been launched. They are expressly acknowledging that they haven't finished it yet. They are still working on it. I think some of the language that they use also falls under the bucket of, you know, sort of inactionable corporate optimism.

I also think the way in which Your Honor is articulating

the -- the potential tension between the public statements and the internal testing, I think it implicates issues of opinion; right.

What -- they are looking at a lot of data.  When they are saying "we are confident about the release of this final stage of the Direct Buy project," they are specifically pointing to the success of the products that have already been launched to existing clients.

Now, I would say in the context of the law of falsity and opinions, the fact that there is some internal testing that -- that suggests cannibalization would fall into the category of facts that cut the other way; i.e., not enough to render an expression of an opinion false because I could imagine someone looking at the totality of the information and concluding "I think this is going to be success."  And I can easily imagine someone looking at it and saying "I think this might fail."  It is a matter of opinion when you are looking at the totality of the evidence that they are talking about.

They are talking about how it's actually performed in the market.  I don't think it would be unreasonable for an executive to say "I care more about what we are seeing in the market than I do about this internal testing."  I also think it would be perfectly reasonable for an executive to say, "yes, I see the internal testing.  That's why we are delaying the launch.  Let's get to work and let's fix whatever it is that's

causing this problem."

So, you can have internal testing that doesn't turn out the way you want it to be.  That doesn't necessarily mean you can't be optimistic about the ultimate launch of the product.  Again, in the context of going out to the market and announcing a delay in the launch, which, by the way, caused them to reduce their long-term guidance.  So, they went out and took a hit.  I don't think it makes any sense to suggest that they went out and took a hit; delayed the launch; lowered their guidance if they didn't genuinely believe that the additional time would allow them to get the product ready to launch and to launch successfully.

**THE COURT:**  I think one other thing I'm struggling with -- and just -- so, I guess two things I'm struggling with I appreciate your thoughts about.  One is, you know, what is the relationship between whether something is an opinion or a statement of fact and whether something is false as opposed to simply misleading by omission?

Somehow it seems to me that there is a very close line.  You know, on the one hand the argument might be this was just an opinion.  On the other hand, it might be that this was so relevant that its omission rendered the ultimate -- even the opinion misleading to the market.  I mean --

**MR. GIBBS:**  Well, I think -- so, first of all, I would say if the issue is expressions of optimism of how a yet to be

launched product is going to perform, I don't know how that could be a matter of fact as opposed to opinion.

In other words, the -- the only fact that's being conveyed -- traditional fact is I am actually optimistic, and the law of opinions obviously addresses that as one of the ways in which an expression of opinion can be false if it is not genuinely held.  Beyond that, I don't know -- you know, again, the *Omnicare* case is very clear on this point.  An expression of opinion is not rendered false just because there is some undisclosed fact that cuts the other way, and that's the response to the omission point.

It would need to be a fact that is so fundamental to the opinion that a reasonable investor would think that that fact is inconsistent with the executive even holding that opinion. That's how I think about it.

And, as I said, I just don't think that's the case here especially when the company -- they weren't saying "we are seeing great internal testing.  This product is going to be a whizbang when we launch it."  They were pointing to how the product had actually performed in the market which was true.

Now, I think there is plenty of room for difference of opinion as to whether you should weigh the testing more heavily than the performance in the market, but that to me just makes it very clear that we are talking about matters of judgment, matters of opinion.

Plaintiffs have cited a number of FEs who thought it was a mistake to launch the product.  That may very well be true, but disagreeing with your senior managers doesn't mean your senior managers are liars; and I think that's particularly important here because -- and here, we sort of bleed in between falsity and scienter -- but it is not plausible, in my view, to suggest at the starting point that the company launched a product they knew was going to fail.  That just strikes me as implausible from the get-go.

It strikes me as especially implausible to think that they publicly delayed the launch of the product, said they were delaying it in order to get it right before the launch -- which necessarily communicates it is not there yet -- made that announcement in a way that required them to lower their guidance -- so they took a stock price hit -- and then just launched the same product six months later knowing it was going to fail.  I don't think that's a plausible scenario.  Whether it is for purposes of falsity of an opinion or for purposes of scienter, it doesn't make sense.  It is not plausible.

**THE COURT:**  And then the one other question -- I do want to -- I do want to give you an opportunity to explain any other any argument you want to make on the scienter issue because obviously they have added quite a bit more as well or they have added more to this complaint on that issue.  I want to give you a chance to explain why that is still insufficient.

The other thing that, you know, it really strikes me -- and maybe this is just not the time on a 12(b)(6) motion for this to come in -- but there is, you know, the other piece of this whole story that's not part of this is, you know, theoretically it could be the case that -- that customers who come in as Direct Buy customers initially without having to have a Fix are not the same quality customers; but if the overall market is larger, that it still may be a net positive for the company, right, if the feeling is, yes, these people -- we are going to get fewer of these people; but at the end of the day, it is going to be five times as many customers.

And so, how -- and is it just the case that, you know, that could be an issue that would come in if this case gets past a motion to dismiss, that's -- that would be something you would bring in to explain on the evidence?  Should I just ignore that at this point?  I mean, maybe that's a question for them.

**MR. GIBBS:**  Maybe.  Well, but what I would say is I think that is a relevant inquiry, and to my mind it folds back into the question of judgment and/or opinion; right.

In other words, the -- in my view the Plaintiffs' theory depends on the notion that observations of this lowered conversion rate by switching the landing page to direct people to Direct Buy instead of Fix, that that necessarily equals failure.  That is, I think, implicit in their theory.  The fact

that --

**THE COURT:** Right.  The theory has to be that -- that the best outcome for the -- the better -- you know, the company knew that the proper way to move forward based on its testing was to not make Direct Buy available to non-Fix customers; correct?

**MR. GIBBS:** Yes.  And I think in that sentence the word "knew" necessarily implies there is no room for debate; there's no room for judgment about what in the aggregate will be best for the company.  And I just the fact that the Court can easily imagine a world where you can take the, quote, cannibalization hit and still be better off as a company, I think that just highlights the fact that the one set of testing results that Plaintiffs have described, which describes this loss of conversion effect, I don't think that's enough to render intentionally or recklessly false or misleading expressions of confidence in the ultimate success of the product.

That's how I think that inquiry is relevant here at the pleading stage as you consider what inferences are plausible from the facts that are alleged.

I would also say relevant to that inquiry is -- it's not like it crashed and burned right away.  They launched the new landing page in August.  The next set of challenged statements are in September where they are in effect saying too early to

say.

In December they start talking about the potential of cannibalization and they had a slower rate of new client acquisition, but it's not yet alarm bells.  Nobody is thinking it is falling off a cliff.  It is just a little slower than they would have liked.  Then you have a reversal where they actually have shrinkage in new active clients in the ensuing two quarters reported in March and June.

And my point with that is, that too, I think, feeds into this question of what inferences one can properly draw from the fact that they saw this conversion slippage in the internal testing.  You know, if it was so clear-cut that that meant the product is a disaster, I think it would have taken less than nine months for that to manifest itself as a disaster but it didn't.

The first quarter after the launch was a slow down in new client acquisition but not obviously a disaster.  It then starts after six months, it is looking bad because it is reversed; and then after nine months they are having layoffs and it is a much more serious problem combined with other problems, by the way.

I just think the fact that it took that long for them to clearly conclude this was a mistake, we have to reverse course and start directing people to a Fix, that goes to the question of whether those test results sort of necessarily rendered the

company's expressions of optimism recklessly or intentionally false or misleading, whether you put that in the scienter bucket or in the falsity bucket.  As I said, they sort of bleed when you are talking about opinions or expressions of optimism.

THE COURT:  Okay.  So, then one final question and I want to give Plaintiffs an opportunity to respond.  I mean, on this question of scienter, I mean, why are the allegations they have now added about, you know, the specific weekly meetings in which these test results were -- as I understand it, at least under their allegation -- disclosed to -- to the leadership of the company, including the individual Defendants here, not sufficient to at least get over the scienter assuming -- like if I have to get to that question, which is only if I find false or misleading statements.

MR. GIBBS:  Yeah, understood.  So, conceptually the answer to that is knowledge of the allegedly undisclosed fact doesn't necessarily always add up to scienter.  We always end up having these debates, and the Plaintiffs focus entirely on whether this information was known to the executives who spoke.  That is, I would suggest, a necessary but not sufficient set of factual allegations for scienter.  And it really -- it overlaps with a lot of what I have already been saying about opinions and judgment.

I don't think that you can say there is a strong inference that either of the two speakers knowingly or recklessly misled

shareholders even if you assume they were aware of these test results because they -- again, timing is important here and as is all these -- as are all these questions about judgment and what conclusions one draws from the testing.

I don't think the fact -- knowledge of the fact of these negative internal tests showing this loss of conversion effect, I don't think that is enough for you to say there is a strong inference that when they went out and expressed confidence in the product, they were lying.  I don't think it's enough because there are plenty of inferences you could draw from that set of circumstances plausibly as part of a holistic analysis that would undercut the inference of scienter.

They may have thought the experience in the market was more important than the testing.  They may have had doubts about the validity or the strength of the testing or the strength of the conclusions one could reach.  They may have acknowledged the validity of the testing but had strong conviction that they could fix whatever the problem was while continuing with the -- with the plan to direct people to Direct Buy.  There are all sorts of components to this product that one could change and one could reasonably believe that those changes could turn around the issue or mitigate it enough so that the overall business result is still acceptable.

You know, I think the Plaintiffs' allegations on this subject make it sound like this is kind of a binary issue.  You

either direct them to Fix or you direct them to Direct Buy; but when you -- especially if you read the transcripts, you can hear the executives talking about all of the different things they have to talk about when they are designing this product; right.  If you get directed to Direct Buy, how many products are you going to be offered?  Are there going to be 30 things up on the page?  Are there going to be 15 things on the page?  How much is it going to be linked to whatever you have told them about your style preferences as you are sort of engaging with them?  How much inventory do they have?  What inventory do they have?  There are all kinds of things that go into the design and the launch of this product.

And so, my point there is just that just because there was internal testing that showed a negative effect in this one respect, I don't think that could plausibly much less support a strong inference that this was fraud because there are so many ways in which the executives could have been fully aware of those test results and still had full confidence in their ability to launch the product successfully especially when you take into account the fact that the company had a disclosed practice of launching products, learning, and modifying them as they went.

So, they weren't telling anybody "this product will be perfect when it launches."  They weren't telling anybody it would perform perfectly from day one.  Quite the opposite.

They repeatedly made the point "We are just getting started. We have learning to do.  We are going to tweak it.  We are going to make it better.  We are going to improve it over time."

So, there is every reason to believe they still believe that in September.  Every reason to believe they still believe that in December, obviously things look a lot worse by March and they look a lot worse by June.  So, my answer to the question is knowledge of the test results does not by itself support a strong inference of scienter because it doesn't tell you anything about what the executives thought the testing meant for the ultimate success of the product.

THE COURT:  So, just as I understand it -- and then I will give Plaintiffs an opportunity to respond -- I mean, it seems like ultimately the kind of -- at least as I'm thinking about this, the issue that you are raising is that we -- there are cases probably where knowledge of a particular fact is sufficient to draw scienter because, you know, you know X and you say Y; right.  So, there are cases where -- where those two are one in the same.  I guess your argument here is that we don't have -- you know, we don't have a statement that our internal tests show that individuals who have the option of getting Direct Buy are spending more money.  And, you know, we don't have -- we don't -- we have a -- there is a question on false or misleading statements based on internal test results.

We don't have a direct misrepresentation of those results themselves.

**MR. GIBBS:**  I completely agree with that.

**THE COURT:**  Okay.  Let me hear from Plaintiffs.

**MS. BOON:**  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MS. BOON:**  Your Honor, a lot has changed since I was last here; and I just would like to start by making a couple of big picture points.  And then if it works for the Court, I would move straight to whether the statements are actionable, which it seems is on the Court's mind at this time.

So, Your Honor, just big picture, we corrected the issues that the Court addressed in the motion to dismiss order.  We clarified in the second amended complaint that Direct Buy was launched to select new and prospective clients at the start of the class period, which we allege to be June 2020, with the Trending For You and influencer programs.  We set that forth in significant detail in our complaint.

We refocused our statements on new and prospective clients.  We refocused our statements on the precise qualities of the product that Defendants were testing.  And I think that's really key and I think that's why we win and I will get to that in one moment.

We also explain specifically in our falsity section why a reasonable investor would understand those statements to be

about the thing that the company was testing, and we set that forth quite expressly within the complaint itself.

I also got the additional detail that the Court asked for on the test.  I personally called back former employee 1 and former employee 2.  I talked with them about the precise categories that the Court had identified in the motion to dismiss order, and I got that additional detail and I set that up in the complaint by category to show the Court what additional information we have.

I also identified a new former employee, former employee 4.  He was a data scientist through the end of the class period.  And critically, former employee 4 specifically confirmed that the product that was ultimately launched was the same as the product that went through the three rounds of testing that we describe with specificity in the complaint.

And, again, this is a pleading motion.  That's what we allege.  The alternative narrative that Defendants are presenting to the Court is set forth nowhere within the complaint.  And it's frankly just not appropriate at this time to credit things about, Oh, well, maybe they had positive tests; maybe they subjectively believed it was going to be okay.  That's not what we allege.

We allege based on four specific former employees.  We explain their basis for knowledge and we set forth very clearly why that was not the case.

And now, Your Honor, I just want to talk big picture for a moment about how this product works and what the complaint alleges.

You go to stitchfix.com.  You fill out a style profile.  Through that process, you're either steered to Direct Buy where you shop items based on the -- your answers to the questions or you are sent to Fix where you schedule a Fix box which is populated with items that they select for you based on your answers to those questions.

FE1 corroborated by FE4 describes that that's exactly what the company was testing.  When you are completing the style profile, the company is testing if I show you Direct Buy focused questions and sending you to Direct Buy, what happens, as opposed if I show you the standard Fix questions and visuals.

That -- the fundamental mechanics of this process were the same throughout the entire class period.  That's confirmed by Defendants' own form 10-Ks.  They submitted one of those to the Court as Exhibit 20 to their exhibits.

It describes a customer onboarded to Freestyle completes a style profile and is then sent to the Freestyle product.  And the reason that this matters -- there are a couple reasons why this matters that I just want to highlight.

The first is that the program they were testing was fundamentally the same in this respect of completing the style

profile and going through the process as what they launched and how they talked about the program at the end.  And Defendants are saying essentially they introduced this landing page change and everything is different, and no statements prior to that point in time can be false.

And I have worked very hard to understand what they are talking about.  I went through the Way Back Machine.  I reviewed their web page at specific points in time.  I have reviewed their 10-K that they submitted.  I reviewed their 10-K from a year later after the product had been launched.  There is only one road in.  It is clicking the style profile.

At all relevant times that we can see -- and we will establish in discovery that that was the case.  The fundamental mechanics were the same at the beginning and at the end.

And now I want to talk about what the testing showed and what they said because that's really the critical issue obviously on this motion.

All of the company's internal testing showed with statistical significance that customers onboarded to Direct Buy purchased nothing or purchased less than they would have if they had been sent to Fix.  As a result, there was cannibalization.  The testing showed that Direct Buy first customers converted at a rate of 30 to 40 percent less than Fix customers; were of lower quality and had less than half the lifetime value of Fix first customers.

Defendants are telling investors the opposite when they are saying Direct Buy will attract high-quality clients. That's false.  That's contradicted by the test results.

THE COURT:  And which -- as we are doing this, let's go -- why don't you give me the individual statements.  So, tell me which statement you are talking about --

MS. BOON:  Sure.

THE COURT:  -- with specificity because I think that, you know, we need to get down to that level of detail.

MS. BOON:  Absolutely, Your Honor.  And I'm happy to just kind of go through the statements if that would be helpful for the Court.  But here just again, I want to present here are the categories and then I will show you the specific statements that have this language.  The testing set, again, is testing quality, conversion, whether the company has -- whether Direct Buy has friction with Fix or not.  And it's saying the opposite.

So, for instance, at 145, they are saying -- at paragraph 145 of the complaint, I should clarify, they are saying, We have witnessed with Direct Buy a frictionless entry point.  We think it represents.  The testing shows there is friction. That is false.

If you look at the next statement from June they say, We believe Direct Buy provides the lightweight entry point for new clients and compliments our Fix offerings.  False.  The testing

is showing it is not a lightweight entry point for new clients because there is friction, and it doesn't compliment our Fix offering --

THE COURT:  So what --

MS. BOON:  -- because there is cannibalization.

THE COURT:  Again, part of the problem here I'm having with this is, like, distinguishing what are actual statements of -- you know, representations of fact of some kind versus what's kind of corporate babble that can't even be understood.

So, friction, you know, I don't -- what does "friction" mean in this context?  How is it -- you know, how did the testing show friction as opposed to just saying this might not be as great and maybe, you know, these customers aren't as great as the customers we get through Fix?

MS. BOON:  "Friction" is a word that Defendants use to tell investors that there was no cannibalization including in specific responses to questions about cannibalization.  And when they discuss cannibalization in the first corrective disclosure -- excuse me -- the third corrective disclosure in March where they said, In leading clients to the Freestyle experience first, we inadvertently created a friction for those seeking a Fix -- again, these are words that the market understood the company to be saying there is no cannibalization, and these are the words that the company used to speak to investors about there being no cannibalization

including in response to direct questions.

As another example, Your Honor, in June they say these two offerings are so highly complimentary versus any sort of cannibalization between the two.  That's false based on the testing.  Another example, June 10th, quote, "Even now with Direct Buy" --

**THE COURT:**  I mean, I just want to -- again, what the meaning of "cannibalization"?

**MS. BOON:**  "Cannibalization" is very clearly defined in our amended complaint to describe how when you come to stitchfix .com and you go through the style profile, if you are sent to Direct Buy first, you don't purchase anything.  You convert at a rate of 30 to 40 percent less than if you had been sent to Fix.  You are of lower quality and you have lower lifetime value.  That's what the testing showed, and that's what "cannibalization" means in this context.

If I'm steered to Fix, I would have bought something.  I would have a higher lifetime value.  I would have converted to the program; but instead because I'm being steered to Direct Buy and that onboarding program, none of those things are happening, which, again, all of the tests confirmed was statistically significant test results, which we include in the additional detail we have in the complaint.

**THE COURT:**  So, it is specific to someone comes to the Stitch Fix website.

**MS. BOON:** Right.

**THE COURT:** And giving them -- providing the option or having some folks sent to Direct Buy -- on the Direct Buy path is cannibalizing in your view because had they -- had that not been available, those people would have been better customers.

**MS. BOON:** Or customers at all.

**THE COURT:** They are more likely to become a Fix customer and spend more money.

**MS. BOON:** They would have been a customer or a better customer. That's what the company was testing. We include, as I mentioned, details from former employees 1 and 4 in the complaint regarding -- explaining that that's how the company viewed cannibalization. And, again, these features that they were testing -- conversion, quality, lifetime value -- that's what they were talking to investors about.

Another example is their statement from June 10th, quote, "Even now with Direct Buy what we are able to do is to be able to convert people who might be on the fence about Stitch Fix." That's false. The tests are showing that they're converting 30 to 40 percent less than Fix, and they are of low quality and they are of low lifetime value.

If they didn't go out and talk to the market about conversion, quality, incremental additive, the precise metrics of the test, then maybe we would be in a different situation. But they did. And, I mean, my adversary here is saying, Oh,

they were expressing confidence in the product.  They weren't just expressing confidence in the product.  They were talking about the specific features of the product that they were testing.  And that's the reason, Your Honor, that the statements aren't forward looking.

The standard here are whether the statements are objectively verifiable when they said them.  And something like Direct Buy fuels conversion, Direct Buy attracts high-quality clients was objectively verifiable because the internal tests that they had -- that we allege with specificity they had in their hands and knew about -- said the exact opposite.

Similar logic applies to the opinion argument.  The standard there is whether the information in Defendants' possession fairly -- it is whether what Defendants said fairly aligned with the information in Defendants' possession at the time they spoke.  It didn't.

They had these tests in their hands regarding conversion, quality, new clients, cannibalization, that did not fairly align with the representations they were making about those precise features of the product.

And I just want to address optimism -- and we touched on this moments ago when you asked me about friction -- with regard to every single one of the words that they say is optimistic -- like complimentary, incremental -- again, those are words Defendants were using -- and the complaint alleges

this very clearly -- to convey to investors that the product was not cannibalizing Fix and that was false.  And that's how analysts understood those words.  And we have examples in our complaint of analysts asking about the cannibalization being provided with this assurance issuing a report echoing those words.

I would refer the Court, for instance, to paragraphs 136 and 137, which talks about incremental and how the analysts accepted that explanation that Defendants provided.

Unless the Court has any additional questions about falsity, I'm happy to touch on scienter if that would be helpful.

**THE COURT:**  That would be helpful.  Thank you.

**MS. BOON:**  Okay.  So, as I said, I respectfully submit I delivered on this.  I called the former employees.  I interviewed them myself.  We got all of this additional detail that lines up with the categories that the Court had identified as lacking in the first motion to dismiss order.  And I would just like to summarize some of the new things that we got that I think are important here.

With regard to who the test tested, we explained clients who had never purchased anything including new clients and prospective clients who had filled out a style profile.  We expressly alleged that my adversary argues in their briefing that Trending For You had nothing to do with the tests.  That's

simply false.  The company -- FE1 specifically confirmed that Trending For You was part of the testing that they were conducting.  That's in the complaint as presently alleged.

In terms of the scope of the test, we include the specific allegation that a percentage of website traffic was sent through the test.  We also explain, as I just noted, that the test specifically included Trending For You, which was launched in June of 2020.  The company didn't wait to launch that product until August of 2021.

With regard to the test parameters, how the test worked, we have FEs 1 and 4 explaining there is the control group and the testing group.  They describe how people being tested were sent through that onboarding test, which, again, starts with the style profile and then from there customers are steered to one product or the other.

We describe how the tests specifically evaluated two metrics; annual customer value and lifetime value along with the conversion rate, which is very important here because again, they make specific statements regarding conversion and lifetime value at the time we allege they have these test results.

And we also provide specific examples from FE1 and FE4 quantifying how the tests worked and why they were statistically sufficient.  We have math -- I'm sure Your Honor has seen we have mathematical examples in our complaint where

they really walk through this with a fair amount of detail in terms of how that testing worked.

With regard to the results and why it was a failure, we have the additional detail of the statistic converted 30 to 40 percent less, which FE1 and FE4 independently confirmed.  We explain they purchased -- less and less likely to purchase from the company again, and that's what makes them lower quality; and we explain that they had half the lifetime value of Fix clients.

We also explain in the complaint how there was a friction and the product was not additive.  For instance, FE2 specifically says, the purpose of this inquiry was to -- the purpose of the testing was to determine whether the product was additive.  The results showed it was not additive because Direct Buy first customers did not convert at all or bought less and returned to Stitch Fix less than Fix first customers.

As a result -- and this is very important in response to Defendants' argument that there was some subjective belief that everything was going to be okay, which, again, is nowhere alleged in the complaint.  This isn't a debate.  It is not a question of judgment.  We expressly allege all the tests were negative.  There were zero positive tests.

We specifically allege that the data scientists unequivocally and unanimously said, Don't move forward with this product.  Essentially it doesn't work.  There's no --

there's not even a -- a hint of debate regarding what these results were consistently showing in the complaint.

The idea that Defendants subjectively believed it was going to be okay is nowhere in the complaint and simply not supported by the fact that all of the test results said the same thing.  We also --

**THE COURT:**  Let me ask you a question just -- and this -- I apologize if I should have caught this in the complaint.  When Freestyle was actually launched to the public, were individuals directed to either -- were they -- you say when someone came -- at the time it was actually launched, someone sets up their style profile --

**MS. BOON:**  Yes.

**THE COURT:**  -- at the end of that process, are they still sending to Freestyle versus some people to direct -- to Fix?  Are they sending everyone to Freestyle or are they giving them the option to choose between the two?

**MS. BOON:**  It doesn't matter and that's a factual issue.  Let me explain.  We know and this is --

**THE COURT:**  Do we know the answer, just as a starting point?

**MS. BOON:**  We know what they said, right, at the end of the class period when they disclosed kind of what had occurred.  So, first, they say we -- we are steering people who came into a Fix to Freestyle.  So that indicates to us that you

fill out the -- I'm somebody who wants to buy a Fix box.  I click on my style quiz button -- which, again, is the only way in -- I start filling out these questions.  The algorithm starts showing me Direct Buy related information, whatever that may be -- and that's really a fact issue that we need to figure out -- and then it sends me to personally shop on Direct Buy, and I don't buy anything.  Conversion rates are down.

So, that's what they disclosed they were doing; and that completely matches up with FE1 and FE4's description of what they were testing.  What happens when I'm a customer who comes to the website; fills out the style profile and is steered to one or the other.  So, based on what they disclosed, they were steering people to Freestyle -- just to directly answer Your Honor's question -- and that is precisely what the testing showed would result in the precise metrics we allege; no conversion, not high quality, low lifetime value.  And they disclosed that that's what they were doing.  They say conversion rates are down.  There is cannibalization.

What we allege the testing showed is exactly what happened.  Similarly, at the end of the class period in June of 2022, they explain, we created this cannibalization problem because when customers came to stitchfix.com we made them sign up for a Fix box before we sent them to Freestyle.  So, this is just -- this is -- this is a variation on the steering issue that they had been dealing with throughout the entire class

period, and it is showing that when the customers are being steered to Freestyle, again, they are not converting -- that's what the company disclosed.  As a result, our conversion rates for both are now down.  That is an express example of cannibalization because it is hurting -- the Freestyle customers are not only hurting Freestyle, they are also hurting Fix, which again is how we define cannibalization.  Freestyle is taking customers away from Fix.

I'm happy to just briefly address anything else the Court would like to discuss, but I also just wanted to talk a little bit about how Defendants knew about the tests if that would be helpful.

**THE COURT:**  I mean, I think -- I think that's been -- I have reviewed the pleading on that.

**MS. BOON:**  I appreciate that.

**THE COURT:**  You know, in a non-PSLRA case we would be in a different thing.  That's the problem we have here, right, in the sense -- and the need to strong -- to have facts that draw a strong inference of scienter.  And what -- you know, one of the facts which is a fact, you know, what do we do with the delay as -- as Stitch Fix's Counsel has addressed it, you know, that, yes, they make these statements and they also say "We don't have it right yet and we are going to take some more time before we launch this product."

In that sense that, you know, that it's suggesting that

there is at least some -- you know, why -- you know, here I need to have a strong inference of scienter, and you can draw from that a contrary inference that they were -- they remained perhaps unreasonably but not recklessly optimistic about the circumstances but -- you know, that it seems that -- that seems to be an issue for you on that point.

**MS. BOON:**  So, Your Honor, the March 2021 disclosure is partially corrective.  They do disclose, We are not getting it right.  We are working on the onboarding function.  They don't disclose "Our tests have unanimously and unequivocally confirmed that this product isn't going to do what" -- that what we say it is going to do with regard to new clients, and this product just doesn't fundamentally have the features that we have been representing to the investors in the quarters before the March 2021 partial corrective disclosure that the company had represented.  So that's one point.

The second point is that they continued to make false statements because they wanted to reassure the public that everything was going to be okay, and they continue to make false statements in March regarding the precise metrics that they were testing.

And one example of that is the lifetime value statement that Your Honor flagged to my adversary.  They specifically said, "Direct Buy is delivering incremental lifetime value.  And as our Direct Buy offering expands, client lifetime values

will continue to grow."  That is absolutely, unequivocally false based on the test results that they indisputably had in their hands at the time that they spoke that statement.

So, the fact that they continued to make false assurances to the public that contradicted the test results they had in their hands certainly doesn't give rise to some kind of innocent state of mind.  It much more plausibly, I would submit, gives rise to -- they are panicking.  All their test results are negative.  The product is not going to do what it's going to do.  Spaulding's entire career depends on launching this product.  They have told investors it's going to transform the company.  So, what did they do?  They said, "We are working on it."  And then they went out and continued to make affirmative misstatements to investors.

Another example in March of 2021 they say (as read:) "Starting with either Fix or Direct Buy as soon as they enter their ecosystem Direct Buy will fuel client acquisition."  That is the literal opposite of what the tests show.

They also say, Similar to the incrementality that we have observed with active Fix clients as they participate in both and seeing that it is actually an additive experience, we are thinking about it similarly as we bring new consumers on to the platform.

No, you are not.  The tests unequivocally are providing you with statistically significant results saying that that is

not true.  So, they continue to mislead investors.

Then we have this period of time, again, where they continue to make false statements.  We have specific allegations in the complaint, and I would refer the Court to Section K of our narrative section where we confirm based on multiple former employees that the test results continue to be negative.  We have FE3 who is saying by the time he left the company, the test results continue to be negative.  If memory serves, I think this starts at paragraph 97 of the complaint.

We have former employee 4 who says the product that was launched was absolutely fundamentally the same.  We have former employees 4 and 2 who stayed through the end of the class period confirming they are not aware of a single positive test that -- and we also specifically have FE4 explaining why this launch and learn concept was not true.  He specifically describes -- in the section I just referred the Court to -- how there was no process in place to learn from -- the launch and learn concept is problematic for two reasons.  One, they didn't disclose what they learned.  They said the literal exact opposite about conversion, high quality, value, whether it was going to fuel client acquisition.  That's what the testing was showed and that's the opposite of what they said.

And in addition, we have specific allegations regarding how that launch -- there was no framework in place to learn from the launch.  There was only pressure from Defendant

Spaulding in a last ditch effort to save her career to get this Freestyle product launched by the time the company's board and investors were expecting her to do that.  And that's what we allege happened here.

THE COURT:  Okay.  Thank you.

MS. BOON:  Thank you, Your Honor.

THE COURT:  We will give two minutes for rebuttal.  We do have another matter scheduled on this 10:00 o'clock hearing and then an 11:00 o'clock matter.  So, we have gone --

MS. BOON:  We appreciate it, Your Honor.

MR. GIBBS:  I understand that and I appreciate it, Your Honor.  So, first of all, I thought Counsel had disagreed with our argument about the landing page.  I think where we got to was that's exactly what the company said was the problem and what Plaintiffs claim was the problem being observed in the internal tests which is the change in the landing page.

That's really important because when Counsel tells you that Direct Buy was available to new and prospective customers starting in June of 2020, that is an incredibly misleading use of the term "Direct Buy" because what they allege was available to, quote, new and prospective customers in June of 2020 was not this landing page feature that directed people to Direct Buy or Freestyle.  It was Trending For You, available to clients who had signed up, completed a style profile but had not yet made a purchase.  That is alleged in their complaint.

That has nothing to do with the change that happened over a year later in the landing page which directed people to Direct Buy instead of Fix, which is what caused the problem and which is what they claim the internal testing was all about. So, that whole argument is a complete red herring.

I do want to address the references to FE4 and FE3 because I think it's critical to Plaintiffs' theory that the product didn't change. Despite all this negative testing, they did literally nothing to try to fix it and then launched it knowing that it would fail even though they had made no efforts to fix it.

Now, again, I think that is wildly improbable on its face; but to the extent they are leaning on allegations about FE4 as saying the product didn't change -- that's in paragraph 93 of the complaint, and it's a one-sentence allegation that says "FE4 confirmed the product that was launched was absolutely fundamentally the same."

I have no idea what that means. "Fundamentally" is doing an awful lot of work in that sentence.

**THE COURT:** Well, I guess, I mean, let's talk about connecting it to the test. I mean, it does seem Stitch Fix itself admitted at the time of its launch to the public people -- customers were being steered toward Direct Buy; correct?

**MR. GIBBS:** Yes, and that gets to another point I

wanted to make, which is really important.  Plaintiffs are assuming -- but don't allege facts I think to support this interest -- this inference -- that the only variable here is that one thing, at the end of the style profile, are they directed to a Fix or are they directed to Direct Buy?  That's the only variable that could possibly affect conversion.

I don't think that's a plausible inference.  It is not supported by particularized facts.  There could be any number of changes that one might make to the process even if it is, quote, fundamentally the same in the sense that you are pushing them to Freestyle that one could easily believe would fix the problem, mitigate the problem, whatever.  But Plaintiffs are just assuming the only thing that matters is which way the customers get steered.

Now, it's true the company ultimately concluded that that was the problem and they reversed course, but they only did that after nine months of flailing around.  Again, wildly implausible.  If they had known in advance that was the problem, why not just fix it right away?  Why would you go through three quarters of declining results and stock drops while you are trying to fix it when -- if you already know the only way to fix it is to switch that thing back?  It makes no sense.  It also --

THE COURT:  Their theory would be because you are deeply invested and you are hoping that -- you are hoping

that -- despite all evidence to the contrary or -- you know, you are maybe not even hoping but you are recklessly trying to put this in the market with the chance that maybe all of that won't happen and you will end up -- you know, you are invested in there being more people on the Direct Buy side than the Fix side since that's evidence of your success.

**MR. GIBBS:** And what I would say is misplaced optimism is not the same as fraud, Your Honor. It just doesn't make sense. To get to fraud, you would have to believe they knew it wouldn't work or that they recklessly avoided learning facts that would have told them that it wouldn't work. And I just --

**THE COURT:** I guess or the theory would be that all you cared about was the number of people who were Direct Buy customers. So, the fact that it was harmful to the Fix side of the company was not something that would -- that you had any concern about. That would be the theory where it is both false and then motivated.

**MR. GIBBS:** Yes. I would suggest that's pretty improbable. That certainly didn't work out very well for Ms. Spaulding, right, did it? I think the idea that she saw problems that doomed the products; made absolutely no effort to fix them; and yet, delayed the launch; publicly disclosed the delay; took down the guidance; took a stock price hit in order to do that and yet said, no, no, no, don't do anything; don't make any changes; don't try to fix it; we are just going to

delay -- for what reason I don't really know -- then we are going to launch it anyway even though the information hasn't changed; we have no basis for believing we are going to get to a better result because my career depends on launching this thing even if it turns out to be a spectacular failure?

Really?  That makes no sense.  It's not plausible.  It's certainly not enough to support a strong inference of scienter as compared with the competing inference, which is there were some negative test results.  They thought they could turn it around.  They tried to turn it around.  It was unclear at first whether they had turned it around, and ultimately they did not.  That is a far more plausible explanation for what happened here than is the one the Plaintiffs are offering you, which is they got unequivocally negative test results.  No way to fix it.  No way for this work, and they decided to do it anyway.  And in the meantime, they publicly disclosed -- falsely I guess -- that they are delaying the launch in order to try to fix it.  Then launch it not having done anything to try to fix it, and then just sit there and watch it fail.

It literally makes no sense.  It is far more plausible to think that they had some basis for believing they could make it work.  That optimism turned out to be misplaced.  And as easy as it is for a bunch of data scientists and others to second-guess that decision, that doesn't make it fraud.

THE COURT:  Okay, thank you.  I will take the motion

under submission and aim to get a decision out forthwith.

THE CLERK:  Thank you.  This matter is concluded.

(Proceedings adjourned at 11:00 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    May 1, 2025

_Marla Knox_

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter