UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> STITCH FIX, INC., et al., <br><br> Defendants. | Case No.  5:22-cv-04893-PCP <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** <br><br> Re: Dkt. No. 91 |

Court-appointed lead plaintiffs (four pension and benefit funds) bring this class action securities lawsuit against Stitch Fix, Inc., Stitch Fix's former CEO Elizabeth Spaulding, and Stitch Fix's founder Katrina Lake. Defendants move to dismiss plaintiffs' second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court denies defendants' motion as to plaintiffs' Section 10(b) claim and grants it as to the Section 20(a) claim.[1]

## BACKGROUND

Stitch Fix is a clothing company whose core product is the "Fix," a box of five items mailed to customers curated by the company's stylists based on a style profile that customers complete. Customers purchase the items they decide to keep and return the rest, paying a fixed styling fee as well.[2]

---

[1] Defendants request judicial notice of various public statements related to the launch of Direct Buy, including SEC filings, transcripts of earnings calls, and transcripts of conference presentations. The Court grants defendants' request for judicial notice because each of the documents at issue is either incorporated by reference into plaintiffs' second amended complaint or available from a source whose accuracy cannot reasonably be questioned.

[2] For purposes of this Rule 12(b)(6) motion, the Court assumes the truth of the allegations in the second amended complaint.

United States District Court
Northern District of California

In October 2019, Stitch Fix publicly announced that it was launching a new product line called "Direct Buy," which would allow customers to shop directly on the company's website for specific products.[3] Direct Buy was rolled out to existing Fix customers and select new, prospective clients in phases. In early June 2020, Trending For You, a version of Direct Buy, was launched to a subset of new customers who had previously registered a profile with Stitch Fix but had never purchased a Fix. Later that month, another iteration of Direct Buy was offered to new clients through a collaboration with fashion influencer Katie Sturino. In March 2021, Shop by Category, another version of Direct Buy, was launched to existing customers. On August 9, 2021, Direct Buy, branded as Freestyle, was launched to new customers.

Plaintiffs allege that Stitch Fix's former executives Spaulding and Lake made material misstatements and omissions about this new business line to the public. In particular, plaintiffs allege that the executives told investors that Direct Buy would be additive, incremental, and complementary to the Fix but knew from internal test results that Direct Buy would cannibalize the Fix business. Below is a timeline of purportedly false and misleading statements that plaintiffs allege defendants made about Direct Buy.

June 8, 2020 earnings conference call:

- Lake stated, "given the momentum we've witnessed with Direct Buy in a frictionless entry point we think it represents, we plan to make it accessible to new clients as an acquisition vehicle in the coming months."

- Spaulding stated, "We believe Direct Buy provides the lightweight entry point for both existing and new clients and complements our Fix offerings[.]"

- Spaulding stated, "Trending for You and our influencer collaboration are prime examples of how we're adding flexibility to the way clients can experience Direct Buy and to more effectively attract new clients. In addition, we believe it can fuel conversion among clients who's [sic] historically been on the fence."

- In response to an analyst's question, "what percent of your overall business do you think [Direct Buy] will approximate over time?", Spaulding stated, "And so, what gets us so excited about what we're seeing with Direct Buy is we're clearly meeting a very complementary set of needs relative to what our Fixes offer us to address. And allows us we believe to cover the full addressable market of apparel spending. And so, while this distinction of share of wallet gain and sort of the mix

---

[3] Plaintiffs allege that this product was initially called "Shop" or "Direct Buy" and was later renamed "Freestyle." For clarity, the Court will refer to it as Direct Buy throughout.

United States District Court
Northern District of California

United States District Court
Northern District of California

of those two is something we'll talk about for the next few quarters. I would imagine that over time there's just going to be a total blurring between services that are more engaged with filing support versus areas where consumers can shop and engage any time that they want to. I think what we're most excited about is to just see that these two offerings are so highly complementary versus any sort of cannibalization between the two."

June 8, 2020 letter to shareholders:

- The letter stated, "We believe Direct Buy provides the lightweight entry point for both existing and new clients and complements our Fix offerings[.]"

- The letter described Trending for You and the influencer collaboration as "prime examples of how we're adding flexibility to the direct buy experience to more effectively attract new clients over time."

June 10, 2020 William Blair Growth Stock Virtual Conference:

- In response to a question from an analyst regarding whether Direct Buy was "an incremental [average order value] opportunity or a way to acquire new customers," Lake responded, "And so what we believe is like all of these steps open up incremental market opportunity, even now with direct buy what we're able to do is to be able to convert people who might be on the fence about Stitch Fix." Lake added, "And to answer your question briefly around like is this just incremental to current clients or is this something we can use more of, I think we've seen it's both opening up more wallet opportunity but we also think that this is something that's going to be able to open up more TAM and be able to get people who might have been on the fence about Stitch Fix over and really address lots of different types of shopping needs through this capability."

December 7, 2020 earnings call:

- Spaulding stated that "our ongoing momentum in direct buy" will allow Stitch Fix to "attract high-quality clients, but also to convert our large prospect population that we estimate is in the millions, clients who are at the precipice, but have not yet converted to Stitch Fix."

- In response to an analyst's question about "the combination of direct buy and the trends that you're seeing in keep rates," including "new customers versus old customers in terms of trends," Lake stated, "At a high level, honestly, I mean, what we're seeing is that the two experiences are really additive[.]" Lake added that "direct buy and Fixes will allow us – the kind of combination of those two things will allow us to address many more types of clients and what we're realizing in [sic] it's really also it's unlocking, I think, both client opportunity but also pretty significantly on the wallet share opportunity side where if you're looking for a down jacket to eat outside, as an example, you'd actually love to buy that through Stitch Fix in a more frictionless way, and on direct buy it's going to be a great way to do that."

December 7, 2020 letter to shareholders:

- Spaulding stated that "our ongoing momentum in direct buy" will allow Stitch Fix to "attract high-quality clients, but also to convert our large prospect population that we estimate is in the millions, clients who are at the precipice, but have not yet

converted to Stitch Fix."

February 10, 2021 Goldman Sachs Technology and Internet Virtual Conference:

- In response to an analyst's question, "what is the vision for direct buy and how has the offering evolved over the last year or so since you started rolling it out?", Lake stated, "I think this really is one of the most exciting things that I've had the privilege of getting to work on because it's one of those initiatives that is both really powerful and we can see in the data that it's working. And at the same time there's still so much opportunity."

March 8, 2021 earnings call:

- Spaulding stated that "[t]his incrementality gives us more optimism to believe that as our direct buy offering expands, client lifetime values will continue to grow."

- Spaulding stated, "The momentum and client engagement we've seen increases our confidence as we look to introduce direct buy to new clients at the end of the fiscal year."

- Spaulding stated, "Our goal is to help clients begin their journey with Stitch Fix in the best possible way, starting with either Fix or direct buy as soon as they enter our ecosystem, and we expect that direct buy will help drive greater engagement and fuel client acquisition in the years ahead."

- In response to an analyst's question about cannibalization concerns surrounding Direct Buy's introduction to new clients, Spaulding stated that "similar to the incrementality that we've observed with active Fix clients as they participate both and seeing that is actually an additive experience. I think we're thinking about it similarly as we bring new consumers onto the platform."

March 8, 2021 letter to shareholders:

- The letter stated that Direct Buy "is delivering incremental lifetime value."

June 7, 2021 earnings call:

- Spaulding stated, "The success in incrementality that direct buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix."

September 21, 2021 earnings call:

- In response to an analyst's question about "how you're thinking about growth of the Fix business as your Freestyle business ramps" to new customers and how "in the past you've talked about low cannibalization," Spaulding stated with respect to "our new onboarding experience" that "what we would anticipate over time is many new clients coming in through this new Freestyle experience, but then finding their way to certain use cases and occasions that a Fix is really a great experience to add on to and vice versa continuing to see clients also enter through [the] Fix business." Spaulding answered "the specific cannibalization question" by stating that "we think that revenue per active client that we shared and the knowledge we have of like the newer cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary …. [W]e see solid growth in both sides of the business in the coming year."

4

- In response to an analyst's request for a "Freestyle update since the public launch" to "new customers," Spaulding stated that the "continued enhancement of what we're doing with Freestyle" is "demonstrated by our revenue per active client crossing that $500 mark."

Plaintiffs allege that the above statements were materially false and misleading because defendants were aware that Stitch Fix's internal testing showed that Direct Buy was cannibalistic. Specifically, plaintiffs allege that defendants were aware of the results of the New Fix Customer Test, a multi-variant test conducted by Stich Fix's Data Science group that compared the lifetime customer value and annual customer value of new customers onboarded through Fix and those onboarded through Direct Buy. At least three statistically significant tests showed that new customers channeled to Direct Buy purchased less and were less likely to return than customers channeled to Fix, and that they were 30–40% less likely to convert, meaning to purchase anything at all. The "new customers" that were the subject of the New Fix Customer Test included both "net new" clients—people who had never purchased from Stitch Fix, signed up for an account, or filled out a profile—and "signed-up prospects"—people who had signed up for an account and filled out a profile, but never scheduled a Fix or made a purchase.

Plaintiffs allege that when the cannibalistic effect of Direct Buy was revealed to investors, Stitch Fix's market value declined by over $6 billion (approximately 90%). They bring this lawsuit on behalf of all persons who purchased Stitch Fix common stock between June 9, 2020 and June 9, 2022. Plaintiffs assert: (1) a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Stitch Fix, Spaulding, and Lake; and (2) a violation of Section 20(a) of the Exchange Act against Spaulding and Lake. They request class certification, damages, costs, and fees.

The Court granted defendants' motion to dismiss plaintiffs' amended complaint on July 16, 2024. Plaintiffs filed a second amended complaint, which defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint fails to state a

claim, the defendant may move for dismissal under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

"A securities fraud complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the PSLRA." *In re VeriFone Holdings, Inc. Secs. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires that, "when fraud is alleged, a party must state with particularity the circumstances constituting fraud." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (cleaned up). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* (cleaned up). A plaintiff must allege the "who, what, when, where, and how" of each alleged misrepresentation. *Id.*

For plaintiffs in securities fraud class actions, the PSLRA creates additional "formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008).

United States District Court
Northern District of California

The PSLRA requires that "a complaint plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). To properly allege falsity, a securities fraud complaint must "specify each statement alleged to have been misleading, [specify] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009) (omission in original). To adequately plead scienter the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 991. A "strong inference" of scienter exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In the Ninth Circuit, a court must conduct a two-part inquiry to determine whether this standard is met: "[F]irst, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). The strong inference standard applies only to the element of scienter, not to falsity. *Id.* ("Falsity is subject to a particularity requirement and the reasonable inference standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a strong inference standard of plausibility.").

## ANALYSIS

### I.   Plaintiffs state a claim under Section 10(b).

To state a claim under Section 10(b), plaintiffs must plead (1) the falsity of material statements or omissions, (2) scienter, (3) a connection between the challenged statements or omissions and a securities transaction, (4) reliance, (5) economic loss, and (6) loss causation. *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). Defendants argue that plaintiffs fail to plead both the first and second requirements.

### A.    Plaintiffs adequately plead falsity.

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (cleaned up). Even if a statement is not false, it may be misleading if it omits material information. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014). "Disclosure is required ... only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (cleaned up). Whether a plaintiff alleges a false statement or an omission, they must allege materiality. "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

Previously, the Court granted defendants' motion to dismiss plaintiffs' amended complaint because it did not adequately plead falsity or scienter. That complaint pleaded facts showing that Spaulding and Lake's public statements about the complementarity of Fix and Direct Buy concerned *existing* Fix customers, while the negative internal tests identified by plaintiffs measured the effects of Direct Buy on *prospective* Stitch Fix customers. Because plaintiffs had not adequately pleaded that Direct Buy was available to new customers as well as existing customers at the time of defendants' statements concerning Direct Buy's success, the Court could only reasonably infer that those statements pertained to existing customers. Accordingly, those statements were not rendered misleading by the defendants' failure to discuss any testing regarding Direct Buy's impact on prospective customers.

Plaintiffs have cured that deficiency in the second amended complaint. Plaintiffs clarify that the "new customers" included in the New Fix Customer Test, which showed significant

8

United States District Court
Northern District of California

cannibalization between Direct Buy and the Fix, included both "net new" clients who had never engaged with Stitch Fix at all before and "signed-up prospects" who had signed up for an account and filled out a profile but never made a purchase. Because plaintiffs plead that as early as June 2020 two versions of Direct Buy, one called Trending For You and another offered through a collaboration with a fashion influencer, were available to customers who had registered a profile but never purchased anything, plaintiffs plead facts showing that defendants' allegedly misleading statements about Direct Buy from this period onward potentially referred to both existing and new customers, making the omission of test results concerning new customers potentially material.[4]

At least some of the statements that defendants made, by omitting the internal test results showing that Direct Buy was cannibalizing Fix customers, directly contradicted what defendants knew at the time and would have given reasonable investors the impression of a state affairs that differed materially from the one that actually existed. In particular, plaintiffs sufficiently plead falsity with respect to four statements: (1) Lake's statement on the December 2020 earnings call that "what we're seeing is that the two experiences are really additive"; (2) Lake's statement at the Goldman Sachs Technology and Internet Virtual Conference in February 2021 that "we can see in the data that it's working"; (3) Spaulding's statement on the June 2021 earnings call that "the success in incrementality that direct buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix"; and (4) Lake's statement in response to a direct question about cannibalization on the September 2021 earnings call that "we think that revenue per active client that we shared and the knowledge we have of like the newer cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary."

Plaintiffs allege that defendants knew that multiple statistically significant tests showed that new customers channeled to Direct Buy converted at rates 30–40% below traditional Fix clients and that those who did convert spent substantially less money and were of lower quality

---

[4] Although defendants continue to maintain that Direct Buy was not made available to new customers until August 2021, for purposes of a Rule 12(b)(6) motion, the court must accept the allegations in the complaint as true.

9

than traditional Fix clients. In light of that information, defendants' statements lauding the incrementality, complementarity, and additive nature of Direct Buy and the Fix, and indicating that the company's data supported such characterizations and showed that Direct Buy was "working," materially misrepresented the success of Direct Buy and its impact on the Fix. "[O]nce defendants [chose] to tout positive information to the market, they [were] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cut[] against the positive information." *Schueneman*, 840 F.3d at 706 (cleaned up). Once defendants chose to extol the incrementality, complementarity, and additive nature of Direct Buy and the Fix, and to proclaim that their data showed the success of Direct Buy, they were bound to disclose the multiple negative internal test results that strongly contradicted such laudatory conclusions.

Defendants contend that "the alleged negative internal tests are not inconsistent with Defendants' statements" because the tests concerned only potential customers, whereas the statements concerned existing customers. But as explained above, plaintiffs now plead that the statements concerned both existing and prospective customers because at the time they were made, some versions of Direct Buy were available to both existing and some prospective customers. Defendants' statements unequivocally lauding the successes of Direct Buy were thus inconsistent with test results revealing major problems with Direct Buy for new customers.

Defendants also argue that plaintiffs fail to plead sufficiently particularized facts about the omitted tests results showing that Direct Buy was "a failure." They contend that the complaint is missing "any allegations about what these internal metrics were or what constituted a 'successful' test."

To be certain, under the heightened pleading standards of Rule 9(b) a plaintiff cannot plead facts sufficient to allege an omission was materially misleading merely by describing the omitted information using "alarming adjectives." *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002). ("[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA."). But plaintiffs here offer much more than mere negative characterizations. They describe the New Fix

United States District Court
Northern District of California

Customer Tests in significant detail, explaining that the company used "multi-variant testing to model out what completion looked like through the onboarding function" in order to "understand how Direct Buy would impact new customers and new customer onboarding." They describe the control and treatment groups in some detail. Former Employee (FE) 1, a senior manager who personally worked on the Direct Buy launch, explained that "the Company viewed 'cannibalization' as an onboarding problem: if potential Direct Buy customers bought less or no products from Stitch Fix, the Company would not be able to win those potential customers back, so Direct Buy would 'cannibalize our potential for new customers' who would have converted to Stitch Fix or purchased more through the Fix experience." Plaintiffs allege that the tests evaluated two metrics: lifetime customer value and annual customer value. They do not merely allege that the test results showed Direct Buy was "a failure" or that it "was cannibalistic"; rather, they explain *why* it was a failure, alleging that the test results showed that customers channeled to Direct Buy purchased less and were less likely to return than customers channeled to Fix, and that they were 30–40% less likely to convert, meaning to purchase anything at all. Accordingly, plaintiffs have pleaded facts about the New Fix Customer Tests sufficient to meet the heightened pleading standard of Rule 9(b).

Additionally, defendants assert that plaintiffs have not pleaded facts sufficient to create an inference that Stitch Fix had any internal test results in 2020, rendering the allegations of falsity as to Lake's December 2020 statement inadequate. But plaintiffs allege that the first New Fix Customer Test occurred in June 2020 and another test occurred later that year. They allege that test results were written into the A/B database as they came in, and that once the analysis was completed through the A/B interface it would be pasted into a Google Docs or Google Slides presentation, which was reviewed in weekly meetings with Defendant Spaulding. Interpreted within the broader context of plaintiffs' allegations about the pace of the rollout of Direct Buy and the significant pressure on Spaulding "to get Direct Buy launched," the Court can plausibly infer from the allegations about the timing of at least the first New Fix Customer Test and the way its results were presented and analyzed that plaintiffs were aware of those results by the time of Lake's statement on the December 2020 earnings call. Unlike *Weston, Fam. P'ship LLLP v.*

*Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022), where the court held that it could not assume or implausibly infer that defendants knew about certain issues in July merely because they disclosed those issues in August, plaintiffs here do not simply rely on temporal proximity. *See id.* ("[W]ithout more, temporal proximity alone does not satisfy the particularity requirements of Rule 9(b)."); *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) ("We have allowed the temporal proximity of an allegedly fraudulent statement or omission and a later disclosure to *bolster* a complaint … but we have never allowed the temporal proximity between the two, *without more,* to satisfy the requirements of Rule 9(b)."). They allege specific facts about how the tests were conducted and reported, as well as the broader context of Direct Buy's launch, that make it reasonable to infer that defendants would have had knowledge of the results of June 2020 tests by December of that year.

Defendants separately contend that many of their allegedly misleading statements are either protected under the PSLRA's safe harbor for forward-looking statements or constitute inactionable corporate optimism. The PSLRA provides that a defendant "shall not be liable" for any forward-looking statement that is either (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (2) not "made with actual knowledge by [the speaker] that the statement was false or misleading." 15 U.S.C. § 78u-5(c). Generally, "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" are held to be inactionable "puffing" because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

None of the four statements that the Court has identified as pleading falsity is among those that defendants assert are protected under the safe harbor. Indeed, "[w]hat we're seeing," "we can see in the data," "the success … that direct buy has demonstrated to date," and "the knowledge we have" all reference what has already happened and what is currently known. Nor do the statements constitute vague expressions of optimism. Characterizations such as additive, incremental, and complimentary, and references to the results of data, are not the kinds of "mildly optimistic,

12

United States District Court
Northern District of California

subjective assessment[s]" that courts tend to find inactionable. *In re Cutera*, 610 F. 3d at 1111; *see, e.g.*, *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1094–5 (N.D. Cal. 1994) (holding that statements including "I think we have a great future," "[w]e're doing well" and "I am optimistic about [the company's] performance during this decade" were inactionable expressions of corporate optimism), *aff'd*, 95 F.3d 922 (9th Cir. 1996); *In re ECOtality, Inc. Sec. Litig.*, No. 13-03791, 2014 WL 4634280, at *9 (N.D. Cal. Sept. 16, 2014) (same regarding statements including "[w]e are making progress," the product represents "a growth opportunity," and "a clear market opportunity exists"). Additive, incremental, and complimentary are not empty corporate babble; they are terms with specific, technical meanings for investors concerning how two products interact in the market. Further, defendants' explicit and implicit references to internal data would have given investors reason to believe the statements were not simply subjective expressions of enthusiasm but rather evidence-backed assessments.

The remaining statements that plaintiffs allege were false or misleading are each inactionable for one or more of the reasons defendants assert.

### B.    Plaintiffs adequately plead scienter.

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705 (cleaned up). In determining whether defendants had the requisite scienter, courts "must consider plausible, nonculpable explanations" for defendants' conduct, and determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Ltd.*, 551 U.S. at 323. The "inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences," but it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323–24 (cleaned up). To establish a strong inference of scienter in a securities fraud case alleging non-disclosure of a potentially material fact, plaintiffs must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*,

13

552 F.3d at 991. Plaintiffs must plead both that "(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *In re Peregrine Sys., Inc. Sec. Litig.*, No. 02CV870, 2005 WL 8158825, at \*41 (S.D. Cal. Mar. 30, 2005).

Plaintiffs plead facts sufficient to show that Spaulding knew about Direct Buy's negative impact on Fix. Plaintiffs allege that Spaulding knew about the results of the New Fix Customer Test, which showed that customers onboarded through Direct Buy converted at significantly lower rates than those onboarded through Fix and spent significantly less money. They allege that the company's Data Science team created Google Slides decks presenting detailed information about the tests, and that those decks were reviewed at weekly meetings with Spaulding that were held for that very purpose. The decks contained data about how the tests were conducted and their results, as well as the data scientists' conclusion that Direct Buy performed poorly relative to Fix and their recommendation that the company not move forward with Direct Buy.

Plaintiffs also plead sufficient facts to support a strong inference that Lake knew about Direct Buy's negative impact on Fix under the core operations theory. "The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (cleaned up). "There are three circumstances under which core operations allegations can support a strong inference of scienter: (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the rare circumstances when they are not particularized, but the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *In re Fibrogen, Inc.*, No. 21-CV-02623, 2022 WL 2793032, at \*29 (N.D. Cal. July 15, 2022) (cleaned up); *see also Police Ret. Sys.*, 759 F.3d at 1062.

Plaintiffs plead that Lake, along with Spaulding, had access to data showing that Direct Buy was cannibalizing Fix. Both defendants had access to the company's A/B database, which contained detailed information about customer behavior and presented the results of the New Fix

14

Customer Test. Both defendants also received weekly reports via email that contained data about customer acquisition and retention that showed that Direct Buy was cannibalizing Fix. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (explaining that courts have found allegations sufficient under the core operations theory where "they included details about the defendants' access to information within the company"). Under the second version of the core operations theory, plaintiffs' particularized allegations that defendants had actual access to material information about Direct Buy that they failed to disclose is sufficient to support an inference of scienter.

Additionally, plaintiffs plead facts showing that Direct Buy was so important to Stitch Fix's business that it would be implausible to conclude that Lake and Spaulding, as founder and CEO (Lake) and president then CEO (Spaulding), were unaware of the results the New Fix Customer Test. Plaintiffs allege that Direct Buy was understood to be "transformational" for Stitch Fix, was "driving [a] pivotal transformation" for the company, and would "play a key role in unlocking additional market opportunity." After the COVID-19 pandemic dramatically changed consumer behavior, Direct Buy became "a cornerstone of the Company's growth strategy." It was seen as an especially important vehicle for new customer acquisition. Analysts forecasted that Direct Buy would be "a long term driver of top line growth" and plaintiffs allege that defendants themselves attributed forecasted revenue growth to the anticipated launch of Direct Buy. They also allege that Spaulding saw Direct Buy as central to her mission of leading the company's "second founding." Given the alleged importance of Direct Buy to Stitch Fix, it is reasonable for plaintiffs to rely on an inference that the defendants, as top executives in the company, were aware of tests results showing Direct Buy's failure as a new customer acquisition vehicle and its significant cannibalization of the company's core product. *See Berson*, 527 F.3d at 988 (holding that plaintiffs could rely on an inference that management was aware of "stop work orders that allegedly halted tens of millions of dollars of the company's work" because it would be absurd to suggest otherwise); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (holding that the company's maintenance problems, and the government's investigation into them, were so important to the company that it was "absurd to

suggest that the Board of Directors would not discuss" them). These allegations regarding defendants' appreciation of Direct Buy's importance to the company are also sufficient to meet the second requirement for scienter, defendants' knowledge that failure to reveal a potentially material fact would likely mislead investors. The extensive facts that plaintiffs have pleaded concerning the centrality of Direct Buy to the company's growth support a strong inference that they knew their failure to disclose information about Direct Buy's cannibalization of Fix would very likely mislead investors.

## II.    Plaintiffs fail to state claim under Section 20(a).

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.' 15 U.S.C. § 78t(a)." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1052. "In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws …; and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (cleaned up). "'Control' is defined in the regulations as the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person." *Am. W.,* 320 F.3d at 945 (cleaned up). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir.1994) (cleaned up).

Although plaintiffs have adequately pleaded an underlying violation of Section 10(b), they have not pleaded control liability as to either of the individual defendants because the four statements that are potentially actionable under Section 10(b) were made by the defendants themselves. A plaintiff may not pursue a claim for "controlling person" liability under Section 20(a) where they also assert direct liability under Section 10(b). *In re Zoom Sec. Litig.*, No. 20-CV-02353, 2022 WL 484974, at *5 (N.D. Cal. Feb. 16, 2022) (holding that where plaintiffs could pursue direct liability against a defendant for a statement that he made, it would be "duplicative and nonsensical to impose Section 20(a) secondary liability on [him] for that statement on the theory that he 'directly or indirectly controlled' himself"); *see also In re Regal Commc'ns Corp. Sec. Litig.*, No. 94-179,

16

United States District Court
Northern District of California

1996 WL 411654 (E.D. Pa. July 17, 1996) ("Where, as here, the defendant is alleged to be primarily liable for violations of the securities laws, it makes no sense to assert secondary liability under Sections 15 and 20(a). A person cannot be both the controller and the controlled."); *cf. Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 685 (9th Cir. 2005) (holding that plaintiffs failed to state a claim under Section 15 where they alleged a company exercised control over itself). While Lake made three of the allegedly misleading statements and Spaulding made one, plaintiffs have not pleaded facts sufficient to allege that either of the individual defendants had control over the other. Accordingly, while Plaintiffs have pleaded facts supporting the individual defendants' direct liability for their own statements, they have not pleaded facts sufficient to allege indirect liability for the other individual defendant's statement or statements.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied as to plaintiffs' Section 10(b) claim and granted as to plaintiffs' Section 20(a) claim. The dismissal of the Section 20(a) claim is without leave to amend but without prejudice. Should discovery reveal facts that would support such a claim against either of the individual defendants, plaintiffs may seek leave to reassert their Section 20(a) claim on that basis.

**IT IS SO ORDERED.**

Dated: July 9, 2025

P. Casey Pitts
United States District Judge

17